IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| CURLEY YOUNG, | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CASE NO:** |
| vs. | : | |
| | : | **1:06-CV-00563-SRW** |
| HONEYWELL TECHNOLOGY | : | |
| SOLUTIONS, INC., | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**DEFENDANT, HONEYWELL TECHNOLOGY SOLUTIONS, INC.'S
BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

I.    **INTRODUCTION**

Defendant, Honeywell Technology Solutions, Inc. ("Defendant" or "Honeywell"), submits this brief in support of its Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56. Defendant sets forth undisputed facts and controlling case law which demonstrate that all of Plaintiff's claims should be dismissed, with prejudice.

Specifically, Curley Young (hereafter "Plaintiff") alleges four claims, all arising under 42 U.S.C. §1981. Plaintiff alleges race discrimination with regard to promotion, termination, and terms and condition of employment as well as retaliation. Plaintiff, a black male, worked as a Junior Range Tech at Honeywell at the Ft. Rucker site near Ozark, Alabama, from December 1997 - May 2006. Honeywell performs preventative maintenance and building services for the Army at Ft. Rucker, pursuant to a government contract. Plaintiff was hired after being terminated from a series

1

of jobs at health care facilities. Plaintiff was disciplined almost every year of his employment with Honeywell, and was finally terminated after violating three basic Honeywell and Army policies: (1) failing to possess blank and completed government-mandated records; (2) failing to maintain his government issued truck in clean and safe condition, including leaving a blower full of gas in the cab of the truck under a seat full of spray paint cans; and (3) failing to follow inventory procedures which Plaintiff, himself, helped to devise to better account for inventory. Plaintiff was written up for the first violation, suspended for the second violation which occurred ten months later, and terminated for the third violation which occurred two months later. James Garrett, Human Resources Director, made the decision to terminate Plaintiff. The Army commended Honeywell on its decision to terminate Plaintiff. Based on these events, Plaintiff cannot show pretext with regard to his termination.

Plaintiff cannot present a prima facie case of race discrimination in promotion as he cannot show he was qualified for the promotion to Electronic Tech. Plaintiff did not possess the minimum qualifications for the position, and he cannot show he was as, or more qualified than, the chosen candidate who possessed a degree in Electronics and eight years of on-the-job experience. Plaintiff cannot show pretext with regard to the promotion for the same reasons.

Plaintiff cannot present a prima facie case of retaliation as to his termination, as he cannot show (1) that the decisionmaker, James Garrett, was aware of his protected expression approximately two to three years earlier, before Garrett was a Honeywell employee; and (2) he cannot show that his alleged protected expression was in temporal proximity to his termination. Plaintiff also cannot show pretext with regard to his termination, based on the undisputed, stated reasons for his termination.

2

Plaintiff also cannot present a prima facie case of discrimination with regard to terms and conditions of employment, as he cannot identify a comparator who was not disciplined for the same violations as he committed, and he cannot identify anyone who was subject to less alleged scrutiny.

## II.    FACTS

### A.  Honeywell's Contract with the Army at Ft. Rucker

Honeywell provides the Army site, Fort Rucker, located near Ozark, Alabama, with preventative maintenance and building services connected to different gunnery ranges on the site. (Tab A - Deposition of Curley Young, p. 76, l. 1-7)  The Army is Honeywell's customer.  (Tab B - Declaration of Kenneth Erickson, ¶¶ 2, 7)  The gunnery ranges which include aviation and small arm ranges are extremely dangerous when in use and can go "hot", meaning they can be utilized by the Army at any time. (Tab B, ¶ 5)    While all the ranges are dangerous, the aviation ranges are especially dangerous as they are  utilized by Army personnel shooting from aircraft. (Tab B, ¶ 5; Tab C - Declaration of William Leyh,  ¶ 7)  Any employee on the ranges must, at the very least, be alert while working on the ranges, and sleeping in the ranges is a gross safety violation. (Tab C, ¶ 10; Tab B, ¶ 6)

Honeywell provides preventative maintenance and building services at Ft. Rucker pursuant to a contract with the government and is rated by the government on its performance on a quarterly basis. (Tab B, ¶ 7)  If Honeywell performs to expectations it receives a quarterly fee award which represents Honeywell's profit on the contract.  However, if there are violations of policy or other personnel or performance matters, the Army may deduct penalties or costs from the quarterly fee award.  (Tab B, ¶¶ 7, 25)

Because Honeywell employees work at Fort Rucker, they work with the Army and other civil government personnel. (Tab A, p. 89, l. 1-4) Army personnel can report any discrepancies or non-compliance with the contract or Army policies to the Honeywell Project Manager. (Tab A, pp. 95-96, l. 13-4) The Project Manager is the top position at the site and supervises all the sections that are assigned to the ranges. (Tab B, ¶ 2) The government liaison to Honeywell is the Contract Officer Representative ("COR") who, during the relevant time period, was Joe Webers. (Tab B, ¶ 7)

Honeywell employs approximately 50 personnel at Fort Rucker. (Tab B, ¶ 2) Honeywell provides anti-discrimination training through on-line testing and training from Human Resources. (Tab B, ¶¶ 10, 11; Tab D - Declaration of James Garrett, ¶ 5)

**B. Plaintiff's History Before His Employment with Honeywell**

Plaintiff, Curley Young, is a black male, forty-eight years of age. (Tab A, pp. 16-17, l. 21-1) Plaintiff graduated from Daleville High School and possesses a diploma as a Licensed Practical Nurse ("LPN"). (Tab A, pp. 27-28, l. 22-23) Plaintiff has been arrested for possession of controlled substances, possession of stolen merchandise and buying and receiving a stolen gun. (Tab A, pp. 23-25, l. 20-20)

Before he was employed with Honeywell, Plaintiff worked at a number of nursing home or care facilities. Immediately prior to his employment with Honeywell, Plaintiff was employed as a Charge Nurse at Pike Manor, a nursing home. (Tab A, p. 31, l. 16-23) While at Pike Manor, Plaintiff was disciplined for medication errors and tardiness. (Tab A, p. 33, l. 12-21)

Prior to his employment with Pike Manor, Plaintiff worked at Enterprise Nursing Home on two occasions. (Tab A, p. 34, l. 13-21; pp. 45-46, l. 11-10) Plaintiff was disciplined several times

at Enterprise Nursing Home for many of the same behaviors for which he was disciplined at Honeywell. (Tab A, p. 40, l. 10-12; pp. 44-45, l. 3-10; Exs. 4, 5) During his first term of employment, Plaintiff was suspended in May 1992, for a no call/ no show. (Tab A, pp. 40-41, l. 22 - 8; Ex. 2) In November 1992, Plaintiff also received a write-up for using profanity in the presence of a family member of a patient. (Tab A, pp. 41-42, l. 14-23; Ex. 3) In January 1993, Plaintiff was terminated for the first time for being insubordinate and argumentative. (Tab A, Ex. 4) Plaintiff was rehired by Enterprise and was subsequently written up for sleeping on the job. (Tab A, pp. 47-48, l. 12-12,  Ex. 6) On October 23, 1993, Plaintiff was again written up for being insubordinate. (Tab A, pp. 48-49, l. 18-8, Ex. 7) Four days later, Plaintiff was suspended for three days for being insubordinate to nursing personnel. (Tab A, pp. 49-50, l. 14-9; Ex.  8) Plaintiff subsequently received a warning for his numerous absences. (Tab A, pp. 50-51, l. 17-7, Ex. 9) In January 1994, Plaintiff was again terminated from Enterprise, for insubordination. (Tab A, p. 51, l. 13-17; Ex. 10)

Prior to Enterprise, Plaintiff worked at Elba Nursing Home where he was terminated. (Tab A, pp. 35-36, l. 18-12) Plaintiff also worked as a Patient Care Assistant at Humana Hospital and was terminated for sleeping on the job. (Tab A, pp. 36-37, l. 13-8)

## C.    Plaintiff Applies with Honeywell

Plaintiff applied with Honeywell as a walk-in in 1997, and was hired by former Project Manager, Jimmy Hodges, a white male. (Tab A, pp. 68-69, l. 15-4; pp. 69-70, l. 20-13)[1] Plaintiff was hired as a Junior Range Tech, otherwise known by the Department of Labor regulations as a

---

[1] Plaintiff now maintains that Mr. Hodges told him upon hire in 1997, that "we need our quota." Plaintiff did not consider this comment a racial comment at the time.  (Tab A, p. 79, l. 1-16)

Maintenance Trades Helper.  (Tab A, p. 69, l. 5-19)  Plaintiff understood he was an at-will employee.  (Tab A, p. 107, l. 18-20; Ex. 24) Plaintiff's starting hourly rate was $11.59 per hour. (Tab A, p. 78, l. 16-22; Ex. 15)

As a Junior Range Tech, Plaintiff was in charge of his assigned gunnery ranges and had to maintain the vegetation, make sure the automated pop-up targets were working properly and perform preventative maintenance and repairs on each of his assigned ranges.  (Tab A, p. 81, l. 3-10)[2]

Upon hire, Plaintiff received an employee handbook and has also received diversity training. (Tab A, p. 84, l. 9-23;  p. 119, l. 4-17; Exs. 17, 27)  Each year Plaintiff was also required to review a number of policies entitled "**Honeywell - The Five Initiatives and 12 Behaviors, Fort Rucker Site Policies**" which he reviewed with his immediate supervisor, Jerry Temple, and the Project Manager(s). (Tab A, p. 88, l. 3-8; p. 90, l. 1-13; Ex. 18; Tab B, ¶ 11)  While the policy numbers changed from year to year, the basic policies relating to *inter alia*, attendance, discipline, and truck maintenance remained the same from year to year. (Tab B, ¶ 11)[3]  Policy 06-03 pertains to the government vehicles used by Honeywell employees, including Plaintiff. (Tab A, p. 92, l. 11-19; Ex. 19) Plaintiff understood that his assigned truck was to be locked and secured at the end of each workday and that it was subject to random checks.  (Tab A, p. 93, l. 7-19) Plaintiff also understood that per policy 06-05, regarding vehicle and equipment maintenance, that his truck was to be free of garbage at the end of his shift, including candy wrappers, drink bottles or discarded work material.

---

[2]The terms Junior Range Tech and Range Tech are used interchangeably.

[3]For example, Plaintiff reviewed the same or very similar policies in March 2005. (Tab B, ¶ 11;  Tab J - Honeywell - The Five Initiatives and 2 Behaviors - Checklist for Policies 2005)

(Tab A, pp. 97-98, l. 1-14; Ex. 20) Compliance with this policy meant that the truck was subject to random checks by supervisors and management. (Tab A, pp. 98-99, l. 15-1; Ex. 20) Plaintiff also received policy 06-07 pertaining to work schedules and tardiness. (Tab A, p. 104, l. 18-21; Ex. 21) If a Honeywell employee is one minute late, he or she is considered tardy per the policy. (Tab A, p. 105, l. 5-8; Ex. 22)[4]

### D. Plaintiff's Employment History with Honeywell 1999 - 2004

Plaintiff was a Junior Range Tech during his entire employment with Honeywell. (Tab B, ¶ 8)  In January 1999, Hodges, the former Project Manager, placed a memo in Plaintiff's file regarding his failure to arrive at Ft. Rucker without a license or proof of insurance for the car he was driving. (Tab A, Ex. 25)  Plaintiff had been previously warned about this exact behavior.  (Tab A, p. 114, l. 6-9; Ex. 25)

In his 1999 performance review, Project Manager Hodges noted that Plaintiff needed improvement in the areas of business acumen, developing people and technical skills.  He  also noted that Plaintiff needed development in understanding the direct needs of the contract and Honeywell's policies. (Tab A, p. 121, l. 5-23; Ex. 28) Additionally, Hodges noted that Plaintiff needed to communicate more effectively with supervisors and other management personnel.  (Tab A, p. 122, l. 4-8; Ex. 28)  Plaintiff did not disagree with the comments on the evaluation. (Tab A, p. 123, l. 14-16)

---

[4]Honeywell employees are not only responsible for following Honeywell policies but are also expected to follow the site rules at Ft. Rucker. (Tab B, ¶¶ 7, 11)

### 1. Plaintiff Is Found Sleeping on the Job

In September 2000, Bill Leyh, a government Quality Assurance employee with Fort Rucker, and Mr. Robert Murphy, the Deputy Program Manager at Honeywell, found Plaintiff sleeping on the job, and were later subject to his inappropriate response to the situation. (Tab A, pp. 124-26, l. 12-3; Ex. 29; Tab C, ¶¶ 5, 6) Specifically, Murphy and Leyh, while conducting a Quality Assurance Inspection at the Aviation Gunnery Range, observed Plaintiff asleep in his truck. (Tab A, Ex. 29; Tab C, ¶ 5)[5] After they pulled up near Plaintiff's truck, Plaintiff suddenly jerked his head up as "if awakened and appeared disoriented." (Tab A, Ex. 29; Tab C, ¶ 5) Plaintiff became very defensive about being accused of sleeping and later confronted Murphy and Leyh when he found out he was being reported to Project Manager Hodges. (Tab A, Ex. 29) Plaintiff also accused Leyh of "being after" him and was very aggressive and belligerent towards the Army employee. (Tab A, pp. 130-131, l. 17-3; p. 133, l. 2-23; Ex. 29; Tab C, ¶ 6)[6] Mathews forwarded the email to Joe Webers, the COR of the contract between Honeywell and the Army. (Tab A, pp. 95-96, l. 17-18;

---

[5]Plaintiff is well aware that the gunnery ranges are dangerous places if one is not alert. (Tab A, p. 152, l. 1-8)

[6]Plaintiff maintains that in addition to the Army and other Honeywell personnel, that subsequent Project Manager Erickson was also "out to get him." (Tab A, p. 183, l. 6-12) Plaintiff maintains that in 2004, he was accused of workplace violence and that Erickson had completed termination paperwork regarding the incident. Plaintiff adds that Erickson was willing to allow him to bring in a witness to the accusation who stated that others were involved, and Erickson subsequently changed his mind about the termination. (Tab A, pp. 183-85, l. 18-23) Erickson maintains that he did not have termination paperwork filled out because he does not have the authority to fire the Plaintiff as this decision must be made by Honeywell HR personnel. (Tab B, ¶ 3; Tab D, ¶ 6) Jim Garrett, a Human Resource Director with Honeywell, actually came to the Ft. Rucker site to investigate the incident, concluded that the accusation had been exaggerated, that witness accounts of the incident conflicted, and therefore, made the decision not to discipline Plaintiff. (Tab D, ¶ 7) Plaintiff first stated that Erickson has been out to "get him" since 2002, but later changed his mind and stated Erickson has only been out to "get him" since 2003. (Tab A, pp. 187-88, l. 22-20; p. 205, l. 19-23)

Ex. 29) Webers forwarded the email to Project Manager Hodges, "for action as appropriate." (Tab A; Ex. 29) Leyh, a government employee, also spoke with Project Manager Hodges and suggested to him that based on Plaintiff's existing poor job performance, in conjunction with this incident, that Plaintiff should be fired. (Tab C, ¶ 8)

Hodges, in response to the emails from Ft. Rucker personnel, wrote Plaintiff a memo reminding him that sleeping on the job was grounds for immediate discharge, and reminding him that he should not handle his disputes in front of Army personnel. (Tab A, pp. 138-39, l. 16-10; Ex. 30) Less than a month later, in October 2000, Plaintiff received a memo regarding his failure to comply with the lockout, tagout policy while repairing a chaffed wire inside a power box at the gunnery range. (Tab A, p. 140, l. 8-23; Ex. 31)

Subsequent to the sleeping incident, Leyh and the new Project Manager, Ken Erickson, found Plaintiff at the Juliet Mover aviation gunnery range, sitting in his truck, apparently reading a magazine. (Tab E - Deposition of Kenneth A. Erickson, pp. 48-49, l. 6-17; Tab B, ¶ 12; Tab C, ¶ 9) Plaintiff had not called in his location at this range, which is a very serious violation as the Army has to know where all personnel are at all times. (Tab C, ¶ 9; Tab B, ¶ 12)

Jerry Temple, a white male, and the Crew Chief for the last nine years, was Plaintiff's immediate supervisor. (Tab A, p. 86, l. 11-17; Tab F - Deposition of Jerry Temple, p. 5, l. 4-8) Temple is the most senior employee at the Honeywell site at Ft. Rucker, having been hired in August 1990. (Tab F, p. 5, l. 1-3) Temple has also found Plaintiff simply sitting in his truck during working hours at least four or five times. (Tab F, p. 25, l. 8-17)

Plaintiff reported Temple to Erickson on one occasion, although he cannot recall when, complaining that Temple had "cussed" at him for no reason. (Tab A, pp. 87-88, l. 18-22) Temple

did not use any racial slurs towards Plaintiff. (Tab A, pp. 256-57, l. 10-8) Plaintiff is aware that Temple has used profanity towards other employees. (Tab A, p. 258, l. 11-21) Plaintiff also admits to arguing with Temple or having "bouts" with him. (Tab A, p. 259, l. 20-22) Plaintiff does not recall making any other complaints to Erickson about Temple. (Tab A, pp. 87-88, l. 23-2)

Plaintiff also maintains that Erickson and Temple were "stalking" him because they came to his gunnery range while he was sitting in his truck "taking a break." (Tab A, pp. 189-91, l. 20-4) Plaintiff concedes that Erickson has the responsibility to check on his employees. (Tab A, p. 191, l. 1-5) Erickson checks on all the Range Techs during periodic spot checks and does not check on one Range Tech more than the other. (Tab B, ¶ 12)

### 2. Plaintiff Damages a Honeywell Vehicle

In 2002, Plaintiff admits he caused an accident when he "failed to notice the small trailer with the Generator attached to his truck" while backing up, which caused a large dent to the truck and a broken light. (Tab A, pp. 141-42, l. 12-23; p. 285, l. 2-4; Ex. 32) Thomas Lavar, a black male, and Honeywell's Quality Control Inspector, later wrote a memo after observing the damage noting that the accident could have been prevented "had the driver not rushed from point A to point B." (Tab A, p. 162, l. 1-7; Ex. 33) Lavar believed that Plaintiff should have been terminated for the accident due to carelessness. (Tab G - Declaration of Thomas Lavar, ¶ 7)

In Plaintiff's 2002 performance evaluation filled out by Erickson, Plaintiff agreed that he needed to strengthen his computer skills, electrician skills and communication skills. (Tab A, pp. 153-154, l. 6-20; Ex. 35) In March 2003, Plaintiff was written up for failing to secure his toolbox and the right door of his truck. (Tab A, pp. 204-05, l. 15-23; Ex. 37)

Both Plaintiff and another Junior Range Tech, Chris Hines, had assigned ranges and the same basic job duties. (Tab E, p. 26, l. 5-14)  In 2004, Erickson rotated Plaintiff's and Hines' gunnery ranges in order to keep both Range Techs abreast of the duties and responsibilities at all the ranges. (Tab E, pp. 26-27, l. 12-2; Tab B, ¶ 8)   Plaintiff admits that the rotation did not change his salary or position title, and that the purpose was to cross-train the Junior Range Techs on the different ranges. (Tab A, pp. 201-202, l. 1-3) Plaintiff was rotated from the west side gunnery range to the small arm ranges where he would have had more visibility and could have received more recognition from the Army as these ranges are used on a daily basis. (Tab E, pp. 23-24, l. 17-18; p. 51, l. 9-13) Both Hines and Plaintiff were assigned help with the new ranges. (Tab A, pp. 202-204, l. 4-6) Neither Hines nor Plaintiff could have had more than one helper at that time due to lack of staff. (Tab E, p. 56, l. 15-17; Tab B, ¶ 17)  If either Range Tech ran behind on their ranges before an inspection, all the Range Techs would assist in helping on a particular range. (Tab E, pp. 55-56, l. 15-6; Tab B, ¶ 17)

Plaintiff alleges that he called Honeywell HR representative Shawanda (sic Shanda) Hunt because Erickson rotated his gunnery locations with  Hines' locations. (Tab A, pp. 200-201, l. 1-3) Erickson never received a call from Ms. Hunt or anyone else at HR regarding a complaint by Plaintiff. (Tab E, p. 56, l. 18-22)[7]

### 3.  Plaintiff Participates in a Six Sigma Project on Inventory

In 2005, Plaintiff completed the first phase of Honeywell's Six Sigma program, in which Plaintiff studied a work-related problem and worked on ways to improve the system. (Tab A, pp. 208-209, l. 12-11) Six Sigma is an internal program provided by Honeywell wherein personnel can

---

[7]Ms. Hunt is no longer employed by Honeywell. (Tab D, ¶ 12)

gain certification in the program after studying an ongoing work issue, such as inventory problems, and finding a new way to approach and solve the problem. (Tab B, ¶ 20)  Plaintiff's project involved inventory controls and ways to improve accountability in  inventory. (Tab A, p. 209, l. 1-11; Tab E, p. 40, l. 3-13; Tab B, ¶ 20)

### E.  Plaintiff's Last Year at Honeywell

#### 1.  Plaintiff Violates the PMCS Policy

Despite his Six Sigma project and its focus on accountability and procedures, and his annual review of Honeywell's policies, Plaintiff was found on many occasions without his Preventative Maintenance Checks and Services ("PMCS") forms, which are used to record preventative maintenance checks on this truck. (Tab A, p. 209, l. 2-23; Tab E, p. 11, l. 6-12; Tab G, ¶ 4)   This is considered a serious offense because it relates to maintaining government equipment. (Tab E, pp. 27-28, l. 23-5)  On February 28, 2005, Lavar found Plaintiff without his PMCS forms and Plaintiff was written up for this violation.[8] (Tab A, pp. 209-10, l. 23-20)  Specifically, Lavar was performing vehicle PMCS spot inspections and found Plaintiff did not have the PMCS form, and although Plaintiff stated he had performed preventative maintenance on his truck, he did not have a completed PMCS on hand. (Tab A, p. 211, l. 8-21; Ex. 39)  On March 3, 2005, Plaintiff received a formal write-up on his failure to have or maintain a PMCS form, noting that it was a clear violation of policy. (Tab A, Ex. 41)  In the write-up, Erickson notes that this error could have been considered a safety violation "by our Customer" (the Army), which could have resulted in a fine to Honeywell. (Tab A, p. 215, l. 12-23; p. 217, l. 1-5; Ex. 41)  Plaintiff was also placed on probation for a year as

---

[8]Plaintiff does not believe that Lavar is racist. (Tab A, pp. 209-10, l. 23-20)

a result of this violation, consistent with Honeywell's policies. (Tab A, pp. 215-16, l. 21-12; Tab B, ¶21)

On April 6, 2005, Plaintiff was forty minutes late to work and was docked an hour's pay consistent with Honeywell's policy. (Tab A, Exs. 22, 42) Plaintiff maintains that he has been this late many times without having his pay docked. (Tab A, pp. 219-20, l. 12-3)[9] Also, during this month, Temple provided an update on Plaintiff's strengths and weaknesses. (Tab A, Ex. 43) Temple provided these updates on all his subordinates, in order to provide input throughout the year for their annual performance review. (Tab F, p. 7, l. 13-21; p. 8, l. 6-15; p. 9, l. 16-22) Temple noted that Plaintiff was strong on troubleshooting and had been upgraded to Crew Chief on several occasions, performing at standard. (Tab A, Ex. 43) Temple also noted that Plaintiff had been tardy to work and did not perform required cleaning duties. (Tab A, Ex. 43) Plaintiff signed the document. (Tab A, Ex. 43)

Temple also completed an update on Plaintiff for the third and fourth quarters of 2005, wherein he reviewed Plaintiff's progress. (Tab A, p. 223, l. 5-13; Ex. 44) Temple notes that Plaintiff has had trouble with data input, that Plaintiff's cleaning habits were substandard, that he

---

[9]In his Complaint, Plaintiff makes a number of assertions that he has since either contradicted or retracted. For example, in attempting to assert that his termination was unjustified Plaintiff claims that a supply closet that always "comes up short in its annual audit" is only accessible to white employees. (Complaint, p. 4) Plaintiff alleges that only white personnel had a key to the supply room; however, in his deposition he stated he had a key to this supply room and Lavar had a key to another supply room. (Tab A, pp. 243-244, l. 3-21) In fact, Plaintiff was the only Honeywell personnel with keys to supply closets on his assigned ranges. (Tab F, p. 18, l. 12-23)

Similarly, Plaintiff asserted in his Complaint that Honeywell's hiring practices are somehow unfair alleging that he was replaced by Hines, a white male that is related to Temple. (Complaint, p. 2) Ironically, at his deposition, Plaintiff testified that Hines is not related to Temple. (Tab A, pp. 159-160, l. 16-23)

was late on occasion, and refers to the incident where Erickson found Plaintiff on an unscheduled break sitting in his truck.  (Tab A, pp. 223-25, l. 17-15; Ex. 44)

## 2.  Plaintiff Applies for the Electronic Tech Position

In November 2005, Plaintiff applied for an Electronic Tech position with Honeywell.  He was not selected because he did not possess the minimal educational requirement or equivalent military experience for the position.  (Tab A, p. 276, l. 14-16; Tab E, p. 46, l. 16-18; Tab B, ¶ 18; Tab K - Electronic Tech Job Description)   Erickson allowed Plaintiff to apply for the job without the minimum qualifications with the thought that if Plaintiff was the most qualified candidate that he could perhaps request a waiver from the Army on the requirement for an electronics degree. (Tab E, p. 13, l. 8-19; Tab B, ¶ 18)  An outside candidate, Jerry Waller, met all the qualifications and had the highest score on the test, but did not take the job. (Tab E, p. 45, l. 15-19; p. 46; l. 1-3)  Robert Hadley was chosen for the position because he possessed all the job qualifications which included a degree in electronics from MacArthur State Technical College and over six years of experience as a maintenance electrician.  (Tab E, p. 46, l. 7-12; Tab B, ¶ 18; Tab L - Robert Hadley selected portions of personnel file - UNDER SEAL)[10]

After Plaintiff was denied the position, Erickson suggested he apply for a higher paying Safety Inspector position,  Plaintiff declined to do so, telling Erickson he could not pass the background check required for the job. (Tab A, p. 83, l. 3-21; Tab B, ¶ 19)

---

[10]Plaintiff also maintains that he was  more qualified for the promotion to Crew Chief that was awarded to Temple nine years ago, but also concedes that this occurred in the time period before 2002, four years before his Complaint was filed on June 26, 2006.  (Tab A, pp. 168-69, l. 13-9)

### 3.  Plaintiff is Disciplined for Another PMCS Violation and Safety Violation

In January 2006,  Lavar wrote  Erickson a memo regarding Plaintiff's failure to maintain his truck consistent with Honeywell's policies. (Tab A, Ex. 45)  Lavar noted, after performing a Preventative Maintenance check on Plaintiff's government issued truck, that there was a small engine blower in the cab of the truck full of gas.  (Tab E, p. 11, l. 12-17) When Lavar opened the truck the fumes were very strong.  (Tab E, pp. 28-29, l. 22-23)  There was also trash in the cup holder, and the cab of the truck was littered with debris, including paint spray cans, WD-40 and one gallon paint cans that were not properly stored in secondary containers. This type of violation is considered very serious as it not only violated rules pertaining to maintenance equipment, but also posed a safety and environmental hazard. (Tab E, pp. 28 -29, l. 14-7; Tab A, Exh. 47)  There was also no PMCS form for the blower that was taken from the shed and found in the truck. (Tab A, p. 228, l. 6-11)  Lavar considered the condition of the truck, " a disaster waiting to happen."  (Tab G, ¶ 8)

Plaintiff was aware that Lavar took photos of the numerous violations noted in his and Erickson's memo.  (Tab A, p. 230, l. 7-10; Ex. 47; Tab G, ¶ 8)  There is a photograph of the blower full of gas sitting on the floor of the cab under a seat full of paint spray cans. (Tab A, p. 230, l. 14-22; Ex. 47; Tab G, ¶ 8) There are also photos showing Plaintiff's failure to place the paint and WD-40 in secondary containers. (Tab A, pp. 232-33, l. 7-17; Ex. 47)   The photos also plainly show candy wrappers, additional exposed paint cans and bottles in the back of the government issued truck. (Tab A, pp. 234-35, l. 19-14; p. 237, l. 3-8; Ex. 47; Tab G, ¶ 8)  Plaintiff admits that it is his duty to clean the truck each day. (Tab A, p. 229, l. 3-5; p. 295, l. 17-23)  Erickson drafted a formal write-up on the multiple violations which was sent to Human Resources. (Tab A, p. 228, l. 12-15,

Ex. 46; Tab B, ¶ 21)   Garrett approved the write-up and suspended Plaintiff for a week given the

fact that Plaintiff was already on probation and the severity of the violation. (Tab D, ¶ 9)

Lavar also took pictures of machinery on Plaintiff's assigned gunnery ranges which show

the tag used by Quality Control had not been pulled, which demonstrated that preventative

maintenance had not been performed on the machinery. (Tab A, pp. 237-39, l. 9-20; p. 240, l. 14-21;

Ex. 47; Tab G, ¶3)   Specifically, Lavar places visible tags in different machinery which is to be

pulled when preventative maintenance is done on the machinery.   The tags are in plain sight. (Tab

A, pp. 237-39, l. 9-20. Ex. 47; Tab G, ¶ 3)   Lavar took pictures of the tags to show that the

preventative maintenance had not been performed on Plaintiff's ranges. (Tab G, ¶ 3)

### F. Plaintiff's Termination

On April 3, 2006, Plaintiff was written up for improper supply accountability and improper

posting of database. (Tab A, Ex. 48; Tab E, p. 38, l. 7-19)   Gregory Clay, a black male and Supply

Technician for Honeywell, found inventory irregularities at Plaintiff's ranges and reported the same

to Lavar, who confirmed the shortage. (Tab A, p. 243, l. 9-10; pp. 285-286, l. 23-4; Ex. 48; Tab E,

pp. 34-35, l. 15-19; p. 52, l. 19-20; Tab B, ¶25)   Temple had warned Plaintiff many times regarding

upcoming inventories and requested that he get his records in order. (Tab F,  p. 19, l. 7-16)   On the

write-up form Erickson notes that Plaintiff has been counseled numerous times about use of the

inventory Form 3318 which is used to denote when an item is removed from inventory. (Tab A, p.

249, l. 3-6; Ex. 48)   Specifically, Plaintiff had failed to keep a proper accounting on target arms at

a different range and Erickson had counseled Plaintiff about this error reminding him that when he

took out inventory, such as a target, he needed to sign it out on a Form 3318. (Tab E, pp. 32-33, l.

1-19)   This type of oversite is a finable offense by the government and was the very issue that

Plaintiff had worked to rectify on his Six Sigma project. (Tab A, pp. 248-49, l. 22-2; Tab E, pp. 11-12, l. 17-1; Tab E, p. 29, 1. 10 - 23; Tab B, ¶ 25)   As a result of this incident, Honeywell had to research the issue and find the two missing mannequins. (Tab E, p. 36, l. 11-16)

Erickson consulted James Garrett, Director of Human Resources located in Maryland, about the incident as he believed that Plaintiff's repeated violations warranted termination.  (Tab B, ¶ 27; Tab E, p. 10, l. 7-13; pp. 11-12, l. 6-1)  Erickson does not have the final authority to terminate employees.  (Tab E, p. 10, l. 7-13; Tab D, ¶ 6; Tab B, ¶ 3)  Garrett reviewed Plaintiff's entire file and determined that Plaintiff should be terminated for his numerous violations of Honeywell and Army policy. (Tab A, p. 249, l. 7-15; Ex. 48; Tab D, ¶ 10)  Based on Plaintiff's history and his many violations of both Honeywell and Army policy, Garrett was not convinced that Plaintiff would improve, especially given a recent write-up regarding serious violations only two months earlier. (Tab D, ¶ 10)  Plaintiff does not believe that Garrett holds any racial animus. (Tab A, p. 250, l. 2-5)

On May 30, 2006,  Plaintiff was terminated for his performance and received a letter from Garrett explaining the reasons for his termination.  (Tab A, Pl. Ex. 1) The letter states:

> As you know, you were previously counseled and received written warnings on January 26, 2006, and March 3, 2005, concerning your failure to comply with Company policies related to the proper maintenance of government equipment. On March 30, 2006, you again failed to comply with Company policies related to the proper accountability of government equipment. After a review of these incidents and your overall performance history at Honeywell, the Company made its decision to end your employment.

(Tab A, Pl. Ex. 1)

Plaintiff was terminated in conformance with Honeywell's existing disciplinary procedures for 2005 and 2006. (Tab A, Ex. 23)  For the PMCS violation in March 2005, he was written-up and placed on one year's probation with the warning that he could be terminated for a second violation

of policy. (Tab A, Ex. 41)  In January 2006, 10 months later, Plaintiff was written up for a serious safety violation, was suspended for a week, with a warning that the next violation could result in termination. (Tab A, Ex. 46) In March 2006, within a year of his first violation, Plaintiff again violated Honeywell's inventory practices, which he helped to devise and on which he had been warned repeatedly. (Tab A, Ex. 48) In accordance with Honeywell's 2006 disciplinary policy, Plaintiff was terminated after receiving a written warning with probation, suspension and subsequent write-up. (Tab A, Ex. 23)

### G.  The Army Commends Honeywell on Plaintiff's Termination

After Plaintiff was terminated from Honeywell, the government, specifically COR Webers, commended Honeywell in a quarterly performance review for its termination of Plaintiff. (Tab A, Ex. 50; Tab E, p. 53, l. 4-15; Tab B, ¶ 28) The entry read "During the quarter, the PM, [Project Manager] made a difficult staffing termination in the range maintenance area." (Tab A, Ex. 50; Tab E,  p.  53, l. 12-23) Since Plaintiff's termination, Leyh has noticed a "marked improvement" in the quality of maintenance to ranges where Plaintiff was assigned. (Tab C, ¶ 11)

Honeywell maintained Plaintiff's employment longer than any of Plaintiff's former employers.  (Tab A, p. 37, l. 9-11) After Plaintiff's termination, Hines was asked to perform Plaintiff's duties in addition to his own Junior Range Tech duties. (Tab E, pp. 5-6, l. 21-15; p. 9, l. 6-9; Tab F, pp. 22-23, l. 15-21)   Hines did not receive any extra pay for performing these extra duties and did not complain about working on additional ranges.  (Tab F,  pp. 22-23, l. 22-2; Tab B, ¶ 29)

Plaintiff believes anyone who was involved in the decision to terminate him must be racist, although he does not believe that Garrett is racist. (Tab A, pp. 162-163, l. 23-5)[11]  Contrary to Plaintiff's Complaint, Temple was not involved, nor even consulted, regarding Plaintiff's termination. (Tab E, p. 12, l. 11-16) Also contrary to Plaintiff's Complaint and Disclosures, he now admits that Doug Reston (sic Wriston), an employee of Honeywell, is not a comparator based on Reston's (sic) accomplishments while at Honeywell.  Plaintiff also agrees that William Culpepper, a white male who was hired after Plaintiff, and terminated before Plaintiff, is not a comparator. (Tab A, pp. 165-67, l. 9-13)[12]

### H.  Plaintiff's Perception Among his Co-Workers and Army Personnel

Leyh, one of the employees of the government, had a very poor perception of Plaintiff's work performance, and had personally witnessed Plaintiff violate range and safety protocols.  (Tab C, ¶¶ 7, 8, 9, 10) As noted above, Leyh had requested that former Project Manager Hodges, reconsider Plaintiff's employment.  (Tab C, ¶ 8)  Similarly, Sean Sparks, a former shift supervisor with Honeywell and currently a Quality Assurance Evaluator with the Department of Defense, located at Ft. Rucker, recalls that Plaintiff was always upset or disgruntled about his duties. (Tab H -

---

[11]Plaintiff once reported an off-color joke made by a co-worker to Erickson.  Erickson confronted the offending employee, Pat Little, and made him apologize to Plaintiff. (Tab E, pp. 16-17, l. 20-9) Erickson asked Plaintiff if he wanted to take the Complaint to HR, but Plaintiff  stated he was satisfied with Erickson's actions. (Tab E, pp. 46-47, l. 19-4) Erickson told Little that if that ever happened again he would be fired. (Tab E, p. 47, l. 5-19)

[12]William Culpepper was hired on January 7, 1999.  (Tab M - Culpepper selected portions or personnel file - UNDER SEAL)  Culpepper was terminated in March 2004, after he failed to perform preventative maintenance on his truck after being reminded to do the same. (Tab E, pp. 40-41, l. 14-8) Culpepper had only one PMCS violation and one safety violation prior to his termination. (Tab E, p. 14, l. 1-16; Tab M - UNDER SEAL) Culpepper was also terminated by a different decisionmaker. (Tab M - UNDER SEAL)

Declaration of Sean Sparks, ¶¶ 2, 3, 5) Plaintiff made numerous remarks that others were unfair to him regarding his work load and performance but never mentioned race as an issue. (Tab H, ¶ 5) While at Honeywell, Sparks did not want to work with Plaintiff as he was a constant complainer. (Tab H, ¶ 5)  After Sparks went to work for the Department of Defense, he noted that on Plaintiff's ranges work was not timely started or completed. (Tab H, ¶ 7) Specifically, Sparks noted that most of the equipment was not in an "acceptable state" or was dirty. (Tab H, ¶ 7) Sparks also found Plaintiff sitting in his truck during working hours and Plaintiff would invariably state each time that he was just ending his break. (Tab H, ¶ 8)  Sparks also notes that since Plaintiff's departure, the "level of support provided by the Junior Range Techs to the Army has increased dramatically." (Tab H, ¶ 10)

Lavar thought that Plaintiff was the worst Range Tech in Honeywell's history and believed that Plaintiff took advantage of the fact that he worked out in the field, away from direct supervision. (Tab G, ¶¶ 4, 10)   Plaintiff did not keep PMCS forms with him as required, did not help his co-workers and did not perform preventative maintenance as required. (Tab G, ¶¶ 4, 5) Lavar also found Plaintiff sitting in his truck during working hours. (Tab G, ¶ 6)

Calvin Flowers, a black male and Junior Range Tech, was also not impressed with Plaintiff's performance.  Flowers noted that Plaintiff complained a lot and could be loud when he did not get his way.  (Tab I - Declaration of Calvin Flowers, ¶ 3)  Flowers suggested to Temple that instead of trying to reason with Plaintiff, he should "put a pen to paper" meaning either write-up Plaintiff or fire him.  (Tab I, ¶ 3)  Since Plaintiff left Honeywell, morale among the employees is much better as Plaintiff is not present yelling or complaining and others do not have to perform his work for him. (Tab E, pp. 53-55, l. 23-4; Tab I, ¶ 4; Tab H, ¶ 10)

Temple noted that Plaintiff was "aggressive, abusive and unruly" about half the time he was employed. (Tab F, p. 23, l. 6-10)

### I.  Chris Hines, Plaintiff's Alleged Comparator

Plaintiff alleges that Hines is his comparator asserting that Hines "has been written up several times."  (Complaint, p. 3; Tab A, p. 331, l. 10-23; p. 337, l.  5-8)  Hines is considered an outstanding worker by Honeywell personnel. (Tab E, p. 18, l. 9-18; Tab G, ¶ 11; Tab B, ¶ 15; Tab I, ¶ 5) Erickson has never questioned Hines' work ethic, nor has he ever found him on the range not doing his job. (Tab E, p. 18, l. 15-18; p. 49, l. 18-22; Tab B, ¶ 15)  Hines has also never been found without his PMCS forms. (Tab E, p. 52, l. 3-7; Tab G, ¶ 11)   Hines has been written up only twice since his hire with Honeywell in June 2003. (Tab B, ¶ 16)   Hines was written up by Erickson on June 22, 2005, for failing to utilize the proper lock out and tag out procedures which caused a slight injury to Hines. (Tab E, p. 19,  l. 4-7 ; Tab B, ¶ 16)  A few months after this incident, Honeywell personnel realized that Hines had not been properly trained on the electrical configuration of this particular bunker; however, the write-up remained in his file. (Tab E,  pp. 19-20, l. 18-1; p. 22, l. 3-7; Tab B, ¶ 16) On June 27, 2005, Hines was written up by his immediate supervisor, Temple, after Army personnel complained that Hines transported materials beyond the length of the truck without a flag or other visible material.  (Tab E, p. 25, l. 12-23; Tab N - Hines selected portions of personnel file - UNDER SEAL) Temple noted in the write-up that "[T]his written warning will be held in your files, however, this is not a written warning from the Program Manager or stronger penalties could apply."  (Tab N - UNDER SEAL)

### J.  Plaintiff's Alleged Complaint on Behalf of Calvin Flowers

Plaintiff also maintains that he was terminated in retaliation for complaining that Calvin Flowers, a black male co-worker, and a Laborer at the time, did not receive a promotion to Junior Range Tech. Plaintiff allegedly made this Complaint in 2003 or 2004, two to three years before he was terminated for his performance. (See Plaintiff's Complaint, p. 2, ¶ 7) Plaintiff allegedly told Erickson that Flowers was discriminated against by two other employees, Little and Culpepper. (See Plaintiff's Complaint, p. 2, ¶ 7) Plaintiff concedes that Hines, a white male, who was a Computer Operator for the ranges at the time of the test for the position scored higher on the test than Flowers. (Tab A, pp. 169-170, l. 22-23) Plaintiff maintains that the test was racially skewed because the white male scored higher on the test, but he has no other independent knowledge or basis for this assertion. (Tab A, p. 172, l. 9-16) Flowers was subsequently awarded the position of Junior Range Tech in March 2005. (Tab A, p. 180, l. 5-7; Tab I, ¶ 8 )[13] Flowers was not aware if Plaintiff actually spoke to Erickson about the Junior Range Tech position, but is aware that Plaintiff tried to claim credit for his placement in the position in 2005. (Tab I, ¶ 8) Flowers works under Temple's supervision and believes he is a fair supervisor. (Tab I, ¶ 2)

### K.  Plaintiff's Post-Honeywell Activities

After Plaintiff was terminated from Honeywell, he called Lavar and tape-recorded the conversation without telling Lavar. (Tab A, pp. 52-53, l. 20-5; pp. 56-57, l. 17-1; p. 61, l. 1-5 ) Plaintiff told Lavar that he had a job with Laural Oaks, a healthcare facility, (which was not true) and also stated that he was "getting that lined up anyway" referring to the fact that he was working on acquiring other employment before he was terminated from Honeywell. (Tab A, pp. 53-56, l. 6-

---

[13]Plaintiff also concedes that when Flowers applied for a Light Equipment Operator position, Erickson asked the Army for an exception to the job requirements so Flowers could hold the job without a CDL license. (Tab A, pp. 180-81, l. 8-21; Tab I, ¶ 6)

3; Ex. 12, p. 5)  Plaintiff also told  Lavar that he was "living good" and "it ain't no big deal."  (Tab A, p. 56, l. 7-16; Ex. 12, pp. 4-5) Later in the conversation with Lavar, Plaintiff said "But, you know, it's all for the better, as far as I'm concerned.  You know, I needed to get back in nursing anyways." (Tab A, p. 64, l. 10-18; Ex. 12, p. 20)  Plaintiff later conceded that he called Lavar in order  "to establish the reason for the true termination."  (Tab A, p. 57, l. 18-22)  Lavar never told Plaintiff he was terminated due to his race. (Tab A, p. 58, l. 8-12; p. 62, l. 9-20; Tab G, ¶¶ 12, 13)

Plaintiff has not seen a counselor or psychologist since he was terminated from Honeywell. (Tab A, p. 197, l. 19-22) Plaintiff also maintains that his life is better now, he is "looking forward." (Tab A, p. 199, l. 20-23) Plaintiff did not work for five months after he was terminated and simply collected unemployment. (Tab A, pp. 297-98, l. 23-5) Plaintiff worked for R & S Trucking for a couple of months after his unemployment ran out, and has now bought his own logging truck which he contracts to others and he does "nothing" all day. (Tab A, p. 311, l. 13-15; pp. 313-14, l. 20- 6)

## III.  <u>ARGUMENT</u>

### A.  **Summary Judgment Standard**

A motion for summary judgment provides the Court an opportunity to assess all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U. S. 574, 587 (1986).  Defendant bears the initial responsibility of informing the Court of the grounds for its  motion and specifically identifying the evidence that it believes demonstrates the absence of a genuine issue of material fact. <u>Celotex</u> <u>Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Once Honeywell meets its initial burden, Plaintiff "must make a sufficient showing to establish the existence of each essential element to [his]

case, and on which [he] will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F. 3d 520, 523 (11th Cir. 1994).

Although all reasonable inferences must be resolved in plaintiff's favor, the Court is not required to "resolve all doubts in such a manner." Barnes v. Southwest Forest Industries, Inc., 814 F.2d 607, 609 (11th Cir. 1987).[14]  "Tenuous and empty speculation based on loose construction of the evidence will not satisfy the non-movant's burden. Mesnick v. General Elec. Co., 950 F. 2d 816, 820 (1st Cir. 1991), cert. denied, 504 U. S. 985 (1992).  Likewise, conclusory allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat summary judgment.  Early v. Champion International Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (citations omitted).  "[T]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law, 'there must be a substantial conflict in evidence to support a jury question.'" Tidwell v. Carter Products, 135 F.3d 1422, 1425 (11th Cir. 1998), citing Carter v. City of Miami, 870 F.2d 578, 581 (11th Cir. 1989).  To defeat summary judgment, a plaintiff's evidence must be admissible or reducible to admissible form at trial. Pritchard v. Southern Co. Services, 92 F.3d 1130, 1135 (11th Cir. 1996), modified on other grounds, 102 F.3d 1118 (11th Cir. 1996).

The substantive law governing the plaintiff's claims determines which facts are material and which are relevant.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  The first step in assessing a motion for summary judgment is to establish the law governing such claims.  Honeywell will demonstrate that the application of law to the undisputed facts clearly dictates that it is entitled to summary judgment with respect to all of Plaintiff's claims in this case.

---

[14] Inferences based on speculation are not considered reasonable.  Marshall v. City of Cape Coral, Fla., 797 F.2d 1555, 1559 (11th Cir. 1986).

**B.      Framework of Analysis For Plaintiff's Claims**

Plaintiff brings all his claims under 42 U.S.C. §1981.  The Plaintiff claims he was subject to race discrimination with regard to promotion and termination under 42 U.S.C. §1981 and termination in retaliation for protected activity under 42 U.S.C. § 1981.  Plaintiff does not have any direct evidence of race discrimination or retaliation.  Therefore, he must rely on the circumstantial model for the allocation of burdens of proof, persuasion, and production for Title VII disparate treatment claims defined and clarified in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981), and <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993) which also apply to claims arising under 42 U.S.C. § 1981.

> An employee bringing a discrimination claim under Section 1981 must prove intentional discrimination by the employer through one of two methods: Presenting direct evidence of discriminatory intent, or presenting circumstantial evidence of discrimination by satisfying the four-prong analysis established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green, 411 U.S. 792. . . (1973)</u> and <u>Texas Dept. Of Comty. Affairs v. Burdine 450 U.S. 248 (1981)</u>.

<u>Davis v. Albany International et. al.</u>, 2006 U.S. Dist. LEXIS 75778 *15 (M.D.Ala. October 17, 2006).  "[C]ourts routinely apply Title VII case law to discrimination claims brought under Section 1981." <u>Id</u>. at *16.  <u>See also</u>, <u>Montgomery v. White,  et. al.</u>,  2006 U.S. Dist. LEXIS 60199, * 27 (M.D. Ala., August 24, 2006) ("The Court notes that in <u>McDonnell Douglas</u>, the Supreme Court articulated the tripartite framework for analyzing claims brought under Title VII.  However, the allocations of the burdens and elements of a <u>prima facie</u> case are the same for employment claims stemming from Title VII and Section 1981.")

To establish a prima facie case of race discrimination, Plaintiff must show: (1) he belongs to a racial minority; (2) he was subjected to an adverse job action; (3) his employer treated similarly

situated employees outside his classification more favorably; and (4) he was qualified to do his job." Montgomery v. White et. al. , 2006 U.S.Dist. LEXIS 60199, *28 (M.D. Ala., August 24, 2006) (quoting from Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

Likewise, to establish a prima facie case of retaliation under 42 U.S.C. § 1981, the plaintiff must demonstrate that:  "(1) he participated in protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relationship between the two events." Lee v. Reinhardt Motors Inc., 2006 U.S.Dist.LEXIS 78093, *33 (M.D. Ala., October 25, 2006).  See also, Weidman v. Wal-Mart Stores, Inc., 141 F.3d 1453 (11th Cir. 1998).

If the Plaintiff can successfully establish a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997), cert. denied, 118 S.Ct. 685 (1998).

If the employer offers one or more non-discriminatory reasons, the burden then shifts back to the plaintiff to prove the employer's proffered reasons for its action are merely a pretext for discrimination.  Id., 106 F.3d at 1528.  If the employer offers more than one non-discriminatory reason for its action, the plaintiff must challenge the validity of each reason offered with credible evidence to survive a motion for summary judgment.  If the plaintiff is unable to prove the employer's justification is pretextual, or if the record conclusively reveals some other non-discriminatory reason for the employer's decision, summary judgment must be granted for the employer.  Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 148 (2000).

**C.  Plaintiff Cannot Present a Prima Facie Case or Pretext of Race Discrimination in Promotion**

      **1.   Plaintiff Cannot Present a Prima Facie Case of Race Discrimination In Promotion As He Cannot Show He was**

### Qualified for the Promotion Nor Can He Show His Qualifications
### Were Superior To the Chosen Candidate's Qualifications

Plaintiff has set forth two failure to promote claims in his deposition testimony: (1) the Crew Chief position given to Temple at some time before 2002; and (2) the Electronic Tech position given to Robert Hadley in November 2005.

As to the first failure to promote claim, Plaintiff contends that the Crew Chief position was open during Project Manager Roger Singletary's tenure, which was before Erickson became Project Manager in 2002. (Tab A, pp. 168-69, l. 13-3)[15] The Eleventh Circuit has ruled that a claim alleging failure to promote arising under Section 1981 has a two-year statute of limitations. "Because Price [plaintiff] was asserting that M & H Valve failed to promote him because of his race, we conclude that his §1981 claims were cognizable under Patterson and thus, time-barred under Alabama's two-year statute of limitations."  Price v. M & H Valve Company, 2006 U.S. App. LEXIS 8415, * 21 (11th Cir., April 7, 2006)  Plaintiff filed his Complaint alleging Section 1981 failure to promote on June 26, 2006, more than four years after he was denied promotion, making the claim for the position of Crew Chief beyond the statute of limitations and therefore, untimely.

As to his second failure to promote claim for the Electronics Tech position, Plaintiff must meet Honeywell's reason for not placing him in the position head on, and he must rebut it to survive summary judgment.

> A plaintiff establishes a prima facie case of discriminatory failure to promote by showing that (1) he is a member of a protected class; (2) he was qualified and applied for the promotion; (3) he was rejected despite his qualifications, and (4) other equally or less qualified employees who were not members of the protected class were promoted.  Wilson v. B/E Aerospace, Inc. 376 F.3d 1079, 1089 (11th Cir. 2004)

Price v. M & H Valve Company, 2006 U.S. App. LEXIS 8415, at *25-26.

---

[15]Temple maintains he has been the Crew Chief for nine years. (Tab F, p. 5, l. 7-8)

Plaintiff cannot satisfy the second prong of his prima facie case because he cannot prove he was qualified for the Electronics Tech  position as it is undisputed that he did not possess the minimum qualifications for the job. (Tab K)  Plaintiff did not have the necessary diploma or equivalent military experience necessary to meet even the minimum qualifications for the position. (Tab E, p. 13, l. 10-13; Tab B, ¶ 18)  Erickson only allowed Plaintiff to apply for the position if, by chance, Honeywell did not have an individual apply that had the minimum qualifications, and he would try to persuade the Army to waive the educational requirement for Plaintiff. (Tab E, p. 13, l. 13-19; Tab B, ¶ 18) A review of the job description clearly states that the Electronic Tech must be a "Technical/vocation school graduate or [have] DS/GS military training and experience." (Tab K)  Because he did not possess even the minimum qualifications for the position, Plaintiff cannot present a prima facie case of race discrimination in promotion. See, Lewis v. Zilog Inc., 908 F. Supp. 931, 955 (N.D. Ga. 2005) ("The Key Account Manager required either an Electrical Engineering degree or equivalent experience.  Plaintiff had neither.  Thus, Plaintiff's (sic) cannot show a prima facie case of discrimination because she was not qualified for the position.)  See also, Harris v. Norfolk Southern Corp., 1990 U.S. Dist. LEXIS 19037, (W.D.Va. 1990) (plaintiff did not establish a prima facie case that she was unlawfully rejected for promotion where she was not qualified for the position because she did not have a masters degree or relevant experience.)

Plaintiff also cannot present the fourth prong of a prima facie case of discrimination in promotion as he cannot show he was more or equally qualified for the position than was Robert Hadley, the individual chosen for the position.   It is undisputed that Hadley met all the minimum requirements for the position including, possessing a degree in electronics and over six  years of on-the-job electrical experience.  (Tab E, p. 14, l. 14-20; Tab B, ¶ 18; Tab L)  As such, it was

determined he was the best candidate for the job, even though he scored a few points lower than Plaintiff on the test.  (Tab B, ¶ 18)    In comparison, Plaintiff did not possess the minimum educational requirement or much, if any, experience, and was only allowed to apply, if, on the off chance he was the most qualified and Erickson could obtain an educational waiver from the Army. (Tab B, ¶ 18)  Given Hadley's degree and many years of experience, Plaintiff's qualifications are not comparable to Hadley's.  As such, Plaintiff cannot show he is as, or more qualified, than Hadley for the Electronic Tech position.

## 2. Plaintiff Cannot Show Pretext of Race Discrimination with Regard to Promotion

Even if Plaintiff could present a prima facie case of race discrimination in promotion, he cannot show that he was not chosen for the Electronic Tech position based on his race.  As the Eleventh Circuit has succinctly stated in Wright v Southland Corporation, 187 F.3d 1287, 1289 (11th Cir. 1999), "Every employment decision involves discrimination.  An employer, when deciding who to hire, who to promote, and who to fire, must discriminate among persons. **Permissible bases for discrimination include education, experience and references**." (emphasis added) See, Smith v. Papp Clinic, P.A. , 808 F.2d 1449, 1452 (11th Cir. 1987) ("Although PAPP clinic treated Smith and Shumake differently, it has not violated Title VII if this differential treatment was unrelated to race.")

Erickson believed that Hadley was the best candidate for the job as he possessed the minimum qualifications, including the required degree and job experience, and passed the test. (Tab E, p. 14, l. 14-20; Tab B, ¶ 18) The Eleventh Circuit has set forth the standard for determining whether there is pretext involved in a promotion decision.  In Price, supra, the Court stated,

> We "must not judge which employee was more qualified, but determine whether any disparity is so great that a reasonable fact-finder could infer that [the employer] did not believe" that the comparator was better qualified. . .  Moreover, "a plaintiff employee may not establish that an employer's proffered reasons is pretextual merely by questioning the wisdom of the employer's reason," as long as "the reason is one that might motivate a reasonable employer." . . .  see also Rowell v. BellSouth Corp., 433 F.3d 794, 798-99 (11th Cir. 2005) (explaining that "it is by now axiomatic that we cannot second-guess the business decisions of an employer," and that the employer's use of competency factors did not demonstrate intent to discriminate based on age.)

2006 U.S. App. LEXIS at *28-29 (some citations omitted).  Given the governing standard, it is easy to conclude that Plaintiff's non-selection for the Electronics Tech position was not based on his race.  It is obvious that Hadley was more qualified, especially given the fact that Plaintiff did not meet the minimum qualifications for the position.  In accordance with controlling case law, Hadley's superior qualifications in the area of education and experience, alone, are enough to defeat allegations of discrimination with regard to the Electronics Tech position.  These are objective qualifications for which Honeywell should not be second-guessed.  As such, Plaintiff's claim for race discrimination in promotion must fail.

### D.    Plaintiff Cannot Show that He was Terminated Based On His Race

#### 1.    Plaintiff Cannot Dispute Honeywell's Legitimate, Nondiscriminatory Reasons for Termination of His Employment

Plaintiff's claim must fail because he cannot dispute Honeywell's legitimate, nondiscriminatory reasons for his discharge, namely that he repeatedly violated both Honeywell and its customer, the Army's, policies and procedures.

It is undisputed that the Army had been unhappy with Plaintiff's performance for quite some time. (Tab C, ¶ ¶ 8, 10)  However, despite this situation and his history of write-ups, Honeywell continued Plaintiff's employment.  However, when Plaintiff began violating the most basic of

policies, Honeywell determined that Plaintiff was not committed to improving his performance and terminated his employment.  (Tab D, ¶¶ 10, 11)

Plaintiff does not dispute the three write-ups that led to his termination.  In March 2005, Plaintiff was found without his blank and completed  PMCS forms, which is a violation of both Army and Honeywell policy and is considered a serious infraction. (Tab A, Ex. 41; Tab E, p. 28, l. 1-5) Plaintiff had been employed by Honeywell for approximately seven years at this time, and was well aware of this basic responsibility. (Tab A, pp. 146-47, l. 11-1) Plaintiff had been warned about this type of violation before.  He was written-up and placed on a year's probation with the warning that  if he was "counseled for any deviation from ...established guidelines, policies and procedure" he would be subject to "immediate employment termination." (Tab A, Ex. 41) This write-up was signed by Plaintiff.  (Tab A, Ex. 41)

Ten months later, Plaintiff committed a gross violation of Honeywell and Army policy when he left a blower full of gas in his government-issued truck along with food wrappers, cans and WD-40 and paint not properly stored in secondary containers. (Tab A, Exs. 45-47) This type of violation demonstrated blatant disregard for Honeywell's policies and the government's property and could have caused great harm to both persons and property had the blower exploded or the fumes become too strong.  Lavar found this violation and reported it to Erickson and also took pictures of the truck. (Tab A, Exs. 45, 47; Tab G, ¶¶ 3, 8)  Plaintiff also had not completed a PMCS form on the blower. (Tab A, Ex. 45)[16]  However, instead of terminating Plaintiff in accordance with his last write-up, Honeywell suspended Plaintiff for a week with another warning that "failure to demonstrate

---

[16]Ironically, Plaintiff first tried to blame the incident on his helper, Lisa Uti, although he claims that he did not have helpers.  (Tab A, pp. 229-30, l. 12-18) He later acknowledged he was ultimately responsible for the truck he operates. (Tab A, p. 229, l. 3-5)

immediate improvement or continued disregard of policies and procedures may result in further disciplinary action, up to and including termination of employment." (Tab A, Ex. 46; Tab D, ¶ 9) This write-up was approved by Human Resources, and Plaintiff was given yet another chance. (Tab D, ¶ 9)

Finally, not two months later, Plaintiff was found in violation of inventory procedures. In March 2006, Clay, the Supply Technician, performed an inventory check and could not account for two missing mannequins on Plaintiff's range. (Tab E, pp. 32-34, l. 22-17; Tab B, ¶ 25) Plaintiff had been warned about this inventory check and about his inventory on many occasions, and worked on inventory accountability in his Six Sigma program. (Tab E, pp. 32-33, l. 22-19; p. 39, l. 3-11; Tab F, p. 19, l. 9-16; Tab B, ¶¶ 25, 26) Given this third violation, Erickson recommended Plaintiff's termination. (Tab E, pp. 11-12, l. 3-1; Tab B, ¶ 27 ) HR Director Garrett approved the recommendation after a complete review of Plaintiff's file and concluded that Plantiff's repeated record of the most basic of Honeywell's policies showed little intent to improve. (Tab D, ¶¶ 10, 11)

Importantly, all three of these violations were found and reported by black employees and co-workers of Plaintiff. Lavar found the first and second violation(s), and Clay found the last violation which was confirmed by Lavar. (Tab A, pp. 209-210, l. 23-20; pp. 285-286, l. 23-4; Tab E, pp. 11-12, l. 6-1; Tab G, ¶¶ 1, 3, 8) Plaintiff was given multiple chances to improve, and chose not to do so. Honeywell employed him longer than any other of his previous employers, even though he engaged in same behaviors at previous employers, such as sleeping, insubordination, and poor performance.

The Army also commended Honeywell on its decision to terminate Plaintiff and even mentioned it in quarterly evaluation. (Tab A, Ex. 50; Tab B, ¶ 28) Given Plaintiff's performance,

his perception among his co-workers and Army personnel, and the multiple chances he was given to improve, it is obvious that Plaintiff was not terminated due to his race, but due to his repeated poor performance.

Case law supports Honeywell's decision. As the Eleventh Circuit has held:

> [F]ederal courts do not sit as a superpersonnel department that reexamines an entity's business decisions. No matter how medieval a firm's practice, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, federal discrimination laws do not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

Curtis et. al. v. Teletech Customer Care Management Inc., 208 F.Supp.2d 1231, 1245 (N.D. Ala. 2002) (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)). Here, there is no dispute the Plaintiff engaged in the behavior for which he was disciplined and these policy violations were discovered by his co-workers as well as management. The customer also witnessed Plaintiff's poor performance. In Curtis, the plaintiff alleged race discrimination in termination. The Court stated,

> for Plaintiff, creating a genuine issue of fact regarding pretext is not a matter of simply presenting sufficient evidence to allow a jury to find that it, or some hypothetical, objectively reasonable employer, would have considered her actual work performance to be satisfactory in the area of asserted deficiency. Rather, she generally must offer sufficient proof to allow a find that the person or person who made the employment decision on behalf of the employer did not believe that her work performance was unsatisfactory.

In Gaddis v. Russell Corporation, 242 F. Supp.2d 1123, 1136 (M.D.Ala. 2003), the Court reiterated this holding, stating

> The plaintiff may establish pretext by undermining the credibility of the Defendant's proffered explanations. . . Instead of relying on conclusory allegations of discrimination, the Plaintiff must come forward with evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

33

employer's proffered legitimate reason for its action that a reasonable fact finder could find them unworthy of credence."

Here, there is no evidence to show that Garrett did not believe that Plaintiff's write-ups were unmerited or false. Garrett reviewed the last two write-ups before they were issued, and reviewed Plaintiff's entire file before he decided that Plaintiff should be terminated. Moreover, there is no evidence to suggest that either Lavar or Clay, who discovered Plaintiff's violations, had any racial animus. Given Plaintiff's history and documentation of write-ups, Plaintiff's claim for race discrimination in termination must fail.

### E. Plaintiff Cannot Prove Retaliation in Termination

> **1. Plaintiff Cannot Present a Prima Facie Case of Retaliation As He Cannot Show That His Termination Was Causally Related To Any Alleged Protected Activity**

Because Plaintiff has not presented any direct evidence of retaliation, he must prove his case using the circumstantial mode. As stated, to establish a prima facie case of retaliation under 42 U.S.C. § 1981, Plaintiff must show that "(1) he participated in protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relationship between the two events." Lee v. Reinhardt Motors Inc., 2006 U.S.Dist.LEXIS 78093, *33 (M.D. Ala., October 25, 2006). See also, Weidman v. Wal-Mart Stores, Inc., 141 F.3d 1453 (11th Cir. 1998).

Plaintiff cannot show the third prong of his prima facie case as he cannot show that the decisionmaker, Garrett, was aware of his alleged protected utterance made 2 ½ to 3 years before his termination. (Complaint, ¶ 7) Plaintiff alleges that he was terminated "2 ½ to 3 years" after he allegedly told Erickson that Calvin Flowers did not score as high on a test for a Junior Range Tech position because the test was racially skewed. (Complaint, ¶ 7) Plaintiff has no basis for this allegation other than that a white male, Hines, scored higher than Flowers on the test. (Tab A, pp.

169-170, l. 22-23; p. 173, l. 3-18) Erickson recalls Plaintiff complaining about the fact that Flowers did not get the Junior Range Tech position at the time, but does not recall any remarks relating to race.[17] (Tab E, p. 16, l. 6-10; Tab B, ¶ 30)  Regardless, Erickson did not make the decision to terminate Plaintiff over 2 ½ years later, and never told Garrett, the decisionmaker, about Plaintiff's complaint regarding Flowers.  In fact, Garrett did not work for Honeywell at the time the complaint was made and was hired approximately a year and a half later.  (Tab D, ¶¶ 4, 12) As such, Plaintiff has no evidence to dispute the fact that Garrett was completely unaware of his alleged protected activity.

Case law is replete with holdings that a termination by a decisionmaker unaware of the alleged protected activity cannot be considered retaliatory.  Here, it is undisputed that Garrett was unaware of any alleged protected expression by Plaintiff.  "As a preliminary matter, a plaintiff must establish that 'the employer was **actually aware** of the protected expression at the time it took adverse employment action'." Clark v. Alabama, 2005 U.S. App. LEXIS 10276, *27 (11th Cir. June 2, 2005) (quoting Brungart v. BellSouth Telecommuncications, Inc., 231 F.3d 791, 799 (11th Cir. 2000) (emphasis added).  See also, Daneshvar v. Graphic Technology, 18 F. Supp. 2d 1277, 1292 (D. Kan. 1998) "In order to establish a causal connection between his protected activity and defendant's adverse employment decisions, "**plaintiff must show** that the individual who took adverse action against him knew of Plaintiff's protected activity."(emphasis added); Carney v. Pena, 992 F.Supp. 1285, 1292-93 (D. Kan. 1998) (summary judgment granted where none of the decisionmakers were aware of protected activity.): Dotson v. Ceres Gulf, 2006 U.S. Dist. LEXIS 1893, *51 (S.D. Tex. January 9, 2006); Byers v. HSBC Finance Corporation, 416 F.Supp.2d 424,

---

[17]Flowers was hired for a Junior Range Tech job in March 2005. (Tab E, pp. 9-10, l. 10-2; Tab I, ¶ 8)

440 (E.D. Va. 2006) ("Since the relevant decisionmaker was unaware of Byer's complaint, the loan

deal was not reassigned 'because of Byer's internal complaint, and there was no causal connection

between the internal complaint and the reassignment'.")

Plaintiff also cannot present a prima facie case of retaliation as he cannot demonstrate a

temporal, causal connection between his alleged remark regarding the test, and his termination 2 ½

to 3 years" later. Numerous courts have ruled that an adverse act cannot be causally related if it is

too distant in time to the protected act. The Supreme Court in <u>Clark County School District v.</u>

<u>Breeden</u>, 532 U.S. 268, 273-74 (2001) has spoken on temporal proximity and causality.

> "The cases that accept mere temporal proximity between an employer's knowledge
> of protected activity and an adverse employment action is sufficient evidence of
> causality to establish a prima facie case uniformly hold that the temporal proximity
> must be 'very close.'" <u>Clark County School District v. Breeden</u>, 532 U.S. 268, 273
> (2001) (quoting <u>O'Neal v. Ferguson Constru.Co.</u>, 237 F.3d 1248, 1253 (10th Cir.
> 2001). See e.g. <u>Richmond v. Oneok, Inc.</u>, 120 F.3d 205, 209, (10th Cir. 1997) (3-
> month period insufficient); <u>Hughes v. Derwinksi</u>, 967 F.2d 1168, 1174-75 (7th Cir.
> 1992) (4-month period insufficient)

Given the time span of "2 ½ to 3 years" as stated in Plaintiff's Complaint, Plaintiff cannot establish

the necessary temporal proximity to present a prima facie case of retaliation. In <u>Higdon v. Jackson,</u>

393 F.3d 1211, 1220 (11th Cir. 2004), the Eleventh Circuit granted summary judgment in a case of

alleged retaliation where the protected activity and adverse act were three months apart. The Court

held that "the temporal proximity" must be 'very close.' If there is a substantial delay between the

protected expression and the adverse action, in the absence of other evidence tending to show

causation, the complaint of retaliation fails as a matter of law." Similarly, in <u>Maniccia v. Brown</u>,

171 F.3d 1364, 1370 (11th Cir. 1999) the appellate court held that a 15-month delay between the

filing of a sexual harassment grievance and a transfer "belied her assertion the former caused the latter."[18]

### 2. Defendant Cannot Show Pretext in His Claim for Retaliation

Case law recognizes that discipline consistent with a history of similar correction provides a legitimate, non-discriminatory reason in response to an allegation of retaliation.    In Canitia v. Yellow Freight System, Inc., 903 F.2d 1064 (6th Cir. 1990), the Court held that even though the Plaintiff engaged in protected activity, his discharge had nothing to do with this activity, and everything to do with his history of disciplinary problems.    Specifically, Canitia had testified on behalf of a former employee who sued the defendant.    Following judgment in the case, Canitia received six disciplinary records, was subjected to a suspension, was placed under surveillance regarding his activities while on duty and was eventually terminated. Id. at 1065.  In holding that Yellow Freight was entitled to summary judgment with regard to Canitia's claims of retaliation, the Court stated:

---

[18]See also, Richmond v. Oneok, Inc., 120 F.3d 205, 209 (10th Cir. 1997) (same holding as to a 3-month period of time); Hughes v. Derinski, 967 F.2d 1168, 1174-1175 (7th Cir. 1992) (same holding as to a 4-month period of time).    The Richmond and Hughes opinions are cited with approval in an opinion issued on April 23, 2001, by the United States Supreme Court, namely, Clark County School District v. Breeden, 2001 U.S. LEXIS 3365 at *9.    See also Valdez v. Mercy Hospital, 961 F.2d 1401, 1403 (8th  Cir.1992) (no retaliation found where six months passed between protected activity and termination) (superseded by statute on other grounds); Leslie v. Mobile Transit Authority, 963 F. Supp. 1142, 1149 (S.D. Ala. 1997) (no retaliatory motive found where 13 months elapsed between the protected activity and the discharge); Balletti v. Sun-Sentinel Co., 909 F. Supp. 1539, 1549 (S.D. Fla. 1995) (elapse of six months between grievance and discharge did not permit inference of causal connection); Juarez v. Ameritech Mobile Communications, Inc., 746 F. Supp. 798, 804 (N.D. Ill.1990) (six months between complaint and termination too remote), aff'd 957 F.2d 317 (7th Cir. 1992); Maldonado v. Metra, 743 F. Supp 563, 568  (N.D. Ill.1990) (five month lapse between protected expression and termination too remote to establish retaliatory discharge); Reeves v. Digital Equipment Corp., 710 F. Supp. 675, 677 (N.D. Ohio 1989) (no retaliation where three months passed between protected expression and adverse employment action); Brown v. A.S.D. Computing Center, 519 F. Supp. 1096, 1116-17 (S.D. Ohio 1981) (discharge four months after protected activity too remote).

> The fact remains that Canitia had been terminated previously and twice recently disciplined . . . for actions similar to those involved in the discharge at issue. This is a strong factor to take into account in considering the issues here. Summary judgment may be appropriate in Title VII cases even where certain facts may be in dispute. <u>Shah v. General Electric Co.</u>, 816 F.2d 264 (6th Cir. 1987); <u>Boddy v. Dean</u>, 821 F.2d 346 (6th Cir. 1987).
>
> . . . a careful examination of the record reveals that Canitia received seven warning letters to his file in 1984, plus at least three in 1985, so that what occurred in 1986 after his testimony in the <u>Few</u> case does not reflect a sudden surge of disciplinary actions.

<u>Id</u>. at 1067. The Court added, "**we are not examining the case of a trouble-free employee during the months and years before the incident which he alleges gave rise to a retaliatory motive and subsequent and sudden job warnings by the employer.**" <u>Id</u>.

Likewise, in <u>Hammond v. George C. Wallace State Community College et. al.</u>, 2006 U.S. App. LEXIS 6396, *15 (11th Cir. March 16, 2006) the Court found that even if plaintiff had established a prima facie case of retaliation, Defendants would still have had a legitimate, non-discriminatory reason for terminating her employment based on her poor performance. "For example, there was extensive evidence that Hammond performed poorly as Dean of Students at Wallace State, as early as August 2002. Hammond was criticized for problems in completing her direct responsibilities, including her coordination of registration and circumvention of school policy for electronic funds transfers. . . " <u>Id</u>. <u>See also</u>, <u>Mahgoub v. Miami Dade Community College</u>, 2006 U.S.App. LEXIS 9291, *8 (11th Cir. April, 13, 2006) ("But Plaintiff has not rebutted as pretextual MDCC's explanation for the [alleged retaliatory] denial of the raise: a poor performance evaluation supported by evidence that he failed to attend a required conference and that his supervisor believed that he sometimes failed to follow instructions.)

These cited cases do not differ from the case at bar.   Plaintiff was terminated after being placed on probation for a PMCS violation, being suspended for a week for a serious safety violation and finally, for failing to keep up with his inventory after being warned about the same. (Tab A, Exs. 41, 46, 48, Pl. Ex. 1; Tab B, ¶¶ 21, 23, 25, 27; Tab D, ¶¶ 9, 10, 11)  The reasons for his termination were well documented and consistent with Honeywell's policies.  The termination was so long overdue that Honeywell's customer, the Army, actually commended Honeywell on the personnel decision. (Tab A, Ex. 50; Tab E, p. 53, l. 12-22; Tab B, ¶ 28) As such, Plaintiff cannot show that his termination was in anyway related to his alleged complaint regarding a test taken by another employee years before.  As such, Plaintiff's claim for retaliation must fail.

### G.   Plaintiff Cannot Show Race Discrimination With Regard to the Terms and Conditions of His Employment

In his Complaint, Plaintiff alleges discrimination with regard to "terms and conditions" of employment stating that other "white employees", who he does not identify, were not disciplined for allegedly violating the same work rules.  Plaintiff also alleges he was "placed under surveillance" and heightened scrutiny as compared to other Junior Range Techs.

Plaintiff cannot establish a prima facie case of disparate treatment as to terms and conditions of employment as he cannot identify any similarly situated employees outside of his classification who were treated more favorably. When asked who was given lesser discipline for the same infractions, Plaintiff could not identify anyone. (Tab A, p. 296, l. 3-6) When Plaintiff cannot identify a comparator in order to establish differential treatment, he cannot present a prima facie case and his claim must fail.  See, Morrisey v. Health Care Service Corporation, 2004 U.S. Dist. LEXIS 87, *20 (N.D. Ill. January 5, 2004) ("Morrisey points to no other potential comparators and so his claim fails because he cannot identify a similarly situated employee outside the protected class who was

treated more favorably.") See also, Miller v. City of Coral Gables, 2000 U.S. Dist LEXIS 19268, *21-23 (S.D.Fla., October 3, 2000) (Plaintiff failed to show an adverse act when she could not provide the names of any male comparators.)

Moreover, Erickson has written-up white employees for the same infractions committed by Plaintiff, specifically, Culpepper for a PMCS violation and Hines, Culpepper, Debbie Woods and David Husey for safety violations, demonstrating that white employees are treated no differently than Plaintiff. (Tab B, ¶ 24) Erickson has not given a write-up to anyone for inventory violations as no one, other than the Plaintiff, has committed such a violation since the Six Sigma program was put in place, and Plaintiff received a number of verbal warnings before his write-up. (Tab B, ¶ 26) Given that Plaintiff cannot identify a white comparator, his claim must fail.

Plaintiff's claims as to "heightened scrutiny" are also without merit. Plaintiff also cannot present a prima facie case of "heightened scrutiny" as he, again, cannot identify others that were subject to "less scrutiny" in order to present a prima facie case. Plaintiff maintains that Erickson and Temple were "stalking" him; however, he also admits that Erickson has a responsibility to check on the work of his subordinates. (Tab A, pp. 190-191, l. 23-12) Plaintiff concedes that if Erickson is checking on everyone, equally, he is not being treated differently. (Tab A, p. 191, l. 9-12) Plaintiff, who worked out on the ranges every day and did not work in with other Range Techs or Erickson on a daily basis, cannot dispute Erickson's testimony that he checked on all Range Techs during periodic spot inspections. (Tab B, ¶¶ 12, 22, 24) There is absolutely no evidence to suggest that Plaintiff was checked on more frequently than other Range Techs. Therefore, Plaintiff cannot show he suffered heightened scrutiny or suffered discrimination as to terms and conditions of employment and these claims must fail.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Honeywell is entitled to summary judgment as to Plaintiff's claims of race discrimination with regard to promotion and termination and retaliation with regard to termination.  Defendant respectfully requests that this Court grant its Motion for Summary Judgment, dismiss this case with prejudice, and award Defendant its costs in defending against this case.

Respectfully Submitted,


<u>/s/Sandra B. Reiss</u>
Sandra B. Reiss (ASB-3650-S80S)
Ryan M. Aday (ASB-3789-A54A)
**OGLETREE, DEAKINS, NASH,**
  **SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
Telephone: (205) 328-1900
Facsimile: (205) 328-6000
E-mail: sandra.reiss@odnss.com
             ryan.aday@odnss.com
*Counsel for Defendant, Honeywell*
*Technology Solutions, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of May, 2007, I filed the foregoing Brief in Support of Motion for Summary Judgment via this Court's CM/ECF , and that an electronic notice and complete copy of the foregoing Brief will be served to Jeffrey W. Bennitt pursuant to this Court's electronic filing service.

/s/Sandra B. Reiss
Sandra B. Reiss (ASB-3650-S80S)
Ryan M. Aday (ASB-3789-A54A)
**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**
One Federal Place, Suite 1000
1819 Fifth Avenue North
Birmingham, Alabama 35203-2118
Telephone: (205) 328-1900
Facsimile: (205) 328-6000
E-mail: sandra.reiss@odnss.com
          ryan.aday@odnss.com
*Counsel for Defendant, Honeywell
Technology Solutions, Inc.*