# FREEDOM COURT REPORTING

Page 1

```
1    IN THE UNITED STATES DISTRICT COURT
2      MIDDLE DISTRICT OF ALABAMA
3         SOUTHERN DIVISION
4
5    CIVIL ACTION NUMBER:  1:06-CV-563
6
7  CURLEY YOUNG,
8      Plaintiff(s),
9
10  vs.
11
12  HONEYWELL TECHNOLOGY SOLUTIONS, INC.,
13      Defendant(s).
14
15  DEPOSITION OF:
16      CURLEY YOUNG, JR.
17      February 27, 2007
18         10:00 a.m.
19  Ogletree, Deakins, Nash, Smoak & Stewart
20         One Federal Place
21            Suite 1000
22         1819 - 5th Avenue North
23         Birmingham, Alabama 35203
```

Page 2

```
1       In accordance with Rule 5(d) of the
2   Alabama Rules of Civil Procedure, as
3   amended, effective May 15, 1988, I,
4   Shannon L. Quinn, am hereby delivering to
5   Ms. Sandra B. Reiss the original
6   transcript of the oral testimony taken on
7   the 27th day of February 2007, along with
8   exhibits.
9       Please be advised that this is the
10  same and not retained by the Court
11  Reporter, nor filed with the Court.
12
13      S T I P U L A T I O N
14      IT IS STIPULATED AND AGREED, by and
15  between the parties through their
16  respective counsel, that the deposition
17  of CURLEY YOUNG, JR. may be taken before
18  SHANNON L. QUINN, CCR, RPR, at the Law
19  Offices of Ogletree, Deakins, Nash, Smoak
20  & Stewart, PC, One Federal Place, Suite
21  1000, 1819 - 5th Avenue North,
22  Birmingham, Alabama 35203, on the 27th
23  day of February 2007.
```

Page 3

```
1       IT IS FURTHER STIPULATED AND AGREED
2   that the signature to and reading of the
3   deposition by the witness is waived, said
4   deposition to have the same force and
5   effect as if full compliance had been had
6   with all laws and rules of court relating
7   to the taking of depositions.
8       IT IS FURTHER STIPULATED AND AGREED
9   that it shall not be necessary for any
10  objections to be made by counsel to any
11  questions except as to form or leading
12  questions, and that counsel for the
13  parties may make objections and assign
14  grounds at the time of the trial, or at
15  the time said deposition is offered in
16  evidence, or prior thereto.
17      IT IS FURTHER STIPULATED AND AGREED
18  that notice of filing of deposition by
19  commissioner is waived.
20
21
22
23
```

Page 4

```
1            I N D E X
2
3   EXAMINATION BY         PAGE NUMBER
4   Ms. Reiss          10 - 317
5                     337 - 342
6                     342 - 343
7   Mr. Bennitt        317 - 337
8                     342 - 342
9
10
11  EXHIBITS  DESCRIPTION   PAGE NUMBER
12  Defendant's:
13  No. 1    Application          38
14  No. 2    Counseling Form      40
15  No. 3    Counseling Form      41
16  No. 4    Counseling Form      43
17  No. 5    Policy On Tardies    45
18  No. 6    Counseling Form      47
19  No. 7    Counseling Form      48
20  No. 8    Counseling Form      49
21  No. 9    Policy on Absences/
22           Tardies             50
23  No. 10   Termination Record   51
```

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 5

1        I N D E X
2        (Continued)
3
4    No. 11    Change in Personnel
5            Status Form        51
6    No. 12    Transcription of Tape-
7            Recorded Conversations    53
8    No. 13    No-Call/No-Show Note    70
9    No. 14    Employment Application    73
10   No. 15    Letter            77
11   No. 16    Position Characteristics    79
12   No. 17    Acknowledgement    84
13   No. 18    Checklist for Policies    85
14   No. 19    Contract Vehicle and Tool
15           Security Policy        90
16   No. 20    Vehicle and Equipment
17           Maintenance Policy    96
18   No. 21    (SKIPPED)        XX
19   No. 22    Standard Work Schedule/
20           Comp Time/Tardiness Policy 104
21   No. 23    Disciplinary Procedure
22           Policy            106
23

Page 7

1        I N D E X
2        (Continued)
3
4    No. 41    Interoffice Correspondence 214
5    No. 42    Memorandum        216
6    No. 43    April '05 Update Note    220
7    No. 44    Third/Fourth Quarter
8            Update Note        223
9    No. 45    Memorandum        225
10   No. 46    Record of Counseling    229
11   No. 47    Photographs        230
12   No. 48    Memorandum        241
13   No. 49    Complaint        245
14   No. 50    Evaluation Summary    251
15   No. 51    Handwritten Notes    252
16   No. 52    Expenses        307
17   No. 53    Receipts        314
18
19   Plaintiff's:
20   No. 1    Termination Letter    318
21
22
23

Page 6

1        I N D E X
2        (Continued)
3
4    No. 24    General Conditions of
5            Employment        109
6    No. 25    Memorandum        109
7    No. 26    Memorandum        115
8    No. 27    Certificate        118
9    No. 28    Evaluation        120
10   No. 29    E-mails            123
11   No. 30    Memorandum        138
12   No. 31    Safety Incident    139
13   No. 32    Report of Incident/
14           Accident/Exposure    141
15   No. 33    Memorandum        144
16   No. 34    Acknowledgement    147
17   No. 35    Evaluation        153
18   No. 36    Disclosures        164
19   No. 37    Developmental Counseling
20           Form            204
21   No. 38    Memorandum        206
22   No. 39    Statement        211
23   No. 40    Evaluation        212

Page 8

1        A P P E A R A N C E S
2    BEFORE:
3        MS. SHANNON L. QUINN, CCR, RPR
4
5    APPEARING ON BEHALF OF THE PLAINTIFF(S):
6        MR. JEFFREY W. BENNITT
7        Jeff Bennitt & Associates, LLC
8        4898 Valleydale Road, Suite 3A
9        Birmingham, Alabama 35242
10
11   APPEARING ON BEHALF OF THE DEFENDANT(S):
12       MS. SANDRA B. REISS and
13       MR. RYAN M. ADAY
14       Ogletree, Deakins, Nash, Smoak &
15           Stewart, PC
16       One Federal Place
17       Suite 1000
18       1819 - 5th Avenue North
19       Birmingham, Alabama 35203
20
21   ALSO PRESENT:
22       MR. KEN ERICKSON
23       MR. THOMAS LAVAR

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 9

1  I, Shannon L. Quinn, acting as
2  Commissioner, certify that on this date
3  as provided by Rule 30 of the Alabama
4  Rules of Civil Procedure and the
5  foregoing stipulation of counsel, there
6  came before me at the Law Offices of
7  Ogletree, Deakins, Nash, Smoak & Stewart,
8  PC, One Federal Place, Suite 1000, 1819 -
9  5th Avenue North, Birmingham, Alabama
10 35203, on the 27th day of February 2007,
11 commencing at approximately 10:00 a.m.,
12 CURLEY YOUNG, JR., witness in the above
13 cause for oral examination, whereupon the
14 following proceedings were had:
15
16     THE REPORTER:  Usual
17 stipulations?
18     MS. REISS:  Yes.
19     MR. BENNITT:  Yes.
20
21
22
23

Page 10

1  Whereupon,
2     CURLEY YOUNG, JR.,
3  being first duly sworn, was examined and
4  testified as follows:
5
6  EXAMINATION BY MS. REISS:
7     Q.  Mr. Young, I'm Sandra Reiss
8  and I represent Honeywell in this
9  lawsuit.  Have you been deposed before?
10    A.  No.
11    Q.  Been in this setting where a
12 lawyer is asking you questions?
13    A.  No.
14    Q.  Well, let me just go over
15 some of the ground rules.  If you ever
16 need to take a break, you are hot, you
17 need to go to the restroom, whatever, as
18 long as there's not a question on the
19 table, just let me know.  We'll go ahead
20 and take a break.  You understand that
21 the oath you just took is the same as you
22 would take in court?
23    A.  Yes.

Page 11

1     Q.  I'm going to ask a series of
2  questions about yourself, your life, your
3  work with Honeywell, and if you don't
4  understand something I say or if I use a
5  legal term you don't understand, just
6  please ask me to clarify.  Okay?
7     A.  (Nods head affirmatively.)
8     Q.  And you will need to speak
9  out for the Court Reporter.
10    A.  Yes.
11    Q.  Can you state your full name
12 for the record?
13    A.  Curley Young, Jr.
14    Q.  Do you have a middle name?
15    A.  No.
16    Q.  Have you ever been known by
17 any other names?
18    A.  Yes.
19    Q.  What was that?
20    A.  Cuz.
21    Q.  How do you spell that?
22    A.  C-U-Z.
23    Q.  Is that a nickname?

Page 12

1     A.  Yes.
2     Q.  Are you currently on any
3  medications that would impair your
4  ability to testify?
5     A.  Repeat that?
6     Q.  Are you currently on any
7  medications that would impair your
8  ability to testify?
9     A.  No.
10    Q.  What's your current address?
11    A.  ████████████ Enterprise,
12 Alabama 36330.
13    Q.  And is that an apartment or a
14 house or --
15    A.  It's a house.
16    Q.  And who owns that house?
17    A.  My mother.
18    Q.  And what's your mother's
19 name?
20    A.  Helen F. Crittenden.
21    Q.  Who else lives in that house
22 with you and your mother?
23    A.  Just me and my mother.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 13

1    Q.    Are you the only child of
2  your mother?
3    A.    Yes.
4    Q.    Is your -- does your mother
5  work?
6    A.    Yes.
7    Q.    Where does she work?
8    A.    Daleville Inn.
9    Q.    Can you spell that, please?
10    A.    D-A-L-E-V-I-L-L-E.
11    Q.    And what is -- what -- what
12  type of job does she have?
13    A.    Receptionist.
14    Q.    Are you currently married?
15    A.    Yes.
16    Q.    And what's your wife's name?
17    A.    Anitra Young.
18    Q.    And what address does she
19  live at?
20    A.    ████████████
21  Enterprise, Alabama 36330.
22    Q.    How long have you been
23  married to Anitra Young?

Page 14

1    A.    Ten years.
2    Q.    So you got married in 1997?
3    A.    I believe that's correct.
4    Q.    Do you know the year you got
5  married?
6    A.    It's '97, I believe.
7    Q.    Do you have any children with
8  Mrs. Young?
9    A.    Yes.
10    Q.    How many children?
11    A.    Two.
12    Q.    Boys or girls?
13    A.    Two girls.
14    Q.    And they are -- are they
15  under the age of eighteen?
16    A.    Yes.
17    Q.    Do you have any other
18  children?
19    A.    No.
20    Q.    Have you ever been married
21  other than to Mrs. Young?
22    A.    Yes.
23    Q.    How many times -- other times

Page 15

1  have you been married?
2    A.    One.
3    Q.    And when were you married the
4  first time?
5    A.    1985.
6    Q.    And what was the -- the name
7  of your wife?
8    A.    Lisa Reese Young.
9    Q.    And how long were you
10  married?
11    A.    Two-and-a-half years.
12    Q.    And you had no children?
13    A.    No children.
14    Q.    Did you divorce Mrs. Reese?
15    A.    Yes, we were divorced.
16    Q.    I'm sorry. What?
17    A.    We were divorced, yes.
18    Q.    Are you separated from your
19  wife at this time?
20    A.    Yes.
21    Q.    How long have you been
22  separated?
23    A.    A year-and-a-half.

Page 16

1    Q.    So you separated in 2005?
2    A.    Yes, 2005 November.
3    Q.    Does she work?
4    A.    Yes.
5    Q.    Where does she work?
6    A.    Enterprise Nursing Home.
7    Q.    Is that where you met her?
8    A.    No.
9    Q.    What's her position at
10  Enterprise?
11    A.    Charge nurse, LPN.
12    Q.    Do the -- so the children
13  live with her?
14    A.    Yes.
15    Q.    Do you know if y'all are
16  going to reconcile or get divorced or --
17    A.    Anything is possible.
18    Q.    Do you have any plans to move
19  back in with her in the near future?
20    A.    It's -- it's in discussion.
21    Q.    What's your date of birth?
22    A.    ███-59.
23    Q.    How old are you currently?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 17

1    A.    Forty-eight.
2    Q.    And your Social Security
3  number?
4    A.    ██████4413.
5    Q.    Have you ever had your
6  license -- your driver's license revoked?
7    A.    Unh-unh (negative response).
8    Q.    Have you ever had it
9  suspended?
10    A.    Yes.
11    Q.    When was it suspended?
12    A.    When?
13    Q.    Yes.
14    A.    1993.
15    Q.    And why was it suspended?
16    A.    Failure to pay a ticket.
17    Q.    Have you ever had it
18  suspended any other time?
19    A.    No.
20    Q.    Have you ever sued anyone
21  other than Honeywell?
22    A.    Yes.
23    Q.    Who else have you sued?

Page 18

1    A.    Henry Coffman.
2    Q.    So you sued him as an
3  individual?
4    A.    Yes.
5    Q.    And when was this?
6    A.    Back in '86, '87.
7    Q.    What court did you sue him
8  in?
9    A.    Houston County.
10    Q.    And what did you sue him for?
11    A.    Malicious prosecution.
12    Q.    What were the basic facts of
13  the case?
14    A.    He accused me of theft of --
15  second degree theft.
16    Q.    And what was the outcome of
17  your lawsuit?
18    A.    I won the case.
19    Q.    Was it tried before -- in a
20  courtroom?
21    A.    We went to court, and during
22  the court proceedings he walked out and
23  they ordered him back. He failed to

Page 19

1  return back and it was awarded to me,
2  null processed, I guess, something of
3  that nature.
4    Q.    Did he own a business?
5    A.    Yes.
6    Q.    What did he accuse you of
7  stealing?
8    A.    It was stereo equipment.
9    Q.    And have you sued anyone
10  else?
11    A.    Yes.
12    Q.    Who else have you sued?
13    A.    City of Daleville.
14    Q.    And why did you sue City of
15  Daleville?
16    A.    False arrest.
17    Q.    And when was this?
18    A.    That was around '86, '87 as
19  well.
20    Q.    Did it involve the issues
21  with Mr. Coffman?
22    A.    It kind of trickled into it,
23  yes.

Page 20

1    Q.    Were you arrested?
2    A.    No. I was arrested because
3  the police officer came out to an
4  apartment that I had rented. I was
5  cleaning the apartment up. He said that
6  I broke in the apartment, arrested me.
7  The apartment was assigned -- it was --
8  it was still my apartment. They took me
9  down, detained me for seven hours, then
10  released me and said they were sorry they
11  made a mistake.
12    Q.    So you sued them?
13    A.    Yes.
14    Q.    And what was the -- and what
15  was the --
16    A.    False -- false arrest. I
17  settled.
18    Q.    And have you sued anyone
19  else?
20    A.    No.
21    Q.    Have you ever been sued?
22    A.    In small claims or something
23  like that or just out and out --

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 21

1  Q.  Any kind of situation?
2  A.  Yes, I have.
3  Q.  How many times?
4  A.  Once that I can recall.
5  Q.  And what were the -- who sued
6  you?
7  A.  Insurance company.
8  Q.  And what did they sue you
9  for?
10  A.  Property damage to a
11  apartment. I was renting an apartment
12  that caught on fire. They sued me for
13  the damages of the apartment.
14  Q.  Did the -- was it the
15  insurance company of the apartment
16  complex or was it your insurance company?
17  A.  No. I didn't have renter's
18  insurance, I guess, and the insurance
19  company was recouping their damages that
20  they -- I guess the complex had insurance
21  when -- you know, when it caught on
22  fire. The insurance company fixed the
23  apartment, then the insurance company

Page 22

1  came after me for their --
2  Q.  How did the apartment catch
3  on fire?
4  A.  It was a grease fire.
5  Q.  So you were -- were you at
6  the apartment at the time?
7  A.  No. It -- what -- what
8  happened was I was cooking some grease --
9  or not grease, some -- some food, and
10  forgot that the eye -- the grease was
11  still on. The alarm went off. I got up,
12  I put it out. At the time of putting it
13  out, the grease came back on my arm, the
14  frying pan landed on the floor. It was
15  out. I thought everything was out. I
16  went to the emergency room. My -- after
17  they fixed my arm, I went home to my
18  grandmother's, because the apartment was
19  smoked up pretty bad and I didn't want to
20  -- I went to a job, when I got back, I
21  was told my apartment had burned. I went
22  over and they had fire retard walls, the
23  heat -- there was a lot of heat damage

Page 23

1  had occurred within.
2  Q.  Have you ever filed any other
3  -- have you ever filed an EEOC charge?
4  A.  No, not to --
5  Q.  Besides the arrest you said
6  by the City of Daleville, have -- have
7  you ever been arrested?
8  A.  Yes.
9  Q.  When was that?
10  A.  Well, no. That would have
11  been -- that was the same -- that was in
12  the same -- no. Other than that, those
13  two, no.
14  Q.  You've never been arrested
15  for possession of a controlled substance?
16  A.  That was with the same --
17  when the lawsuit came in. Well, that
18  would have been the one leading up to it
19  and then the one --
20  Q.  How many times have you been
21  arrested, Mr. Young?
22  A.  It would be twice.
23  Q.  So you were arrested for

Page 24

1  possession of a controlled substance by
2  whom?
3  A.  City of Daleville.
4  Q.  And this is when you were --
5  A.  Hold on.
6  Q.  -- working in the apartment?
7  A.  No. No. No. No. Okay.
8  The controlled substance -- all that
9  leads into the same incident. The
10  controlled substance was the first one.
11  Henry Coffman came into that ordeal at
12  the same time. Because when they came in
13  and arrested me for the controlled
14  substance, which was marijuana, they
15  confiscated all my belongings, then Henry
16  Coffman came in and tried to say that I
17  stole his merchandise -- that was his
18  merchandise. And that's how he came in.
19  So they were all at the same time. And
20  then the one with the apartment came
21  later.
22  Q.  Were you -- what were you
23  charged with when you -- when you were

6 (Pages 21 to 24)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 25

1  arrested when you had the controlled
2  substance?  What were the charges?
3      A.   There was five charges:
4  Controlled substance; two or three second
5  degree theft; and one was with a gun,
6  buying and receiving a gun, I believe.
7      Q.   Buying and receiving a gun,
8  how is that illegal?
9      A.   It was a stolen gun.
10     Q.   Were you convicted on any of
11 these arrests?
12     A.   No.  I was charged with the
13 misdemeanor possession.
14     Q.   But were you convicted of any
15 of these charges?
16     A.   No.  The only one I was
17 convicted of was the -- not the -- it was
18 misdemeanor possession of the marijuana
19 seeds.  They were seeds.  That's what I
20 was convicted of.
21     Q.   You weren't convicted of the
22 -- the -- having a gun?
23     A.   No.  All that was dropped.

Page 26

1      Q.   Now, it's my understanding
2  that at one point Mr. Erickson suggested
3  -- suggested you might want to apply for
4  a security job at Honeywell.  Do you
5  recall that?
6      A.   Security guard?
7      MR. ERICKSON:  Safety job.
8      A.   Oh, safety job?  Yes.
9      Q.   And did you tell him that you
10 couldn't take that job because of your
11 background?
12     A.   No.
13     Q.   You didn't tell him that you
14 couldn't -- wouldn't make that job
15 because of your background?
16     A.   No, I did not.
17     Q.   They do a background check on
18 security positions or safety positions;
19 correct?
20     A.   Yes.
21     Q.   Why weren't you interested in
22 the safety job?
23     A.   Because of my wife's working

Page 27

1  and me keeping up with my girls as far as
2  baby-sitting, that job has to do with
3  shift work, and I needed a stable job
4  because my wife worked 11:00 to 7:00.  I
5  was working days and our baby-sitting --
6  I would watch the girls at night.
7      Q.   There wasn't a safety job
8  that was a day-shift job?
9      A.   All -- all their jobs
10 rotate.  You work a month or two months
11 and then you go to an evening shift, then
12 you go to a night shift job.
13     Q.   Do you know if you would have
14 passed the security clearance had you
15 applied for the job?
16     A.   I have no knowledge of that.
17 I don't know what's pertaining to the
18 security clearance.
19     Q.   Have you ever been a witness
20 in a lawsuit?
21     A.   No.
22     Q.   Where did you graduate high
23 school?

Page 28

1      A.   Daleville.
2      Q.   What year?
3      A.   '78.
4      Q.   What post-high school
5  education do you have?
6      A.   Post what?
7      Q.   High school education, if
8  any?
9      A.   You are pertaining to my
10 college?
11     Q.   Anything you've -- any
12 education you have post-high school?
13     A.   I'm a licensed nurse, LPN.
14     Q.   You are a licensed nurse?
15     A.   I'm a licensed LPN nurse.
16     Q.   And what does LPN stand for?
17     A.   Licensed practical nurse.
18     Q.   Where did you go to school to
19 get that degree, or do you have -- do you
20 have a degree to be a licensed practical
21 nurse?
22     A.   I have a diploma.
23     Q.   A diploma from where?

7 (Pages 25 to 28)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 29

1    A.    MacArthur Tech.
2    Q.    And where is that located?
3    A.    Opp, Alabama.
4    Q.    And how long did you attend
5    MacArthur Tech?
6    A.    Eighteen months.
7    Q.    And what -- what time period
8    did you attend?
9    A.    It would be '94, '95.
10   Q.    Any other post-high school
11   education?
12   A.    I have credits in --
13   elevating towards my RN degree. I
14   also --
15   Q.    Where did you get those at?
16   A.    Enterprise State Junior
17   College.
18   Q.    And when did you attend
19   there?
20   A.    '97 -- I believe it was '97,
21   '98.
22   Q.    Okay.
23   A.    I also have a year-and-a-half

Page 30

1    at RETS Electronic Technical School here
2    in Birmingham.
3    Q.    And when did you attend
4    there?
5    A.    In 1979, 1980.
6    Q.    Did you live in Birmingham at
7    the time?
8    A.    I sure did.
9    Q.    What were you doing in
10   Birmingham during that time?
11   A.    I worked at the -- part-time
12   for Golden Flake.
13   Q.    And what was your job there?
14   A.    Maintenance -- not
15   maintenance, but cleaning up the machines
16   and whatnot at night.
17   Q.    Why did you leave that job?
18   A.    That job, I believe I was
19   terminated.
20   Q.    What were you terminated for?
21   A.    They just stated they didn't
22   need any students.
23   Q.    How long did you work there?

Page 31

1    A.    Six to eight months.
2    Q.    Any other post-high school
3    education?
4    A.    That's all.
5    Q.    Are you still currently an
6    LPN?
7    A.    Yes.
8    Q.    Do you have to have
9    continuing educational --
10   A.    Yes.
11   Q.    -- credits?
12   A.    Yes.
13   Q.    Okay.
14   A.    I keep them -- keep my
15   license active.
16   Q.    Now, where were you employed
17   right before Honeywell?
18   A.    Before Honeywell, Pike Manor.
19   Q.    And what is Pike Manor?
20   A.    Nursing home.
21   Q.    And what was your position
22   there?
23   A.    Charge nurse.

Page 32

1    Q.    How long did you -- were you
2    employed at Pike Manor?
3    A.    Two years. I also worked
4    part-time with Honeywell -- while I was
5    working with Honeywell, I had a part-time
6    at Oakview Manor as well as a charge
7    nurse.
8    Q.    How long did you -- what
9    years did you work at Oakview Manor?
10   A.    I went -- I believe it was
11   '02, '03.
12   Q.    Did you work nights?
13   A.    Every other weekend.
14   Q.    And why did you leave Oakview
15   Manor?
16   A.    My father passed away and I
17   had to take care of his business.
18   Q.    What was his business?
19   A.    Funeral and whatnot.
20   Q.    Oh, not -- not a business he
21   had, but taking care of the -- okay.
22   A.    The estate.
23   Q.    Did you inherit a pretty

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 33

1  sizable inheritance from your father's
2  death?
3      A.   It depends on what you call
4  -- I would say no.
5      Q.   Why did you leave Pike Manor?
6      A.   I resigned.
7      Q.   Why did you resign?
8      A.   I wanted to get closer to the
9  -- to my house.
10     Q.   Where is Pike Manor located?
11     A.   Troy.
12     Q.   Were you ever accused of --
13  were you ever disciplined at Pike Manor?
14     A.   Yes.
15     Q.   What were you disciplined
16  for?
17     A.   I had some medication errors.
18     Q.   Anything else?
19     A.   Maybe coming in late.
20     Q.   Anything else?
21     A.   I can't recall.
22     Q.   Were you ever accused of
23  stealing medication?

Page 34

1      A.   No.
2      Q.   Were you allowed to resign in
3  lieu of termination?
4      A.   No, not to my knowledge.
5      Q.   They kept you on when you had
6  medication errors?
7      A.   Yes.
8      Q.   Did you ever make any
9  complaints at Pike Manor?
10     A.   No.
11     Q.   Where did you work before
12  Pike Manor?
13     A.   Before Pike Manor, I was in
14  school because --
15          MR. BENNITT:  Don't think out
16  loud.  Everything gets recorded.
17     A.   I can't recall.
18     Q.   Did you work at Enterprise
19  Nursing Home?
20     A.   There you go.
21     Q.   Okay.
22     A.   That was before school, yes,
23  Enterprise Nursing.

Page 35

1      Q.   How many years did you work
2  at Enterprise Nursing Home?
3      A.   Three, maybe.
4          MR. BENNITT:  Don't guess.
5      A.   Three.
6      Q.   What were you at Enterprise
7  -- what was your position at Enterprise
8  Nursing Home?
9      A.   CNA, certified nursing
10  assistant.
11     Q.   Thank you.  Were you employed
12  there twice?
13     A.   I can't recall.
14     Q.   And before Enterprise Nursing
15  Home, where were you employed?
16     A.   I can't recall.  That's a
17  long time ago.
18     Q.   Did you work at Elba Nursing
19  Home before that?
20     A.   I've worked there.
21     Q.   How long did you work at Elba
22  Nursing Home?
23     A.   Maybe a year.

Page 36

1      Q.   Why did you leave Elba
2  Nursing Home?
3      A.   I can't recall.
4      Q.   Were you terminated?
5      A.   I can't recall.
6      Q.   Could it -- is it possible
7  you were terminated?
8      A.   I can't recall.
9      Q.   If you wrote down you were
10  terminated on a job application, would
11  that be a true statement?
12     A.   Yes.
13     Q.   Did you work for Humana?
14     A.   Yes.
15     Q.   What was Humana?
16     A.   That was a hospital.
17     Q.   And what was your job with
18  Humana?
19     A.   CNA -- PCA.
20     Q.   And what does PCA mean?
21     A.   At the time, patient care
22  assistant.
23     Q.   And how long did you work at

9  (Pages 33 to 36)

## FREEDOM COURT REPORTING

Page 37

1  Humana?
2      A.  I'll say a year.
3      Q.  And why did you leave Humana?
4      A.  I was terminated there.
5      Q.  Why were you terminated?
6      A.  Sleeping.
7      Q.  On the job?
8      A.  Yes.
9      Q.  What is the longest you've
10  ever held any job, Mr. Young?
11      A.  Honeywell.
12      Q.  I'm going to have some
13  exhibits I'm going to show you.  If I
14  give you an exhibit that has highlight on
15  it, pass it back to me.  That's my copy.
16  But I always do it every time, so just
17  let me know.  I'm going to show you what
18  we are going to mark as Exhibit No. 1 and
19  ask you if -- let you review that and
20  tell me when you are through.
21      MS. REISS:  Here you go,
22  Jeff.  Here's you a copy.
23      MR. BENNITT:  Oh, thanks.

Page 38

1  (Whereupon, Defendant's Exhibit No. 1 was
2  marked for identification, and same is
3  attached hereto.)
4
5      A.  Okay.
6      Q.  Is that your handwriting on
7  this application?
8      A.  Yes.
9      Q.  And this is your application
10  at Enterprise Nursing Home?
11      A.  Yes.
12      Q.  It's funny to see a 205 for
13  Enterprise.  That's the old days when you
14  had -- still everybody had the same area
15  code.
16
17      (Off-the-record discussion.)
18
19      Q.  All right.  Did you fill this
20  out, this -- this application out
21  truthfully?
22      A.  To my knowledge, I did.
23      Q.  You answered on this

Page 39

1  application on the question on the second
2  page:  Have you ever been discharged from
3  a job, forced, or asked to resign?  You
4  said:  No.  That's a lie, is it not?
5      A.  Where is this at?
6      Q.  It's right under where you
7  listed your previous employers.
8      A.  Well, I mis -- I mean, it's
9  clearly up here stated that I was
10  terminated, so I just misput the block.
11      Q.  And you stated you were still
12  employed with Elba.  But somebody --
13  that's not your handwriting up there
14  where it says:  No longer working;
15  correct?
16      A.  Right.
17      Q.  So you were not still
18  employed when you filled this out?
19      A.  I can't recall, because I --
20  I could have applied for the job and was
21  still working at -- at the time.  I just
22  -- I don't say that's a lie.
23      Q.  Down here you state that you

Page 40

1  attended George Wallace.  What is George
2  Wallace?
3      A.  That's a community college.
4      Q.  Did you tell me that before?
5      A.  No.  I forgot.  I attended
6  there years ago for -- as a matter of
7  fact, that's where I first started my
8  nursing.  And then I also was there for
9  electronics.
10      Q.  Were you disciplined at
11  Enterprise Nursing Home?
12      A.  Yes.
13
14  (Whereupon, Defendant's Exhibit No. 2 was
15  marked for identification, and same is
16  attached hereto.)
17
18      Q.  I'll show you what we are
19  going to mark as Exhibit No. 2 and ask
20  you to review this document, please, sir?
21      A.  (Witness complies.)
22      Q.  Is this a counseling form you
23  received from Enterprise?

10 (Pages 37 to 40)

## FREEDOM COURT REPORTING

Page 41

1    A.   That's what it is.
2    Q.   Is that your signature at the
3  bottom of the page?
4    A.   Yes, it is.
5    Q.   And you were suspended for
6  not calling in or coming in on May 10th,
7  1992?
8    A.   That's what it says.
9
10  (Whereupon, Defendant's Exhibit No. 3 was
11  marked for identification, and same is
12  attached hereto.)
13
14    Q.   I'll show you what we're
15  going to mark as Exhibit No. 3.  Tell me
16  when you've had time to review it.  Was
17  this a complaint made by a patient's
18  relative about you -- your language in
19  the nursing home?
20    A.   I don't recall.
21    Q.   Is that what this says?
22    A.   It says:  Received report
23  from sponsor.  It doesn't necessarily

Page 42

1  mean it was a relative.
2        MR. BENNITT:  That wasn't the
3  question.  Does it say what it says?
4    A.   It is what it says.
5    Q.   And you signed it; correct?
6    A.   Yes.
7    Q.   And you said -- you also
8  understood that profanity in the
9  workplace is not acceptable?
10    A.   Yes.
11    Q.   And this was a first written
12  warning you received; correct?
13    A.   If that's what it is.
14    Q.   Is that what it --
15    A.   I don't recall it.
16    Q.   -- says on the top left-hand
17  corner?
18        MR. BENNITT:  We do not deny
19  that the -- that all of these documents
20  exist and every one of them are
21  authenticated.  They are part of his
22  personnel file.
23        MS. REISS:  That's great.

Page 43

1  Okay.  We're still going to go through
2  them.
3        MR. BENNITT:  Well, I mean,
4  you can.  But I'm just saying --
5        MS. REISS:  Okay.
6
7  (Whereupon, Defendant's Exhibit No. 4 was
8  marked for identification, and same is
9  attached hereto.)
10
11    Q.   I'll show you Exhibit No. 4.
12  Have you seen this document before?
13    A.   No, I haven't -- I don't
14  recall this one.
15    Q.   Were you terminated at one
16  point from Enterprise Nursing Home?
17    A.   Yes.
18    Q.   And then you were hired back?
19    A.   No.
20    Q.   Does this document note you
21  were terminated for this --
22    A.   Yes.
23    Q.   -- behavior?  Do you remember

Page 44

1  refusing to sign this document?
2    A.   I don't recall.
3    Q.   Do you remember playing
4  guitar at the nursing home?
5    A.   Yes.
6    Q.   Do you think it's appropriate
7  to slam down your guitar and yell at your
8  co-workers?
9    A.   I don't recall that
10  happening.
11    Q.   You don't -- you don't recall
12  why you were terminated from Enterprise?
13    A.   I recall why I was
14  terminated.
15    Q.   Why were you terminated?
16    A.   They stated that I was
17  insubordinate.
18    Q.   Argumentative, did they also
19  state you were argumentative?
20    A.   I don't recall.
21    Q.   Have you ever been accused of
22  being argumentative before?
23    A.   I don't recall.

11  (Pages 41 to 44)

# FREEDOM COURT REPORTING

Page 45

1    Q.   So you don't remember if
2  you've ever been accused of that?
3    A.   No.
4    Q.   Have you ever been told that
5  you refused to follow instructions of
6  supervisors?
7    A.   I don't recall.
8    Q.   So that means you could have
9  or you could not have; correct?
10   A.   Correct.
11   Q.   Now, it appears to be, from
12  the documents, that you were rehired.
13  You don't recall this by Enterprise
14  Nursing Home? I'll show you what I'm
15  going to mark as Exhibit No. 5. Is that
16  your signature at the bottom, Mr. Young?
17
18  (Whereupon, Defendant's Exhibit No. 5 was
19  marked for identification, and same is
20  attached hereto.)
21
22   A.   Um-hum (positive response).
23   Q.   Does it look like you've been

Page 46

1  rehired?
2    A.   This is stating I was
3  rehired?
4    Q.   No. Does it look like you've
5  been -- you returned -- look at your last
6  exhibit, if you would, please? You were
7  terminated in January, then this says
8  since February you've had three tardies,
9  Exhibit No. 5?
10   A.   Okay. Okay. So what are you
11  asking me?
12   Q.   Were you rehired by
13  Enterprise Nursing Home?
14   A.   No.
15   Q.   So were -- I don't
16  understand. Were you never fired?
17   A.   I was terminated here
18  (indicating).
19      MR. BENNITT: What exhibit
20  are you saying -- you are pointing at
21  something. Name it.
22   A.   It's Exhibit No. 4.
23   Q.   Okay. So how did they have a

Page 47

1  write-up on you for being tardy in '93,
2  March of '93, if you weren't rehired?
3    A.   I guess they have a problem
4  with their --
5      MR. BENNITT: Don't guess if
6  you don't know the answer.
7      MS. REISS: Don't coach your
8  witness, please.
9    A.   The answer to your question
10  as whether -- whether or not I was
11  rehired, no, I was not rehired.
12   Q.   Then explain this to me.
13  I'll show you Exhibit No. 6, and if you
14  can explain to me how you got a third
15  written warning in August of '93, if you
16  were not rehired, for sleeping on the
17  job?
18
19  (Whereupon, Defendant's Exhibit No. 6 was
20  marked for identification, and same is
21  attached hereto.)
22
23   A.   I don't recall. This -- it's

Page 48

1  what it is.
2    Q.   And you were fired from
3  Humana for sleeping on the job; is that
4  correct?
5    A.   Yes.
6    Q.   Do you remember an employee
7  -- an employee named Lisa Whitaker or an
8  employee named Ann Cox at Enterprise
9  Nursing Home?
10   A.   Yes.
11   Q.   Were they your supervisors?
12   A.   Yes.
13
14  (Whereupon, Defendant's Exhibit No. 7 was
15  marked for identification, and same is
16  attached hereto.)
17
18   Q.   I'll show you what I'm going
19  to mark as Exhibit No. 7, and this is
20  another write-up in October of '93. Do
21  you recall this incident?
22   A.   Yes, I recall.
23   Q.   And here you were counseled

12 (Pages 45 to 48)

# FREEDOM COURT REPORTING

Page 49

1  for being insubordinate again; is that
2  correct?
3      A.   This is what it is.
4      Q.   Were you counseled again for
5  being insubordinate?
6      A.   That's what it says.
7      Q.   Is that what happened?
8      A.   Yes.
9
10  (Whereupon, Defendant's Exhibit No. 8 was
11  marked for identification, and same is
12  attached hereto.)
13
14      Q.   And here is a document noting
15  a suspension in October of '93 from
16  Enterprise Nursing Home. Is that your
17  signature at the bottom, Mr. Young?
18      A.   Yes, it is.
19      Q.   And why were you -- why were
20  you suspended?
21      A.   I can't recall.
22      Q.   What was the -- well, you
23  signed this document.  What was the

Page 50

1  reason given?
2      A.   I can't recall.  They don't
3  have it stated.
4      Q.   Does it say:  After
5  investigation and talking with you at
6  length this a.m. regarding being
7  insubordinate to your charge nurses, you
8  are suspended for three days?
9      A.   Yes, that's what it says.
10
11      (Off-the-record discussion.)
12
13  (Whereupon, Defendant's Exhibit No. 9 was
14  marked for identification, and same is
15  attached hereto.)
16
17      Q.   Have you ever seen this
18  document before, Mr. Young, Exhibit No.
19  9, from Enterprise Nursing Home?
20      A.   You are asking me if I
21  remember this?
22      Q.   Yeah.  Have you seen this
23  document before?

Page 51

1      A.   I don't recall.
2      Q.   It denotes that you have at
3  least nine points due to absences or
4  tardies as of January 13th, 1994?
5      A.   It is what it is.
6      Q.   Is that what it says?
7      A.   That's what it says.
8      Q.   I'm not here to play games.
9  I'm just -- we'll get through this a lot
10  quicker.  Were you -- you were terminated
11  from Enterprise Nursing Home?
12      A.   Yes.
13      Q.   Do you remember why you were
14  terminated?
15      A.   Yes.
16      Q.   Why?
17      A.   Insubordination.
18
19  (Whereupon, Defendant's Exhibit Nos. 10
20  and 11 were marked for identification,
21  and same is attached hereto.)
22
23      Q.   Have you ever seen this

Page 52

1  document before, and that's Exhibit No.
2  10?  I'm going to show you Exhibit No. 11
3  with it.
4      A.   Okay.
5      Q.   Have you seen the document
6  before?
7      A.   No.
8      Q.   Have you seen Exhibit No. 11?
9      A.   Okay.
10      Q.   Have you seen that before?
11      A.   No.
12      Q.   It states you are not
13  eligible for rehire by Enterprise Nursing
14  Home; correct?
15      A.   Correct.
16      Q.   Did you ever receive
17  unemployment based on your leaving their
18  employment?
19      A.   I don't recall.
20      Q.   When you called Mr. Lavar, do
21  you recall that after you left Honeywell?
22      A.   Yes.
23      Q.   And you tape-recorded him; is

13 (Pages 49 to 52)

# FREEDOM COURT REPORTING

Page 53

1  that correct?
2      A.  That's correct.
3      Q.  Did you tell him you were
4  tape-recording him?
5      A.  No.
6      Q.  You told him you were working
7  at Laurel Oaks, I believe; correct?
8      A.  I don't recall.
9      Q.  Fortunately, he tape-recorded
10  it for us.  Let's see here.  I'm going to
11  mark this as Exhibit No. 12.  If you will
12  look at page five, please, sir, and tell
13  me if you told him you were working at
14  Laurel Oaks?  Could you read what you
15  said there on -- starting on line seven
16  through line ten, please?
17
18  (Whereupon, Defendant's Exhibit No. 12
19      was marked for identification, and same
20      is attached hereto.)
21
22      A.  Starting at line ten?
23      Q.  Starting at line seven?

Page 54

1      A.  Seven: Mr. Young: No. Hell
2  no. I'm at Laurel Oaks back in nursing,
3  man, which I already was getting that
4  lined up anyways.
5      Q.  You've never worked at Laurel
6  Oaks since you left Honeywell?
7      A.  No.
8      Q.  So you lied to Mr. Lavar?
9      A.  I didn't state I was working
10  there.
11      Q.  You said: I'm at Laurel Oaks
12  back in nursing.  What does that mean?
13      A.  It means that I had a job
14  lined up at Laurel Oaks at the time, went
15  through the interview, during the time it
16  takes to call back and forth, then the
17  job fell through.
18      Q.  You said you were getting
19  that lined up anyways.  What does that
20  mean?
21      A.  That means I was planning to
22  get back in nursing prior to me being
23  terminated from Honeywell.

Page 55

1      Q.  Had you already sent out
2  applications before you left Honeywell?
3      A.  I had not sent out
4  applications, no.
5      Q.  How were you getting that
6  lined up?
7      A.  Telephone conversations with
8  individuals.
9      Q.  So you were calling nursing
10  homes?
11      A.  Not nursing homes, that
12  particular nursing facility.  That's not
13  a nursing home.
14      Q.  Well, who -- how were you
15  getting things lined up before you left
16  Honeywell?
17      A.  I was talking to the human
18  resources at Laurel Oaks, which is a
19  behavioral management for adolescents.  I
20  was told that I had the job, get all my
21  licenses current, get all of my CUs
22  current, come down with all my paperwork
23  and do a formal interview.

Page 56

1      Q.  And that was before you left
2  Honeywell?
3      A.  Yes.
4      Q.  And why didn't you get the
5  job at Laurel Oaks?
6      A.  They hired someone else.
7      Q.  On page four of the
8  transcript, could you read line twenty-
9  three onto line one on page five?
10      A.  Line twenty-three?
11      Q.  Yes.
12      A.  Mr. Young: Hey, man, I'm
13  living good, man.  It ain't no big deal.
14      Q.  How -- what do you mean by
15  I'm living good?
16      A.  It means my health is well.
17      Q.  What -- when did you call Mr.
18  Lavar?
19      A.  I don't recall exactly.
20      Q.  How long after you left
21  Honeywell?
22      A.  I really don't recall.
23      Q.  Was it one month, two months?

14  (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 57

1    A.    Within one month.
2    Q.    Why did you call Mr. Lavar?
3    A.    At the time, I just don't
4  recall the exact reason.
5    Q.    Did y'all socialize outside
6  of work?
7    A.    We have, yes.
8    Q.    How many times?
9    A.    Two, three.
10   Q.    In the -- how many years were
11 you at Honeywell?
12   A.    Eight.
13   Q.    And you don't recall why you
14 called Mr. Lavar?
15   A.    No, I don't recall.
16   Q.    Have you called him since?
17   A.    No.
18   Q.    Did you get what you wanted
19 out of him? Why did you tape-record
20 them?
21   A.    I was trying to establish the
22 reason for the true termination.
23   Q.    So that's why --

Page 58

1    A.    That's --
2    Q.    -- you called Mr. Lavar?
3    A.    That's -- that's why I called
4  Mr. Lavar.
5    Q.    So you now remember why you
6  called him?
7    A.    Yes.
8    Q.    And did -- anywhere in this
9  transcript did Mr. Lavar say it's because
10 Honeywell is racist? Did he tell you
11 that?
12   A.    Those exact words, no.
13   Q.    Did he give you -- did he
14 even get close to that?
15   A.    From what I can recall, he
16 just -- he simply stated that they were
17 out to get me.
18   Q.    Where does he say that, if
19 you could find that in the transcript,
20 please?
21   A.    Okay. Here's part of it.
22   Q.    Okay.
23   A.    Mr. Lavar: Always looking

Page 59

1  out --
2    Q.    What page are you on?
3    A.    Eleven.
4    Q.    Okay.
5    A.    Always looking out, you know,
6  over his shoulder with you or whatever.
7  Okay. That's one section where they were
8  out to get me.
9    Q.    And then will you read your
10 response?
11   A.    Yeah. I know. He was always
12 having to go out and check on me.
13   Q.    And then what does Mr. Lavar
14 say?
15   A.    Well, not necessarily check
16 on you.
17   Q.    And then --
18   A.    There's another --
19   Q.    And then will you read what
20 you wrote -- said next?
21   A.    Well, what about when the --
22 I don't know what those lines are for,
23 you know, the one incident with the -- I

Page 60

1  know you did it because of -- because you
2  told me that he -- you did it by request
3  when the cards went out in the trucks for
4  you -- you know, one was on the reservoir
5  and you put them out and I asked you what
6  was that for and you said I was
7  instructed to do that.
8    Q.    And then Mr. Lavar says: Oh,
9  yeah, that was -- and there's some noise
10 -- Jerry. He assumed that, you know, you
11 wasn't performing your B-O-T-S in the
12 morning and basically just -- just out
13 there and then filling the truck up
14 without, you know, actually looking over
15 the truck or anything. So he said, well,
16 plant -- you know, go ahead and plant
17 something out there and see if you pick
18 it up. Now, let me ask you something,
19 Mr. Young: Mr. Lavar's job was quality
20 control; correct?
21   A.    He was an inspector.
22   Q.    Right. Was his -- what was
23 his title?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 61

1    A.    Inspector.
2    Q.    And he did quality control
3  for Honeywell; correct?
4    A.    I -- inspector is all I know
5  he was.
6    Q.    You don't know that he worked
7  in quality control and you worked with
8  him for many years?
9    A.    His title is inspector.
10    Q.    Would he leave tags out for
11  you to find during preventive
12  maintenance?
13    A.    At random he would leave them
14  out.
15    Q.    And would he do that for all
16  the employees who performed preventive
17  maintenance?
18    A.    I can't answer that.
19    Q.    And then you say: Right.
20  He's doing that just on me, see.  And Mr.
21  Lavar says: Um-hum (positive response).
22  And then you say: Yeah, that is what I
23  thought.  And Mr. Lavar said: Well,

Page 62

1  everybody had something in there.  So can
2  you tell me where he says they are just
3  out to get you?
4    A.    I thought I showed it to you.
5    Q.    Well, we read in context,
6  though, correct, and that's not what it
7  says; correct?
8    A.    That's what I interpret it.
9    Q.    Can you see -- tell me
10  anywhere else where -- where you can see
11  where he just flat out says they are out
12  to get you based on your race?
13    A.    Based on my race out of this
14  conversation --
15    Q.    Because that's what your
16  lawsuit is about; correct?
17    A.    That's correct.
18    Q.    Okay.
19    A.    In this transcript, I don't
20  see.
21    Q.    I believe in -- on page five
22  you ask: Why did Ken have such a hard
23  dick for me, man?  Is that how you spoke

Page 63

1  at work?
2    A.    I wasn't at work when this
3  conversation went on.
4      MR. BENNITT:  That wasn't the
5  question.  Answer the question.
6    A.    No.
7    Q.    Is that how -- do you think
8  it's appropriate to speak that way?
9    A.    No, I don't think it's
10  appropriate.
11    Q.    You didn't ask him, why is
12  Ken so racist, did you?
13    A.    No.
14    Q.    And then -- I'm confused.
15  You ask -- you say you are doing well.
16  We just read it; right?  I'm living
17  good.  It ain't no big deal.  Why are you
18  suing Honeywell if you are better off?
19    A.    Because I wasn't treated
20  fairly.
21    Q.    But you said it ain't no big
22  deal in this transcript; correct?
23    A.    I didn't say that Honeywell

Page 64

1  mistreating me wasn't a big deal.
2    Q.    What did you mean by: Hey,
3  man, I'm living good, it ain't no big
4  deal?
5    A.    My health is well.  I'm --
6  I'm glad to be alive.
7    Q.    What was no big deal?
8    A.    That -- it's just in life in
9  general.
10    Q.    And then on page twenty you
11  say -- line ten, if you will look on page
12  twenty, please, Mr. Young:  And this is
13  what I figure has happened.  But, you
14  know, it's all for the better, as far as
15  I'm concerned.  You know, I needed to get
16  back in nursing anyways.  Is that a
17  truthful statement?
18    A.    That's a truthful statement.
19    Q.    So you were -- it was for the
20  best that you left Honeywell, that is
21  what you are saying; correct?
22    A.    Yes.
23    Q.    And this was a month after

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 65

1  you left Honeywell; correct?
2      A.  Yes.
3      Q.  Why didn't you tell Mr. Lavar
4  you were tape-recording him?
5      A.  I didn't feel I needed to
6  tell him that.
7      Q.  Do you think he would have --
8  do you think he would have kept talking
9  to you if he knew he was being tape-
10  recorded?
11     A.  I felt if he was going to
12  tell the truth he would have told the
13  truth regardless.
14     Q.  So why didn't you tell him
15  you were tape-recording him?
16     A.  I didn't feel there was a
17  need.
18     Q.  And you tape-recorded Mr.
19  Garrett also?
20     A.  Yes.
21     Q.  And did you tape-record Ms.
22  -- tape-record Mr. Flowers when you
23  called him?

Page 66

1      A.  I don't recall.
2      Q.  Didn't you just recently call
3  him?
4      A.  Yes.
5      Q.  Did you tape-record him?
6      A.  No.
7      Q.  How long did you speak with
8  Mr. Flowers?
9      A.  Approximately five minutes.
10     Q.  What was the -- what was said
11  in that conversation?
12     A.  The conversation was stated
13  that the hearing was coming up close, all
14  I wanted him to do was tell the truth and
15  nothing but the truth.
16     Q.  And what did he say?
17     A.  He said, I'll have to see.
18  He says, I have to work with them.  And I
19  said, well, I'm -- I'm not asking you to
20  do no more or less, just tell the truth.
21  That's all you've got to do, tell the
22  truth.  I said, you know that they were
23  racist and you know how they treated us

Page 67

1  when we were there.  All I'm asking you
2  to do is tell the truth.
3      Q.  And what did he say to that?
4      A.  He says, well, I'll see, you
5  know, I have to work with them.
6      Q.  And did he get off the phone?
7      A.  After I said that's all I
8  wanted, I hung up.
9      Q.  Did he end the conversation
10  or did you end the conversation?
11     A.  I believe I ended the
12  conversation.
13     Q.  Is that the only time you've
14  ever called Mr. Flowers since you've left
15  Honeywell?
16     A.  No.
17     Q.  How many other times have you
18  contacted him?
19     A.  Approximately two.
20     Q.  And what were -- why did you
21  call him on those occasions?
22     A.  I was calling to check to see
23  how he was doing.

Page 68

1      Q.  Did you record any of those
2  conversations?
3      A.  Not to my recollection, no.
4      Q.  Have you had any
5  conversations with any former or current
6  Honeywell employees about your lawsuit
7  besides Mr. Flowers and indirectly Mr.
8  Lavar?
9      A.  No, not that I can recall.
10     Q.  Have any current or former
11  employees of Honeywell agreed to be
12  witnesses for you?
13     A.  I haven't spoken to any at
14  Honeywell, no.
15     Q.  How did you come to apply
16  with Honeywell?
17     A.  I was hired through Jimmy --
18  Jimmy Hodges.
19     Q.  But how did you come to apply
20  with Honeywell?  Did you -- was it posted
21  somewhere?  Did you see an advertisement?
22     A.  I walked in the building and
23  saw a posting on the wall and asked about

17 (Pages 65 to 68)

# FREEDOM COURT REPORTING

Page 69

1  the job, inquired through the project
2  manager at the time. He said, I'll give
3  you an application, and I filled the
4  application out and I was hired.
5      Q.   What was the job you applied
6  for?
7      A.   Range tech.
8      Q.   And is that what you were
9  when you were terminated, were you a
10  range tech?
11      A.   Well, the proper name is
12  maintenance trades helper, and that's
13  what I was when I left there.
14      Q.   And was that the DOL job
15  name, the Department Of Labor title?
16      A.   Maintenance trades helper.
17      Q.   And -- but you were referred
18  to as a range tech at the site; correct?
19      A.   Yes.
20      Q.   And Jimmy Hodges was the
21  project manager?
22      A.   Yes.
23      Q.   Is that the highest position

Page 70

1  at the site for Honeywell?
2      A.   Yes.
3      Q.   And what was Mr. Hodges'
4  race?
5      A.   He was Caucasian.
6      Q.   And he hired you; is that
7  correct?
8      A.   Yes.
9      Q.   And what year was that?
10      A.   Eight years ago.
11      Q.   Do you remember what year you
12  were hired?
13      A.   No. '97.
14
15  (Whereupon, Defendant's Exhibit No. 13
16   was marked for identification, and same
17   is attached hereto.)
18
19      Q.   Let me show you what I'm
20  going to mark as Exhibit No. 13 and ask
21  you if you've seen this document before?
22  I sent this entire file to your
23  attorney. I'm just wondering if you've

Page 71

1  seen this document before? It's from the
2  Enterprise Nursing Home docs.
3
4      (Off-the-record discussion.)
5
6      Q.   Had you had a problem with
7  no-call and no-shows at the Elba Nursing
8  Home?
9      A.   No.
10      Q.   So this -- okay. You've
11  testified that you were terminated from
12  Golden Flake, Humana, Elba Nursing Home,
13  Enterprise Nursing Home. What other jobs
14  have you been terminated from?
15      A.   I can't recall.
16      Q.   And Honeywell. You don't
17  remember any other jobs you've been
18  terminated from?
19      A.   I can't recall.
20      Q.   Where else have you been
21  employed?
22      A.   R&S Logging.
23      Q.   That's since Honeywell;

Page 72

1  correct?
2      A.   (Nods head affirmatively.)
3      Q.   Where else have you been
4  employed before Honeywell?
5      A.   Y'all -- I can't recall. I
6  was working at the Officers Club at Fort
7  Rucker.
8      Q.   What was your job there?
9      A.   Busboy.
10      Q.   And how long were you there?
11      A.   A year-and-a-half.
12      Q.   Okay.
13      A.   A year.
14      Q.   And why did you leave there?
15      A.   I quit.
16      Q.   Do you remember any other
17  positions you've had?
18      A.   Say again?
19      Q.   Any other jobs you've had?
20      A.   I just can't recall right
21  now.
22      Q.   But you've been fired from at
23  least five jobs; is that correct?

18 (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 73

1    A.    I could say that, yes.

2

3    (Whereupon, Defendant's Exhibit No. 14

4    was marked for identification, and same

5    is attached hereto.)

6

7    Q.    I'll show you what we're

8    going to mark as Exhibit No. 14.  Let me

9    ask you:  Did you -- you didn't sue any

10   of these previous employers, correct,

11   that fired you?

12   A.    No.

13   Q.    Why not?

14   A.    Because they didn't do me

15   injustice as far as being racist.

16   Q.    But you were employed by

17   Honeywell longer than anywhere you've

18   ever been employed; correct?

19   A.    Yes.

20   Q.    Is that your application?

21   A.    Yes.

22   Q.    And AlliedSignal became

23   Honeywell; is that correct?

Page 74

1    A.    Yes.

2    Q.    So this is your application

3    for your job that you eventually had with

4    Honeywell?

5    A.    Yes.

6    Q.    Do you remember your starting

7    salary?

8    A.    Yes.

9    Q.    What was it?

10   A.    Eleven fifty-nine.

11   Q.    Is that more than you had

12   ever made before?

13   A.    No.

14   Q.    Where had you made a higher

15   salary?

16   A.    Pike Manor.

17   Q.    On here you state your ending

18   salary at Pike Manor was eleven dollars

19   an hour?

20   A.    Well, based on that, yes.

21   But that's incorrect.

22   Q.    Well, you typed it; correct?

23   A.    Yes.  It was -- I got fifty

Page 75

1    cents an hour for being the supervisor.

2    Q.    So -- okay.  So you typed

3    this incorrectly, is that what you are

4    saying?

5    A.    That was a misprint, yes.

6    Q.    Now, one of your references

7    is a Terry Adkins; is that correct?

8    A.    Yes.

9    Q.    Now, he -- you've asked him

10   for a job since you left Honeywell; is

11   that right?

12   A.    Yes.

13   Q.    And he did not hire you; is

14   that correct?

15   A.    That's right.

16   Q.    And you didn't list all of

17   your employers in the past seven years on

18   this application, did you?

19   A.    No, I didn't.  I was

20   instructed I didn't have to.

21   Q.    Who instructed you?

22   A.    Jimmy Hodges.

23   Q.    Tell me what -- what does

Page 76

1    Honeywell do at Fort Rucker?

2    A.    They are a maintenance

3    contractor.

4    Q.    What types of things do they

5    do for Fort Rucker?

6    A.    They maintain the area of

7    gunnery range and small arms ranges.

8    Q.    How many employees does

9    Honeywell have out there?

10   A.    I couldn't tell you at this

11   point.

12   Q.    When you were employed?

13   A.    Approximately forty.

14   Q.    Can you tell me why you

15   didn't mention going to George Wallace or

16   this application or to Enterprise State?

17   A.    I didn't put Pike Manor -- I

18   mean, MacArthur Tech either.  Yes, I

19   did.  MacArthur.  Probably because I

20   didn't receive degrees there.

21   Q.    Who interviewed you for your

22   job -- did you have an interview for your

23   job with Honeywell?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

## FREEDOM COURT REPORTING

Page 77

1    A.   Yes, I did.
2    Q.   Who interviewed you?
3    A.   Jimmy Hodges, Jerry Temple,
4  Roger Singletary.
5    Q.   Had you heard anything about
6  AlliedSignal or Honeywell before you went
7  to work there?
8    A.   Yes.
9    Q.   What did you hear?
10   A.   I heard they were out there
11 at Fort Rucker working as a maintenance
12 contractor.
13   Q.   You hadn't heard anything
14 else about --
15   A.   No.
16   Q.   -- the work atmosphere?
17   A.   No.
18
19 (Whereupon, Defendant's Exhibit No. 15
20 was marked for identification, and same
21 is attached hereto.)
22
23   Q.   Let me show you Exhibit -- I

Page 78

1  think that's No. 15. Do you recall
2  receiving this letter?
3    A.   Okay. You are asking me if I
4  remember this?
5    Q.   Did you receive it?
6    A.   No.
7    Q.   You never got that letter?
8    A.   No.
9    Q.   How did you know to accept
10 the -- the offer?
11   A.   I was called back in and told
12 I had the job.
13   Q.   Did you ever live at 317
14 Alberta Street?
15   A.   Yes.
16   Q.   Do you recall being offered
17 the job at a rate of eleven fifty-nine
18 per hour?
19   A.   Yes.
20   Q.   Were you satisfied with that
21 starting hourly rate?
22   A.   Yes.
23   Q.   Did you think Jimmy Hodges

Page 79

1  was racist?
2    A.   Yes.
3    Q.   Why?
4    A.   When he initially hired me in
5  or interviewed me, his comments to me at
6  the time was, we need our quota.
7    Q.   Did you report that to
8  anyone?
9    A.   At the time, I didn't really
10 know what that meant.
11   Q.   So you don't know if it was
12 meant in a racial sense?
13   A.   At that time, I did not.
14   Q.   Okay.
15   A.   Otherwise, I wouldn't have
16 took the job.
17
18 (Whereupon, Defendant's Exhibit No. 16
19 was marked for identification, and same
20 is attached hereto.)
21
22   Q.   Have you seen that document
23 before?

Page 80

1    A.   I haven't seen the document,
2  no.
3    Q.   Is it a -- are the position
4  characteristics; correct?
5    A.   Yes.
6      MS. REISS:  Let's take a
7  break.
8
9      (Brief recess.)
10
11   Q.   (By Ms. Reiss)  Are you
12 ready, Mr. Young?
13   A.   Yes.
14   Q.   And you understand you are
15 still under oath?
16   A.   Yes, I do.
17     MR. BENNITT:  Yes, ma'am.
18   A.   Yes, ma'am.
19   Q.   It's okay.  You've done
20 pretty good about not saying um-hum or
21 unh-unh.  That's normally -- I wouldn't
22 be able to get through one of these
23 without saying that.  Now, we'll just

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 81

1    refer to you as a range tech. Okay?
2    What was your job as a range tech?
3        A.    My job as a range tech was to
4    go down range. I was -- my last job
5    responsibility was in charge of twenty-
6    seven ranges or so. I had to maintain
7    the vegetation, the automated pop-up
8    targets, repair them as needed, and
9    perform daily maintenances on the units
10   themselves.
11       Q.    And you say you had twenty-
12   seven targets?
13       A.    No.
14       Q.    You said twenty-seven ranges?
15       A.    Correct.
16       Q.    How many are there total out
17   there that Honeywell works on?
18       A.    When I was there, it was
19   approximately twenty-seven ranges.
20       Q.    And you worked on all of
21   them?
22       A.    Pretty much.
23       Q.    Why did they have two other

Page 82

1    range techs if you worked on all the
2    ranges?
3        A.    We all did the same and
4    worked in together. There would be days
5    I would work on the area of gunnery
6    range. There would be days I would work
7    on MRF range. They would come work on
8    the MRF range with me. They would work
9    on the CPQC, the MPMG. The -- the new
10   ranges, we didn't do that much, but I was
11   involved in setting them up and at any
12   point in time if we were needed or needed
13   -- the range was scheduled, we would have
14   to go perform maintenance on it or do
15   whatever was needed.
16       Q.    You weren't assigned to
17   specific ranges?
18       A.    I was assigned small arms
19   ranges. Under that umbrella comes about
20   twenty-four to twenty-seven ranges.
21       Q.    We were talking earlier about
22   Mr. Erickson approached you about a
23   safety job. Remember?

Page 83

1        A.    I recall you making that
2    statement.
3        Q.    Did he approach you about a
4    safety job?
5        A.    He didn't approach me to say,
6    hey, I have a safety. We were in
7    discussion and he says, hey, why don't
8    you apply?
9        Q.    Is that a higher paying job?
10       A.    Yes. At the time, I -- I
11   believe -- I don't -- I don't recall at
12   the time.
13       Q.    But you just said yes and
14   then --
15       A.    Well, because when I left
16   there, they were like one penny ahead of
17   us, maybe.
18       Q.    And are you aware that as of
19   2005 the safety positions were set shifts
20   that did not rotate?
21       A.    No, I wasn't aware of that.
22       Q.    When you first became a range
23   tech, who was your direct supervisor?

Page 84

1        A.    Roger Singletary.
2        Q.    Was Jerry Temple employed
3    there at the time?
4        A.    Yes, he was.
5        Q.    What was your hourly rate at
6    the time you left Honeywell?
7        A.    I believe it was thirteen
8    eighty-one.
9        Q.    And you recall receiving a
10   handbook when you started with Honeywell?
11       A.    Yes.
12       Q.    And did you read the
13   handbook?
14       A.    Yes.
15
16   (Whereupon, Defendant's Exhibit No. 17
17   was marked for identification, and same
18   is attached hereto.)
19
20       Q.    Is this your signature
21   acknowledging your receipt of the
22   handbook at the time you were hired?
23       A.    Yes.

21 (Pages 81 to 84)

# FREEDOM COURT REPORTING

Page 85

1     Q.   Now, Mr. Lavar, was he
2 employed at the time you were hired?
3     A.   Yes.
4     Q.   He was?
5     A.   Yes.
6     Q.   Was Mr. Flowers employed at
7 the time you were hired?
8     A.   No.
9     Q.   He was hired later?
10     A.   Yes.
11     Q.   Do you know who hired him?
12     A.   No, I don't know who hired
13 him.
14
15 (Whereupon, Defendant's Exhibit No. 18
16 was marked for identification, and same
17 is attached hereto.)
18
19     Q.   I'll show you what we're
20 going to mark as Exhibit No. 18, and this
21 is an acknowledgement of receipt of a
22 number of Honeywell policies, and ask you
23 if that's your signature on the bottom of

Page 86

1 that page?
2     A.   Yes.
3     Q.   Do you remember going over
4 this with -- who did you go over this
5 page with, this document, with Mr.
6 Erickson or Mr. Temple?
7     A.   Both.
8     Q.   Did Mr. Temple follow Mr.
9 Singletary being your supervisor?
10     A.   Say that again.
11     Q.   Was Mr. Temple the supervisor
12 you had after Mr. Singletary was no
13 longer your direct supervisor?
14     A.   Yes.
15     Q.   How long was Mr. Temple your
16 supervisor, direct supervisor?
17     A.   Three years.
18     Q.   Did you ever call Honeywell
19 and report his behavior to anyone?
20     A.   Yes.
21     Q.   When was that?
22     A.   I don't recall the exact
23 date.

Page 87

1     Q.   Who did you call?
2     A.   I reported it to Mr. Erickson
3 at one time.
4     Q.   And when was that? Oh, you
5 don't remember; correct?
6     A.   No.
7     Q.   And what did you report to
8 Mr. Erickson about Mr. Temple?
9     A.   The first time that I
10 remember was when Mr. Temple had cussed
11 me for no reason.
12     Q.   And what did you talk to Mr.
13 Erickson about?
14     A.   Stated that he had cussed me
15 for no reason.
16     Q.   And what was Mr. Erickson's
17 response?
18     A.   He told me that maybe he did
19 it because I was late for work.
20     Q.   And was anything else said in
21 that conversation?
22     A.   Pretty much he blamed me.
23     Q.   Any other -- did you make any

Page 88

1 other reports to Mr. Erickson?
2     A.   I can't recall.
3     Q.   Now, looking at this March
4 15, 2006 document that you went over with
5 Mr. Erickson and Mr. Temple, you received
6 a -- a number of policies from Honeywell;
7 correct?
8     A.   Yes.
9     Q.   And Honeywell is under
10 contract with the Army at Fort Rucker; is
11 that right?
12     A.   Yes.
13     Q.   And does the Army renew that
14 contract each year based on Honeywell's
15 performance?
16     A.   I'm not in administration, so
17 I couldn't tell you that.
18     Q.   What is your knowledge based
19 -- being employed there for a number of
20 years?
21     A.   I know that when the contract
22 is awarded, it's awarded five years with
23 a one year option.

22 (Pages 85 to 88)

# FREEDOM COURT REPORTING

Page 89

1     Q.   Do you interface with the
2  Army while you are out there, Army
3  personnel?
4     A.   Yes.
5     Q.   Do you know a gentleman named
6  William Leyh or Bill Leyh?
7     A.   Yes.
8     Q.   And what's his position with
9  the Army?
10    A.   Currently, when I left there,
11 he was division chief.
12    Q.   Of what?
13    A.   Of Fort Rucker -- or, excuse
14 me, of range control.
15    Q.   Was he -- was he at one time
16 an employee of Honeywell?
17    A.   Yes.
18    Q.   What was his position with
19 Honeywell?
20    A.   I couldn't tell you.  He was
21 there and gone after me.
22    Q.   Okay.
23    A.   Or before me.

Page 90

1     Q.   I want to go over some of
2  these policies that were included in that
3  packet that you went over with Mr.
4  Erickson and Mr. Temple.  Exhibit No. 19
5  is the contract vehicle and tool security
6  policy.  Did you drive a truck as an
7  employee of Honeywell?
8
9  (Whereupon, Defendant's Exhibit No. 19
10    was marked for identification, and same
11    is attached hereto.)
12
13    A.   Yes.
14    Q.   And was that truck government
15 property?
16    A.   Once again, I was not in the
17 administration department as far as
18 knowing whether or not that's a
19 government vehicle.  We were treated as a
20 government vehicle, but as ownership of
21 it, I have no knowledge of that.
22    Q.   You don't know if the
23 government owned the -- the truck that

Page 91

1  you drove around?
2     A.   No.  At this time, this truck
3  was a Honeywell truck.
4     Q.   What time?
5     A.   At the time that you are
6  talking about here.  It's a Honeywell
7  truck.  It's not a GSA owned truck.
8     Q.   How did you know your truck
9  was a Honeywell owned truck?
10    A.   It has Honeywell on the side
11 of the door.
12    Q.   And that's the truck you
13 drove for how long?
14    A.   Which truck are you referring
15 to?
16    Q.   That's what I'm asking you.
17 How long did you drive a Honeywell
18 truck?  You said during this time, which
19 would have been February of '06?
20    A.   February of '06, I drove that
21 truck -- it's an '06 truck.  I believe
22 so, '06.
23    Q.   Before that you had some

Page 92

1  government trucks?
2     A.   I have not driven but --
3  wait.  Time out.  I -- I drove a
4  government truck one time and then come
5  to -- the one ton truck was a government
6  truck.  But the time before that was a
7  Honeywell truck.  So the last -- the last
8  truck that I was driving there was a GSA
9  truck.
10    Q.   Was a --
11    A.   That one -- I stand
12 corrected.  That truck, I -- that truck
13 was a government truck.
14    Q.   And under this regulation
15 that you received policy 06-03, this
16 states that:  Contract vehicles -- I mean
17 -- and I take that to mean government
18 trucks; is that correct?
19    A.   It's a wording thing.
20    Q.   Well, you knew -- that's what
21 you understood; is that correct?
22    A.   What are you asking me?
23    Q.   Were contract vehicles

23 (Pages 89 to 92)

# FREEDOM COURT REPORTING

Page 93

1  government trucks?
2      A.   I can't answer that.
3      Q.   Did you ask Mr. Temple what
4  this meant when he went over this policy
5  with you?
6      A.   No, I didn't.
7      Q.   Will be locked and secured at
8  the end of each workday.  You understood
9  that your truck was to be locked and
10  secured at the end of the workday;
11  correct?
12      A.   Yes.
13      Q.   Regardless of the fact if it
14  was a Honeywell or a government truck?
15      A.   Yes.
16      Q.   And that supervisors could
17  perform random checks to make sure this
18  was done; is that correct?
19      A.   Yes.
20      Q.   You don't have a background
21  in the Army, do you?
22      A.   No.
23      Q.   Many of your co-workers do,

Page 94

1  though; is that correct?
2      A.   Probably fifty/fifty.
3      Q.   Mr. Lavar has a background in
4  the Army?
5      A.   Yes.
6      Q.   Mr. Flowers?
7      A.   Yes.
8      Q.   Mr. Erickson?
9      A.   I guess.
10      Q.   You never talked to him about
11  it?
12      A.   It's personal.
13      Q.   Well, you didn't know he was
14  retired Army?
15      A.   Who are you asking about?
16      Q.   Mr. Erickson?
17      A.   Yes.  Well, no.  I -- he's
18  not retired Army.  He's National Guard or
19  something.
20      MR. ERICKSON:  Retired Army
21  Reserves.
22      A.   Reserves.
23      Q.   And it's my understanding

Page 95

1  that -- that Army personnel would also
2  watch over Honeywell employees, make sure
3  they were doing their job, spot-check,
4  things of that nature; is that correct?
5      A.   No.  That's -- that's out of
6  compliance with the policy.
7      Q.   Out of compliance with what
8  policy?
9      A.   Honeywell's policy.
10  Government employees have no -- can't do
11  anything in Honeywell's business.  It's
12  against --
13      Q.   But they can report things
14  they see to Honeywell, could they not?
15      A.   They have to go through the
16  COR, not to Honeywell.
17      Q.   And the COR is what?
18      A.   Contract and officer
19  representative.
20      Q.   And that's an -- an Army
21  employee who is -- who is contracting
22  with Honeywell; correct?
23      A.   I -- yes.

Page 96

1      Q.   But they report things they
2  might see to the COR who then reports it
3  to Honeywell?
4      A.   Yes.
5      Q.   And who was the COR at the
6  time you left Honeywell?
7      A.   I have no idea.
8      Q.   Was his name Jerry Webers?
9      A.   No.
10      Q.   Was there a COR named Jerry
11  Webers?
12      A.   There was a Mr. Webers.  I
13  don't know if it was Jerry.
14      Q.   Okay.
15      A.   But he wasn't the --
16      Q.   Joe Webers, how about Joe
17  Webers?
18      A.   Joe Webers.
19
20  (Whereupon, Defendant's Exhibit No. 20
21  was marked for identification, and same
22  is attached hereto.)
23

24  (Pages 93 to 96)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 97

1    Q.   I'll show you what we're
2  going to mark as Exhibit No. 20, policy
3  06-05 regarding vehicle and equipment
4  maintenance. Have you seen that document
5  before?
6    A.   Yes.
7    Q.   And it's -- on the heading
8  there, it says: To employees affected by
9  contract DABK 31-03-C-0001 --
10    A.   Time out. Time out. Where
11 are you at?
12    Q.   Under the -- by the to line.
13    A.   Okay.
14    Q.   Under date.
15    A.   Okay.
16    Q.   Is that the contract that
17 Honeywell was under with the government?
18    A.   I assume. I --
19    Q.   Okay. And on this -- on this
20 policy, number seven states: The
21 interior and exterior, including the
22 toolboxes, are to be free of garbage at
23 the end of the shift?

Page 98

1    A.   That's correct.
2    Q.   For example, no vehicle will
3  be left by the operator at the end of the
4  shift with drink bottles, candy wrappers
5  or discarded work material in the
6  interior or the exterior of vehicle?
7    A.   That's correct.
8    Q.   Floorboards and cargo areas
9  of vehicles will be free of mud, dirt,
10 and grime at the end of the shift?
11    A.   That's correct.
12    Q.   All discarded trash shall be
13 placed in the proper container?
14    A.   That's correct.
15    Q.   Shift supervisors will
16 inspect and assure that vehicles are
17 cleaned, fueled and stocked for the next
18 day; is that correct?
19    A.   That's correct.
20    Q.   And supervisors and
21 management have responsibility for
22 performing random checks; is that
23 correct?

Page 99

1    A.   That's correct.
2    Q.   Did you comply with this
3  policy?
4    A.   Yes.
5    Q.   Did you comply with the
6  policy that requires you to lock and
7  secure your vehicle at the end of the
8  workday?
9    A.   This one (indicating), no.
10 Lock and secure my vehicle, the vehicle
11 was locked, yes.
12    Q.   So you are saying you
13 complied with that policy?
14    A.   The toolbox was unlocked, if
15 that's what you are asking.
16    Q.   So you didn't comply with
17 that?
18    MR. BENNITT: Just answer the
19 questions. Okay?
20    THE WITNESS: Okay.
21    MR. BENNITT: You know, try
22 not to interpret and guess. Just answer
23 the question.

Page 100

1    A.   Yes.
2    Q.   You complied with both
3  policies?
4    A.   This one right here
5  (indicating), no, I didn't comply.
6    Q.   What's this one, Exhibit No.
7  19?
8    A.   Exhibit No. 19.
9    Q.   And what policy is that one?
10    A.   Policy -- which -- which one
11 do you want, Exhibit No. 19?
12    Q.   Is that locking and securing
13 the vehicle?
14    A.   Yes.
15    Q.   You complied with that?
16    A.   No, I didn't comply with
17 that.
18    Q.   But you complied with Exhibit
19 -- is that No. 20, vehicle and equipment
20 maintenance?
21    A.   Yes.
22    Q.   You were never written up for
23 violating that policy?

25 (Pages 97 to 100)

# FREEDOM COURT REPORTING

Page 101

1    A.  Yes, I was.
2    Q.  So you didn't comply with it?
3    A.  No, I complied.  I was wrote
4    up, but I complied.
5    Q.  Okay.
6    A.  There was another individual
7    that rode with me that was responsible
8    for those.
9        MR. BENNITT:  I didn't hear a
10   question.
11       THE WITNESS:  Yes, sir.
12   Q.  Who was the other individual
13   that rode with you?
14   A.  Lisa Uti.
15   Q.  And what was her position
16   title?
17   A.  Computer operator.
18   Q.  Was she subordinate to you?
19   A.  No.
20   Q.  Why was the computer operator
21   riding with you?
22   A.  Assisting, had no -- had no
23   ranges to operate.

Page 102

1    Q.  So she was assisting you with
2    your work?
3    A.  Yes.
4    Q.  So you basically were her
5    supervisor during the time she assisted
6    you with your work?
7    A.  I was instructed I was not
8    her supervisor.  She had her own
9    supervisor.
10   Q.  You were ultimately
11   responsible for that truck; correct?
12   A.  I ultimately was assigned
13   that truck.
14   Q.  And it was -- and you were
15   ultimately -- that was your truck, you
16   were operator of the truck; correct?
17   A.  I was operator of the truck.
18   Q.  And this policy applies to
19   operators of the trucks; correct?
20   A.  I'm not -- not the operator.
21   Anyone can operate that truck that has a
22   license.
23   Q.  Were you assigned a specific

Page 103

1    truck to do your job duties?
2    A.  Did I sign and was told --
3    Q.  Were you assigned a specific
4    truck to do your job duties?
5    A.  I drove a specific truck
6    every day, yes.
7    Q.  And you were the operator of
8    that truck; correct?
9    A.  That day, yes.
10   Q.  Each day you had that --
11   A.  Each day I used that truck,
12   yes.
13   Q.  And so you were responsible
14   for these policies each day you had that
15   truck?
16   A.  Whoever drove that truck was
17   responsible for that truck at the time.
18   Q.  Were you the operator of --
19   considered the operator of the truck?
20   A.  She was also considered the
21   operator of the truck as well.
22   Q.  She was assisting you;
23   correct?

Page 104

1    A.  But she also drove the truck.
2    Q.  Are you blaming her?
3    A.  I'm not pointing a finger.
4    Q.  I'm just want to make sure.
5    So you are taking responsibility?
6    A.  Responsibility for what?
7    Q.  For violating --
8    A.  I did not violate --
9    Q.  -- the policy?
10   A.  -- the policy.
11   Q.  Were you written up for it?
12   A.  Yes.
13
14   (Whereupon, Defendant's Exhibit No. 22
15   was marked for identification, and same
16   is attached hereto.)
17
18   Q.  Did you receive Exhibit No.
19   -- No. 22, the policy on work schedule,
20   comp time and tardiness?
21   A.  Yes.
22   Q.  And you understood that it
23   would be a -- a late arrival is defined

26 (Pages 101 to 104)

# FREEDOM COURT REPORTING

Page 105

1  as an employee arriving one to thirty
2  minutes after the start of a scheduled
3  shift?
4      A.  Yes.
5      Q.  So if you were one minute
6  late, that was considered a tardy; is
7  that correct?
8      A.  Yes.
9      Q.  You did not fill out time
10  cards when you were at Honeywell;
11  correct?
12      A.  Correct.
13      Q.  Okay.
14      MS. REISS:  So that will
15  answer one of your questions there,
16  Jeff.
17      MR. BENNITT:  Yeah, it
18  does.
19      MS. REISS:  You probably
20  should have checked with your client
21  first, but --
22      MR. BENNITT:  Well, actually,
23  I just wanted to make sure.

Page 106

1  (Whereupon, Defendant's Exhibit No. 23
2  was marked for identification, and same
3  is attached hereto.)
4
5      Q.  And you also received the
6  disciplinary procedure policy; is that
7  right, Mr. Young?
8      A.  Regarding to what?
9      Q.  Policy 06-09.
10      MR. BENNITT:  What number is
11  that, No. 23?
12      A.  No, I don't recall receiving
13  this one.
14      Q.  Well, let's go back to --
15  can you give me the number of the
16  exhibit, what the checklist was?
17      A.  No. 23.
18      Q.  Can you tell me what number
19  that is in your -- over here, please?
20      A.  The one that's in my hand?
21      Q.  No.  The checklist you
22  received that had these policies you went
23  over.

Page 107

1      A.  Oh.
2      Q.  No. 18.  It is marked that
3  you received the disciplinary --
4  disciplinary action policy 06-09 --
5      A.  Okay.  I stand corrected.  I
6  received it.
7      Q.  And did you ever -- did you
8  -- did you ask any questions about this
9  policy?
10      A.  No.  At the time that I
11  received it did I ask any questions,
12  that's what you are asking?
13      Q.  Yes.
14      A.  No.
15      Q.  Did you have any questions
16  about it?
17      A.  No.
18      Q.  You understood you were an
19  at-will employee at Honeywell?
20      A.  Yes.
21      Q.  What does that mean to you?
22      A.  It means they can fire you
23  any time they get ready.

Page 108

1      Q.  How many times were you
2  disciplined while at Honeywell?
3      A.  I don't recall.
4      Q.  How many times -- was it over
5  five?
6      A.  I don't recall.  Policy --
7  the personnel file would tell that you.
8      Q.  Well, this is your deposition
9  and you -- you are suing them, so I would
10  hope you would have some kind of
11  recollection?
12      A.  I don't.
13      Q.  Do you know if it was more
14  than ten times?
15      A.  I don't recall.
16      Q.  Do you recall being written
17  up in 1999 for -- for having an out-of-
18  state tag on your car that was out of
19  date?
20      A.  No, I don't.
21
22
23

27  (Pages 105 to 108)

# FREEDOM COURT REPORTING

Page 109

1  (Whereupon, Defendant's Exhibit No. 24
2  was marked for identification, and same
3  is attached hereto.)
4
5      Q.   Exhibit No. 24, did you
6  receive these general conditions of
7  employment when you were hired with
8  Honeywell?
9      A.   I received this.
10
11     (Off-the-record discussion.)
12
13  (Whereupon, Defendant's Exhibit No. 25
14  was marked for identification, and same
15  is attached hereto.)
16
17     Q.   Let me show you what's
18  Exhibit No. 25, Mr. Young, if you could
19  review that, please?
20     A.   Okay.
21     Q.   Do you recall this incident?
22     A.   I recall the incident.
23     Q.   It says here that Mr. Hodges

Page 110

1  -- who was your project manager; is that
2  correct?
3      A.   That's right.
4      Q.   Observed you arrive at work
5  with a car with expired, out-of-state
6  license plate?
7      A.   That's right.
8      Q.   And that you had previously
9  been warned about driving an uninsured,
10  unlicensed vehicle because it violated
11  Fort Rucker military regulations; is that
12  correct?
13     A.   I don't recall that.
14     Q.   And he asked you for proof of
15  registration and insurance during this
16  occasion, Mr. Hodges did?
17     A.   I don't recall. I believe --
18  I don't recall.
19     Q.   And you acknowledged that the
20  car was unlicensed and uninsured; do you
21  remember that?
22     A.   No.
23     Q.   You remember accusing Mr.

Page 111

1  Hodges of singling you out?
2      A.   No, I don't recall this.
3      Q.   If you were -- did, in fact,
4  drive an uninsured, unlicensed car on the
5  premises, that would be a violation of
6  Fort Rucker policies and Honeywell
7  policies and state law; correct?
8      A.   No.
9      Q.   It wouldn't?
10     A.   No. You are allowed ten days
11  to get your registration once you have
12  purchased.
13     Q.   But if you've been previously
14  warned about this?
15     A.   State law, you have ten days
16  to get your license, insurance and
17  whatnot.
18     Q.   And you are saying you don't
19  remember whether you had been previously
20  warned about this?
21     A.   I don't remember this as far
22  as -- I remember the incident. But as
23  far as being warned and all that, I don't

Page 112

1  remember all that.
2      Q.   Does this memo indicate that
3  Mr. Young -- Mr. Hodges felt threatened
4  by you, that you stood by his door for
5  about five minutes and wouldn't leave?
6      A.   Do what? No. I don't know
7  -- I don't even know where this document
8  came from.
9      Q.   Where do you think it came
10  from?
11     A.   I believe someone conjured it
12  up and stuck it in someone's file or
13  something. I don't --
14     Q.   And what evidence do you have
15  that someone conjured it up?
16     A.   Okay. If this is a -- well,
17  where is my signature at or it's
18  showing --
19     Q.   It's a memo, for the record.
20  It doesn't ask for your signature.
21     A.   Well, then I -- then I don't
22  recollect if it's a memo. That's for
23  their personnel file.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 113

1  **Q. Right. So how -- what**
2  **evidence do you have --**
3      A. How would I know anything
4  about this?
5      **Q. -- that someone conjured it**
6  **up?**
7          MR. BENNITT: Let her finish
8  the question.
9          THE WITNESS: Okay.
10     A. Because I don't recall this
11  and you -- you are telling me that it's
12  happened and somebody got it in here.
13     **Q. Actually, you just testified**
14  **that you do recall the incident?**
15     A. The incident. But as far as
16  the statement that you made -- what was
17  it? Being warned about this previously,
18  I -- I don't recall that.
19     **Q. I'm asking you for the third**
20  **time: What evidence do you have that**
21  **someone conjured this up other than the**
22  **fact that you've never seen the document**
23  **before? And conjured is your word.**

Page 114

1      A. Because I've never seen this
2  document before.
3      **Q. So just because you've never**
4  **seen a document before it must be false**
5  **or fake?**
6      A. Well, I didn't -- like I
7  said, I don't recall it. All I recall is
8  the incident, but as far as the other
9  stuff here, I don't recall it.
10     **Q. Is that your statement?**
11  **Just --**
12     A. That's my statement.
13     **Q. You've never seen the**
14  **document before, it must be false or**
15  **fake?**
16     A. I've never seen the document
17  is what I'm stating.
18     **Q. And does that mean it's false**
19  **or fake?**
20     A. I'm not to say that. I'm
21  saying --
22     **Q. All right. Good.**
23     A. -- I've never seen the

Page 115

1  document.
2          MR. BENNITT: Is that a
3  question?
4          MS. REISS: I just want to be
5  clear here that we don't start casting
6  aspersions about things we have
7  absolutely no basis for.
8          MR. BENNITT: Well, okay.
9      **Q. Do you recall being given a**
10  **memo about the fact that you didn't keep**
11  **-- had a flat tire for your spare tire in**
12  **the bed of your truck?**
13     A. No.
14
15  (Whereupon, Defendant's Exhibit No. 26
16  was marked for identification, and same
17  is attached hereto.)
18
19     **Q. I'll show you Exhibit No.**
20  **26. It's a memo written to you, Mr.**
21  **Temple and to Mr. Little.**
22     A. That's right.
23     **Q. Tell me when you've had a**

Page 116

1  chance to read it, please?
2      A. I know what this is.
3      **Q. You do recall this?**
4      A. This was just a general memo
5  for my section. Pat Little had the tire
6  that wasn't in his truck, not my truck.
7      **Q. Why is the memo written to**
8  **you?**
9      A. It's not.
10     **Q. It has to Jerry Temple, Pat**
11  **Little and Curley Young?**
12     A. The section. It's to the
13  section. It's not to me.
14     **Q. What section is that?**
15     A. Range tech.
16         MR. BENNITT: What number is
17  that?
18         THE WITNESS: No. 26.
19     **Q. Would this be in a truck you**
20  **had access to?**
21     A. No.
22     **Q. Why do you -- so you are just**
23  **-- you are just included in this memo**

29 (Pages 113 to 116)

# FREEDOM COURT REPORTING

Page 117

1  because you are in this section?
2      A.   It was a memo for the
3  section, all section personnel, that in
4  the event that this occurred again that
5  the tires needed to be fixed at the
6  appropriate time.  It was -- we all had
7  separate trucks at the time.  Temple had
8  a truck.  Pat Little had a truck.  Curley
9  Young had a truck.  This was Pat Little's
10  truck.
11     Q.   What was your truck at the
12  time?
13     A.   I -- I don't recall which --
14  oh, there it is, 05 truck.  I had it --
15  my truck was 06.  There it is right
16  there.  In the bed of 99-05.  That will
17  tell you whose truck it was.  I had 06.
18  99-06 was my truck, or 07.  05 is Pat --
19  no.  That's -- as a matter of fact,
20  that's the admin's truck, if I'm not --
21  Mr. Lavar, is that not admin's --
22     Q.   He's not here to answer your
23  questions.  He's not here to answer your

Page 118

1  questions.
2      A.   Well, Ken can't answer it.
3          MR. BENNITT:  No.  No.  No.
4  No.  Here's the -- here's the way it
5  works.  She asks the question and you
6  answer it.  Okay, sir?
7      Q.   Mr. Young, my understanding
8  is that '99 is the year of the truck, not
9  '05.  This memo was written in March of
10  2000.  What was your truck at the time
11  this memo was written?
12     A.   99-05 is not my truck.
13     Q.   What was your truck?
14     A.   If I'm not mistaken, 99 '07
15  was my truck.  These were the Ford
16  F-150's.
17
18  (Whereupon, Defendant's Exhibit No. 27
19  was marked for identification, and same
20  is attached hereto.)
21
22     Q.   I'll show you what we are
23  going to mark as Exhibit No. 27 and ask

Page 119

1  you if you recall receiving this
2  certificate?
3      A.   Yes.
4      Q.   Did you go to a diversity
5  awareness training put on by Honeywell?
6      A.   Yes.
7      Q.   And how long did that
8  training last?
9      A.   I don't recall.
10     Q.   And what was it about?
11     A.   Diversity awareness.
12     Q.   What does that mean?
13     A.   Just as it says.
14     Q.   Would you explain a little
15  further to me, Mr. Young, or is that all
16  you can recall about it?
17     A.   That's all I can recall.
18     Q.   Do you remember who gave the
19  training?
20     A.   Frank Shap, I believe.
21     Q.   And who is that?
22     A.   At the time, I believe he was
23  the program manager of the contract at

Page 120

1  the time.
2      Q.   Now, the Honeywell site --
3  the entire time you worked for Honeywell,
4  you worked on Fort Rucker property;
5  correct?
6      A.   That's correct.
7      Q.   And you were evaluated from
8  time to time; is that right?
9      A.   Every year.
10
11  (Whereupon, Defendant's Exhibit No. 28
12  was marked for identification, and same
13  is attached hereto.)
14
15     Q.   Let me show you Exhibit No.
16  28 and show you your -- I believe this is
17  your 2000 evaluation?
18     A.   Yes.
19     Q.   Is that your signature at the
20  bottom?
21     A.   Yes.
22     Q.   And this was an evaluation
23  performed by James Hodges?

30 (Pages 117 to 120)

## FREEDOM COURT REPORTING

Page 121

1    A.   Yes.
2    Q.   Or y'all call him Jimmy
3  Hodges?
4    A.   Yes.
5    Q.   And he noted that you needed
6  development in three areas; is that
7  correct?
8    A.   Yes.
9    Q.   Business acumen, developing
10  people, and technical skills; is that
11  right?
12    A.   Yes.
13    Q.   And under developmental
14  needs, he said you need a better
15  understanding of the direct needs of the
16  contract.  What contract is he referring
17  to there?
18    A.   Honeywell's contract.
19    Q.   Develop an understanding of
20  program goals and objectives, achieve a
21  better understanding of HTSI policies.
22  Do you recall what that was about?
23    A.   No, I don't.

Page 122

1    Q.   What does HTSI stand for?
2    A.   Honeywell Technology
3  Solutions, Incorporated.
4    Q.   And then communicate more
5  effectively with supervisors and other
6  management personnel.  What was he
7  talking about there?
8    A.   I don't recall.
9    Q.   And he suggested that you
10  enroll in college; is that right?
11    A.   I -- that's what it says
12  here.
13    Q.   Did you ever enroll in
14  college?
15    A.   I took online courses.
16    Q.   What courses -- oh, you
17  didn't mention that to me in your post-
18  high school education.  What online
19  courses did you take?
20    A.   Computers.
21    Q.   What university were you
22  online with?
23    A.   I -- I don't recall.

Page 123

1    Q.   You don't recall the
2  university you were online with?
3    A.   It was one that Honeywell --
4  it was one that Honeywell set up for us.
5  I think it was --
6    Q.   You don't remember the name?
7    A.   Brown maybe or --
8    Q.   How long -- how many courses
9  did you take online?
10    A.   I don't recall.
11    Q.   How long did you take courses
12  online?
13    A.   Probably three months.
14    Q.   Did you have any
15  disagreements with this evaluation?
16    A.   No.
17
18  (Whereupon, Defendant's Exhibit No. 29
19  was marked for identification, and same
20  is attached hereto.)
21
22    Q.   Let me show you what we are
23  going to mark as Exhibit No. 29.  Now,

Page 124

1  you told me Joe Webers was the COR;
2  correct?
3    A.   At one time, he was.
4    Q.   And who is Ron -- who was --
5  do you know a man named Ron Matthews?
6    A.   Yes.
7    Q.   And what's his position?
8    A.   I don't know what it is at
9  this point.  At the time that -- he
10  wasn't affiliated with the contract when
11  I left.
12    Q.   In 2000, what did you know
13  Ron -- what was Ron Matthews?
14    A.   Range division chief.
15    Q.   With Fort Rucker?  He was
16  employed with the Army?
17    A.   I -- he's civil service, I
18  believe.
19    Q.   And Mr. Leyh in 2000, what
20  was his position?
21    A.   He was QA, quality assurance,
22  I believe.
23    Q.   With Honeywell or with the

31 (Pages 121 to 124)

# FREEDOM COURT REPORTING

Page 125

1  Army?
2      A.  In what year?
3      Q.  In 2000?
4      A.  Honey -- or government.
5      Q.  I'm going to show you a
6  series of e-mails between Mr. Hodges, Mr.
7  Webers, Mr. Leyh regarding an incident
8  involving you.  Do you recall in 2000
9  sitting in your truck and Mr. Leyh
10 approached you with Mr. Murphy?
11     A.  Yes.
12     Q.  Who is Mr. Murphy?
13     A.  He was an employee of
14 Honeywell's.
15     Q.  What was his job?
16     A.  He was the deputy program
17 manager.
18     Q.  And they were -- it states --
19 it appears that they were -- Mr. Leyh
20 wrote this memo to Mr. Matthews and
21 states that:  On the 28th of September at
22 around 9:30 while they were conducting a
23 quality assurance inspection, he observed

Page 126

1  you asleep in your vehicle.  Do you
2  recall this?
3      A.  I recall the incident.
4      Q.  And that your head was tilted
5  back against the headrest of the car and
6  that you jerked your head as if you were
7  awakened.  Do you remember that?
8      A.  I don't recall this document
9  here.
10     Q.  No, but do you recall this
11 incident?
12     A.  I don't recall it as he --
13 you're stating it.
14     Q.  Are you saying you weren't
15 asleep?
16     A.  That's right.
17     Q.  But you were fired from
18 Humana for sleeping on the job?
19     A.  And what does that have to do
20 with this?
21     Q.  Were you fired from Humana --
22     MR. BENNITT:  Just answer the
23 question.

Page 127

1      Q.  -- for sleeping on the job?
2      A.  Yes.
3      Q.  What does it have to do with
4  it?  And you were also written up by
5  Enterprise Nursing Home for sleeping on
6  the job; correct?
7      A.  That's right.
8          MR. BENNITT:  Just answer the
9  questions.  Go ahead.  I'm sorry.  I
10 didn't mean to interrupt.  What number
11 was this, by the way?
12         THE WITNESS:  No. 29.
13     Q.  Do you remember Mr. Leyh
14 saying that unless your paperwork was on
15 the ceiling of your cab he couldn't see
16 how you were reviewing paperwork?
17     A.  Yes, I recall that.
18     Q.  And what did you say to him?
19 What did you say in response?
20     A.  I don't recall.
21     Q.  So the Army does go along
22 with Honeywell to check up on employees,
23 see how things are going; is that

Page 128

1  correct?
2      A.  Incorrect.
3      Q.  So what was Mr. Leyh doing
4  with Mr. -- with Mr. Murphy?
5      A.  He was doing an inspection.
6      Q.  What's wrong with what I just
7  said?  What is the difference between
8  that?
9      A.  He wasn't there to inspect on
10 me.  He was there to inspect on the
11 equipment.
12     Q.  Did you ask him why he was
13 there inspecting?
14     A.  That's not my job.
15     Q.  So you are not sure what he
16 was doing there?
17     A.  Yes, I am.
18     Q.  Do you know if Mr. Erickson
19 and Mr. Leyh have performed quality
20 control inspections before --
21     A.  Yes.
22     Q.  -- together?
23     A.  Yes.

32 (Pages 125 to 128)

# FREEDOM COURT REPORTING

Page 129

1    Q.   Do you know if they were just
2  looking at equipment?
3    A.   They were looking at -- they
4  were inspecting the -- the general
5  grounds.
6    Q.   Do you know if they were also
7  looking to see if the employees were
8  doing what they were supposed to be
9  doing?
10   A.   No, I don't know that.
11   Q.   You were later called by Mr.
12  Hodges to report to his office after this
13  incident?
14   A.   That's correct.
15   Q.   And before you got to Mr.
16  Hodges' office, you ran into Mr. Murphy
17  and Mr. Leyh?
18   A.   That's correct.
19   Q.   And you asked them if you
20  were being called into Mr. Hodges' office
21  because of the accusations that were
22  being made against you about sleeping; is
23  that correct?

Page 130

1    A.   Incorrect.
2    Q.   What did you -- what's
3  incorrect about that?
4    A.   I was at Juliette seven, I
5  believe, lifter, and Mr. Leyh and Mr.
6  Murphy was at that same lifter I was, and
7  at the time I received a call, I asked
8  Mr. Murphy if that was in reference to
9  the incident that occurred ten minutes
10  earlier.
11   Q.   And he said it was --
12   A.   Yes.
13   Q.   -- with regard to that?  And
14  then what did you say next?
15   A.   I believe I said I'm -- I
16  don't recall exactly what I said.
17   Q.   Well, this memo says that you
18  said: Y'all have been after me for the
19  last year.  Do you recall saying that?
20   A.   Yes, I said that.
21   Q.   And who is y'all there, Mr.
22  Murphy and Mr. Leyh?
23   A.   Honeywell.

Page 131

1    Q.   Mr. Leyh is not with
2  Honeywell; correct?
3    A.   No.
4    Q.   And Mr. Murphy -- okay.  The
5  e-mail reads: Mr. Murphy informed Mr.
6  Young that he had not yet briefed Mr.
7  Hodges on the incident.  Before Mr.
8  Murphy could finish this sentence, Mr.
9  Young replied by saying:  I don't know
10  how you could know my eyes were closed
11  when I was wearing glasses.  Since Mr.
12  Young's comments appeared to be directed
13  at Mr. Murphy, as well as myself, I
14  informed Mr. Young I had made no such
15  statement.  Mr. Young continued to talk
16  as he entered his vehicle and departed
17  the HO5L location.  From my perspective,
18  Mr. Young chose to confront Mr. Murphy
19  and I in an inappropriate environment and
20  distributed -- displayed behavior that
21  was aggressive, belligerent and
22  confrontational in nature.  I did not
23  appreciate Mr. Young inferring I had been

Page 132

1  after him for the last year since this is
2  the first time -- first instance that I
3  have directly observed during an
4  inspection involving Mr. Young.  So Mr.
5  Leyh believed that your remark was
6  directed at him?
7    A.   My conversation with Mr. --
8  was with Mr. Murphy.
9    Q.   Mr. Leyh was standing right
10  there?
11   A.   He was in the -- probably
12  fifteen feet away.
13   Q.   And so he wrote a e-mail
14  memorializing this to Mr. Matthews, who
15  is an employee of Honeywell; correct?
16   A.   Incorrect.
17   Q.   Mr. Matthews is an employee
18  of the Army?
19   A.   Yes.
20   Q.   And then Mr. Matthews wrote
21  -- sent that -- forwarded that e-mail to
22  Joe Webers; is that correct?
23   A.   I -- I -- whatever direction

33 (Pages 129 to 132)

# FREEDOM COURT REPORTING

Page 133

1  it went.
2  Q.   Does that -- is that what it
3  says on the -- on this document?
4  A.   Where are you at on it?  I
5  wasn't following it.
6  Q.   Well, it appears that Mr.
7  Matthews sent this to Joe Webers stating:
8  Need you to get this to Jimmy at your
9  earliest.  Am sure he will evaluate the
10  merits and then initiate appropriate
11  measures, if needed.  However, sleeping
12  or not, we don't need an associate giving
13  the appearance of grinding an internal
14  axe in our presence.
15  A.   Um-hum (positive response).
16  Where was this -- where are you at?
17  Q.   Front page, Mr. Young.  Now,
18  these are all Army personnel, correct,
19  that have written this so far?
20  A.   Okay.
21  Q.   So is the Army after you
22  also?
23  A.   Well, yes.

Page 134

1  Q.   Okay.  So --
2  A.   According --
3  Q.   -- the Army is after you and
4  Honeywell is after you?
5  A.   I -- I -- I -- I mean, it is
6  what it is.  You tell me.
7  Q.   No.  I'm asking you?
8  A.   I don't know.  I don't know.
9  Q.   Well, I believe you just said
10  yes.  Why would the Army be after you?
11  A.   I don't know.  I --
12  Q.   Are you saying the Army is
13  racist also?
14  A.   No, I didn't say that.  I
15  didn't say that.
16  Q.   Okay.
17  A.   I -- I --
18  Q.   So this was forwarded from
19  Mr. Webers to Mr. Hodges; correct?
20  A.   Yes.
21  Q.   And it says:  Forwarded for
22  your information and action as
23  appropriate.  Request you advise us of

Page 135

1  your findings and final disposition.
2  Were you aware that the Army wanted you
3  out of Honeywell?
4  A.   Was I aware of it?
5  Q.   Yes.
6  A.   I had suspicions.
7  Q.   But Mr. Hodges never
8  terminated you, did he?
9  A.   Mr. Hodges didn't terminate
10  me.  No, he didn't.  Mr. Erickson did.
11  Q.   But you were aware that the
12  Army was pressuring Mr. Hodges to
13  terminate you; correct?
14  A.   I see it now.
15  Q.   And so -- but you are you
16  still maintaining that Mr. Hodges was
17  somehow racist?
18  A.   Yes.
19  Q.   And what do you base that on?
20  A.   I stated it at the beginning
21  of my interview.
22  Q.   But then you said you didn't
23  understand the context.  Any other -- any

Page 136

1  other evidence?
2  A.   No.  That's what I -- that's
3  the reason.
4  Q.   Are you maintaining that the
5  Army was racist towards you?
6  A.   I'm maintaining what I see
7  here is that they pressured and used
8  tactics to try to get me out of Honeywell
9  when it's against government policy,
10  so --
11  Q.   What's against government
12  policy?
13  A.   For government to interfere
14  with contractor's business.
15  Q.   The government has every
16  right to --
17  A.   No, they don't.
18  Q.   -- report wrongdoing, do they
19  not?
20  A.   No, they don't.
21  Q.   Cite me to any document that
22  says they don't have a right to report to
23  Honeywell your performance on their

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 137

1 property?
2     A.   I don't work for them; I work
3 for Honeywell.
4     Q.   So cite to me where they
5 cannot report your performance to
6 Honeywell?
7     A.   I can't cite that.
8     Q.   Okay.
9     A.   But they will answer to that.
10        MR. BENNITT:  Wait a minute
11 now.  You -- you've got to wait for a
12 question.
13        THE WITNESS:  Okay.
14        MR. BENNITT:  If there's not
15 a question on the floor, you don't give
16 an answer.  You don't talk.  Do you need
17 to go take a break?
18        THE WITNESS:  Yes.
19
20        (Lunch recess.)
21
22     Q.   (By Ms. Reiss)  Mr. Young,
23 are you ready?

Page 138

1     A.   I'm ready.
2     Q.   You understand that if -- you
3 are under penalty of perjury in this
4 testimony; correct?
5     A.   That's correct.
6     Q.   We were back on the sleeping
7 incident.  I want to show you a memo that
8 Mr. Hodges wrote to you and ask you about
9 this.  It's Exhibit No. 30.  Have you
10 seen this memo before?
11
12 (Whereupon, Defendant's Exhibit No. 30
13  was marked for identification, and same
14  is attached hereto.)
15
16     A.   Yes, I have.
17     Q.   Now, he reminds you that if
18 you are found sleeping on the job that it
19 means immediate discharge from Honeywell;
20 correct?
21     A.   That's correct.
22     Q.   And that he -- he suggests
23 that you not engage in any conversations

Page 139

1 with Honeywell employees in the presence
2 of customer personnel?
3     A.   That's correct.
4     Q.   So the government is
5 Honeywell's customer in this instance;
6 right?
7     A.   That's correct.
8     Q.   He didn't actually write you
9 up for this, did he?
10     A.   No, he did not.
11
12 (Whereupon, Defendant's Exhibit No. 31
13  was marked for identification, and same
14  is attached hereto.)
15
16     Q.   I'll show you what we're
17 going to mark as Exhibit No. 31.  This is
18 also the year 2000.  Do you recall
19 getting this memo?
20     A.   Yes, I recall this.
21     Q.   Did you have any disagreement
22 with this memo?
23     A.   This memo?  That's what it

Page 140

1 was was a memo.
2     Q.   Yeah.  Did you disagree with
3 it at all?
4     A.   Yes.
5     Q.   Did you call Lisa Evans, the
6 HR generalist, about it?
7     A.   I don't recall that one.
8     Q.   What do you disagree with
9 about the memo?
10     A.   I -- I wasn't counseled on
11 this as far as a right -- the incident
12 occurred, but it wasn't a write-up.
13     Q.   I asked you what you
14 disagreed with about the memo?
15     A.   I don't disagree with the
16 memo.
17     Q.   And Mr. Hodges explains here
18 that not following lockout/tagout
19 procedures can be considered
20 insubordination; correct?
21     A.   That's what it states.
22     Q.   Okay.
23     A.   Can be.

35 (Pages 137 to 140)

# FREEDOM COURT REPORTING

Page 141

1    Q.   Well, actually, I believe I
2  was a little more liberal.  It says is
3  considered insubordination, isn't that
4  what the document says?
5    A.   Yes.
6    Q.   Now, do you recall when you
7  backed your truck into a trailer?
8    A.   No.
9    Q.   You don't remember?
10   A.   I didn't back the truck into
11 the trailer.  It jackknifed.
12   Q.   Did your truck hit a trailer?
13   A.   There was damage to my truck,
14 yes.
15
16 (Whereupon, Defendant's Exhibit No. 32
17  was marked for identification, and same
18  is attached hereto.)
19
20   Q.   Did you write the statement
21 at the bottom where it says:  Give a
22 complete description of the incident.
23 Did you write that description?

Page 142

1    A.   Yes, I wrote that.
2    Q.   And you wrote:  I was
3  instructed to go to the golf mover to
4  check the electrical status of the
5  mover.  After finding the status, I began
6  to give my report to my crew chief over
7  the two-way radio while backing up my
8  truck.  I failed to notice the small
9  trailer with the gen -- the --
10      MR. BENNITT:  Generator.
11      MS. REISS:  Generstoe it
12 looks like.
13      MR. BENNITT:  Oh, sorry.
14      MS. REISS:  Or generator.
15 You are right.
16   Q.   Attached to my truck.  The
17 trailer jackknifed into the right rear of
18 the quarter-panel, causing a large dent
19 and breaking the taillight out of the
20 truck.  I then stopped the truck.  So
21 your carelessness, you hit -- you hit
22 something with your truck?
23   A.   Yes.

Page 143

1    Q.   Is that not what I originally
2  asked you?
3    A.   I don't --
4    Q.   Was this a -- could this --
5  would this have been a terminable
6  offense?
7    A.   No.
8    Q.   Why do you say it would not
9  have been a terminable offense?
10   A.   I was not told that if I had
11 an accident that I would be terminated,
12 if that's what you are asking.
13   Q.   But you are basically
14 admitting that this was due to your
15 carelessness; correct?
16   A.   It was an accident.
17   Q.   Due to your carelessness;
18 correct?  You -- you weren't looking to
19 see what was behind your truck?
20   A.   It was an accident.
21   Q.   Was it due to --
22   A.   I can't say if it --
23   Q.   -- your carelessness?

Page 144

1    A.   I'm not saying it was due to
2  my carelessness.
3    Q.   You say:  I failed to notice
4  the small trailer.  Those are your words;
5  correct?
6    A.   That's right.
7    Q.   You were not terminated for
8  this; correct?
9    A.   That's correct.
10   Q.   Have you ever seen the
11 statement by Mr. Lavar regarding this
12 incident?
13   A.   No.  Okay.
14
15 (Whereupon, Defendant's Exhibit No. 33
16  was marked for identification, and same
17  is attached hereto.)
18
19   Q.   Okay.  It was Mr. Lavar's
20 impression that the incident could have
21 been avoided; is that correct?
22   A.   I -- he didn't discuss it
23 with me.

36 (Pages 141 to 144)

## FREEDOM COURT REPORTING

Page 145

1      Q.   Does it state that on the
2  document?
3      A.   The statement is what it is.
4      Q.   Was it Mr. Lavar's impression
5  that the accident could have been
6  avoided?
7      A.   He states that it could have
8  been avoided.
9      Q.   Now, do you believe that Mr.
10  Lavar is out -- Lavar is you to get you
11  also?
12      A.   I never stated that.
13      Q.   Even though he -- he -- he
14  believes you could have avoided this
15  accident, you don't think he's out to get
16  you?
17      A.   I think I've answered that.
18      MR. BENNITT:  Just answer the
19  question.
20      THE WITNESS:  I did.
21      Q.   Okay.  As the operator of a
22  -- of the vehicle you are assigned, you
23  do the preventive maintenance check on it

Page 146

1  each day?
2      A.   That's right.
3      Q.   So your -- okay.  What's a
4  preventive maintenance check?  Tell me
5  what that is.
6      A.   It's a checklist of the truck
7  prior to pre-op, pre -- pre-operation.
8      Q.   Do you do it at the end of
9  the day also?
10      A.   No.
11      Q.   Are you supposed to have
12  those -- what are those forms called?
13      A.   PMCS sheets.
14      Q.   PMCS sheets?
15      A.   Um-hum (positive response).
16      Q.   Okay.  And you are supposed
17  to have those forms in your possession at
18  all times?
19      A.   No, not in my possession at
20  all times.
21      Q.   When you are in the truck?
22      A.   Well, if you are going to
23  operate a piece of equipment, before you

Page 147

1  operate it, you should have a PMCS sheet.
2      Q.   And your testimony is that
3  you don't have to perform -- you don't
4  have to fill out a PMCS sheet after -- at
5  the end of the day?
6      A.   We haven't filled them out.
7  Whether we are supposed to or not, I --
8  we don't fill them out.  What we fill out
9  at the end of the day on my truck is
10  mileage and at the end of that day we
11  turn the sheet in.
12
13  (Whereupon, Defendant's Exhibit No. 34
14  was marked for identification, and same
15  is attached hereto.)
16
17      Q.   Let me show you what I'm
18  going to mark as Exhibit No. 34 and ask
19  if you -- is this the original handbook
20  you received where you signed that
21  acknowledgement?
22      A.   Yes, this is the -- the
23  original.

Page 148

1      Q.   Okay.
2      A.   I'm not going to say this is
3  the original, no.  This isn't the one I
4  signed when I -- I'm really not sure
5  because that was eight years ago.  It
6  could be.
7      Q.   Is there anything in here
8  that makes you think it wasn't the one
9  you received?
10      A.   It was a long time ago.  It
11  was eight years ago.  I can't -- I don't
12  recall.
13      Q.   Now, the cost of the
14  accident, did that money come out of the
15  contract?
16      A.   I have no idea.
17      Q.   You don't have any idea where
18  the money came from to pay for that, but
19  in your complaint your -- you assert that
20  Honey -- that money came out of
21  Honeywell's contract due to a hey
22  incident; is that correct?
23      A.   Due to a what?

37 (Pages 145 to 148)

# FREEDOM COURT REPORTING

Page 149

1    Q.   An -- let me see.  I'm
2  looking at --
3        MR. BENNITT:  I've got it.
4  I'll get it for him.  I'll show it to
5  him.
6        MS. REISS:  Okay.  Page
7  four.
8        MR. BENNITT:  Start with
9  prior.
10        THE WITNESS:  Right here?
11        MR. BENNITT:  Yeah.
12    Q.   Yes.  Prior to this March
13  3rd, 2005 paragraph.  You state that
14  several white employees were involved in
15  improper accountability of hey which
16  resulted in the government fined them
17  monies lost from the fee awards.  That's
18  how I'm reading it.
19    A.   Yes.  Yes.  Yes.
20    Q.   How do you know that the
21  government fined Honeywell for that?
22    A.   Because they document when
23  there's award fee deductions on the

Page 150

1  evaluation, and we had to do a -- what's
2  it called?  We had to do an evaluation to
3  correct the issue is the reason why we
4  really know.
5    Q.   But how do you know that the
6  government fined Honeywell money for
7  this?
8    A.   Mr. Erickson told us that it
9  was that way.
10    Q.   When was that?
11    A.   During a meeting.
12    Q.   Did he say it could result in
13  a fine or that Honeywell was fined?
14    A.   Honeywell was fined, and it
15  is documented that he gives out -- they
16  give out evaluation sheets.
17    Q.   Have you seen where it's
18  documented?
19    A.   Yes, I've seen it before.
20    Q.   On what kind of sheet?
21    A.   It was -- Mr. Temple had
22  showed it to me.
23    Q.   Did the sheet have a number

Page 151

1  or --
2    A.   I don't recall.
3    Q.   Because, in fact, Honeywell
4  was not fined for this incident?
5        MR. BENNITT:  You've got to
6  let her finish her question.  Okay?
7  Sorry.
8    Q.   You weren't terminated when
9  you caused damage to a truck, were you?
10    A.   No, I wasn't.
11    Q.   So why are you upset that
12  none of these white men were terminated
13  when there was improper accountability
14  for hey?
15    A.   I was terminated for
16  inaccountability of two mannequins that
17  were supposedly unaccounted for.
18    Q.   Are you sure that's why you
19  were terminated?
20    A.   That's what I was told.
21    Q.   Who told you that?
22    A.   Mr. Garrison or -- yeah,
23  Garrett, Jim Garrett.

Page 152

1    Q.   Are the gunnery ranges
2  dangerous places to work?
3    A.   Anywhere is dangerous to work
4  if you are not alert.
5        MR. BENNITT:  No.  No.  No.
6  Just answer the question.
7        MS. REISS:  Okay.  That's --
8  no.  That's perfect.  He answered.
9        MR. BENNITT:  Okay.
10        MS. REISS:  That's great.
11        MR. BENNITT:  I'm sorry.  I
12  didn't mean to interrupt.
13    Q.   So if you are asleep on a
14  gunnery range, that's pretty dangerous?
15    A.   If the range is hot and you
16  are down range and they are shooting upon
17  you, yes, it is.
18    Q.   Well, if you are asleep and
19  then the range goes hot, that could also
20  be dangerous; correct?
21    A.   If you are.
22    Q.   Are you aware if Mr. Lavar
23  thought you should have been terminated

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 153

1 for the -- the truck accident?
2     A. No.
3     Q. You are not aware?
4     A. No, I am not.
5
6 (Whereupon, Defendant's Exhibit No. 35
7 was marked for identification, and same
8 is attached hereto.)
9
10     Q. I will show you your
11 evaluation, Exhibit No. 35, for the year
12 2003. When did Mr. Erickson become the
13 project manager; do you recall?
14     A. No, I don't.
15     Q. Did he follow Mr. Hodges?
16     A. No, he did not.
17     Q. Who was between Mr. Hodges?
18     A. Roger Singletary.
19     Q. Was Mr. Singletary asked to
20 leave?
21     A. I don't know the stipulations
22 of his -- his exit.
23

Page 154

1 (Off-the-record discussion.)
2
3     Q. Tell me when you've had a
4 chance to review the document.
5     A. I reviewed it.
6     Q. Did you agree with this
7 evaluation?
8     A. Yes.
9     Q. And Mr. Erickson encouraged
10 you to develop your electrician skills;
11 is that correct?
12     A. Encouraged?
13     Q. He said it was a
14 developmental need?
15     A. That's what he stated.
16     Q. And he also thought it was a
17 developmental need for you to strengthen
18 knowledge in the computers and in
19 communication skills?
20     A. Correct.
21     Q. Did y'all discuss your need
22 to develop your communication skills?
23     A. No.

Page 155

1     Q. Were you close friends with
2 anyone you worked with, Mr. Young?
3     A. Yes.
4     Q. Who?
5     A. At the time, I was -- Calvin,
6 the ground section, Jimmy Hines. Let's
7 see. Who else is still out there?
8     Q. Or anyone, even if they are
9 there or not there. I just want to know
10 anyone you were close to at the site?
11     A. Chris, I was -- we -- we
12 talked. I mean, I'm not -- I don't know
13 what you would classify as close. As --
14 as far as co-workers --
15     Q. Okay.
16     A. -- I spoke with all of them.
17     Q. And you are talking about
18 Chris Hines?
19     A. I -- I spoke with him. I
20 mean, I wasn't close, but I -- I -- I
21 talked to him.
22     Q. Were -- well, I thought you
23 just said he was a friend of yours?

Page 156

1     A. No, not friend. He was a
2 co-worker of mine.
3     Q. Were there any co-workers of
4 yours that you would consider friends?
5     A. I would consider Calvin my
6 friend. I would consider the -- I forgot
7 his name, he was a short stay.
8     Q. Did you review your complaint
9 before it was filed?
10     A. Yes.
11     Q. How do you know that Jerry
12 Temple was involved in the decision to
13 terminate you?
14     A. He was my supervisor.
15     Q. So that's all you are basing
16 that on?
17     A. He was my supervisor and he's
18 -- he wanted me out of there.
19     Q. Did he ever tell you he
20 wanted you out of there?
21     A. Yes, he did.
22     Q. When did he say that?
23     A. He and I were having a

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 157

1  discussion one day and he said that he
2  was going to get me terminated.
3      Q.   What was the discussion?
4      A.   It was in regards to someone
5  stating -- ground section stating that I
6  wasn't doing my work and I said, if I'm
7  not doing my work then someone needs to
8  tell me.  If -- if that's the case, then
9  you need to terminate me.  He says, okay,
10  I'll have you terminated.
11      Q.   Were y'all in the heat of --
12  y'all were not just discussing, y'all
13  were arguing with each other; correct?
14      A.   I was in a discussion with
15  him.
16      Q.   Were you not arguing with Mr.
17  Temple?
18      A.   No, it -- it wasn't an
19  argument.  It was a statement he had
20  made.
21      Q.   Is that the same day that you
22  were out -- out in the range yelling at
23  some of the grounds crew?

Page 158

1      A.   I wasn't yelling at the
2  grounds crew.
3      Q.   Didn't you stop work for
4  about thirty minutes on your tirade?
5      A.   On my what?
6      Q.   Your tirade to the grounds
7  crew?
8      A.   What's a tirade?
9      Q.   Screaming and yelling?
10      A.   Oh, no.  I stopped -- I
11  stopped Pat Little and asked him a
12  question and he proceeded to explain to
13  me what he had made -- what statement he
14  had made, Pat Little did.  So Pat may
15  have stopped us for about fifteen
16  minutes.
17      Q.   So you are now blaming Mr.
18  Little for the --
19      A.   No, I'm not blaming him.  I'm
20  telling you what happened.
21      Q.   Do you know if Mr. Temple
22  even has the power to hire or terminate
23  employees?

Page 159

1      A.   Do I know?
2      Q.   Yes.
3      A.   I know that he had me
4  terminated.
5      Q.   Does he have the power to
6  hire and --
7      A.   I don't know that.
8      Q.   Do you even know if he was
9  consulted in the decision to terminate
10  you?
11      A.   Do I know?  Yeah -- I wasn't
12  there when the consulting was going on.
13      Q.   Do you know who recommended
14  your termination?
15      A.   No, I don't.
16      Q.   How do you know that Chris
17  Hines is related to Jerry Temple, because
18  based on my knowledge, they are not
19  related at all?
20      A.   Chris Hines is engaged to
21  Jerry Temple's wife's niece.
22      Q.   So they are not related?
23      A.   Biologically, no.

Page 160

1      Q.   And there -- she's not even
2  -- he's not even married --
3      A.   They are engaged.
4      Q.   To his wife's what?
5      A.   They go to the same family
6  reunion.
7      Q.   To his wife's what?  What was
8  the relationship?
9      A.   I believe it's her niece.
10      Q.   So -- but right now they are
11  not even married, but you put in this
12  complaint --
13      A.   I don't know.  I don't --
14      Q.   -- that they are related?
15      A.   If that's what's there, it's
16  what's there.
17      Q.   But I asked you if you read
18  the complaint before you filed it?
19      A.   And I said if that's what I
20  wrote, that's what's there.
21      Q.   But it's incorrect; right?
22      A.   No, it's not.
23      Q.   They are not married, are

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 161

1 they?
2     A.    You tell me.
3         MS. REISS: You need to get
4 control of your client.
5         MR. BENNITT: Okay.
6         MS. REISS: I'm not here to
7 be back-talked to.
8         MR. BENNITT: Okay. Come
9 on. Let's go outside.
10         MS. REISS: Although, this is
11 consistent with his employment record.
12         MR. BENNITT: That -- object
13 to form.
14
15         (Brief recess.)
16
17     Q.    (By Ms. Reiss) Mr. Young,
18 when you had this accident with the --
19 jackknifed into the trailer, did you
20 report it to -- immediately after it
21 occurred or did you drive off?
22     A.    I reported it immediately.
23     Q.    Who did you report it to?

Page 162

1     A.    I believe I told my
2 supervisor, Mr. Temple, and then Thomas
3 Lavar was notified, I believe.
4     Q.    And why was Mr. Lavar
5 notified?
6     A.    I believe he was the
7 inspector at the time.
8     Q.    In paragraph five of your
9 complaint where you write about Mr. Hines
10 who is related to Jerry Temple, what does
11 that have to do with your claims, the
12 fact that Mr. Lavar is related to Mr.
13 Temple or is not related to Mr. Temple?
14     A.    My claim is that Mr. Temple
15 term -- had me terminated on racial
16 issues.
17     Q.    And if Mr. Temple was not
18 involved in your termination at all, you
19 would agree that -- that you would not
20 have a race claim; correct?
21     A.    If he was not involved, I
22 would say that? No. No, I wouldn't.
23     Q.    So you are saying that Mr. --

Page 163

1 whoever -- whoever made the decision to
2 terminate you must have been racist?
3     A.    Yes.
4     Q.    And why is that?
5     A.    That's the way I feel.
6     Q.    Is it because you were such a
7 stellar employee?
8     A.    No. I'm not perfect. But --
9     Q.    I'm not asking for
10 perfection. I'm asking --
11     A.    You said stellar. I'm not a
12 stellar.
13     Q.    I believe you wanted to
14 compare yourself to Doug Reston; is that
15 correct? He's a possible comparator to
16 you?
17     A.    Doug Riston?
18     Q.    Yes. Doug Riston. Excuse
19 me.
20         MR. BENNITT: Just -- I'll
21 find it, I guess.
22         MS. REISS: I believe it's in
23 your disclosures.

Page 164

1         MR. BENNITT: It's not in
2 here.
3     A.    Do what?
4     Q.    Do you compare yourself to
5 Doug Riston?
6     A.    Compare myself to Doug? No,
7 I don't compare myself to Doug.
8     Q.    Okay.
9     A.    Not as far as his
10 accomplishments at Honeywell.
11
12     (Whereupon, Defendant's Exhibit No. 36
13     was marked for identification, and same
14     is attached hereto.)
15
16     Q.    I'm going to show you what we
17 are going to mark as Exhibit No. 36,
18 which was --
19         MR. BENNITT: I've got it
20 right here.
21         MS. REISS: Good. Great.
22 And -- no. He can look at the one I
23 have, so.

41 (Pages 161 to 164)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 165

1    Q.   And ask you -- these were the
2  disclosures that your attorney sent to us
3  regarding witnesses who might testify on
4  your behalf.  And if you will look on
5  page three or page -- yeah, three, you
6  have Doug Reston, who I'm assuming is
7  supposed to be Riston; is that correct?
8    A.   Riston.
9    Q.   And you -- and it has
10 possible comparator to Plaintiff, which
11 is you.  Is that incorrect?
12   A.   Possible comparator in -- in
13 what aspect are you stating -- are you
14 asking?
15   Q.   I don't know.  Your lawyer
16 wrote it.  I didn't.
17   A.   We are electronically
18 inclined together as far as that's
19 concerned.  But as far as his
20 accomplishments at Honeywell, I don't
21 compare myself to that.  But as far --
22   Q.   Do you know if his
23 disciplinary record even comes close to

Page 166

1  yours at Honeywell?
2    A.   I -- I would say that Mr.
3  Riston probably has never been
4  disciplined.
5    Q.   Now, William Culpepper you
6  also list as a possible comparator.  Why
7  do you list William Culpepper?
8    A.   William Culpepper?  We --
9  yeah, I see that.  William was terminated
10 from Honeywell.
11   Q.   Before you?
12   A.   Yes.
13   Q.   How else is he a comparator
14 to you?
15   A.   I can't recall at this
16 moment.
17   Q.   He didn't work at -- --at --
18 how -- he was hired after you at
19 Honeywell; correct?
20   A.   Yes.
21   Q.   And he was fired before you;
22 correct?
23   A.   Hired after me?

Page 167

1    Q.   Yes.
2    A.   Yes.
3    Q.   And he was fired before you?
4    A.   Yes.
5    Q.   And he's a white male?
6    A.   Yes.
7    Q.   So he had a shorter tenure at
8  Honeywell than you did?
9    A.   Yes.
10   Q.   Looking over these
11 disclosures, you -- did you review these
12 disclosures before they were sent out?
13   A.   Yes.
14   Q.   You note under Jerry Temple:
15 He is a frame carpenter by trade who
16 became Mr. Young's immediate supervisor.
17 What is the relevance of he was a frame
18 carpenter by trade?
19   A.   He was less experienced for
20 the job than I was.
21   Q.   How long had he been at --
22 with Honeywell?
23   A.   Fifteen years now.

Page 168

1    Q.   Do you know what year he was
2  hired?
3    A.   No.
4    Q.   Had he been there at least
5  five years prior to the time you had been
6  there?
7    A.   Yes.
8    Q.   Do you know if he received
9  experience on the job?
10   A.   I don't know that.
11   Q.   Are you saying that you --
12 you should have been his supervisor?
13   A.   What I'm saying is we were
14 given a on-the-job test, myself, Lavar
15 and another co-worker, for the
16 supervisor, slash, electrician job and I
17 scored highest on the test than either --
18 all of them.  I was denied the job.  And
19 then six months later Mr. Temple was
20 given the job without testing.
21   Q.   When -- when did this occur?
22   A.   During Roger Singletary's
23 tenure.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 169

1    Q.   So that would have been pre
2 2002? Mr. Erickson came in 2002.
3    A.   Yes.
4    Q.   You realize that claim would
5 not be timely in this lawsuit?
6    A.   Say again.
7    Q.   You realize that claim is not
8 timely in this lawsuit?
9    A.   (No response.)
10    Q.   Okay.  Calvin Flowers you
11 list as a witness.  You state: He was
12 passed over for promotion to range tech
13 -- what's his current position at
14 Honeywell?
15    A.   Range tech.
16    Q.   Okay.  And the position was
17 given to Chris Hines.  Now, when they --
18 did they take a test for this position?
19    A.   The test was given to them by
20 Doug Riston, which was written up by
21 Doug, yes.
22    Q.   And what was Chris' position
23 at the time he took the test?

Page 170

1    A.   I think he was computer
2 operator.
3    Q.   Was he working out on the
4 ranges?
5    A.   He was computer operator.
6    Q.   What does that mean?
7    A.   It means he operated
8 computers for the ranges.
9    Q.   And at that same time, Mr.
10 Flowers was a laborer; correct?
11    A.   Yes.
12    Q.   So Mr. Hines scored higher on
13 the test than Mr. Flowers; is that
14 correct?
15    A.   Yes.
16    Q.   Okay.
17    A.   But he was given the job.
18    Q.   Mr. -- yeah.  Mr. Hines, who
19 scored higher --
20    A.   Because he scored higher.
21    Q.   -- was given the job;
22 correct?
23    A.   Right.  Right.

Page 171

1    Q.   And you state you complained
2 to Mr. Erickson that the test was
3 racially screwed -- screw -- "skeewed",
4 excuse me, racially "skeewed" --
5    MR. BENNITT:  Skewed.
6    MS. REISS:  Is that how you
7 spell skewed?
8    MR. BENNITT:  I have no
9 idea.
10    MS. REISS:  All right.
11 Well --
12    MR. BENNITT:  But it -- it
13 exists somewhere.
14    MS. REISS:  Yeah.  I think
15 it's -- but that -- well, anyway.
16    Q.   What was your -- what was any
17 evidence you had that the test was
18 racially skewed?
19    A.   Mr. Hines was a white
20 individual that didn't have the
21 experience that Calvin -- Calvin had
22 forty hours of on-hand experience in the
23 field that was documented on range tech

Page 172

1 work.  Okay?  And as it progressed, he
2 scored higher on the computer test.  The
3 test wasn't geared around the range work,
4 which that's what the job was.  So they
5 made the test up to cater to Mr. Hines'
6 strong points, and the reason I know
7 this is because I was in on the interview
8 when the test was given.
9    Q.   How does that mean the test
10 is racially skewed?
11    A.   Because they gave it to the
12 white man.
13    Q.   So if the white guy scores
14 higher that means the test is racially
15 skewed?
16    A.   Okay.  Yes.
17    Q.   So every test you've ever
18 taken that a white person has made a
19 higher score than you, that means the
20 test is racially skewed?
21    A.   No, I don't mean it's
22 racially skewed every time.
23    Q.   Well --

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 173

1    A.    But this particular
2    situation, it was.
3        Q.    And I'm asking you:  What
4    basis do you -- do you understand what
5    the term racially skewed means for a
6    test?  They both took the same test;
7    correct?
8        A.    They took the same test, but
9    their qualifications were not equally the
10   same and they gave it to him only because
11   -- I mean, he -- Calvin was qualified for
12   the job as far as hands-on knowing the
13   job.  He -- the -- the job as far as
14   range tech, they geared it up for a
15   computer which was for Chris Hines.
16       Q.    Are you saying Mr. Hines was
17   not qualified for the job?
18       A.    At the time, no.
19       Q.    And that -- who made the
20   decision on this job?
21       A.    Mr. Erickson.
22       Q.    On this description it says:
23   Haynes later given Curley's job after

Page 174

1    Curley fired.  Who is Haynes?
2        A.    It's Hines.  Chris Hines.
3        Q.    Did you read this before it
4    was submitted?
5        A.    Yes.
6        Q.    And you didn't catch that?
7    You have Hines, Haynes.  I thought that
8    was a different person?
9        A.    It's not.  That's Chris
10   Hines.
11       Q.    Now, Mr. Hines was already
12   working as a range tech at the time you
13   were terminated; correct?
14       A.    Yes.
15       Q.    And who was going to fill in
16   for your ranges after you left?  Who do
17   you think they should have filled your
18   job with?
19       A.    I feel that a test should
20   have been given in-house like I was given
21   every time I had to apply for a job
22   in-house and --
23       Q.    But Mr. Hines was already a

Page 175

1    range tech; correct?
2        A.    He was an aerial gunnery
3    range tech.
4        Q.    Had he not worked on all the
5    ranges like yourself?
6        A.    So had Calvin.
7        Q.    So you admit that he was
8    doing the same job you were at the time
9    you left?
10       A.    Not the same job, but we had
11   the same title.
12       Q.    And he worked on all the
13   ranges like you had?
14       A.    Not all the ranges.  Or he
15   had, is that what you are saying?
16       Q.    Yes.
17       A.    Yes, he had.
18       Q.    And you say you went and
19   complained to Mr. Erickson that -- about
20   Mr. Flowers not getting the job?
21       A.    Yes.
22       Q.    Is that correct?
23       A.    Yes.

Page 176

1        Q.    And what -- how -- what did
2    -- what did you say?
3        A.    Getting -- I basically told
4    him that he should have got the job over
5    Chris Hines.  I just voiced my opinion.
6        Q.    And then what did Mr.
7    Erickson say?
8        A.    He said -- he basically told
9    me he wasn't wanting to hear it.  He told
10   me to get out of his office.
11       Q.    He told you to get out of his
12   office?
13       A.    Yeah.  He's told me that
14   several times.
15       Q.    Was there any witness to
16   this?
17       A.    No.
18       Q.    Now, it's my understanding
19   that Mr. Flowers, he was hired on as a
20   laborer and then he left for a time to go
21   work in the prison system?
22       A.    He was laid off.
23       Q.    But did he not voluntarily

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 177

1 quit one time and then come back?
2     A.   No.
3     Q.   Are you sure?
4     A.   Yes.
5     Q.   Have you seen his personnel
6 file?
7     A.   No. But during the time that
8 this incident happened, we were in the
9 middle of a contract changeover. There
10 was five people laid off from our job.
11 It was Dickey Gill, Calvin Flowers.
12 There was Angie Bowman. Okay. They were
13 all laid off due to the contract
14 changeover. Upon we getting awarded the
15 contract, we were all brought back in.
16 The -- the ones that were there kept
17 their jobs. Those that were laid off,
18 they were supposed to be the first hired
19 back. We hire back into those slots.
20 Angie was hired back. It's supposed to
21 be first come first -- Calvin should have
22 been the first one hired back. He wasn't
23 originally hired back. And all the rest

Page 178

1 of them were either offered a job or
2 hired back. Calvin never was hired back
3 during that time. Mr. Erickson came in
4 in the middle of all of this. He -- I
5 went -- they -- they kept interviewing
6 and Calvin was never -- was never called
7 back.
8     Calvin kept calling me at night
9 wanting to know, you know, if I could get
10 his job back. I told him I would talk to
11 them about it. Well, they kept saying
12 that he -- he wasn't qualified, which he
13 was supposed to be hired back first come
14 back. I went in to Mr. Erickson and I
15 told him, I said, I don't know what's
16 going on with the ground section, why
17 they won't hire Calvin back. I said, but
18 you can ask anyone out here, he can do
19 his job. You don't have to take my word
20 for it, just go -- Mr. Erickson said,
21 hold on a minute. I'll -- I'll look into
22 it. And within a week, Calvin was hired
23 back.

Page 179

1     Q.   So at that point in time Mr.
2 Erickson didn't say get out of my office?
3     A.   No.
4     Q.   Who sits outside of Mr.
5 Erickson's office?
6     A.   His secretary, I guess.
7     Q.   And who was his secretary at
8 the time you left?
9     A.   Debbie Wood.
10     Q.   You don't remember a separate
11 time that Calvin voluntarily quit to go
12 work in the prison system and came back?
13     A.   Yes.
14     Q.   Okay.
15     A.   Yes.
16     Q.   And you don't think his
17 coming and going and his tenure with the
18 company would not have affected his
19 ability to pass that test?
20     A.   No.
21     Q.   But that's just your opinion;
22 correct?
23     A.   That's my opinion.

Page 180

1     Q.   Mr. Flowers didn't ask you to
2 go talk to Mr. Erickson about his job,
3 did he?
4     A.   Yes, he did.
5     Q.   And you acknowledge that Mr.
6 Flowers is now a range tech?
7     A.   Yes.
8     Q.   Did Mr. Flowers also apply
9 for a light equipment operator job?
10     A.   Yes, did he.
11     Q.   And he didn't get that job;
12 is that correct?
13     A.   No, he didn't. He was
14 promised that job.
15     Q.   Who promised him that job?
16     A.   Mr. Erickson.
17     Q.   Do you know why he didn't get
18 the job?
19     A.   At the time when the job was
20 being promised to him, light equipment
21 operator, you could get the job and then
22 get your certification and Honeywell
23 would work with him to get it. Well,

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 181

1  then all of a sudden the policy changed
2  and they wouldn't allow him -- he had to
3  have the certification before he got the
4  job.
5      Q.  Do you know if Mr. Erickson
6  went to the Army and asked them to waive
7  the CDL qualification?
8      A.  To waive it?
9      Q.  Yes.
10     A.  I heard in conversation
11 through some meetings that that was a
12 possible venture.
13     Q.  And do you know that the Army
14 would not make that exception?
15     A.  I don't know whether they
16 would or wouldn't.
17     Q.  But if they wouldn't, that
18 would be out of Mr. Erickson's control;
19 correct?
20     A.  If they wouldn't waive that
21 policy, correct.
22     Q.  You state here that Larry
23 Cophen -- is that his name?

Page 182

1      A.  Cophen.
2      Q.  Is expected to testify that
3  Mr. Temple referred to black people as
4  catfish at the bottom of the pond, little
5  "N" word babies?
6      A.  Yes.
7      Q.  I interviewed Mr. Cophen, he
8  says he's never said that.  When are you
9  saying he said that?
10     A.  In conversation with us,
11 he --
12     Q.  When?
13     A.  He -- he made the statement
14 and --
15         MR. BENNITT:  Listen to the
16 question.
17     Q.  When did he say that?
18     A.  Around 2003.
19     Q.  Did you call Honeywell's HR
20 department and report it?
21     A.  No, I didn't.
22     Q.  Why not?
23     A.  I really didn't want to stir

Page 183

1  any problems, you know.
2      Q.  Didn't you have a duty to
3  report any kind of comments like that to
4  Honeywell?
5      A.  I have a duty, yes.
6      Q.  Did you go to Mr. Erickson
7  about it and tell him about it?
8      A.  Mr. Erickson wouldn't -- at
9  that time during this situation, he was
10 already out to get me anyway, so any
11 comments I made to him was -- was always
12 my fault.
13     Q.  Why was he out to get you?
14     A.  You will have to ask Mr.
15 Erickson.
16     Q.  Well, what -- what are you
17 basing that statement on?
18     A.  There was an incident that
19 occurred where I was accused of violence
20 in the workplace, which never went down.
21 He never asked me any information about
22 what went on.  The only thing I knew was
23 he called me into the office and asked me

Page 184

1  -- or told me that this was my
2  termination papers and that I was
3  forwarding this to HR and you are being
4  terminated for violence in the
5  workplace.  After investigation --
6      Q.  By who?
7      A.  HR -- not HR, but Honeywell.
8  I filed a complaint.  I called Honeywell
9  about it.  Well, the way it went down was
10 I told him if he would call Jimmy Hines
11 in, he was down there when all of this
12 went on, if he tells you I did what they
13 say I did, I'll give you my resignation.
14 He says okay.  He called --
15     Q.  I thought he was going to
16 fire you said?
17     A.  He -- I was fired at that
18 time.  He had the paperwork --
19     Q.  Well, how can you give him a
20 resignation if he's already fired you?
21     A.  Because -- because he was
22 sending the paperwork.  He had the
23 termination in his hand.  Okay?  He had

46 (Pages 181 to 184)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 185

1  the paperwork. He was forwarding it to
2  HR. I told him that -- at that point, if
3  you call him in here and you ask him the
4  truth and he will tell you -- I don't
5  know him from Adam, if he -- whatever he
6  tells you, if he says I did it, I'll sign
7  a resignation. He says okay.
8      He calls him in and they tell him
9  right there that it didn't happen. He
10  says, well, there was other people
11  involved. He says, they were smaller.
12  Jerry says, you know that you -- I
13  intimidate him because Jimmy was the same
14  size as me. I says, well -- Mr. Erickson
15  says, call them in here. We will ask
16  them. They come in and he asked did I
17  say that and were they intimated. They
18  said no. Mr. Erickson says, well, I
19  guess that's the end of story.
20      **Q.  So he didn't fire you?**
21      A.   No. Because I had to prove
22  -- he didn't even ask me to begin with.
23  He had me fired and terminated,

Page 186

1  forwarding it and everything. He told me
2  whether you sign it or not, I'm
3  forwarding it to -- to human resources.
4      **Q.   And was that because he had**
5  **received reports that you had been**
6  **violent?**
7      A.   He had -- I guess, but it was
8  all -- he should have investigated it. I
9  did -- I called Honeywell and told them
10  what went on. Hold on, if you don't
11  mind.
12      **Q.   I'm not saying anything.**
13      A.   Because of -- because --
14      MR. BENNITT: You looked like
15  you were going to.
16      A.   Because I called Honeywell,
17  they had to launch an independent
18  investigation. Now it was out of his
19  hands, my hands, everybody's hand because
20  of the nature of the allegation. Once
21  that went down, they deemed that there
22  was nothing to it and it was thrown out.
23      **Q.   So Honeywell did the right**

Page 187

1  **thing; correct?**
2      A.   On that issue, on the
3  violence in the workplace they did. But
4  it was his initiation -- he had me
5  terminated, pulling it up to Garrison.
6      **Q.   And that was because he had**
7  **heard reports that you might have been**
8  **violent?**
9      A.   Whether he heard or not, it
10  wasn't -- it wasn't -- I mean, why didn't
11  he ask me? Why didn't he investigate? I
12  had to pull -- if I hadn't insisted, he
13  would have had me terminated then,
14  wrongfully.
15      **Q.   But that's clear and that's**
16  **out of your record. And what year did**
17  **that occur?**
18      A.   '05.
19      **Q.   Okay.**
20      A.   It was either -- it was
21  November, I think --
22      **Q.   Well, I just asked you about**
23  **did you report this to Mr. Erickson about**

Page 188

1  what Mr. Temple said, which you said
2  occurred in '03, and you said, oh no, he
3  was already out to get me by then. But
4  now you -- the incident you are saying he
5  was out to get you on --
6      A.   That was --
7      **Q.   -- happened in '05?**
8      A.   That was --
9      MR. BENNITT: Let her finish
10  the question before you answer.
11      **Q.   How can he be out to get you**
12  **on something that happened later?**
13      A.   It started -- that was just
14  part of it. That's just the ending of
15  it.
16      **Q.   So when in your mind did Mr.**
17  **Erickson begin to be out to get you?**
18      A.   When did he start -- when did
19  he start working there?
20      **Q.   In 2002, I believe.**
21      A.   I believe it was around 2003
22  all of this started tumbling down.
23      **Q.   What started tumbling down?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 189

1     A.   To -- to get me terminated
2  from Honeywell.
3     Q.   What happened that you
4  thought he wanted you terminated from
5  Honeywell?
6     A.   I just told you one incident.
7     Q.   That was in 2005.  What
8  happened in 2003 that you say he wanted
9  to get you terminated from Honeywell?
10     A.   2003?  I can't recall.
11     Q.   2004?
12     A.   I just stated 2004.  It was
13  either December of 2004 or 5 when that
14  incident went down.  That was the one
15  incident.  There are other incidents.
16     Q.   That happened after that or
17  before that?  I don't know.  I'm asking
18  you?
19     A.   Yes.
20     Q.   What happened before that
21  incident that led you to believe Mr.
22  Erickson was out to, quote, get you?
23     A.   Mr. Erickson and Mr. Temple

Page 190

1  were stalking me at one time.  They came
2  down on the range while I was performing
3  work, parked the truck on the way -- on
4  the thing, they were walking down,
5  stalking me at my work -- my work
6  performance.
7     Q.   Stalking you at your work
8  performance.  Explain that occurrence.
9     A.   They were walking up on me.
10  I was down in a range and they were
11  trying to sneak up on me.  I was in a
12  truck taking a break and they come up
13  behind me.  I seen them in the mirrors
14  but I didn't move because I was on my
15  break.  And then Mr. Erickson is going to
16  say, well, you know, you are not supposed
17  to have scheduled breaks or whatever.
18  But, you know, you have to take a break
19  when you can take a break down there.
20     Q.   How is that stalking you?
21     A.   Because they were sneaking up
22  on me.  That was just one incident.
23     Q.   Does Mr. Erickson have the

Page 191

1  right to check up on his employees?  Are
2  you saying Mr. Erickson does not have the
3  right to check up on his employees?
4     A.   No, I'm not saying that.
5     Q.   Okay.
6     A.   But does he check up on all
7  of them?
8     Q.   I'm not here to answer your
9  questions.  I'm asking:  Does he have the
10  right to see if you were doing your job?
11     A.   If he's doing it on an even
12  keel.
13     Q.   Do you know whether any of
14  your co-workers had the opinion that you
15  should have been fired long before you
16  were?
17     A.   No, I don't have that.
18     Q.   Do you know if your
19  co-workers are -- say that the workplace
20  is a much more relaxed, smooth running
21  place now that you are gone?
22     A.   No, I do not.
23     Q.   Tell me -- you say Mr. Lavar

Page 192

1  is expected to testify that Mr. Temple
2  was keeping a secret journal on you.
3  What are you talking about here?
4     A.   Mr. Lavar told me he was
5  keeping a journal on me.
6     Q.   Was he keeping notes on your
7  -- on -- on your work performance?
8     A.   I was told he was keeping a
9  journal on me.
10     Q.   Is he -- and now, he's your
11  supervisor; correct?
12     A.   Who is that?
13     Q.   Mr. Temple?
14     A.   Yes, he is.
15     Q.   What does that have to do
16  with your claims?
17     A.   Was he keeping a journal on
18  every employee, all white -- all white
19  employees?
20     Q.   I'm not here to answer your
21  questions.
22     A.   Well, that's my claim.  He
23  was not keeping a -- he was keeping it on

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 193

1  just me.
2      Q.   Was it because you had
3  substandard work performance?
4      A.   Not according to my
5  evaluations.
6      Q.   Were you ever rated higher
7  than at standard ever?
8      A.   Yes.
9      Q.   Overall, were you ever rated
10  higher than at standard?
11      A.   I don't think anyone was.
12      Q.   Did you ever receive any kind
13  of performance bonuses after 2002?
14      A.   I received one when Roger
15  Singletary was there.  That's the only
16  one.
17      Q.   After 2002?
18      A.   Is that -- you are saying
19  monetary awards?
20      Q.   (Nods head affirmatively.)
21      A.   Yes.  I got a bravo award.
22      Q.   Was that a monetary award?
23      A.   Yes.

Page 194

1      Q.   And that was when you
2  completed your green belt?
3      A.   No.
4      Q.   What was that for?
5      A.   Safety award.
6      Q.   And when did that occur?
7      A.   I'll have to get the date.
8  It was in '04 -- '04 and '03.
9      Q.   You say Mr. Roger and Travis
10  Engles will -- and they are brothers;
11  correct?
12      A.   Yes.
13      Q.   Do they work under each
14  other?
15      A.   They work with each other.
16  They did when I was there.
17      Q.   Did they work under each
18  other?
19      A.   I don't know what you are
20  saying.
21      Q.   Did one supervise the other?
22      A.   No.
23      Q.   And they had two different

Page 195

1  jobs; is that correct?
2      A.   Yes.
3      Q.   Okay.
4      A.   Well, they were -- I don't
5  know what their title was.  They did the
6  same thing.
7      Q.   Well, you just said they had
8  two different jobs?
9      A.   I don't know what their title
10  was.
11      Q.   One is a light equipment
12  operator; correct?
13      A.   Right.
14      Q.   And one is a laborer?
15      A.   Okay.  They have two
16  different jobs then.
17      Q.   All right.  And you said they
18  may testify about the racial atmosphere
19  at the company.  What are you referring
20  to there?
21      A.   If they are brought in, they
22  may testify to the atmosphere.
23      Q.   What atmosphere?

Page 196

1      A.   The racial tension.
2      Q.   And these are both white
3  males; correct?
4      A.   Yes.
5      Q.   And what did they tell you --
6  did they tell you they were going to
7  testify for you?
8      A.   They did at one time.
9      Q.   Have they since changed their
10  minds?
11      A.   I haven't spoken to no one
12  there outside of Mr. Flowers.
13      Q.   Are you aware that some of
14  the grounds, the laborers, the grounds
15  crew made complaints that you did not
16  help out with the work?
17      A.   No, I wasn't aware.  As a
18  matter of fact, they stated that that
19  wasn't the case, the ones that I know.
20      Q.   So if we get signed
21  statements, sworn statements, are you
22  going to say they are lying?
23      A.   Yes.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 197

1    Q.   Do any -- did any of these
2  people know you were going to list them
3  as witnesses? Did you contact them and
4  ask them beforehand?
5    A.   No, I didn't. I felt that
6  they would tell the truth.
7    Q.   What does that have to do
8  with whether you contacted them
9  beforehand?
10   A.   Why would I have to
11 contact --
12        MR. BENNITT: Just answer the
13 question.
14   A.   I didn't feel I needed to
15 contact them. I just knew they -- I felt
16 they would tell the truth. If they don't
17 want to tell the truth, they don't tell
18 the truth.
19   Q.   You've never been to see a
20 psychologist or a counselor or anything
21 based on your termination from Honeywell?
22   A.   No.
23   Q.   Have you ever seen -- gone to

Page 198

1  a psychologist or a counselor or a
2  psychiatrist in your life?
3    A.   Yes.
4    Q.   When was that?
5    A.   '96 or '97.
6    Q.   And what -- and I don't want
7  to hear the details. But what was just
8  the basis for you going?
9    A.   When I was getting my nursing
10 license, I had to go through stipulations
11 that the Board of Nursing put out in
12 order to get my nursing license and to go
13 to a counselor was one of them.
14   Q.   Were these special
15 stipulations for you or were they
16 required for all LPNs?
17   A.   No. Just for me.
18   Q.   And why was it required for
19 you?
20   A.   Because I was placed on
21 probation provided I adhere to their
22 stipulations.
23   Q.   Who placed you on probation?

Page 199

1    A.   The Board of Nursing.
2    Q.   Why?
3    A.   Because of the possession
4  charge.
5    Q.   How long were you in
6  counseling?
7    A.   A year, maybe. I was -- I
8  was stated to go for thirty-six months,
9  but because of my good behavior and the
10 fact that they knew that it was a bogus
11 issue, they dropped it to, I believe it
12 was, sixteen months, if that long, twelve
13 months.
14   Q.   Have you gone to any
15 counseling based --
16   A.   Twenty-four months.
17   Q.   -- on the separation from
18 your wife?
19   A.   No.
20   Q.   And I believe you stated that
21 things are getting better for you now;
22 correct?
23   A.   Yes. I'm looking forward.

Page 200

1    Q.   And you've never reported
2  that -- to Honeywell's HR or corporate or
3  anyone like that that you felt like
4  you've been treated differently based on
5  your race while you were employed with
6  Honeywell?
7    A.   Yes, I did, with Shawanda
8  Hunt, I believe is her name.
9    Q.   What was her position?
10   A.   HR generalist.
11   Q.   And when was that?
12   A.   That was in -- I believe it
13 was '03.
14   Q.   Where was she located at?
15   A.   Honeywell -- she was at
16 Maryland, Columbia, Maryland.
17   Q.   What did you -- did you call
18 her?
19   A.   Yes, I did.
20   Q.   What did you say to her?
21   A.   I told her I felt I was being
22 racially discriminated and at the time it
23 was because of Mr. Erickson had taken me

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 201

1  from my range tech position and placed me
2  over to another position and swapped me
3  with -- me and Chris Hines.
4      Q.  You were still a range tech;
5  correct?
6      A.  I was still a range tech.
7      Q.  Your position didn't change?
8      A.  No, my position didn't
9  change.
10     Q.  Your pay didn't change?
11     A.  No, my pay didn't change.
12     Q.  So how did he change your
13  position?
14     A.  He changed my job location.
15     Q.  Did he rotate you and Mr.
16  Hines?
17     A.  He told me that it was for a
18  -- it was a rotation that was going to be
19  -- everybody was going to do it and it
20  was only going to be for six months.  Six
21  months came, he didn't rotate back or any
22  of the other range techs rotated.  It was
23  supposed to be a cross-training is what I

Page 202

1  was told.  It was a cross-training
2  endeavor and we all were going to cross-
3  train.
4      Q.  So Mr. Hines had to rotate
5  also; is that right?
6      A.  Yeah.  He went to a better
7  job.
8      Q.  Why is it a better -- he --
9  what, did he go to your old job?
10     A.  Yeah.
11     Q.  Why is that a better job?
12     A.  Because the responsibility
13  that he threw at me was to take care of
14  twenty-seven ranges with one range tech.
15  When Hines was originally there, he had
16  three other assistants with him and he
17  threw me out with no help and expected me
18  to perform the job.
19     Q.  And so what did -- how did
20  Ms. -- how did Ms. Hunt respond to this?
21     A.  It was during Christmastime
22  when that complaint was made.
23     Q.  Christmas of 2003?

Page 203

1      A.  I believe.  And she said that
2  she would get in touch with me and she
3  never got back in touch with me.
4      Q.  Do you know Ms. -- Ms. Hunt's
5  race?
6      A.  No, I do not.
7      Q.  Did you follow-up with her?
8      A.  I tried to call her several
9  times and never could get in touch with
10  her.
11     Q.  Did you leave voice mail?
12     A.  Yes.
13     Q.  Are you sure Mr. Erickson
14  didn't tell you the rotation was for a
15  year?
16     A.  He told me six months, then
17  he came back when I went back to him, he
18  said, it's a year, and then when I went
19  back again, he said it wasn't happening.
20     Q.  And you had no help, is that
21  your testimony?
22     A.  On occasions I would get
23  help.  They hired in a computer operator

Page 204

1  that would come in and would assist every
2  now and then, but no one with any
3  knowledge of the work.
4      Q.  Do you know if the helper
5  position was defunded by the Army?
6      A.  I don't know that.
7      Q.  Okay.
8          MR. BENNITT:  Objection to
9  form.
10
11  (Whereupon, Defendant's Exhibit No. 37
12  was marked for identification, and same
13  is attached hereto.)
14
15     Q.  Here is Exhibit No. 37, and
16  tell me if you've seen this document?
17     A.  Yes.
18     Q.  Is this a write-up because
19  you did not properly secure your toolbox
20  or the right passenger door of the truck?
21     A.  Yes.
22     Q.  Did you testify earlier that
23  you just didn't secure the toolbox?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 205

1    A.    That's what I was --
2    Q.    It was the truck and the
3    toolbox; correct?
4         MR. BENNITT: Objection to
5    form.
6    A.    If that's -- yeah. If that's
7    what it's saying, yes.
8    Q.    You also left tools in the
9    truck that belonged in the toolroom; is
10   that correct?
11   A.    Well, the -- yeah. Yeah.
12   Q.    And you signed this document?
13   A.    Yes.
14   Q.    And this was supposedly
15   during the time that Mr. Erickson was
16   trying to get rid of you?
17   A.    No. This is when Mr.
18   Erickson just started working there.
19   Q.    So he wasn't trying to get
20   rid of you as of March of '03?
21   A.    No. He -- Thomas Lavar found
22   this. Mr. Erickson just signed off of
23   it.

Page 206

1    Q.    Was Thomas Lavar trying to
2    get rid of you?
3    A.    No.
4    Q.    Are you sure?
5    A.    No. I'm not sure of
6    anything.
7         MR. BENNITT: Are we at a
8    stopping point or are you --
9         MS. REISS: That's fine.
10
11        (Brief recess.)
12
13   (Whereupon, Defendant's Exhibit No. 38
14   was marked for identification, and same
15   is attached hereto.)
16
17   Q.    (By Ms. Reiss) I'm going to
18   show you Exhibit No. 38, Mr. Young, and
19   ask you if you've seen this document?
20   A.    Yes.
21   Q.    You have? Okay.
22   A.    Yes.
23   Q.    And you -- you were tardy

Page 207

1    that day?
2    A.    I don't recall.
3    Q.    Can you pull your application
4    for me, Mr. -- to Honeywell? I believe
5    it's an early exhibit, probably like No.
6    12 or something, maybe, or -- No. 14.
7    A.    There's No. 14. There's No.
8    13.
9    Q.    Looking on the last page or
10   -- yeah, the last page of that exhibit
11   under certification statement, you signed
12   a -- you signed stating that: I certify
13   that all the information I have provided
14   is true and complete, and that would
15   refer to the first sentence under the
16   certification statement saying: I
17   understand that any omission or
18   misrepresentation by me in this
19   application may be cause for immediate
20   dismissal and that any offer of
21   employment is contingent upon it, and it
22   goes into your medical stuff. Why did
23   you not list the Elba Nursing Home and

Page 208

1    your previous employers that would go
2    back seven years on your employment
3    record?
4    A.    I believe I stated earlier
5    that Mr. Hodges said that I only needed
6    three.
7    Q.    Well, you only listed two?
8    A.    Two? Well, it was two then.
9    Q.    Okay.
10   A.    I mean, he said that was all
11   I needed. I was only doing what he said.
12   Q.    You were green belt certified
13   in 2005?
14   A.    Yes.
15   Q.    And that's with the Six Sigma
16   program?
17   A.    Yes.
18   Q.    What was your project with
19   the Six Sigma program?
20   A.    I believe we was working on
21   inventory controls.
22   Q.    So you understood the
23   importance of keeping inventory under

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 209

1  check?
2      A.   I understood the problems
3  that Honeywell had.
4      Q.   But you under -- and you,
5  yourself, understood the importance of
6  keeping inventory on your check?
7      A.   Yes.
8      Q.   In fact, that was your
9  project to get your green belt; is that
10 correct?
11     A.   Yes.  We all worked on that.
12     Q.   But -- now, there were --
13 there would be spot inspections to make
14 sure that people had their PMCS forms;
15 correct?
16     A.   Yes.
17     Q.   And you were caught without
18 one more than once; is that right?
19     A.   I don't recall.  Do you have
20 something to show me?
21     Q.   You don't recall?
22     A.   I know once.
23     Q.   Who caught you without your

Page 210

1  PMCS form?
2      A.   Thomas Lavar.
3      Q.   And, yet, you maintain that
4  it's Mr. Erickson that is out to get you
5  because of your race; is that correct?
6      A.   Yes.
7      Q.   But Mr. Lavar is the person
8  who caught you that would -- that would
9  lead to write-ups, is that not -- is that
10 correct?  Many of his reports is what led
11 to your write-ups; is that right?
12     A.   I'm sorry.  Say that again.
13     Q.   Mr. Lavar was the person who
14 caught you violating Honeywell policy
15 which led to your write-ups?
16     A.   Yes.
17     Q.   Are you saying that Mr. Lavar
18 has a problem with you because of your
19 race?
20     A.   No.
21     Q.   So it only becomes a race
22 issue if Mr. Erickson ends up giving you
23 a write-up about something that Mr. Lavar

Page 211

1  reports to him?
2      A.   I didn't say that.
3
4  (Whereupon, Defendant's Exhibit No. 39
5  was marked for identification, and same
6  is attached hereto.)
7
8      Q.   On this -- do you remember
9  this write-up from -- that Mr. Lavar
10 found you without a PMCS sheet?  Do you
11 remember this incident that happened
12 on --
13     A.   This one that you just handed
14 me?
15     Q.   Yes.
16     A.   Yes.
17     Q.   And he asked to see your
18 current preventive maintenance worksheet
19 and you did not have one and you didn't
20 have any blank copies; is that correct?
21     A.   That's correct.
22     Q.   Was he stalking you when he
23 walked up to you?

Page 212

1      A.   I don't know.
2          MR. BENNITT:  What was the
3  answer?
4          MS. REISS:  He doesn't know.
5      Q.   Let me show you a performance
6  review in 2005.  Who went over this
7  performance review with you?
8      A.   Mr. Temple and Mr. Erickson.
9
10 (Whereupon, Defendant's Exhibit No. 40
11 was marked for identification, and same
12 is attached hereto.)
13
14     Q.   I'll show you what's marked
15 as Exhibit No. 40.  Tell me when you've
16 had a chance to review it.
17     A.   Go ahead.
18     Q.   Okay.  Did you have any
19 disagreements with this evaluation?
20     A.   No.
21     Q.   And this was approximately a
22 year before you were terminated; is that
23 correct?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 213

1   A.   If it's in '04, yes.
2   Q.   It's '05.
3        MR. BENNITT: I think in '04.
4        MS. REISS: Signed in '05.
5        MR. BENNITT: Oh, sorry.
6   That's what she's talking about down
7   there. Right there (indicating).
8   A.   But it's an '04 performance
9   evaluation.
10  Q.   Right. Right. You are
11  correct. You are correct.
12       MR. BENNITT: What was the
13  question?
14       MS. REISS: I don't have one.
15       THE WITNESS: This is an '05
16  performance --
17       MS. REISS: I don't have a
18  question.
19       MR. BENNITT: Oh, okay.
20  Sorry.
21
22
23

Page 214

1   (Whereupon, Defendant's Exhibit No. 41
2   was marked for identification, and same
3   is attached hereto.)
4
5   Q.   Let me show you what we're
6   going to mark as Exhibit No. 41, and this
7   is a follow-up to that Exhibit No. 39, I
8   believe, where Mr. Lavar found that you
9   didn't have a current preventive
10  maintenance sheet or any extras. You
11  received this written warning from Mr.
12  Erickson based on Mr. Lavar's report to
13  him; is that correct?
14  A.   Yes.
15  Q.   And you told Mr. Lavar you
16  had performed a preventive maintenance on
17  the vehicle but you didn't have a form
18  for it; is that correct?
19  A.   That's correct.
20  Q.   So had you -- so how could
21  you have performed it if you didn't have
22  the form?
23  A.   Because I had done it every

Page 215

1   day for the last eight years and I know
2   what needs to be checked.
3   Q.   But you are -- but you are
4   supposed to complete the form on it,
5   correct, so there's documentation?
6   A.   The form is -- the form is to
7   be handed in at the end of the day.
8   Q.   But you are supposed to
9   complete the form when you do the check;
10  is that correct?
11  A.   Yes.
12  Q.   And Mr. Erickson notes that:
13  The incident could have resulted in a
14  safety violation by our customer. So
15  this indicates that the Army could
16  consider this a safety violation when
17  renewing the contract. Does Honeywell
18  get fined by the Army for safety
19  violations?
20  A.   Yes.
21  Q.   And you were placed on
22  probation for a year as a result of this
23  incident; is that correct?

Page 216

1   A.   Yes.
2   Q.   An incident that Mr. Lavar
3   reported to Mr. Erickson?
4   A.   Yes.
5   Q.   And this is consistent with
6   Honeywell's disciplinary policies; is
7   that correct?
8   A.   As far as the write-up or the
9   year?
10  Q.   The year, probation for a
11  year?
12  A.   Yes.
13
14  (Whereupon, Defendant's Exhibit No. 42
15  was marked for identification, and same
16  is attached hereto.)
17
18  Q.   I'm going to ask you if
19  you've seen Exhibit No. 42? The Army is
20  very document intensive, is it not?
21  A.   I don't work for the Army.
22  Q.   But you worked at a Army base
23  for seven years, did you not?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 217

1    A.    I worked for Honeywell for --
2    Q.    Right.
3    A.    -- seven -- for eight years.
4    Q.    Whose customer was the Army?
5    A.    Right.
6    Q.    They like everything checked
7    off, safe, clear; correct?
8    A.    I've never worked for the
9    Army.
10    Q.    Are you saying you don't
11    understand what the Army expects out of
12    Honeywell?
13    A.    I know what Honeywell wants.
14    Q.    Are you saying that you don't
15    understand what the Army expects out of
16    Honeywell?
17    A.    The voice of the customers,
18    what they want.
19    Q.    Let me show you Exhibit No.
20    42. Have you seen this document before?
21    A.    No, I haven't.
22    Q.    Do you remember being docked
23    pay for an hour due to being forty

Page 218

1    minutes late to work?
2    A.    Yes.
3    Q.    And Mr. Temple told you that
4    he was going to talk to Mr. Erickson
5    about it?
6    A.    No, he didn't tell me that.
7    Q.    Did he say it was going to be
8    documented?
9    A.    No, he didn't.
10    Q.    So you are saying he lied on
11    this memo?
12    A.    This memo was not to me; it
13    was to Ken.
14    Q.    I'm asking you: Are you
15    saying he lied on this memo when he said:
16    I told Curley that this would be
17    documented and --
18    A.    Yes.
19    Q.    -- he is aware of it?
20    A.    Yes.
21    Q.    But you were -- you were
22    aware you were going to be docked an
23    hour's pay?

Page 219

1    A.    No.
2    Q.    But you just testified you
3    did -- you were aware of that?
4    A.    I was aware that it occurred,
5    but I wasn't aware that it was going to
6    happen when it happened.
7    Q.    What does that mean?
8    A.    It means after I -- the day
9    that it happened, I think, if I'm not
10    mistaken, he told me that -- that I
11    couldn't make it up is what he said.
12    Q.    Well, it's also corporate
13    policy that this is considered a tardy;
14    correct? In fact, it says on the policy
15    06-07: Late arrival greater than thirty
16    minutes is not subject to make up; is
17    that correct?
18    A.    It's not subject to, but they
19    do allow it.
20    Q.    But that's what the rules
21    say?
22    A.    But they do allow us to do
23    it. I've done it many times.

Page 220

1    Q.    Mr. Temple allowed you to do
2    it before?
3    A.    Yes.
4
5    (Whereupon, Defendant's Exhibit No. 43
6    was marked for identification, and same
7    is attached hereto.)
8
9    Q.    I'll show you what we're
10    going to mark as Exhibit -- this is in
11    the same time frame, April of '05,
12    Exhibit No. 43. Is this your signature
13    at the bottom of this page, Mr. Young?
14    A.    Yes, it's my signature.
15    Q.    And your name is correctly
16    spelled C-U-R-L-E-Y?
17    A.    Yes.
18    Q.    Can you tell me why in your
19    complaint before the Court it is not
20    spelled correctly? Did you review this
21    before it was filed?
22    A.    Yes, I did.
23    Q.    And you didn't notice your

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 221

1  name wasn't spelled correctly?
2      A.   No, I didn't.
3      Q.   Right now you don't have the
4  proper party suing Honeywell.
5      A.   That's a matter of opinion.
6      Q.   No.  It's a matter of law.
7  Now, who -- do you know who wrote this --
8  you signed this correct?  Is that your
9  signature at the bottom?
10     A.   Yes.
11     Q.   And who did you go -- did you
12 go over this with someone?
13
14     (off-the-record discussion.)
15
16     Q.   Did you go over this with
17 someone?
18     A.   Go over this with someone?
19     Q.   Yes.
20     A.   I believe I -- with Temple.
21     Q.   Do you know if this was the,
22 quote, secret journal he was keeping on
23 you?

Page 222

1      A.   I never seen the journal.  I
2  couldn't tell you if this was it or not.
3      Q.   Well, it wouldn't be secret
4  if he showed it to you, would it?
5      A.   Excuse me?
6      Q.   It wouldn't be secret if he
7  showed it to you, would it?
8      A.   No, if he showed it to me, it
9  wouldn't be secret.
10     Q.   And on here he notes some of
11 your good traits and some of the more
12 recent shortcomings you've had; correct?
13     A.   I don't know.  I never seen
14 the journal.
15     Q.   Did you sign this?
16     A.   If this is -- you are calling
17 this the journal?
18     Q.   I didn't call this the
19 journal.  I said on this document he
20 noted some of your strengths and some of
21 your shortcomings?
22     A.   Yes.
23

Page 223

1      (Whereupon, Defendant's Exhibit No. 44
2  was marked for identification, and same
3  is attached hereto.)
4
5      Q.   Now I'm going to show you
6  what we're going to mark as Exhibit No.
7  44, and this was for the third and fourth
8  quarter of '05, and ask you if you've
9  seen this document?
10     A.   Yes.
11     Q.   And did Mr. Temple go over
12 this with you also?
13     A.   Yes.
14     Q.   And he notes that you are a
15 good troubleshooter; is that correct?
16     A.   Yes.
17     Q.   But you have minor problems
18 with data input; is that correct?
19     A.   Yes.  That's because the
20 computer crashed every other day.
21     Q.   So it's not your fault, it's
22 the computer's fault?
23     A.   On that particular issue,

Page 224

1  yes.
2      Q.   But he says that he checks
3  the input regularly and has found tasks
4  that Curley completes wrong or are not
5  completely filled out.  How does that --
6  how does that have to do with the
7  computer crashing?
8      A.   Those particular items were
9  just mistakes.
10     Q.   And then in June, was this
11 the situation where Mr. Erickson found
12 you sitting in your truck when you said
13 you needed to take a break even though it
14 was not a scheduled time?
15     A.   Yes.
16     Q.   And Mr. Temple notes that the
17 perception from the customer, that would
18 be the Army, is that Honeywell is always
19 on break and that y'all have discussed
20 this on several occasions; is that
21 correct?
22     A.   I don't recall.
23     Q.   Did he go over this with you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 225

1    A.   Yes. He went over this
2 particular document.
3    Q.   And do you remember him
4 stating that your cleaning habits were
5 less than desirable?
6    A.   Yes.
7    Q.   And that you were late both
8 on July 22nd and August 3rd?
9    A.   He stated that, but I wasn't
10 late.
11   Q.   So you would disagree with
12 this statement:  Curley is always on the
13 edge of tardiness and refuses to do any
14 different?
15   A.   I disagree with that.
16
17 (Whereupon, Defendant's Exhibit No. 45
18 was marked for identification, and same
19 is attached hereto.)
20
21
22   Q.   I'll show you a memo from Mr.
23 Lavar to Mr. Erickson dated January 25th

Page 226

1 -- it says 2000, but it's 2006, as you
2 can see from the body of the document,
3 and ask you if you have seen this memo
4 before from Mr. Lavar to Mr. Erickson?
5    A.   Yes, I've seen it.
6    Q.   Okay. Do you recall --
7    MR. BENNITT:  Is this
8 Defendant's Exhibit No. 45?
9    MS. REISS:  I don't know.
10 You can see better than I can over
11 there.
12   MR. BENNITT:  Okay.
13   Q.   Mr. Lavar performed a
14 preventive maintenance on J-002.  Was
15 that your vehicle that you drove?
16   A.   Yes.
17   Q.   And that's a government
18 vehicle?
19   A.   Yes.
20   Q.   And in the cab of the vehicle
21 he found a small engine blower with a
22 full tank of gas; is that correct?
23   A.   That's correct.

Page 227

1    Q.   And in the cab in the rear of
2 the vehicle, there was trash, including
3 soda cans and food wrappers and candy
4 wrappers; is that correct?
5    A.   That's correct.
6    Q.   And then in the -- also in
7 the bed of the truck there were paint
8 cans, spray cans, WD-40 that were not
9 properly stored; is that correct?
10   A.   That's correct.
11   Q.   And when he asked to see the
12 PMCS sheets, it stated that the
13 preventive maintenance had been completed
14 on this vehicle; is that correct?
15   A.   The vehicle had a completed
16 PMCS sheet on the vehicle, Juliette 002.
17   Q.   But obviously it was in -- if
18 you had done a preventive maintenance on
19 this -- these, you wouldn't have all of
20 this in the truck, a blower full of gas,
21 trash, et cetera?
22   A.   Wrong.
23   Q.   Why is that wrong?

Page 228

1    A.   Because the -- the items that
2 he's referring to was found the day
3 before. The item as far as PMCS in that
4 truck for that day, the truck was PMCS
5 for that day. What he's --
6    Q.   Okay. Well, maybe I — I
7 misread this. He says he wanted to see a
8 PMCS sheet for the blower that was taken
9 from the EQ shed and there was no such
10 document?
11   A.   Now, that's correct.
12   Q.   All right. And then you --
13 Mr. Erickson then wrote you up for this;
14 is that right?
15   A.   Yes.
16   Q.   And you were suspended for a
17 week; is that correct?
18   A.   Right. But I was wrongfully
19 done on that behalf. The individual that
20 was with me was the one that checked the
21 blower out. I didn't check the blower
22 out. But they saw fit to hammer me with
23 the -- the blower. She was using the

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 229

1  blower, not me.  She checked it out, not
2  me.
3      Q.   Are you ultimately
4  responsible for that truck?
5      A.   For the truck, yes.
6
7  (Whereupon, Defendant's Exhibit No. 46
8  was marked for identification, and same
9  is attached hereto.)
10
11     Q.   I'll show you Exhibit No. 46.
12  And you would agree this is the second
13  violation in a year regarding policies on
14  maintenance checks and services?
15     A.   Yes.
16     Q.   Where is that -- your helper,
17  what was her name gain?
18     A.   Lisa Uti.
19     Q.   And where is she currently --
20  right now?
21     A.   The last -- she was deployed
22  the last time I was there.
23     Q.   To Iraq?  You don't know?

Page 230

1      A.   (Nods head negatively.)
2
3  (Whereupon, Defendant's Exhibit No. 47
4  was marked for identification, and same
5  is attached hereto.)
6
7      Q.   I'll show you Exhibit No.
8  47.  These are -- do you recall Mr. Lavar
9  taking photos of your truck that day?
10     A.   Yes.
11         MS. REISS:  Jeff, you may
12  want to look at the photos.
13         MR. BENNITT:  Oh, thanks.
14     Q.   Now, is this a blower -- is
15  that the blower on the floorboard of the
16  passenger seat?
17     A.   Yes.
18     Q.   And it was full of gas?
19     A.   Yes.
20     Q.   And it's sitting under spray
21  paint cans?
22     A.   Yes.
23     Q.   How hot does it normally get

Page 231

1  in the -- what is the average temperature
2  in Ozark in the summer?
3      A.   I don't know.  I don't live
4  in Ozark.
5      Q.   You worked in Ozark; correct?
6      A.   No.
7      Q.   Fort Rucker is not in Ozark?
8      A.   No.
9      Q.   Where is it at?
10     A.   It's got a Daleville address.
11     Q.   Is Daleville south of Ozark
12  or north of Ozark?
13     A.   I don't know.
14     Q.   What is the average
15  temperature in Daleville in the summer?
16     A.   In the summer, ninety.
17     Q.   Or more; correct?
18     A.   Ninety.
19     Q.   And this was the state of
20  your truck when Mr. Lavar did a
21  spot-check, this first picture here?
22     A.   This is the first time I've
23  seen these pictures, so --

Page 232

1      Q.   But you agree he took
2  pictures of the -- of your truck at that
3  time; correct?
4      A.   Yes.
5      Q.   Okay.
6      A.   Yes.
7      Q.   And looking at the second
8  page, is the paint cans all jumbled
9  there?  They are supposed to be in a
10  protective container, aren't they?
11  Correct?
12     A.   What do you think they are
13  in?
14     Q.   That's the secondary
15  container that they are -- does it have a
16  top on it?
17     A.   It didn't have a top on it.
18  What are you talking about is there a top
19  on it?  It's not required.
20     Q.   It's not supposed to be
21  completely protected?  Where are the tops
22  to some of these containers?
23     A.   The tops are not required to

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 233

1  be on them.
2      Q.   Why did Mr. -- do you know
3  why Mr. Lavar took this third picture of
4  the WD-40 can sitting out on the bed of
5  the truck?
6      A.   Yeah.  Because it's not
7  supposed to be in the bed of the truck.
8      Q.   Is it supposed to have a top
9  on it?
10     A.   No.  It doesn't have to have
11 a top.  It's not required in the policy.
12     Q.   Is it supposed to be in the
13 secondary container?
14     A.   Yes.  That's supposed to be
15 -- well, that particular one doesn't have
16 to be.  Paint has to be in a secondary
17 container.  WD-40 does not have to be.
18     Q.   Where does it say that WD-40
19 does not have to be in a secondary
20 container?
21     A.   Where does it state that
22 WD-40 has to be in a container?
23     Q.   Let's see.  Let's go back to

Page 234

1  the -- the policies.
2      A.   Paint has to be in a
3  secondary container.
4      Q.   Let's see how it reads.  Does
5  WD-40 carry a Hazmat label?
6      A.   Yes, it does.
7      Q.   And what does that mean?
8      A.   That's just a label that
9  identifies the content, the safety, the
10 PPE, that you have to use to use the
11 equipment or to use the item.
12     Q.   And is one of the safety
13 regulations that it's not supposed to be
14 left out and exposed without a top on it?
15     A.   No.
16     Q.   How do you know that?
17     A.   That's not part of the PPE of
18 it.
19     Q.   Looking at the fourth page of
20 the photos there, you left bottle -- cans
21 in the back of the truck?
22     A.   Yes.
23     Q.   And that's a government

Page 235

1  truck?
2      A.   Yes.
3      Q.   You also left, on the fifth
4  page, exposed paint cans not in a
5  secondary container?
6      A.   Yes.
7      Q.   Sixth page you left wrappers
8  in the back of the truck?
9      A.   Wrappers?
10     Q.   Yes.  And bottle -- cans?
11     A.   Yeah.
12     Q.   Now, what are those white
13 containers beside the M&M's wrapper?
14     A.   Those are empty containers.
15     Q.   Are they Hazmat containers?
16     A.   They are empty.  There's
17 nothing in them.
18     Q.   Are they a Hazmat container?
19     A.   A Hazmat?  It has a Hazmat
20 label, but it's nothing in it.
21     Q.   But you are supposed to put
22 Hazmat type instruments like WD-40 in
23 those containers; correct?

Page 236

1      A.   You -- is this the picture we
2  are looking at?
3      Q.   Yes.
4      A.   No.  I don't know what you
5  are -- no.  What's in those containers
6  right there are bolts and nuts that I
7  saved for the other ranges.
8      Q.   I thought you just said they
9  were empty?
10     A.   These -- this particular --
11 they don't have -- what came in here in
12 this container are humidifiers that we
13 put at the -- the HG live range.  What I
14 have in -- the content that goes in there
15 is not in there.  What I have in here is
16 stored bolts.
17     Q.   How do you know if you don't
18 know when Mr. Lavar took these pictures
19 what's in those containers?
20     A.   Because I know what's in -- I
21 know what the container is.  I wouldn't
22 have -- the humidifier would not have
23 been in there.  When I empty them out, I

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 237

1   put them in the back of the truck and use
2   them for storage bins.
3       Q.   I believe it's the seventh
4   page. Is this more McDonald's garbage in
5   the back of the truck and cans and --
6       A.   Yes. Yes.
7       Q.   And unlidded containers?
8       A.   Yes. Yes.
9       Q.   Now, looking at the last two
10  pages, can you tell me -- the next to the
11  last page, what is that we are looking
12  at?
13      A.   QC tags.
14      Q.   What is the -- what is the
15  machinery we are looking at?
16      A.   It's a thumb tag.
17      Q.   It's a what? A what?
18      A.   It's a thumb tag.
19      Q.   A thumb tag, the machinery?
20      A.   You -- you are asking for the
21  ITM?
22      Q.   I'm asking: What is this
23  machine?

Page 238

1       A.   ITM.
2       Q.   What's an ITM?
3       A.   Integrated target mechanism.
4       Q.   Is it something y'all use out
5   on the range?
6       A.   Yeah.
7       Q.   And the tag inside of it
8   says: Please return the tag to QC or
9   program manager?
10      A.   Yes.
11      Q.   What -- what is the purpose
12  of that tag?
13      A.   To see if you are performing
14  preventive maintenance --
15      Q.   So.
16      A.   -- on a timely manner.
17      Q.   Okay. So if you've performed
18  preventive maintenance on this I -- what
19  did you call it, I --
20      A.   ITM.
21      Q.   ITM -- I'm not -- I don't
22  know all of these acronyms -- you are
23  supposed to pull that tag; correct?

Page 239

1       A.   Yes.
2       Q.   And this is a photograph
3   where Mr. Lavar has found that you did
4   not perform preventive maintenance on
5   that machinery?
6       A.   I don't know if it was me.
7       Q.   Do you know Mr. Lavar to be a
8   dishonest person?
9       A.   What I'm saying is that tag
10  is in that box, but three other range
11  techs pulled maintenance on this box or
12  on the range. It could have been them,
13  me or the other two.
14      Q.   But you are assigned to do
15  preventive maintenance on -- on certain
16  boxes at certain times; correct?
17      A.   That's right.
18      Q.   And Mr. Lavar is considered
19  QC; correct?
20      A.   That's right.
21      Q.   Because before when I asked
22  you, you said he was an inspector, but
23  you now acknowledge that he's part of the

Page 240

1   QC department?
2       A.   Well, he's -- his title is
3   inspector, ma'am.
4       Q.   But he's in the QC
5   department?
6       A.   I don't even think we have a
7   QC in our -- as a -- we don't have a QC
8   title. He's an inspector.
9       Q.   Looking on the last page, Mr.
10  Young, what is that machinery that we are
11  looking at?
12      A.   The same machinery we were
13  looking at before.
14      Q.   And, again, the tag has been
15  left in the machinery?
16      A.   Again, the tag is in the
17  machinery.
18      Q.   And did you know Mr. Lavar to
19  take photos when a tag was left in the
20  machinery?
21      A.   Yes.
22      Q.   At the time you were
23  suspended from work for a week, were you

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 241

1  already separated from your wife?
2      A.  I don't recall.
3      Q.  You don't?  You don't
4  remember if you spent the week at home
5  with your wife or --
6      A.  No.  I don't recall.
7
8  (Whereupon, Defendant's Exhibit No. 48
9  was marked for identification, and same
10 is attached hereto.)
11
12     Q.  Let me show you what we're
13 going to mark as Exhibit No. 48.  Have
14 you ever seen this document?
15     A.  I seen it when my lawyer
16 showed it to me was the first time.
17     Q.  Really?  I wonder how your
18 lawyer got it.  I don't -- I've never
19 given this to your lawyer.  And you are
20 under oath, so please answer correctly.
21     A.  To the best of my knowledge,
22 that's when I seen it, was in his
23 office.

Page 242

1      MS. REISS:  Have you ever
2  seen this, Mr. Bennitt?  It's dated April
3  3rd, 2006.  ***(start of not on tape)***
4  And if it helps, it has Honeywell at the
5  top.
6      MR. BENNITT:  I'm going
7  through every one of my files -- I mean,
8  every one of the documents in my file.
9      MS. REISS:  You don't have
10 it, Mr. Bennitt?
11     MR. BENNITT:  I don't see it.
12 The only thing that I see that comes
13 close to it is y'alls letter.  And it's
14 not the document.  It's just a paragraph
15 in here about supply accountability.
16     MS. REISS:  Okay.  But, no,
17 I'm talking about this document with
18 Honeywell logo on it.
19     MR. BENNITT:  Okay.  No.
20     Q.  Do you remember when you saw
21 this, Mr. Young?  Apparently it was not
22 in your attorney's office.
23     A.  It may have been in -- maybe

Page 243

1  it was some documents that I got from Mr.
2  Garrett.
3      Q.  Now, it says:  On April 3rd,
4  2006, Gregory Clay was conducting an
5  inventory when he discovered some
6  shortage at a range; is that correct?
7      A.  I don't -- that's what it
8  says.
9      Q.  What is the race of Mr. Clay?
10     A.  He's an African-American.
11     Q.  In your complaint, did you
12 state that -- you did state that only
13 white employees have keys to the supply
14 room?  Now that's incorrect, isn't it?
15     A.  I don't know.
16     Q.  Why would you state that,
17 then, if you don't know?
18     A.  Only whites have a key to the
19 -- at the time, they did.
20     Q.  At what time?
21     A.  During the time that I was
22 out there.
23     Q.  You are saying Mr. Lavar

Page 244

1  didn't have a key to the supply room
2  during the time you were out there?
3      A.  The -- the key was to be --
4  can be checked out, I guess.  I had a
5  key.  I was assigned a key and the key --
6  the other keys are in the -- in the key
7  box.
8      Q.  So you, yourself, had a key
9  to the supply room?
10     A.  Yes.  Because I was -- to the
11 supply room at CPQC because I was in
12 charge of that range.
13     Q.  What are you talking about
14 here, then, only white employees have
15 keys to the supply room?
16     A.  That's the supply room at
17 CPQC.
18     Q.  And you had a key to that?
19     A.  I had one.
20     Q.  And you are not white?
21     A.  No.
22     Q.  Why would you make that
23 statement in the complaint to the Court?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 245

1  That is absolutely false?
2      A.  The --
3      Q.  Why would you make that
4  statement?
5      A.  It's not false.
6      Q.  You just said you had a key?
7      A.  Other than me.
8      Q.  You said only white employees
9  have keys to the supply room.  You didn't
10 say other than me?
11     A.  Can I see that?
12     Q.  I think you have a copy over
13 there.
14         MS. REISS:  Do you have a
15 copy of the complaint, Jeff, over there?
16 Here.  I can give him a copy.  Well,
17 that's not it.  Hold on.
18
19 (Whereupon, Defendant's Exhibit No. 49
20 was marked for identification, and same
21 is attached hereto.)
22
23     Q.  Okay.  Exhibit No. 49 is your

Page 246

1  complaint.  Page five.
2      A.  Okay.  This is the supply
3  room in the bay area.  That's not CPQC.
4  And that is correct, I don't have a key
5  to that.
6      Q.  Does Mr. Lavar have a key to
7  that?
8      A.  At one time, he did.
9      Q.  And did Mr. Clay have a key
10 to that?
11     A.  I don't -- I know Mr. -- the
12 chief that was -- I don't know.  I forget
13 his name, that was over Clay had a key to
14 it.  I don't know.
15     Q.  But you are not sure whether
16 Clay had a key or not?
17     A.  No.
18     Q.  But right now we know the
19 statement is false; correct?
20     A.  No, I don't know that.
21     Q.  Mr. Lavar had a key to
22 this --
23     A.  I don't -- Lavar did not have

Page 247

1  a key to it, I don't think.  He was an
2  inspector.
3      Q.  Mr. Lavar would be the best
4  person to know if he had a key; right?
5      A.  Yes.
6      Q.  Now, in this memo, this
7  write-up, Exhibit -- what is it?  Exhibit
8  48, I believe, you -- your inventory was
9  incorrect on mannequins; correct?
10     A.  I don't know.
11     Q.  You don't know?
12     A.  No.  I was never inquired
13 about it.
14     Q.  I thought you testified
15 earlier you thought that's why you were
16 fired?
17     A.  That's why I was fired, but
18 as far as the mannequins being missing, I
19 was never questioned about that.
20     Q.  Well, the inventory was short
21 on two mannequins, you did not know that?
22     A.  I was not there when the
23 inventory was done.

Page 248

1      Q.  Were you told about that
2  issue?
3      A.  No.  I wasn't told about this
4  until May 30th.
5      Q.  Were you told May 30th about
6  this?
7      A.  I was told at May 30 that I
8  was terminated for inaccountability of
9  government supply, whatever that was --
10 whatever the statement was.
11     Q.  Improper supply
12 accountability and improper posting of
13 database.  And on this form it states:
14 You have been counseled numerous times on
15 your inventory procedures.  Did you see
16 that?
17     A.  Yes.  It's on there, but --
18     Q.  And, in fact, you -- your
19 green belt project was about inventory;
20 correct?
21     A.  That's correct.
22     Q.  And Honeywell can get fined
23 by their customer, the government, if

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 249

1  their inventory is off; is that correct?
2      A.   That's correct.
3      Q.   And you are required to post
4  a form 3318 to keep track of your
5  inventory; right?
6      A.   That's correct.
7      Q.   And do you know who made --
8  and you said you didn't know who made the
9  recommendation for your termination. Do
10 you know who made the final decision for
11 your termination?
12     A.   The final decision would have
13 came from Honeywell.
14     Q.   Right. But what person?
15     A.   Jim Garrett.
16     Q.   Did he ever work with you on
17 a day-to-day basis?
18     A.   Never.
19     Q.   What information do you have
20 that Mr. Garrett might be racist?
21
22         (Brief interruption.)
23

Page 250

1      A.   Repeat the question, please?
2      Q.   What evidence, if any, do you
3  have that Mr. Garrett would have fired
4  you based on your race?
5      A.   I don't have any evidence.
6      Q.   In fact, Mr. Garrett sent you
7  a severance agreement; correct?
8      A.   That's correct.
9      Q.   And you called him and asked
10 him for -- he offered you more time to
11 fill it out beyond the deadline for it?
12     A.   He did.
13     Q.   And you decided not to sign
14 the severance agreement?
15     A.   I did.
16     Q.   Do you know that the -- were
17 you aware that the government
18 congratulated Honeywell on your
19 termination?
20     A.   No, I wasn't.
21
22
23

Page 251

1  (Whereupon, Defendant's Exhibit No. 50
2  was marked for identification, and same
3  is attached hereto.)
4
5      Q.   Let me show you what we will
6  mark as Exhibit No. 50, and I'll show you
7  this is a performance evaluation. Part
8  of it is whited out as these are
9  confidential. Under staffing and
10 personnel for which they rate Honeywell,
11 it's stated in the middle of that
12 paragraph: During the quarter, the PM,
13 that would be the project manager, made a
14 difficult staffing termination in the
15 range maintenance area. Honeywell
16 personnel have proven their flexibility
17 and initiative in their outstanding
18 support to new and different training
19 events.
20         Mr. Young, were you aware that the
21 government commended Mr. Erickson on this
22 decision?
23     A.   No, I wasn't.

Page 252

1  (Whereupon, Defendant's Exhibit No. 51
2  was marked for identification, and same
3  is attached hereto.)
4
5      Q.   I'm going to show you what
6  was produced to us by your attorney.
7  Tell me what that is, please, sir?
8      A.   This was my personal
9  documentation of incidents that were
10 occurring and when I felt --
11     Q.   Okay. You made those notes
12 for yourself?
13     A.   Yes.
14     Q.   And if we can just go through
15 some of it so I can make sure I
16 understand. You say reason for what?
17 What is that word?
18     A.   Inquiry.
19     Q.   You state you feel like
20 you've been treated unfairly in promotion
21 advances. What promotion are you talking
22 about there?
23     A.   Being promoted.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

## FREEDOM COURT REPORTING

Page 253

1    Q.    What promotion?
2    A.    When I applied for the range
3  tech or the electronic technician job.
4    Q.    You wrote this on December
5  14, '04?
6    A.    Okay.  That was not that
7  one.  That was -- this was for promotions
8  prior to.
9    Q.    What promotions did you apply
10  for before this?
11   A.    Supervisor.
12   Q.    That was the job Jerry Temple
13  got?
14   A.    Yes.
15   Q.    And that was, you said, pre
16  2002; correct?
17   A.    That was.
18   Q.    Okay.  Any other promotion
19  positions?
20   A.    If I'm not mistaken, this is
21  the one where -- with the electronic
22  technician as well.  This is December
23  '04.  Yeah.  This is the electronic tech,

Page 254

1  if I'm not mistaken.
2    Q.    Was that position not awarded
3  in November of '05?
4    A.    It was awarded -- I don't
5  know.
6    Q.    Any other promotion
7  positions?
8    A.    Those are the -- those are
9  the two that I applied for.
10   Q.    You say: Position movement
11  from within department section.  What
12  does that mean?
13   A.    Those are the positions.
14   Q.    What?
15   A.    Those are the positions from
16  within.
17   Q.    Oh, okay.  But we've talked
18  about the two promotions you are talking
19  about; is that correct?
20   A.    That's right.
21   Q.    And you -- then you say: I
22  also feel I've been denied because I'm
23  African-American.  What were the other

Page 255

1  reasons you felt like you had been
2  denied?
3    A.    Okay.  The way the question
4  reads is:  I feel that I have been
5  treated unfairly in promotion advances.
6    Q.    And then you say:  I also
7  feel I've been denied because I'm
8  African-American.  So what --
9    A.    That's right.  I felt that I
10  was denied those advances because I was
11  African-American.
12   Q.    But you say you were treated
13  unfairly.  How were you --
14   A.    Unfairly, yes, because I was
15  denied promotion because I was as
16  qualified with my years there as well as
17  the experience that I had.
18   Q.    Let me make sure I ask the
19  question clearly for the record.  You
20  say:  I feel like I've been treated
21  unfairly in the beginning, and then you
22  say:  I also feel like I've been denied
23  because I'm African-American.  If you say

Page 256

1  also, that tends to show there were other
2  reasons.  What were the other reasons you
3  thought you were denied promotion?
4    A.    I just told you the reasons
5  and what I said.  There's -- I mean, you
6  are cat-and-mousing with the words.  I --
7  I'm telling you what I said and what I
8  meant.  I don't know what -- I don't know
9  what more you want me to say.
10   Q.    How did -- and you say -- is
11  Mr. Temple the person who you are
12  referring to who cussed you?
13   A.    Yes.
14   Q.    How did he curse at you?
15   A.    I came in from my lunch
16  hour.  I got a sandwich, like we usually
17  do, put it in the microwave.  He was
18  sitting down eating.  He looked up, and
19  he said, what the fuck are you doing in
20  here?  I turned around and looked at
21  him.  I didn't say anything.  I turned
22  around and pulled my sandwich back out,
23  put it back in the refrigerator.  I

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 257

1 walked out, and then I walked back in,
2 and I told him that he needed to learn
3 how to speak to people. And I turned
4 back around and walked back out, got in
5 my truck and left. I then --
6 **Q. You went home?**
7 A. No. I left and went back to
8 my job.
9 **Q. Okay.**
10 A. I came back that afternoon,
11 went in and explained what happened to
12 Mr. Erickson. Mr. Erickson said that it
13 was my fault, that I made him cuss me
14 because I came in late that day. And I
15 said, is that right? He goes, yeah. And
16 I said, how was I wrong? I have
17 witnesses that saw what happened. I
18 didn't do anything to provoke him. Well,
19 that was -- that was your fault.
20 **Q. What -- who were your**
21 **witnesses?**
22 A. The -- at the time, it was
23 the supply clerk and David Holland.

Page 258

1 **Q. And I'm sorry --**
2 A. Mr. Holland went to Ken and
3 told Ken that Jerry was wrong in what he
4 did and told him what he did and Mr.
5 Erickson says -- told him, well, I know
6 he did it, but, you know, Jerry is just
7 Jerry.
8 **Q. Did Mr. Temple cuss at other**
9 **people?**
10 A. Not to my knowledge.
11 **Q. You never heard him cuss at**
12 **anyone else?**
13 A. Not in that -- not in that
14 way, no.
15 **Q. In what way?**
16 A. The way that he cussed me.
17 **Q. What ways did he cuss other**
18 **people?**
19 A. As far as in cussing people,
20 not cussing them in general. But talking
21 to them using profanity, yes.
22 **Q. Okay.**
23 A. Not in the manner to belittle

Page 259

1 someone. I mean -- you know, I'm not a
2 dog or nothing, you know. I don't expect
3 to be treated that way.
4 **Q. You said he used profanity**
5 **with other people?**
6 A. Yes.
7 **Q. Okay.**
8 A. As my supervisor, yes, he
9 cussed me.
10 **Q. And when -- and he cussed**
11 **other people he supervised?**
12 A. I don't know.
13 **Q. I thought you just said he**
14 **used profanity with other people?**
15 A. I said he used profanity
16 around. I didn't say he cussed anyone.
17 I said he used profanity around other
18 people. I don't know that. All I know
19 is what he did to me.
20 **Q. Did you ever talk back to**
21 **him?**
22 A. Yes. We've had our bouts.
23 **Q. You said: I've been accused**

Page 260

1 **of sleeping by supervisor and program**
2 **manager numerous times but never**
3 **documented. Do you know if you were**
4 **accused because the government saw you**
5 **sleeping and reported it to Honeywell?**
6 A. Say that again.
7 **Q. Do you know if you were**
8 **accused because the government saw you**
9 **sleeping and reported it to Honeywell?**
10 A. I wasn't sleeping to begin
11 with. I mean, they accused me of that
12 and reported it. I don't even -- I don't
13 know if the report was actually accusing
14 me of sleeping.
15 **Q. Well, the e-mails we saw from**
16 **Mr. Leyh say that you were sleeping;**
17 **correct?**
18 A. Is that on that one -- yeah.
19 **Q. And then you say: Moved from**
20 **my position to a -- to -- in my section**
21 **to a lesser technical position. Are you**
22 **saying that's when you had the rotation**
23 **with Mr. Hines?**

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 261

1    A.    Yes.
2    Q.    And you are saying: You give
3  my job to a younger man with no
4  experience. Mr. Hines was a range tech
5  at the same time -- at that time as you
6  were; right?
7    A.    Yes.
8    Q.    So he did have experience?
9    A.    No.
10    Q.    He didn't?  He was a range
11  tech with no experience, is that --
12    A.    Yes.
13    Q.    -- what you are saying?
14    A.    Yes.
15    Q.    You say: I have been here
16  seven years and I am divi -- I don't know
17  what that word is.  It starts with a D.
18    A.    Are you on the first page
19  still?
20    Q.    Um-hum (positive response).
21  See where the sentence starts: I've been
22  here seven years and I am something with?
23    A.    I don't even see where I've

Page 262

1  been here --
2    Q.    Eight lines from the bottom.
3    A.    From where, the bottom?
4    Q.    Right.
5    A.    Okay.  Diversed.
6    Q.    I've been diversed in all
7  areas of this facility?
8    A.    I didn't say been.  I said:
9  I am diversed in all areas of the
10  facility.
11    Q.    What does that mean?
12    A.    That means that I can do
13  every job out there.
14    Q.    You say: African-Americans
15  hired in all required -- are all required
16  to have educational requirements with no
17  exceptions, when white man applies there
18  are exceptions?
19    A.    That's right.
20    Q.    We currently have an
21  individual hired with no high school
22  education or GED in a highly skilled and
23  educational position.  Who is that?

Page 263

1    A.    David Holland.
2    Q.    When was David Holland hired?
3    A.    One year before I was.
4    Q.    And what was he hired as?
5    A.    He was hired as a laborer.
6    Q.    Okay.
7    A.    But he -- he was paid step-
8  grade as a -- a light equipment operator.
9    Q.    Does he have a CDL?
10    A.    He eventually got a Class B.
11    Q.    And does the light equipment
12  operator have -- require an educational
13  minimum?
14    A.    No.
15    Q.    So what -- what is -- why are
16  you making this statement?
17    A.    Because his job that he
18  possesses now does.
19    Q.    But this -- you wrote this in
20  -- in December of '04?
21    A.    That's right.  And he was at
22  that position at that time.
23    Q.    What position is that?

Page 264

1    A.    What's his position title?
2    Q.    I don't -- I don't work at
3  Honeywell.  You tell me.
4    A.    He's a carpenter.
5    Q.    Okay.
6    A.    He has a Class B.
7    Q.    Does a carpenter have a
8  minimal educational requirement?
9    A.    That position has one.
10    Q.    What is it?
11    A.    You have to have at least a
12  GED, high school education or X amount of
13  years, but -- and to work at any job at
14  Honeywell, you have to have either a GED
15  or a high school education.
16    Q.    You just said the job
17  required a GED or experience equivalent,
18  did you not?
19    A.    No, I never stated that.  I
20  never completed that equivalent.
21    Q.    Are you positive that the
22  carpenter job has an education -- has a
23  requirement of either a GED or five years

66 (Pages 261 to 264)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 265

1  experience?
2      A.  I'm not absolute.
3      Q.  Then you say: "Manger"
4  continues to hire family members,
5  sisters, brothers and nephews working
6  directly with each other in the same
7  section, Paula and Angie Bowman.  Now,
8  they are both in safety; correct?
9      A.  Yes.
10     Q.  They do not work under each
11 other, do they?
12     A.  At times they do.
13     Q.  When do they ever report to
14 each other?
15     A.  When Paula is -- is -- she
16 gets the lead -- what's it called, shift
17 leader position.
18     Q.  They never worked on the same
19 shift is my understanding.
20     A.  They have.
21     Q.  How many times?
22     A.  I don't recall.  I don't --
23 I'm just --

Page 266

1      Q.  Was it an exception?
2      A.  They have done it.
3      Q.  Do you know how many times?
4      A.  At least once.
5      Q.  And then the Engles brothers,
6  is that Travis and Roger?
7      A.  Yes.
8      Q.  They have two different jobs?
9      A.  Yes.
10     Q.  And they don't report to each
11 other?
12     A.  No.
13     Q.  And then Holland and nephew.
14 Who is the nephew?
15     A.  That was Chris Holland.
16     Q.  Did they report to each
17 other?
18     A.  At times they did.
19     Q.  Who reported to who?
20     A.  Chris reported to David.
21     Q.  What was Chris' job?
22     A.  Laborer.
23     Q.  Then you write:  I feel

Page 267

1  investigation into the hiring practices
2  needs to be done to ensure that future
3  integrity and well-being of the fellow
4  employees is not jeopardized because of
5  -- what does that have to do with -- with
6  your claim?
7      A.  This right here was my
8  personal documentation.  This never --
9      Q.  Okay.  You never showed this
10 to anybody?
11     A.  That's right.
12     Q.  Okay.  And then you just
13 summarize underneath here, is that what
14 you did?
15     A.  Yes.
16     Q.  Now, you have number four:
17 Refused to hire African-American equally
18 and you have a question mark out beside
19 that.  Why did you put a question mark
20 out there?
21     A.  I wanted to require further
22 investigation.
23     Q.  So you were investigating

Page 268

1  Honeywell at this point?
2      A.  On my own to -- to see if
3  they were treating the African-Americans
4  properly.
5      Q.  Is this like a secret
6  journal?
7      A.  No.  It's not a secret
8  journal.  If it was, you wouldn't --
9      Q.  You didn't show it to anyone,
10 did you?
11     A.  It was my personal journal.
12     Q.  Well then -- okay.  The
13 position move placed on me has been
14 humiliating, degrading and very
15 "embrercing" to me?
16     A.  Embarrassing.
17     Q.  Okay.  It's not spelled that
18 way.  Why was it humiliating and
19 degrading to be transferred among ranges?
20     A.  The -- the way in which Ken
21 went about doing it is -- is the -- his
22 whole intentions was to -- to set me up
23 to get me terminated to begin with.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

1     **Q.   How is that?**
2     A.   Look at all what you've got
3  there. It sums it up.
4     **Q.   I'm asking you specifically:**
5  **How was it humiliating and degrading to**
6  **you to do a rotation shift on a range**
7  **job?**
8     A.   I felt -- I felt that he
9  changed my position to humiliate me.
10    **Q.   What do you base that on?**
11    A.   I based it on the fact that
12  he brought in a lesser individual as far
13  as trained to -- to -- to change me over.
14    **Q.   Does Mr. Hines have the**
15  **disciplinary history you have?**
16    A.   He has a disciplinary
17  history.
18    **Q.   Does he have the same -- as**
19  **many as you do?**
20    A.   Well, I've been there eight
21  years. He's only been there four --
22  three or four. But he has -- he has some
23  serious violations --

1     **Q.   Have you --**
2     A.   -- and award fee costs.
3     **Q.   Have you had an award fee**
4  **issue?**
5     A.   No. Mine weren't -- didn't
6  cost the award --
7     **Q.   The government didn't --**
8     A.   -- to my knowledge.
9     **Q.   They didn't have to pay for**
10  **-- to fix that truck that you --**
11    A.   No. It came out of
12  Honeywell's pocket, not the government's.
13    **Q.   Is that not worse to come out**
14  **of Honeywell's pocket?**
15    A.   No. It didn't cost -- the
16  award fee is worse.
17    **Q.   It's all Honeywell's money,**
18  **is it not?**
19       MR. BENNITT:  Y'all want to
20  take a break? I do.
21       MS. REISS:  Okay.
22       MR. BENNITT:  Take about ten.
23

1       (Brief recess.)
2
3     **Q.   (By Ms. Reiss) Mr. Young, do**
4  **you have a CDL license?**
5     A.   Not a license.
6     **Q.   Okay.**
7     A.   But I am -- I have a -- I'm
8  taking the test Monday.
9     **Q.   But you didn't have one when**
10  **you worked at Honeywell?**
11    A.   No.
12    **Q.   So you couldn't have done a**
13  **number of the jobs at Honeywell, correct,**
14  **without a CDL license?**
15    A.   The only one I couldn't do is
16  drive a truck. As far as operating all
17  the equipment, I could operate all the
18  equipment. I've been trained in it.
19    **Q.   Mr. -- you say here that Mr.**
20  **Erickson told you that the government had**
21  **a perception of you that you slept on the**
22  **job; is that right?**
23    A.   I said that?

1     **Q.   Yes. In your notes?**
2     A.   I don't -- I don't recall
3  stating in there that Mr. Erickson said
4  that. I said the supervisors.
5     **Q.   The project manager informed**
6  **certain individuals my move was because**
7  **of a perception of a government employee**
8  **I was sleeping on the job?**
9     A.   Oh, yes. Yes. Okay.
10    **Q.   Okay.**
11    A.   My bad. That was absolute.
12    **Q.   Now, I'm looking at this --**
13  **I'm just going to show you this document**
14  **right here. This is your handwriting;**
15  **correct?**
16    A.   Um-hum (positive response).
17    **Q.   And you say: Before**
18  **Christmas I made a complaint that I was**
19  **being unfairly treated. Who -- is that**
20  **when you called --**
21    A.   Shawanda.
22    **Q.   Okay. And that's Christmas**
23  **2004?**

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 273

1    A.    I believe so.
2    Q.    Do you know if Mr. Erickson
3    was ever alerted to that complaint?
4    A.    I'm not aware.
5    Q.    Do you have your complaint in
6    front of you?
7    A.    This one (indicating)?
8    Q.    Your complaint that you filed
9    with the Court.
10   A.    Hang on.
11   Q.    There it is.  Okay.  Why are
12   you living with your mother?
13   A.    Why am I living with my
14   mother?
15   Q.    (Nods head affirmatively.)
16   A.    Because I'm separated from my
17   wife.
18   Q.    Why don't you have your own
19   place?
20   A.    At the time I didn't have
21   anywhere to go.
22   Q.    You -- you didn't want to get
23   your own apartment or anything?

Page 274

1    A.    Excuse me?
2    Q.    You didn't want to get your
3    own apartment or anything?
4    A.    At the time I wasn't
5    financially able to get my own apartment.
6    Q.    Does your mother charge you
7    rent?
8    A.    Yes.
9    Q.    How much does she charge you
10   in rent?
11   A.    I pay half the bills.
12   Q.    What does that average out
13   to?
14   A.    It fluctuates.
15   Q.    What does that average out to
16   a month?
17   A.    Seven hundred.
18   Q.    On paragraph six of your
19   complaint, you say you failed to get a
20   promotion that you were qualified to
21   receive and the promotion was given to a
22   white male, Robert Hadley.  Is that the
23   electronics job?

Page 275

1    A.    Yes.
2    Q.    And do you know who actually
3    had the high -- who had the highest score
4    overall for that job?
5    A.    Yes.
6    Q.    Who was that?
7    A.    I did.
8    Q.    Actually, no.  A man named
9    Mr. Walls I believe had the highest
10   score.  Were you aware of that?
11   A.    Doug Riston informed me that
12   I had the highest score.
13   Q.    On the test; correct?
14   A.    On the test.
15   Q.    Okay.
16   A.    Yes.
17   Q.    But that -- Mr. Walls
18   actually had the highest score on the
19   test.  He was an outside applicant.  Do
20   you know him?
21   A.    No.  I was informed by Mr.
22   Riston, who gave the test, that I had the
23   highest score.

Page 276

1    Q.    Okay.
2    A.    He told me this when the job
3    was handed out, that I didn't get the job
4    because he handed it to -- he gave it to
5    Robert Hadley, and I asked him who had
6    the highest score and he said, you did.
7    Q.    Between you and Mr. Hadley;
8    is that correct?
9    A.    No.
10   Q.    Well, did he qualify it?  Did
11   he say, you had the highest score of
12   everyone or did he --
13   A.    I didn't ask him that.
14   Q.    Okay.  Now, do you -- did you
15   have the degree necessary for the job?
16   A.    No, I didn't.
17   Q.    Did Mr. Hadley?
18   A.    The job asked for a degree or
19   equivalent experience.  So I didn't have
20   the degree, but I had the experience.  He
21   had the degree, but not the experience.
22   I scored highest on the test, between the
23   two of us, me and Mr. Hadley, as you say.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 277

1     Q.    Well, were you aware of Mr.
2  Hadley's experience outside -- he was an
3  outside applicant; correct?
4     A.    Yes.
5     Q.    Were you aware of his
6  experience outside of Honeywell?
7     A.    Yes.
8     Q.    When was Mr. Hines placed on
9  a year's probation?
10    A.    Excuse me?
11    Q.    When was Mr. Hines placed on
12 a year's probation?
13    A.    When he had a serious safety
14 violation, he failed to lockout/tagout a
15 enter box, electrical box, which caused
16 him to have a -- get electrocuted and had
17 to be sent to the emergency room.
18    Q.    How do you know he was placed
19 on a year's probation because of this?
20    A.    Because they have what they
21 call the wall of fame where people who
22 get violations, safety, whatever, they
23 post it on the wall for everybody to see.

Page 278

1     Q.    And here's my question: How
2  do you know he was put on a year's
3  probation, because I do not have that
4  knowledge?
5     A.    He was placed on a year's
6  probation.
7     Q.    Where did you see that?
8     A.    It was a safety violation.
9     Q.    Where did you see he was
10 placed on a year's probation?
11    A.    Mr. Erickson stated he was
12 put on a years.  Chris stated he was put
13 on a years.
14    Q.    When did Mr. Erickson state
15 he was placed on a year's probation?
16    A.    For the safety violation.
17    Q.    When did he say that?
18    A.    Shortly thereafter.  It came
19 out on -- on the brief.
20    Q.    On the brief?
21    A.    Not the brief, but the wall
22 of fame.
23    Q.    It said Mr. Hines is placed

Page 279

1  on a year's probation?
2     A.    Okay.  Chris told me he was
3  on a year's probation.  Mr. Erickson told
4  me he was on a year's probation.  I did
5  not see his form that said he was on a
6  year's probation.
7     Q.    When did Mr. Erickson tell
8  you that, for the third time I've asked
9  that?
10    A.    Thereafter, he was -- it was
11 -- it was -- it happened.  A week after.
12    Q.    Why was he talking to you
13 about Mr. Hines?
14    A.    You'll have to ask him.
15    Q.    Were you placed on a year's
16 probation when you violated a lockout/
17 tagout?
18    A.    At the time, that policy
19 wasn't in.
20    Q.    Do you know if Mr. -- when
21 was he placed on this year's probation?
22    A.    Ma'am, I don't --
23    Q.    According to you?

Page 280

1     A.    I don't know the exact date.
2     Q.    Do you know if he's had any
3  other -- did he have --
4     A.    Yes.
5     Q.    -- any other violations
6  within that year?
7     A.    Yes.
8     Q.    What year was it then?
9     A.    '05.
10    Q.    What other violations did he
11 have in '05?
12    A.    He was transporting a piece
13 of iron on the back of a truck with --
14 without the proper flagging and he was
15 cited for that.  They were -- he was also
16 involved with Mr. Erickson's truck that
17 got hit by a moving piece of equipment
18 from the bay area.  When it was
19 investigated by a safety individual from
20 Jacksonville, it was noted that Mr.
21 Erickson was at fault, so they decided
22 not to report it.
23    Q.    Because it wasn't Mr. Hines'

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 281

1  fault?
2      A.    Well, they stated it was all
3  of their fault, Mr. Erickson for parking
4  his car too close to the work area.  So
5  he decided not to report it to the
6  government but give everybody
7  disciplinary actions on it.
8      Q.    Have you ever seen Mr. Hines'
9  file?
10     A.    No.
11     Q.    You state here that Mr. Hines
12  grossly violated a safety procedure.
13  Isn't it true that the machinery he was
14  working on was wired differently than the
15  other machinery?
16     A.    No.
17     Q.    And they've since made a
18  chart of how these -- these mechanisms
19  are wired?
20     A.    No.
21     Q.    You've never seen the chart
22  that Mr. Lavar made of the mechanism he
23  worked on?

Page 282

1      A.    He made a mechanism for
2  procedure on how to lockout/tagout a
3  box.  The box itself has never changed.
4  It's wired the same.
5      Q.    It's wired differently than
6  the other boxes, though; correct?
7      A.    No.
8      Q.    You state on page three of
9  your complaint:  Plaintiff alleges he was
10  terminated after blank years on the job
11  on May 30th, 2006.  The reason given to
12  him was poor performance supported by
13  numerous write-ups.  Then on the next
14  page you say:  Plaintiff alleges that the
15  reason he was given for being terminated
16  was two mannequin pop-up targets were
17  missing.  Which is it, the numerous
18  write-ups or the mannequin pop --
19  mannequins missing?
20     A.    Improper accountability and
21  the mannequins.
22     Q.    So you are --
23     A.    It's improper accountability

Page 283

1  of the mannequins is what it was, and the
2  database.  I didn't get this information
3  until a month or two months afterwards
4  when at termination they just stated that
5  I was being terminated, and when I asked
6  Mr. Erickson, he told me, you know, you
7  are just terminated.  And then -- I mean,
8  I had to get it from Mr. Garrison and
9  then they typed --
10     Q.    Mr. Garrett; correct?
11     A.    Garrett.  I --
12     Q.    So which reason is it, poor
13  performance supported by numerous
14  write-ups or terminated because two
15  mannequin pop-up targets were missing?
16     A.    You are asking me --
17     Q.    Yes.
18     A.    -- why it was?
19     Q.    It's your complaint.  You
20  wrote two different reasons for why you
21  were terminated.
22     A.    The termination that I was
23  given was inaccountability, which is for

Page 284

1  the -- the two mannequins, and improper
2  data entry, I guess.
3      Q.    And this was your third
4  write-up in a year on these mannequins;
5  correct?
6      A.    No.
7      Q.    The documentation speaks for
8  itself.  And you have cost the company
9  money yourself, correct, in the past and
10  were not terminated?
11     A.    No, I don't recall.
12     Q.    The truck accident?
13     A.    I -- if he says it.  I mean,
14  he wasn't here when it went on, so I say
15  no.
16     Q.    You just told me Honeywell
17  had to pay for that accident?
18     A.    I -- I was told Honeywell
19  did, but I don't know who paid for it.
20     Q.    Well, somebody had to pay for
21  it, didn't they?
22     A.    That's right.
23     Q.    And it wasn't you?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 285

1    A.   No, it wasn't.
2    Q.   And you caused that accident;
3  correct?
4    A.   That's right.
5    Q.   But you want Mr. Hines to be
6  fired for being injured on a lockout/
7  tagout situation, but you don't think you
8  should have been fired for the car
9  accident, the truck accident?
10   A.   I didn't say I wanted Mr.
11 Hines fired for that. I just said he --
12   Q.   You compared --
13   A.   I just said he was not
14 terminated for that infraction.
15   Q.   You did not note that the
16 mannequins were taken out of inventory on
17 the 3318 sheet, were you?
18   A.   I don't recall. If the
19 inventory was to be done properly, I
20 should have been on-site to -- to justify
21 whether they were or not. Mr. Clay was
22 there by himself.
23   Q.   Mr. Clay is a black male?

Page 286

1    A.   Yes, he is.
2    Q.   And he's the one who noticed
3  the discrepancy?
4    A.   He was the only one there.
5    Q.   Are you saying that Mr. Clay
6  has something against you because of your
7  race?
8    A.   No. What I'm saying is if it
9  was a proper inventory, that two
10 individuals would be there to -- that are
11 involved to conduct it, not one
12 individual. The government requires that
13 it be done with Honeywell and with the
14 government. I mean, it could have been
15 twenty of them, for all I know. He could
16 have said twenty were missing.
17   Q.   Well, so you are saying Mr.
18 Clay lied?
19   A.   I'm not -- I'm saying that I
20 was not present --
21   Q.   Okay. And this --
22   A.   -- for the accountability.
23   Q.   But I'm asking you -- you are

Page 287

1  saying that you were --
2    A.   I'm saying --
3    Q.   -- terminated based on your
4  race and I'm saying does Mr. Clay have a
5  vendetta against you because of your
6  race?
7    A.   I'm saying Mr. Erickson sent
8  Clay down there to do that.
9    Q.   How do you know that?
10 Doesn't the government contract require
11 ten percent inventories on a monthly
12 basis?
13   A.   Scheduled by Mr. Erickson.
14   Q.   How did he know what Mr. Clay
15 was going to find?
16   A.   Why wasn't I present?
17   I don't know why you left
18 McDonald's wrappers in your truck
19 either. I can't answer questions for
20 you. I'm asking you: How did he know
21 what Mr. Clay was going to find?
22   A.   He didn't.
23   Q.   Okay.

Page 288

1    A.   But my termination was based
2  on Mr. Clay's evaluation; right?
3    Q.   I'm not here to answer your
4  questions. I'm here to ask them. Okay.
5  You say here that -- on page five of your
6  complaint: Plaintiff alleges that he was
7  put on a year's probation for one year
8  for not filling out a PMCS form before
9  driving his truck, in contraindication to
10 the written company policy which calls
11 for a written warning. You were given a
12 written warning for that violation?
13   A.   For which violation?
14   Q.   For not having your PMCS
15 forms; correct?
16   A.   Yes.
17   Q.   It doesn't prohibit him from
18 putting you on probation with the written
19 warning for a year, does it, the
20 disciplinary policy?
21   A.   Does not what?
22   Q.   Prohibit him from putting you
23 on probation with that written warning?

72 (Pages 285 to 288)

# FREEDOM COURT REPORTING

Page 289

1  In fact, Honeywell's disciplinary policy
2  states on the second page: The company
3  reserves the exclusive right to
4  interpret, administer and apply this
5  policy, to make exceptions to it and to
6  change the policy at any time and for any
7  reason; is that correct?
8      A.  That's correct.
9      Q.  Mr. Culpepper, you stated,
10  had six preventive maintenance violations
11  before he was terminated.  How do you
12  know that?
13      A.  Because when he gets a
14  violation, then it's noted.
15      Q.  But they weren't all
16  preventive maintenance violations, were
17  they?
18      A.  Yes.
19      Q.  Have you seen his personnel
20  file?
21      A.  No.
22      Q.  And then you state in your
23  complaint that you were suspended for

Page 290

1  five days in January of '06 for having a
2  Coke can and a candy wrapper in the
3  truck.  Now, that's not true, is it?
4      A.  Yes, it is.
5      Q.  You also had a blower full of
6  gasoline in the truck?
7      A.  The blower wasn't assigned to
8  me.
9      Q.  But the truck was assigned to
10  you, was it not?
11      A.  The truck was assigned to me.
12      Q.  And the blower full of gas
13  was in the truck; correct?
14      A.  I was -- I was given
15  permission to leave the blower in my
16  truck.
17      Q.  Who gave you that permission?
18      A.  Jerry Temple.
19      Q.  Did you tell Mr. Lavar that?
20      A.  He knew that.
21      Q.  Did you tell Mr. Lavar that?
22      A.  Mr. Lavar didn't ask me until
23  after the infraction.  But, yes, I told

Page 291

1  Mr. Lavar.
2      Q.  Did he note that in his
3  write-up, that you had gotten permission
4  from Mr. Temple to leave a gas -- a
5  blower full of gas in a truck with --
6  with spray paint and oil cans?
7      A.  Did he note it?
8      Q.  Did he note that Mr. Temple
9  gave you that permission?
10      A.  Did he know that, yes.
11      Q.  Did he note it in his
12  write-up?
13      A.  Evidently not.  No, I don't
14  see it.
15      Q.  And you are stating under
16  oath that you told Mr. Lavar that Mr.
17  Temple said you could do that?
18      A.  Yes.
19      Q.  You said earlier that your
20  helper had put it in there without your
21  knowledge.  Which is it, Mr. Young, did
22  your helper put it in the truck or did
23  Mr. Temple give you permission to do it?

Page 292

1      A.  The truck --
2      Q.  You are under oath, Mr.
3  Young.
4      A.  Yes, ma'am.  Can I answer?
5      Q.  I think you've committed
6  perjury at this point.
7      A.  No, ma'am.  If you will let
8  me explain.
9      Q.  Try to get out of this one.
10  I'm ready.
11      A.  I checked that truck out
12  every day.  I had a blower in my truck
13  every day when I was by myself.  That
14  blower was in my truck every day signed
15  to me.  The time that this incident
16  occurred, my helper, Uti, had to get the
17  -- the blower and sign it out and -- and
18  bring it to the truck.
19      Q.  I thought you said Mr. Temple
20  gave you permission to keep it in the
21  truck?
22      A.  He had given me permission to
23  leave it in the truck.

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 293

1  Q.  Full of gas?
2  A.  It -- I had been leaving it
3  in the truck, whether it was full of
4  gas. He didn't say, leave it full of
5  gas. I just left it full of gas.
6  Q.  Okay.
7  A.  He didn't say not to --
8  Q.  You just said --
9  A.  He didn't say not to leave it
10  full of gas.
11  Q.  You would agree that it is
12  absolutely dangerous to leave a gas
13  blower full of gas in the cab of your
14  truck with oil and paint cans in it?
15  A.  No.
16  Q.  You wouldn't agree with me?
17  A.  No. It's -- it's at the end
18  of the day when no one is in the truck.
19  It's when it's locked up. The next
20  morning I come back, I get it out and I
21  put it in the back of my truck. So, no,
22  it's not dangerous. Who is -- there's no
23  hazard.

Page 294

1  Q.  Is this -- was that
2  considered a safety violation?
3  A.  They wrote it down as a
4  safety violation.
5  Q.  And in accordance with the
6  disciplinary policy, a major safety
7  violation, second event -- offense calls
8  for a suspension of a week; is that
9  correct?
10  A.  If they want to do that.
11  Q.  And that -- but you state in
12  your complaint that the disciplinary
13  policy calls for a verbal warning. That
14  is not true, is it?
15  A.  If that's what it says.
16  Q.  So so far in this complaint
17  we've found at least three statements
18  that are absolutely untrue?
19  A.  If that's what you say.
20  Q.  No. That's what you filed
21  with the Court. I didn't say any of
22  this. You filed this with the Court.
23  How many trucks are on-site at Honeywell?

Page 295

1  A.  That belong to Honeywell and
2  the government?
3  Q.  Or that y'all work with,
4  either government trucks or Honeywell
5  trucks that the Honeywell employees work
6  with?
7  A.  There's probably seven,
8  eight.
9  Q.  And you state here you've
10  seen thousands of trucks after working
11  hours with trash in them. How can that
12  be?
13  A.  They would be the
14  government's trucks, Honeywell's trucks
15  over a period of whatever, eight years
16  I've been there.
17  Q.  But you know it's a policy to
18  clean up the truck; correct? You are
19  responsible for cleaning up that truck;
20  correct?
21  A.  Yes.
22  Q.  It's not a big deal, is it?
23  A.  No.

Page 296

1  Q.  Okay.
2  A.  It's not.
3  Q.  Who was given a lesser
4  discipline for something that you were
5  disciplined for?
6  A.  I can't recall.
7  Q.  The -- when you were -- you
8  noted here you were falsely accused of
9  violence in the workplace. You were
10  never disciplined or reprimanded for that
11  accusation, were you?
12  A.  No.
13  Q.  You didn't suffer any adverse
14  act because of that --
15  A.  Oh yes, I did.
16  Q.  What? What was that?
17  A.  The idea that they were
18  accusing me of something I didn't do to
19  begin with, the -- the fact that if, in
20  fact, it went through for the two weeks
21  of the investigation not knowing I could
22  lose my nursing license because of the --
23  the criminal act. Yes, I was -- I was --

74 (Pages 293 to 296)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 297

1    Q.    But none of that happened;
2  correct?
3    A.    Yes, I was distraught over
4  it.
5    Q.    But none -- you didn't -- you
6  didn't lose your nursing license?
7    A.    No.  Had I not have put up
8  the fight, I could have.
9    Q.    How come you haven't gone to
10 see any kind of psychiatrist or
11 psychologist regarding your termination
12 from Honeywell?
13   A.    I guess I'm in denial.
14   Q.    I thought you said things
15 were getting better?
16     MR. BENNITT:  Don't guess.
17   A.    They are starting, first of
18 the year it's getting better.
19   Q.    You've been terminated from
20 other jobs.  Why is this one different?
21   A.    The other ones wasn't
22 racially discriminating.
23   Q.    You did not work for five

Page 298

1  months after you were terminated; is that
2  correct?
3    A.    Yes.
4    Q.    You just collected
5  unemployment?
6    A.    Yes.
7    Q.    How did you pay your seven
8  hundred dollar rent bill to your mother?
9    A.    I had savings.
10   Q.    Do you pay child support?
11   A.    No.
12   Q.    How -- what do you do to
13 support your children?
14   A.    They stay with me half the
15 time.
16   Q.    You say you applied at
17 Hartford Health Care for an -- what's an
18 LPH job?
19   A.    Never heard of such.
20   Q.    It's in your answers that you
21 signed.
22   A.    Should be LPN.
23   Q.    Did you review your answers

Page 299

1  before you signed them?
2    A.    Yes.
3    Q.    You made a telephone inquiry
4  to Hartford Health Care?
5    A.    Yes.
6    Q.    And that's it, you didn't
7  fill out an application?
8    A.    No.
9    Q.    Who did you speak with at
10 Hartford?
11   A.    The human resource person.  I
12 didn't document a name.
13   Q.    Oakview Manor, you didn't
14 fill out an application?
15   A.    No.  Phone inquiry.
16   Q.    Laura Oaks is Laurel Oaks?
17   A.    (Nods head affirmatively.)
18   Q.    And you only put in an
19 application there?
20   A.    Yes.
21   Q.    Even though you told Mr.
22 Lavar you had a job there?
23   A.    Yes.

Page 300

1    Q.    Transmatic Transmission.
2  What experience did you have with being
3  -- did you have experience as a mechanic?
4    A.    Yes.
5    Q.    Do you have race cars or
6  you've had race cars in the past?
7    A.    Yes.
8    Q.    Do you currently have race
9  cars?
10   A.    Yes.
11   Q.    How many?
12   A.    One.
13   Q.    When did you get that?
14   A.    2000.  That particular one or
15 all -- all the --
16   Q.    Well, you said you have just
17 one now?
18   A.    I have one that's a race car
19 and then I have a chassis of a race car,
20 but, I mean, it's not a race car.
21   Q.    How many race cars have you
22 had at one time, the most that you've had
23 at one time?

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 301

1    A.   Two.
2    Q.   And you just -- you didn't
3  fill out an application at Transmatic
4  Transmission?
5    A.   No.
6    Q.   Wiggins Customs?
7    A.   Right.
8    Q.   You didn't fill out an
9  application?
10   A.   Walk-in.
11   Q.   Fred Hill Motors, you didn't
12  fill out an application?
13   A.   Walk-in.
14   Q.   And then Terry — we talked
15  about Terry Adkins earlier; correct?
16   A.   Correct.
17   Q.   Do you have experience in
18  concrete finishing?
19   A.   As a helper, yes.
20   Q.   When did you do that?
21   A.   What do you mean when did I
22  do that?
23   Q.   When were you a helper in

Page 302

1  concrete finishing?
2    A.   Off and on during the -- the
3  time that I was terminated from -- as far
4  as helping Carnell, and then he -- I was
5  going to see if I could work on with him,
6  he never needed anyone.  I was basically
7  helping him on-site.
8    Q.   And he wasn't paying you?
9    A.   No.
10   Q.   You were just volunteering?
11   A.   To get some experience, yes.
12   Q.   Ricky Presley Construction,
13  you didn't fill out an application?
14   A.   No.
15   Q.   So for five months you
16  couldn't find a job?
17   A.   No.
18   Q.   But you started working in
19  November for this logging company?
20   A.   Yes.
21   Q.   What were you doing for R&S
22  Logging?
23   A.   I was running a cutter.

Page 303

1    Q.   What does -- what does that
2  mean?
3    A.   That cuts the tree down.
4    Q.   And also during this time you
5  were collecting unemployment?
6    A.   No.
7    Q.   I believe you said your
8  unemployment ended in December; is that
9  correct?
10   A.   There -- I believe it was in
11  December or November.  I don't know which
12  one.
13   Q.   So you were working while you
14  were collecting unemployment?
15   A.   Somewhat.
16   Q.   Do you know if that's
17  illegal?
18   A.   No, I didn't.
19   Q.   How could you collect
20  unemployment if you are working?  You are
21  not unemployed?
22   A.   Well, there was days I was
23  working and days I wasn't working.

Page 304

1  That's piecework when you are working in
2  the -- in the woods.  It's not by the
3  hour or whatever.  There would be days
4  you work and days you don't work.
5    Q.   Did you report your income to
6  the unemployment office?
7    A.   My income?
8    Q.   Yeah.  On the days you
9  worked?
10   A.   No.
11   Q.   Now you have your own logging
12  truck; is that correct?
13   A.   Yes.
14   Q.   Why did you leave R&S?
15   A.   I didn't leave R&S until a
16  week ago.  I believe it was a week or
17  two.
18   Q.   It says here that you've been
19  there four weeks -- self-employed for
20  four weeks as of the time you gave us
21  this, which was --
22   A.   No.  It should have been -- I
23  was working at R&S Logging and I

76  (Pages 301 to 304)

## FREEDOM COURT REPORTING

Page 305

1  purchased a truck to work in with R&S
2  Logging, so I was working both sides.
3      Q.   And now you're self-employed?
4      A.   Yeah.
5      Q.   As of a week ago?
6      A.   Two weeks, really.
7      Q.   How much did this truck cost?
8      A.   The truck cost twenty-six
9  thousand.
10     Q.   Where did you get the funds
11 for the truck?
12     A.   I borrowed the money.
13     Q.   From who?
14     A.   A friend.
15     Q.   Who is the friend?
16     A.   Mooney Motor Sports out of
17 Marietta, Georgia.
18     Q.   Money Motor Sports?
19     A.   Mooney.
20     Q.   Mooney - say that again.  I'm
21 sorry.
22     A.   Mooney Motor Sports.
23     Q.   So that's a business?

Page 306

1      A.   He's an LLC.
2      Q.   Who is he behind the LLC?
3      A.   Blaine B. Mooney.
4      Q.   What did you give him as
5  collateral?
6      A.   I didn't give him anything
7  for collateral.
8      MR. BENNITT:  Not even the
9  truck?
10     A.   He's -- he's a lienholder.
11 Oh, my bad.
12     MR. BENNITT:  Listen to the
13 questions.
14     MS. REISS:  Don't coach him
15 at this point.  It's too late now.
16     A.   He's the lienholder.
17     Q.   I was confused.  Why did you
18 give me these -- why did you produce to
19 me these documents -- and maybe your
20 attorney can help me with this one, Mr.
21 Bennitt.  I don't understand why you
22 provided me with these expense documents?
23

Page 307

1  (Whereupon, Defendant's Exhibit No. 52
2  was marked for identification, and same
3  is attached hereto.)
4
5      THE WITNESS:  Why did we
6  provide her with the expense documents?
7      MR. BENNITT:  Everything you
8  and I say is privileged.  You don't ask
9  me questions in front of --
10     THE WITNESS:  Okay.
11     MS. REISS:  Okay.  Mr.
12 Bennitt, why did you provide me with
13 these expense documents?  I don't see how
14 Honeywell is in any way responsible.
15     MR. BENNITT:  No.  That's
16 part of his expenses to run his
17 business.
18     MS. REISS:  Well, what does
19 that have to do with Honeywell?
20     MR. BENNITT:  Nothing.  It
21 just has to do with whether or not he's
22 making money at his job.  See what I'm
23 trying to say?  When he became an

Page 308

1  independent contractor with the logging
2  truck, those are his expenses that go
3  with the money he brought in.
4      MS. REISS:  And these show
5  that he became -- oh.  I'm confused.
6      MR. BENNITT:  Well, let me
7  see that.  Let me see why I --
8      MS. REISS:  Woe.  Woe.  Woe.
9      Q.   When did you become an
10 independent contractor?
11     MS. REISS:  You mean when he
12 owned -- when he opened his business?
13     MR. BENNITT:  I had better
14 look at them and see exactly what they
15 are.
16     MS. REISS:  Here.  Here's a
17 copy.  Because according to him, he only
18 started opening his own business two
19 weeks ago.
20     A.   No.
21     Q.   That's what you just
22 testified --
23     A.   That's when I -- I no longer

77 (Pages 305 to 308)

# FREEDOM COURT REPORTING

1  worked for R&S Logging.
2      **Q.  Right.  That's what I'm**
3  **saying.**
4      A.  I haven't -- but the --
5      MR. BENNITT:  Yeah, that's
6  what -- what it is, Young Trucking.
7      THE WITNESS:  The truck
8  was --
9      MS. REISS:  And it starts in
10  January and he said he didn't have his
11  own business --
12      MR. BENNITT:  Well, I was
13  gone to get a cup of coffee.
14      **Q.  When did -- Young Trucking is**
15  **your business; right?**
16      A.  Yes.
17      **Q.  And that started two weeks**
18  **ago?**
19      A.  No.
20      **Q.  That's what you testified to**
21  **earlier?**
22      A.  No.  The business is
23  documented there at the first of January,

1  I think, or thereof.  Is it --
2      **Q.  Um-hum (positive response).**
3  **That's right.**
4      A.  Yeah.
5      **Q.  And that's when you started**
6  **your own business?**
7      A.  That's when the truck went
8  into business.
9      **Q.  And that's when you started**
10  **your own business?**
11      A.  Yes.  The truck is mine.
12      **Q.  And you said start-up, in the**
13  **corner, thirty thousand dollars; is that**
14  **correct?**
15      A.  That's correct.
16      **Q.  That's the start-up of the**
17  **business cost?**
18      A.  Yes.
19      **Q.  So you borrowed this thirty**
20  **thousand dollars from Mooney Motor**
21  **Sports --**
22      A.  No.
23      **Q.  -- LLC?**

1      A.  No.  I borrowed --
2      **Q.  Where did you borrow that**
3  **money?**
4      A.  I borrowed twenty-eight
5  thousand from Mooney Motor Sports.
6      **Q.  Um-hum (positive response).**
7      A.  I had the additional monies
8  saved up to go with the thirty thousand
9  start-up.
10      **Q.  Okay.**
11      A.  So the company start-ups with
12  thirty thousand.
13      **Q.  So you no longer work for R&S**
14  **as of January?**
15      A.  No.
16      **Q.  You did?**
17      A.  As of two weeks ago.
18      **Q.  Then why -- okay.  Well,**
19  **explain to me -- I don't understand and**
20  **it's late.  Why does that say Young**
21  **Trucking and it's January?**
22      A.  Young Trucking is my truck.
23  I purchased the truck first of January --

1  well, no.  The truck was purchased before
2  January.  It did not go into business
3  until the first of January.  I was
4  working R&S Logging at the same time as I
5  owned the truck.
6      **Q.  So you were doing both?**
7      A.  Yes.
8      **Q.  And you quit R&S two weeks**
9  **ago?**
10      A.  Yes.
11      **Q.  Okay.**
12      A.  But my truck is still --
13      **Q.  Got it.**
14      A.  -- with R&S.
15      **Q.  And you have drivers who**
16  **drive it for you?**
17      A.  Yes.
18      **Q.  Glad we got that cleared up.**
19  **All right.  So these receipts that you**
20  **gave me, like January on where you made**
21  **fourteen hundred dollars --**
22      A.  That's Young Trucking.
23      **Q.  Who -- they gave you this**

# FREEDOM COURT REPORTING

Page 313

1  check?
2      A.  Yes.
3      Q.  And then you have to take the
4  expenses out?
5      A.  No.  Well --
6      Q.  Right?
7      A.  Yes.  This is -- this is a
8  gross --
9      Q.  Okay.
10     A.  Right.  And then I pay my --
11     Q.  And this is your calculation
12  of the expenses?
13     A.  Right.
14     Q.  So you let them use your
15  truck basically?
16     A.  No.
17     Q.  No?
18     A.  They contract me to haul
19  their wood for them.
20     Q.  And now you no longer haul,
21  you have other people haul?
22     A.  I never did haul.  I've had a
23  driver from day one.

Page 314

1      Q.  So what do you do -- oh, and
2  you are no longer trimming for them?
3      A.  Right.
4      Q.  What do you do now during the
5  day?
6      A.  Nothing.
7      Q.  Sounds pretty good.  All
8  right.  Have you thought about getting
9  another job?
10     A.  Yes.
11     Q.  Well, what are you thinking
12  about doing?
13     A.  Buying another truck and
14  driving it.
15     Q.  You didn't need a C -- okay.
16     A.  Yes, I do need a CDL.
17     Q.  Okay.  That's why you are
18  getting your CDL license?
19     A.  That's right.
20
21  (Whereupon, Defendant's Exhibit No. 53
22  was marked for identification, and same
23  is attached hereto.)

Page 315

1      Q.  Can you tell me why you
2  provided me with all of these receipts,
3  Exhibit No. 53?
4      A.  For the same reason you got
5  the other receipts, to show expenses.
6      Q.  You provided me with a
7  receipt for two twenty-nine for Twizzlers
8  from Rite-Aid?
9      A.  That's expenses.
10     Q.  Is that an expense?
11     A.  Yes.
12        MR. BENNITT:  What is a
13  Twizzlers?
14        MS. REISS:  It's licorice.
15        THE WITNESS:  It's lunch.
16        MR. BENNITT:  Sure it doesn't
17  have nothing to do with the -- the
18  logging industry?
19        THE WITNESS:  That was my
20  lunch.
21        MR. BENNITT:  Maybe it's a
22  kind of scrap or -- you know, who knows.
23  I'm sure it's licorice.

Page 316

1      Q.  Okay.  Why do I have these
2  overweight assessment citations?
3      A.  It's an expense.
4      Q.  Because your drivers don't
5  watch how much their haul weigh?
6      A.  Yeah.  And I -- and I have to
7  pay it.
8        MS. REISS:  Are you kidding
9  me, Jeff?  I'm getting his citations for
10  his business?
11        MR. BENNITT:  I just turned
12  over the documents.
13     Q.  I mean, all this says to me
14  is that your drivers don't pay attention
15  to the law or somebody is not training
16  them to pay attention to the law.
17     A.  That's why I don't have that
18  driver anymore.
19     Q.  Well, it's three different
20  drivers as far as I can tell.  We have
21  Jeff Hawk, Robert Douglas and --
22     A.  Two different -- two
23  different drivers.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 317

1    Q.   And Robert -- no.  Robert
2  Phillips.  There's three different names
3  on here.
4    A.   But they are the same if you
5  look at the driver's license number.
6  Phillips and Robert are the same.  Hawk
7  is the other one.
8    Q.   Why does Robert -- why does
9  Robert have two last names?
10    A.   Because whoever inputted it
11 in the computer made an entry --
12    Q.   An error.  Okay.  All right.
13    MS. REISS:  These don't come
14 to Honeywell.
15    MR. BENNITT:  No.
16    MS. REISS:  All right.  Okay.
17 We would agree on that.
18
19    (Brief recess.)
20
21 EXAMINATION BY MR. BENNITT:
22    Q.   What's -- please identify
23 Plaintiff's Exhibit No. 1?

Page 318

1  (Whereupon, Plaintiff's Exhibit No. 1 was
2  marked for identification, and same is
3  attached hereto.)
4
5    A.   This is Jim -- from Jim
6  Garrett, reference, termination.
7    Q.   And does it list the -- the
8  reasons that the company gives for your
9  termination?
10    A.   Yes.
11    Q.   And does it list in that
12 document these -- Defendant's Exhibit No.
13 No. 46 -- I'm sorry, Defendant's Exhibit
14 Nos. 46, 48 --
15    MS. REISS:  And?
16    Q.   And Defendant's Exhibit -- I
17 forgot to write this one down.  This is
18 the March 2005 write-up, which is
19 referenced in that Plaintiff's Exhibit
20 No. 1.
21    MS. REISS:  Actually, it says
22 March 2003.
23    MR. BENNITT:  Let me see

Page 319

1  that.  Well, I'll be darn.  Well, let's
2  see.  We've got two out of three there.
3    Q.   Do you know what -- let's go
4  back to Plaintiff's Exhibit No. 1.  What
5  -- when it says March 2005, do you know
6  which one he's talking about?  Okay.
7  He's talking for sure about Defendant's
8  Nos. 46 and 48; correct?
9    A.   Correct.
10    Q.   And now he's got March 2005.
11 Do you -- we've been here all day --
12    A.   March 3rd, 2005.  That's
13 going to be -- that's going to be when
14 the -- the PMCS on the truck.
15    Q.   Well, this -- this is --
16 isn't that the toolbox thing on the
17 truck?
18    A.   No.
19    Q.   Okay.  Now, you -- this --
20 this right here, January the 26th, okay,
21 is --
22    A.   Of '06.
23    Q.   Is right there?

Page 320

1    A.   Yes.
2    Q.   And this is Defendant's No.
3  46?
4    A.   Um-hum (positive response).
5  Yes.
6    Q.   All right.  Now, what do you
7  mean by PMC on the truck?  Did I say PMC?
8    MS. REISS:  S.
9    A.   PMCS.
10    Q.   PMCS.  Have you got -- can
11 you look -- look in there and see if you
12 can't find the March 2005 disciplinary.
13    MS. REISS:  Here it is.  He
14 signed it.
15    MR. BENNITT:  And that was
16 Exhibit --
17    THE WITNESS:  March 2005?
18
19    (Off-the-record discussion.)
20
21    THE WITNESS:  Is that it?
22    MR. BENNITT:  That's it.
23 Exhibit No. 41.

80  (Pages 317 to 320)

# FREEDOM COURT REPORTING

1    MS. REISS: All right.
2    MR. BENNITT: Got that --
3    Madam Court Reporter got those three?
4    Okay. So these are the three they are
5    talking about, correct, Nos. 48, 46 and
6    41; correct?
7    A.    Correct.
8    Q.    That's what they say you got
9    terminated over; right?
10    A.    Yes.
11    Q.    Okay.
12    MS. REISS: Watch your
13    leading.
14    MR. BENNITT: Oh.
15
16    (Off-the-record discussion.)
17
18    MS. REISS: I just want to
19    make sure I'm seeing what I'm seeing.
20    Q.    Okay. Do you -- are you
21    ready for the next question?
22    A.    Ready.
23    Q.    I'm going to show you this

1    one, this is the Honeywell -- and I don't
2    have the number on this one either.
3    A.    It's up at the top, No. 23.
4    Q.    Yeah. No. 23. That's one
5    you've been talking about in this
6    deposition, the disciplinary policy?
7    A.    Yes.
8    Q.    What is the date on that
9    policy?
10    A.    14th of March, 2006.
11    Q.    What -- and that's
12    Defendant's No. 23?
13    A.    Yes.
14    Q.    Now, some of those
15    disciplinaries that -- that they are
16    talking about here on Plaintiff's Exhibit
17    No. 1 come before the date on that
18    policy; right?
19    A.    That's correct.
20    Q.    Well, have you ever seen any
21    written disciplinary policy other than
22    Defendant's No. 23?
23    A.    No.

1    Q.    There may be -- they may
2    exist but you've just never seen them; is
3    that right?
4    A.    I've never seen them.
5    Q.    Well, have you ever heard
6    from anybody who said that there was a
7    drop-off time for stuff being knocked out
8    of your file, you personnel file?
9    A.    Yes. Yes.
10    Q.    And what -- first of all,
11    what -- who did you hear it from?
12    A.    Jimmy Hodges.
13    Q.    What did -- what did he say?
14    A.    He told me that after every
15    two years that the file was cleaned out,
16    personnel file.
17    Q.    Did -- did you ever see a
18    written policy on that?
19    A.    No.
20    Q.    You were asked whether or not
21    Mr. Temple had any input in your
22    termination sometime in this deposition?
23    A.    Yes.

1    Q.    I'm going to show you
2    Defendant's Exhibit No. 41 -- nope. Not
3    that one. Defendant's Exhibit No. 46.
4    It says here that you could suffer
5    further disciplinary action up to and
6    including termination, and then below
7    it's got his signature, doesn't it?
8    A.    Yes.
9    Q.    Now, this Defendant's Exhibit
10    No. 48, one of the reasons you got
11    terminated doesn't have -- does it have
12    any signatures on it?
13    A.    No.
14    Q.    Did you sign this?
15    A.    No.
16    Q.    Have you ever seen this?
17    A.    No.
18    MS. REISS: Object. It
19    contradicts his testimony.
20    Q.    That's right. You said you
21    saw it in my office?
22    A.    I've seen this one, yes.
23    Yes.

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 325

1        MS. REISS:  Get your story
2  straight.
3        A.   It's straight.  I've seen
4  it.  I've seen that one.
5        Q.   Well, did you sign it?
6        A.   No.
7        Q.   Was it offered to you at
8  work?  I mean --
9        A.   No.
10        Q.   Do you -- when you got --
11  okay.  Are you familiar with the three
12  techs that got removed from the Army
13  funding that were working your range,
14  ranges before you took over the job?  Do
15  you know who those three techs were?
16        A.   The three techs?
17        Q.   You testified earlier that
18  Chris Hines had three techs working for
19  him at the ranges that you currently got
20  when there was a -- when Temple shifted
21  you guys around?
22        A.   He had three assistants,
23  which at the time I -- I don't recall

Page 326

1  their names.  But they were the computer
2  operators.
3        Q.   Do you know what happened to
4  them?
5        A.   They either -- some of them
6  went to range tech -- I mean, safety
7  positions or they are no longer working.
8  I believe Calvin may have assisted him at
9  one time.
10        Q.   Who is Calvin?
11        A.   Calvin Flowers.
12        Q.   Do you know if he had a --
13  okay.  Strike that.  Going back to No.
14  23, you were given a year's probation but
15  for which disciplinary precisely?  I've
16  got three here in front of me.  Which of
17  these three did you get the year's
18  probation on?
19        A.   For not properly -- or not
20  filling out a PMCS form.
21        Q.   That was the 2005?
22        A.   Right.
23        Q.   Looking here at this

Page 327

1  disciplinary policy dated 2006, are you
2  aware of anything like this back in 2005?
3        A.   No.
4        Q.   And on this policy, is there
5  anything about probation written down
6  here, Defendant's Exhibit No. 23?
7        A.   No, there's not.
8        Q.   You haven't seen a handbook
9  -- you signed for that handbook, didn't
10  you?
11        A.   Right.  Right.
12        Q.   Which handbook am I talking
13  about?
14        A.   I signed for a employment --
15  employee handbook.
16        Q.   When you first started?
17        A.   Yes.  Eight years ago.
18        Q.   And did you read it?
19        A.   Sections of it.
20        Q.   Did you read the disciplinary
21  section?
22        A.   I don't recall if there is a
23  disciplinary in that particular handbook.

Page 328

1        Q.   Let's talk about Mr. Hines
2  for a minute, Chris Hines.  You testified
3  earlier he got -- he cost the company
4  money; right?
5        A.   Yes.
6        Q.   And -- but you weren't -- you
7  didn't have -- did you have any firsthand
8  knowledge of whether or not he cost them
9  money?  Were you like there when they
10  wrote the check?
11        A.   No.
12        Q.   Well, did you hear it from
13  someone?
14        A.   Yes.
15        Q.   Who did you hear it from?
16        A.   I heard it from Mr. Temple
17  and Mr. Erickson.
18        Q.   What did -- why would Mr.
19  Temple tell you that?  What was the
20  circumstances surrounding that?
21        A.   Because when an individual in
22  our section has a deficiency of that
23  nature, it affects the whole section, so

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 329

1  he was letting us know what happened and,
2  you know, what actually it cost him so
3  that we won't go down the same avenue
4  again.
5      Q.  Was this during a meeting?
6      A.  Yes.
7      Q.  What kind of meeting?
8      A.  One meeting is we have a -- a
9  meeting every morning before we go out
10  and --
11     Q.  Is that like a safety
12  meeting?
13     A.  Yes.  In the morning.
14         MS. REISS:  Leading.  Don't
15  lead him.  Go ahead.
16         MR. BENNITT:  Sorry.
17     Q.  What kind of meeting was it?
18     A.  It was a safety meeting.
19     Q.  Do you do that -- do you --
20  how many safety meetings a week do you
21  have?
22     A.  We are required to have a --
23  a meeting and discuss safety every

Page 330

1  morning.
2      Q.  How -- let me ask the
3  question again:  How many safety meetings
4  do you have a week?
5      A.  Five.
6      Q.  And who runs them?
7      A.  Mr. Temple.
8      Q.  And part of the conversation
9  is what?
10     A.  The -- we'll pick out a topic
11  and discuss it and --
12     Q.  Do you discuss other
13  employees' disciplinaries at those
14  meetings?
15     A.  When there's -- when there's
16  one that occurs in that section, yes, we
17  do.
18     Q.  I'm not -- safety
19  violations --
20     A.  Safety --
21     Q.  -- do you discuss other
22  employees' safety violations?
23     A.  Yes, we do.

Page 331

1      Q.  Is that where you got your
2  information on Mr. Hines?
3      A.  That was one place I got my
4  information was during the meeting.
5      Q.  What did he say?
6      A.  He basically stated that Mr.
7  Hines had --
8      Q.  Not basically.
9      A.  He stated --
10     Q.  What did he say?
11     A.  He stated that Mr. Hines had
12  had an incident, a safety violation,
13  explained how the incident occurred, and
14  then stated how we and what we would do
15  to prevent it from happening again.
16     Q.  What was the incident?
17     A.  Failure to lockout/tagout a
18  electrical box while performing a PMCS,
19  properly lock it out.
20     Q.  What happened when he -- for
21  not doing that?
22     A.  He was severely electrocuted
23  and was sent to the emergency room --

Page 332

1      Q.  Okay.
2      A.  -- for his -- his burned
3  hand.
4      Q.  So how did the Army -- how --
5  did he say how the Army was notified?
6      A.  Any time an incident occurs,
7  the government --
8      Q.  What kind of incident?
9      A.  Of a safety violation, the
10  government has to be informed.
11     Q.  So what -- did he -- when, if
12  ever, did you find out about a loss of an
13  award, or whatever it's called?
14     A.  Award --
15         MS. REISS:  Is that a
16  question?
17         MR. BENNITT:  Yes.
18     A.  The award fee --
19     Q.  The penalty, loss of award?
20         MS. REISS:  Loss of award
21  meaning they have no contract.
22     A.  Just award fee.
23     Q.  Award fee?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 333

1    A.    Award fee.
2         MS. REISS: Let's not messy
3  up the --
4         MR. BENNITT: Messy up.
5    Q.    What did you -- what did you
6  find out about whether or not this
7  particular incident cost --
8    A.    We found out at the end of
9  the quarter when the evaluation comes
10 out.
11   Q.    What -- what are you talking
12 about?
13   A.    The award fee evaluation.
14 They document how much award fee we get
15 for the quarter.
16   Q.    What did the document say?
17   A.    It's in depth. I mean, I
18 can't read it.
19   Q.    What did it say about Mr.
20 Hines?
21   A.    The -- the government stated
22 that they were -- a percentage would be
23 -- was docked. You have -- I mean, the

Page 335

1  that?
2    A.    Right.
3    Q.    You saw that?
4    A.    Right.
5    Q.    What -- did Mr. -- did Mr.
6  Erickson or Mr. Temple see that? You
7  said they.
8    A.    I believe Thomas Lavar was
9  the one that initially reported it.
10   Q.    What were the other ones?
11   A.    Based on that last statement
12 as well, I think the government, Bill
13 Leyh, had seen it and made an issue to
14 Temple, or maybe Mr. Erickson, but it was
15 noted that -- he was put on the wall of
16 shame. Mr. Lavar had him put on the wall
17 of shame for that incident.
18   Q.    What about the truck
19 accident?
20        MS. REISS: What truck
21 accident?
22        MR. BENNITT: I thought we
23 were -- well, I -- that's what I wrote.

Page 334

1  way they grade it is through percentages,
2  and based on the -- the incident that had
3  occurred that they would dock a certain
4  percentage on the award fee.
5    Q.    Does that equate into
6  dollars?
7    A.    Yes.
8    Q.    How much?
9    A.    Oh, I don't know. It's a
10 percentage.
11   Q.    So you -- okay.
12        MS. REISS: He doesn't know.
13   Q.    You also said he had three or
14 four other safety violations or -- or
15 other type disciplinaries?
16   A.    Yes.
17   Q.    Now, tell me, did you have
18 firsthand knowledge of any of these
19 things or are these things you heard?
20   A.    No. Firsthand knowledge on
21 the one where the -- they loaded some
22 iron on the back of a trailer.
23   Q.    You already testified to

Page 336

1  Those are what my notes say. They say M
2  period Erickson's truck which got --
3        MS. REISS: I object to form,
4  foundation, basis, who, what. I don't
5  even know what you are talking about.
6        THE WITNESS: He's talking
7  about the time when Mr. Erickson's truck
8  was hit while they were moving a mover
9  out of the bay area.
10        MS. REISS: And you've
11 already testified that -- that Mr.
12 Erickson was found for that one.
13        THE WITNESS: He was noted to
14 be at fault.
15        MS. REISS: Okay. Anything
16 else, Jeff?
17        MR. BENNITT: Okay. I'll let
18 you go.
19   Q.    Do you have any other
20 incidents that you heard of or otherwise
21 have some kind of knowledge on, first,
22 second or thirdhand?
23        MS. REISS: About what?

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

Page 337

1    MR. BENNITT: Mr. Hines. Mr.
2  Hines.
3    A.   I can't recall at this time,
4  but there's others.
5    Q.   Who -- in this lawsuit of
6  race discrimination, who are you
7  comparing yourself with?
8    A.   Christopher Hines.
9    MR. BENNITT:  That's all.
10
11  RE-EXAMINATION BY MS. REISS:
12    Q.   You -- I believe you said
13  earlier that Mr. Hodges had a policy that
14  you could clean out your files after two
15  years, any write-ups?
16    A.   That's what he had told me.
17    Q.   Has that policy changed since
18  Mr. Hodges left?
19    A.   I -- I know at one time that
20  Mr. Erickson had a lot of documents that
21  were being destroyed, which was personnel
22  files and whatnot from the attic.  Now,
23  whether the policy was still in current,

Page 338

1  I do not know.
2    Q.   Did you see the actual
3  documents that were being destroyed?
4    A.   Yes, I did.
5    Q.   Are you sure they were
6  personnel documents or were they
7  financial documents?
8    A.   They were personnel
9  documents.
10    Q.   Whose personnel documents?
11    A.   Some of them were Jerry
12  Temple's.  Some of them were Bill Leyh's.
13    Q.   Bill Leyh was no longer an
14  employee at that time; correct?
15    A.   You asked which documents.
16  I'm just stating which.
17    Q.   Was Bill Leyh an employee at
18  that time?  That's the question I'm
19  asking.
20    A.   During the time that these
21  documents were being destroyed?
22    Q.   That you say they were being
23  destroyed, yes.

Page 339

1    A.   No.
2    Q.   Okay.  What documents of
3  Jerry Temple's file was being destroyed
4  by Mr. Erickson?
5    A.   Mr. Erickson didn't destroy
6  them, per se, by his hand.  He had
7  employees doing it.  And the employees
8  would do it at random.  When they didn't
9  have anything to do, he would have them
10  go up and destroy the -- the documents.
11    Q.   Do you know how old the
12  documents were?
13    A.   No.
14    Q.   And Mr. Temple is the oldest
15  employee at this site, isn't he?
16    A.   That's right.
17    Q.   The most senior tenure.  And
18  Mr. Leyh was no longer employed at the
19  time?
20    A.   That's right.
21    Q.   On this disciplinary form --
22  I believe I asked you this question
23  before.  But this disciplinary form does

Page 340

1  not prohibit putting you on probation,
2  does it?
3    A.   It doesn't have it on there.
4    Q.   It doesn't prohibit it, does
5  it?
6    A.   No, I guess not.
7
8    (Brief recess.)
9
10    Q.   (By Ms. Reiss)  Mr. Young, do
11  you have any evidence to show that this
12  policy changed from 2005 to 2006?
13    A.   No.
14    Q.   Was the bunker that Mr. Hines
15  injured himself on wired differently than
16  other bunkers?
17    A.   I can't testify to that.
18    Q.   Did you ever see a chart Mr.
19  Lavar made to prevent that from happening
20  again because it was wired differently
21  than the other ones?
22    A.   No.
23    Q.   Are you denying Mr. Lavar

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 341

1  made that chart?
2    A.  No.
3    Q.  Do you know how much your
4  violations have cost Honeywell?
5    A.  No.
6    Q.  So you have no idea whether
7  your violations cost Honeywell more than
8  Chris Hines' one violation that cost
9  Honeywell?
10    A.  I know that my violations, to
11  my knowledge, haven't cost.  Otherwise, I
12  would have been told and I was never
13  told.
14    Q.  Do you know why the
15  government commended Mr. Erickson on your
16  termination?
17    A.  No.  I -- I didn't see where
18  that termination had my name on it.
19    Q.  Well, there's no reason for
20  me to misrepresent this in this
21  deposition, so --
22    A.  I don't know who that was
23  for.

Page 342

1    Q.  It was for you.  Do you know
2  why the government commended Mr. Erickson
3  on your termination?
4    A.  No, I do not.
5    MS. REISS:  I'm through.
6    MR. BENNITT:  Yeah.  I've got
7  one follow-up.  That's it.
8
9  RE-EXAMINATION BY MR. BENNITT:
10    Q.  Does -- because of a way a
11  machine is wired, does that in any way
12  trump the need to lockout and tagout?
13    A.  Because -- no.  You still
14  lock it out and tag it out, and you also
15  -- before you go in, you check for
16  voltages to make sure that the power is
17  turned off before you stick your hand in
18  it.  Had he have done it the proper way,
19  he wouldn't have gotten electrocuted.
20
21  RE-EXAMINATION BY MS. REISS:
22    Q.  Let me ask you this, Mr.
23  Young:  Do you know if Mr. Hines had any

Page 343

1  preventive maintenance tags left in the
2  machinery where he did not perform
3  preventive maintenance like you did?
4    A.  I am not aware.
5    Q.  So he was actually hurt
6  performing his job, whereas sometimes you
7  just didn't even perform that job;
8  correct?
9    A.  No, that's not correct.
10    MS. REISS:  That's all.
11
12    FURTHER DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23

Page 344

1    CERTIFICATE
2
3  STATE OF ALABAMA
4  JEFFERSON COUNTY
5
6    I hereby certify that the above
7  and foregoing deposition was taken down
8  by me in stenotype and the questions and
9  answers thereto were transcribed by means
10  of computer-aided transcription, and that
11  the foregoing represents a true and
12  correct transcript of the testimony given
13  by said witness upon said hearing.
14    I further certify that I am
15  neither of counsel, nor of kin to the
16  parties to the action, nor am I in
17  anywise interested in the result of said
18  cause.
19
20
21    SHANNON L. QUINN, CCR, RPR
22
23

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**A**

ability 12:4,8
179:19
able 80:22 274:5
absences 4:21
51:3
absolute 265:2
272:11
absolutely 115:7
245:1 293:12
294:18
accept 78:9
acceptable 42:9
access 116:20
accident 143:11
143:16,20
145:5,15
148:14 153:1
161:18 284:12
284:17 285:2,9
285:9 335:19
335:21
Accident/Exp...
6:14
accomplishme...
164:10 165:20
accountability
149:15 151:13
242:15 248:12
282:20,23
286:22
accusation
296:11
accusations
129:21
accuse 19:6
accused 18:14
33:12,22 44:21
45:2 183:19
259:23 260:4,8
260:11 296:8
accusing 110:23
260:13 296:18
achieve 121:20

acknowledge
180:5 239:23
acknowledged
110:19
acknowledge...
5:12 6:16
85:21 147:21
acknowledging
84:21
acronyms
238:22
act 296:14,23
acting 9:1
action 1:5 107:4
134:22 324:5
344:16
actions 281:7
active 31:15
actual 338:2
acumen 121:9
Adam 185:5
ADAY 8:13
additional 311:7
address 12:10
13:18 231:10
adhere 198:21
Adkins 75:7
301:15
administer
289:4
administration
88:16 90:17
admin's 117:20
117:21
admit 175:7
admitting
143:14
adolescents
55:19
advances 252:21
255:5,10
adverse 296:13
advertisement
68:21

advise 134:23
advised 2:9
aerial 175:2
affiliated 124:10
affirmatively
11:7 72:2
193:20 273:15
299:17
African-Amer...
243:10 254:23
255:8,11,23
267:17
African-Amer...
262:14 268:3
afternoon
257:10
age 14:15
aggressive
131:21
ago 35:17 40:6
70:10 148:5,10
148:11 304:16
305:5 308:19
309:18 311:17
312:9 327:17
agree 154:6
162:19 229:12
232:1 293:11
293:16 317:17
agreed 2:14 3:1
3:8,17 68:11
agreement
250:7,14
ahead 10:19
60:16 83:16
127:9 212:17
329:15
ain't 56:13
63:17,21 64:3
Alabama 1:2,23
2:2,22 8:9,19
9:3,9 12:12
13:21 29:3
344:3

alarm 22:11
Alberta 78:14
alert 152:4
alerted 273:3
alive 64:6
allegation
186:20
alleges 282:9,14
288:6
AlliedSignal
73:22 77:6
allow 181:2
219:19,22
allowed 34:2
111:10 220:1
amended 2:3
amount 264:12
Angie 177:12,20
265:7
Anitra 13:17,23
Ann 48:8
answer 47:6,9
61:18 63:5
93:2 99:18,22
105:15 117:22
117:23 118:2,6
126:22 127:8
137:9,16
145:18 152:6
188:10 191:8
192:20 197:12
212:3 241:20
287:19 288:3
292:4
answered 38:23
145:17 152:8
answers 298:20
298:23 344:9
anybody 267:10
323:6
anymore 316:18
anyway 171:15
183:10
anyways 54:4,19

64:16
anywise 344:17
apartment
12:13 20:4,5,6
20:7,8 21:11
21:11,13,15,23
22:2,6,18,21
24:6,20 273:23
274:3,5
Apparently
242:21
appearance
133:13
appeared
131:12
APPEARING
8:5,11
appears 45:11
125:19 133:6
applicant
275:19 277:3
application 4:13
5:9 36:10 38:7
38:9,20 39:1
69:3,4 73:20
74:2 75:18
76:16 207:3,19
299:7,14,19
301:3,9,12
302:13
applications
55:2,4
applied 27:15
39:20 69:5
253:2 254:9
298:16
applies 102:18
262:17
apply 26:3 68:15
68:19 83:8
174:21 180:8
253:9 289:4
appreciate
131:23

---

# FREEDOM COURT REPORTING

approach 83:3,5
approached
  82:22 125:10
appropriate
  44:6 63:8,10
  117:6 133:10
  134:23
approximately
  9:11 66:9
  67:19 76:13
  81:19 212:21
April 7:6 220:11
  242:2 243:3
area 38:14 76:6
  82:5 246:3
  251:15 280:18
  281:4 336:9
areas 98:8 121:6
  262:7,9
arguing 157:13
  157:16
argument
  157:19
argumentative
  44:18,19,22
arm 22:13,17
arms 76:7 82:18
Army 88:10,13
  89:2,2,9 93:21
  94:4,14,18,20
  95:1,20 124:16
  125:1 127:21
  132:18 133:18
  133:21 134:3
  134:10,12
  135:2,12 136:5
  181:6,13 204:5
  215:15,18
  216:19,21,22
  217:4,9,11,15
  224:18 325:12
  332:4,5
arrest 19:16
  20:16 23:5

arrested 20:1,2
  20:6 23:7,14
  23:21,23 24:13
  25:1
arrests 25:11
arrival 104:23
  219:15
arrive 110:4
arriving 105:1
asked 39:3 60:5
  68:23 75:9
  110:14 129:19
  130:7 140:13
  143:2 153:19
  158:11 160:17
  181:6 183:21
  183:23 185:16
  187:22 211:17
  227:11 239:21
  250:9 276:5,18
  279:8 283:5
  323:20 338:15
  339:22
asking 10:12
  46:11 50:20
  66:19 67:1
  78:3 91:16
  92:22 94:15
  99:15 107:12
  113:19 134:7
  143:12 163:9
  163:10 165:14
  173:3 189:17
  191:9 218:14
  237:20,22
  269:4 283:16
  286:23 287:20
  338:19
asks 118:5
asleep 126:1,15
  152:13,18
aspect 165:13
aspersions 115:6
assert 148:19

assessment
  316:2
assign 3:13
assigned 20:7
  82:16,18
  102:12,23
  103:3 145:22
  239:14 244:5
  290:7,9,11
assist 204:1
assistant 35:10
  36:22
assistants
  202:16 325:22
assisted 102:5
  326:8
assisting 101:22
  102:1 103:22
associate 133:12
Associates 8:7
assume 97:18
assumed 60:10
assuming 165:6
assurance
  124:21 125:23
assure 98:16
atmosphere
  77:16 195:18
  195:22,23
attached 38:3
  40:16 41:12
  43:9 45:20
  47:21 48:16
  49:12 50:15
  51:21 53:20
  70:17 73:5
  77:21 79:20
  84:18 85:17
  90:11 96:22
  104:16 106:3
  109:3,15
  115:17 118:20
  120:13 123:20
  138:14 139:14

141:18 142:16
  144:17 147:15
  153:8 164:14
  204:13 206:15
  211:6 212:12
  214:3 216:16
  220:7 223:3
  225:19 229:9
  230:5 241:10
  245:21 251:3
  252:3 307:3
  314:23 318:3
attend 29:4,8,18
  30:3
attended 40:1,5
attention 316:14
  316:16
attic 337:22
attorney 70:23
  165:2 252:6
  306:20
attorney's
  242:22
at-will 107:19
August 47:15
  225:8
authenticated
  42:21
automated 81:7
avenue 1:22
  2:21 8:18 9:9
  12:11 13:20
  329:3
average 231:1
  231:14 274:12
  274:15
avoided 144:21
  145:6,8,14
awakened 126:7
award 149:23
  193:21,22
  194:5 270:2,3
  270:6,16
  332:13,14,18

332:19,20,22
  332:23 333:1
  333:13,14
  334:4
awarded 19:1
  88:22,22
  177:14 254:2,4
awards 149:17
  193:19
aware 83:18,21
  135:2,4,11
  152:22 153:3
  196:13,17
  218:19,22
  219:3,4,5
  250:17 251:20
  273:4 275:10
  277:1,5 327:2
  343:4
awareness 119:5
  119:11
axe 133:14
a.m 1:18 9:11
  50:6

**B**

B 2:5 8:12
  263:10 264:6
  306:3
babies 182:5
baby-sitting
  27:2,5
back 16:19 18:6
  18:23 19:1
  22:13,20 37:15
  43:18 54:2,12
  54:16,22 64:16
  78:11 106:14
  126:5 138:6
  141:10 177:1
  177:15,19,19
  177:20,22,23
  178:2,2,7,10
  178:13,14,17

# FREEDOM COURT REPORTING

178:23 179:12
201:21 203:3
203:17,17,19
208:2 233:23
234:21 235:8
237:1,5 256:22
256:23 257:1,4
257:4,7,10
259:20 280:13
293:20,21
319:4 326:13
327:2 334:22
**backed** 141:7
**background**
26:11,15,17
93:20 94:3
**backing** 142:7
**back-talked**
161:7
**bad** 22:19
272:11 306:11
**base** 135:19
216:22 269:10
**based** 52:17
62:12,13 74:20
88:14,18
159:18 197:21
199:15 200:4
214:12 250:4
269:11 287:3
288:1 334:2
335:11
**basic** 18:12
**basically** 60:12
102:4 143:13
176:3,8 302:6
313:15 331:6,8
**basing** 156:15
183:17
**basis** 115:7
173:4 198:8
249:17 287:12
336:4
**bay** 246:3

280:18 336:9
**bed** 115:12
117:16 227:7
233:4,7
**began** 142:5
**beginning**
135:20 255:21
**behalf** 8:5,11
165:4 228:19
**behavior** 43:23
86:19 131:20
199:9
**behavioral**
55:19
**believe** 14:3,6
25:6 29:20
30:18 32:10
53:7 62:21
67:11 83:11
84:7 91:21
110:17 112:11
119:20,22
120:16 124:18
124:22 130:5
130:15 134:9
141:1 145:9
160:9 162:1,3
162:6 163:13
163:22 188:20
188:21 189:21
199:11,20
200:8,12 203:1
207:4 208:4,20
214:8 221:20
237:3 247:8
273:1 275:9
303:7,10
304:16 326:8
335:8 337:12
339:22
**believed** 132:5
**believes** 145:14
**belittle** 258:23
**belligerent**

131:21
**belong** 295:1
**belonged** 205:9
**belongings**
24:15
**belt** 194:2
208:12 209:9
248:19
**Bennitt** 4:7 8:6,7
9:19 34:15
35:4 37:23
42:2,18 43:3
46:19 47:5
63:4 80:17
99:18,21 101:9
105:17,22
106:10 113:7
115:2,8 116:16
118:3 126:22
127:8 137:10
137:14 142:10
142:13 145:18
149:3,8,11
151:5 152:5,9
152:11 161:5,8
161:12 163:20
164:1,19 171:5
171:8,12
182:15 186:14
188:9 197:12
204:8 205:4
206:7 212:2
213:3,5,12,19
226:7,12
230:13 242:2,6
242:10,11,19
270:19,22
297:16 306:8
306:12,21
307:7,12,15,20
308:6,13 309:5
309:12 315:12
315:16,21
316:11 317:15

317:21 318:23
320:15,22
321:2,14
329:16 332:17
333:4 335:22
336:17 337:1,9
342:6,9
**best** 64:20
241:21 247:3
**better** 63:18
64:14 121:14
121:21 199:21
202:6,8,11
226:10 297:15
297:18 308:13
**beyond** 250:11
**big** 56:13 63:17
63:21 64:1,3,7
295:22
**bill** 89:6 298:8
335:12 338:12
338:13,17
**bills** 274:11
**bins** 237:2
**Biologically**
159:23
**Birmingham**
1:23 2:22 8:9
8:19 9:9 30:2,6
30:10
**birth** 16:21
**black** 182:3
285:23
**Blaine** 306:3
**blamed** 87:22
**blaming** 104:2
158:17,19
**blank** 211:20
282:10
**block** 39:10
**blower** 226:21
227:20 228:8
228:21,21,23
229:1 230:14

230:15 290:5,7
290:12,15
291:5 292:12
292:14,17
293:13
**Board** 198:11
199:1
**body** 226:2
**bogus** 199:10
**bolts** 236:6,16
**bonuses** 193:13
**borrow** 311:2
**borrowed**
305:12 310:19
311:1,4
**bottle** 234:20
235:10
**bottles** 98:4
**bottom** 41:3
45:16 49:17
85:23 120:20
141:21 182:4
220:13 221:9
262:2,3
**bouts** 259:22
**Bowman** 177:12
265:7
**box** 239:10,11
244:7 277:15
277:15 282:3,3
331:18
**boxes** 239:16
282:6
**Boys** 14:12
**bravo** 193:21
**break** 10:16,20
80:7 137:17
190:12,15,18
190:19 224:13
224:19 270:20
**breaking** 142:19
**breaks** 190:17
**brief** 80:9
161:15 206:11

# FREEDOM COURT REPORTING

249:22 271:1
278:19,20,21
317:19 340:8
**briefed** 131:6
**bring** 292:18
**broke** 20:6
**brothers** 194:10
265:5 266:5
**brought** 177:15
195:21 269:12
308:3
**Brown** 123:7
**building** 68:22
**bunker** 340:14
**bunkers** 340:16
**burned** 22:21
332:2
**Busboy** 72:9
**business** 19:4
32:17,18,20
95:11 121:9
136:14 305:23
307:17 308:12
308:18 309:11
309:15,22
310:6,8,10,17
312:2 316:10
**buying** 25:6,7
314:13
**B-O-T-S** 60:11

**C**

**C** 8:1 314:15
**cab** 127:15
226:20 227:1
293:13
**calculation**
313:11
**call** 33:3 54:16
56:17 57:2
66:2 67:21
86:18 87:1
121:2 130:7
140:5 182:19

184:10 185:3
185:15 200:17
203:8 222:18
238:19 277:21
**called** 52:20
57:14,16 58:2
58:3,6 65:23
67:14 78:11
129:11,20
146:12 150:2
178:6 183:23
184:8,14 186:9
186:16 250:9
265:16 272:20
332:13
**calling** 41:6 55:9
67:22 178:8
222:16
**calls** 185:8
288:10 294:7
294:13
**Calvin** 155:5
156:5 169:10
171:21,21
173:11 175:6
177:11,21
178:2,6,8,11
178:22 179:11
326:8,10,11
**candy** 98:4
227:3 290:2
**cans** 227:3,8,8
230:21 232:8
234:20 235:4
235:10 237:5
291:6 293:14
**car** 108:18 110:5
110:20 111:4
126:5 281:4
285:8 300:18
300:19,20
**cards** 60:3
105:10
**care** 32:17,21

36:21 202:13
298:17 299:4
**carelessness**
142:21 143:15
143:17,23
144:2
**cargo** 98:8
**Carnell** 302:4
**carpenter**
167:15,18
264:4,7,22
**carry** 234:5
**cars** 300:5,6,9
300:21
**case** 18:13,18
157:8 196:19
**casting** 115:5
**catch** 22:2 174:6
**cater** 172:5
**catfish** 182:4
**cat-and-mousi...**
256:6
**Caucasian** 70:5
**caught** 21:12,21
209:17,23
210:8,14
**cause** 9:13
207:19 344:18
**caused** 151:9
277:15 285:2
**causing** 142:18
**CCR** 2:18 8:3
344:21
**CDL** 181:7
263:9 271:4,14
314:16,18
**ceiling** 127:15
**cents** 75:1
**certain** 239:15
239:16 272:6
334:3
**certificate** 6:8
119:2 344:1
**certification**

180:22 181:3
207:11,16
**certified** 35:9
208:12
**certify** 9:2
207:12 344:6
344:14
**cetera** 227:21
**chance** 116:1
154:4 212:16
**change** 5:4
201:7,9,10,11
201:12 269:13
289:6
**changed** 181:1
196:9 201:14
269:9 282:3
337:17 340:12
**changeover**
177:9,14
**characteristics**
5:11 80:4
**charge** 16:11
23:3 31:23
32:6 50:7 81:5
199:4 244:12
274:6,9
**charged** 24:23
25:12
**charges** 25:2,3
25:15
**chart** 281:18,21
340:18 341:1
**chassis** 300:19
**check** 26:17
59:12,15 67:22
127:22 142:4
145:23 146:4
191:1,3,6
209:1,6 215:9
228:21 313:1
328:10 342:15
**checked** 105:20
215:2 217:6

228:20 229:1
244:4 292:11
**checklist** 5:13
106:16,21
146:6
**checks** 93:17
98:22 224:2
229:14
**chief** 89:11
124:14 142:6
246:12
**child** 13:1
298:10
**children** 14:7,10
14:18 15:12,13
16:12 298:13
**chose** 131:18
**Chris** 155:11,18
159:16,20
169:17,22
173:15 174:2,9
176:5 201:3
266:15,20,21
278:12 279:2
325:18 328:2
341:8
**Christmas**
202:23 272:18
272:22
**Christmastime**
202:21
**Christopher**
337:8
**circumstances**
328:20
**citations** 316:2,9
**cite** 136:21
137:4,7
**cited** 280:15
**City** 19:13,14
23:6 24:3
**civil** 1:5 2:2 9:4
124:17
**claim** 162:14,20

# FREEDOM COURT REPORTING

Page 349

169:4,7 192:22
267:6
claims 20:22
162:11 192:16
clarify 11:6
Class 263:10
264:6
classify 155:13
Clay 243:4,9
246:9,13,16
285:21,23
286:5,18 287:4
287:8,14,21
Clay's 288:2
clean 295:18
337:14
cleaned 98:17
323:15
cleaning 20:5
30:15 225:4
295:19
clear 115:5
187:15 217:7
clearance 27:14
27:18
cleared 312:18
clearly 39:9
255:19
clerk 257:23
client 105:20
161:4
close 58:14
66:13 155:1,10
155:13,20
165:23 242:13
281:4
closed 131:10
closer 33:8
Club 72:6
CNA 35:9 36:19
coach 47:7
306:14
code 38:15
coffee 309:13

Coffman 18:1
19:21 24:11,16
Coke 290:2
collateral 306:5
306:7
collect 303:19
collected 298:4
collecting 303:5
303:14
college 28:10
29:17 40:3
122:10,14
Columbia
200:16
come 55:22
68:15,19 82:7
92:4 148:14
161:8 177:1,21
178:13 185:16
190:12 204:1
270:13 293:20
297:9 317:13
322:17
comes 82:19
165:23 242:12
333:9
coming 33:19
41:6 66:13
179:17
commencing
9:11
commended
251:21 341:15
342:2
comments 79:5
131:12 183:3
183:11
commissioner
3:19 9:2
committed
292:5
communicate
122:4
communication

154:19,22
community 40:3
comp 5:20
104:20
company 21:7
21:15,16,19,22
21:23 179:18
195:19 284:8
288:10 289:2
302:19 311:11
318:8 328:3
comparator
163:15 165:10
165:12 166:6
166:13
compare 163:14
164:4,6,7
165:21
compared
285:12
comparing
337:7
complained
171:1 175:19
complaint 7:13
41:17 148:19
156:8 160:12
160:18 162:9
184:8 202:22
220:19 243:11
244:23 245:15
246:1 272:18
273:3,5,8
274:19 282:9
283:19 288:6
289:23 294:12
294:16
complaints 34:9
196:15
complete 141:22
207:14 215:4,9
completed 194:2
227:13,15
264:20

completely
224:5 232:21
completes 224:4
complex 21:16
21:20
compliance 3:5
95:6,7
complied 99:13
100:2,15,18
101:3,4
complies 40:21
comply 99:2,5
99:16 100:5,16
101:2
computer
101:17,20
170:1,5 172:2
173:15 203:23
223:20 224:7
317:11 326:1
computers
122:20 154:18
170:8
computer's
223:22
computer-aided
344:10
concerned 64:15
165:19
concrete 301:18
302:1
conditions 6:4
109:6
conduct 286:11
conducting
125:22 243:4
confidential
251:9
confiscated
24:15
confront 131:18
confrontational
131:22
confused 63:14

306:17 308:5
congratulated
250:18
conjured 112:11
112:15 113:5
113:21,23
consider 156:4,5
156:6 215:16
considered
103:19,20
105:6 140:19
141:3 219:13
239:18 294:2
consistent
161:11 216:5
Construction
302:12
consulted 159:9
consulting
159:12
contact 197:3,11
197:15
contacted 67:18
197:8
container 98:13
232:10,15
233:13,17,20
233:22 234:3
235:5,18
236:12,21
containers
232:22 235:13
235:14,15,23
236:5,19 237:7
content 234:9
236:14
context 62:5
135:23
contingent
207:21
continued 5:2
6:2 7:2 131:15
continues 265:4
continuing 31:9

# FREEDOM COURT REPORTING

contract 5:14
88:10,14,21
90:5 92:16,23
95:18 97:9,16
119:23 121:16
121:16,18
124:10 148:15
148:21 177:9
177:13,15
215:17 287:10
313:18 332:21
contracting
95:21
contractor 76:3
77:12 308:1,10
contractor's
136:14
contradicts
324:19
contraindicati...
288:9
control 60:20
61:2,7 89:14
128:20 161:4
181:18
controlled 23:15
24:1,8,10,13
25:1,4
controls 208:21
conversation
62:14 63:3
66:11,12 67:9
67:10,12 87:21
132:7 181:10
182:10 330:8
conversations
5:7 55:7 68:2,5
138:23
convicted 25:10
25:14,17,20,21
cooking 22:8
Cophen 181:23
182:1,7
copies 211:20

copy 37:15,22
245:12,15,16
308:17
COR 95:16,17
96:2,5,10
124:1
corner 42:17
310:13
corporate 200:2
219:12
correct 14:3
26:19 39:15
42:5,12 45:9
45:10 48:4
49:2 52:14,15
53:1,2,7 60:20
61:3 62:6,7,16
62:17 63:22
64:21 65:1
69:18 70:7
72:1,23 73:10
73:18,23 74:22
75:7,14 80:4
81:15 87:5
88:7 92:18,21
93:11,18 94:1
95:4,22 98:1,7
98:11,14,18,19
98:23 99:1
102:11,16,19
103:8,23 105:7
105:11,12
110:2,12 111:7
120:5,6 121:7
124:2 127:6
128:1 129:14
129:18,23
131:2 132:15
132:22 133:18
134:19 135:13
138:4,5,20,21
139:3,7 140:20
143:15,18
144:5,8,9,21

148:22 150:3
152:20 154:11
154:20 157:13
162:20 163:15
165:7 166:19
166:22 170:10
170:14,22
173:7 174:13
175:1,22
179:22 180:12
181:19 187:1
192:11 194:11
195:1,12 196:3
199:22 201:5
205:3,10
209:10,15
210:5,10
211:20,21
212:23 213:11
213:11 214:13
214:18,19
215:5,10,23
216:7 217:7
219:14,17
221:8 222:12
223:15,18
224:21 226:22
226:23 227:4,5
227:9,10,14
228:11,17
231:5,17 232:3
232:11 235:23
238:23 239:16
239:19 243:6
246:4,19 247:9
248:20,21
249:1,2,6
250:7,8 253:16
254:19 260:17
265:8 271:13
272:15 275:13
276:8 277:3
282:6 283:10
284:5,9 285:3

288:15 289:7,8
290:13 294:9
295:18,20
297:2 298:2
301:15,16
303:9 304:12
310:14,15
319:8,9 321:5
321:6,7 322:19
338:14 343:8,9
344:12
corrected 92:12
107:5
correctly 220:15
220:20 221:1
241:20
Corresponden...
7:4
cost 148:13
270:6,15 284:8
305:7,8 310:17
328:3,8 329:2
333:7 341:4,7
341:8,11
costs 270:2
counsel 2:16
3:10,12 9:5
344:15
counseled 48:23
49:4 140:10
248:14
counseling 4:14
4:15,16,18,19
4:20 6:19 7:10
40:22 199:6,15
counselor
197:20 198:1
198:13
County 18:9
344:4
courses 122:15
122:16,19
123:8,11
court 1:1 2:10

2:11 3:6 10:22
11:9 18:7,21
18:22 220:19
244:23 273:9
294:21,22
321:3
courtroom
18:20
Cox 48:8
co-worker 156:2
168:15
co-workers 44:8
93:23 155:14
156:3 191:14
191:19
CPQC 82:9
244:11,17
246:3
crashed 223:20
crashing 224:7
credits 29:12
31:11
crew 142:6
157:23 158:2,7
196:15
criminal 296:23
Crittenden
12:20
cross 202:2
cross-training
201:23 202:1
Culpepper
166:5,7,8
289:9
cup 309:13
Curley 1:7,16
2:17 9:12 10:2
11:13 116:11
117:8 174:1
218:16 224:4
225:12
Curley's 173:23
current 12:10
55:21,22 68:5

# FREEDOM COURT REPORTING

68:10 169:13
211:18 214:9
337:23
currently 12:2,6
13:14 16:23
31:5 89:10
229:19 262:20
300:8 325:19
curse 256:14
CUs 55:21
cuss 257:13
258:8,11,17
cussed 87:10,14
256:12 258:16
259:9,10,16
cussing 258:19
258:20
customer 139:2
139:5 215:14
217:4 224:17
248:23
customers
217:17
Customs 301:6
cuts 303:3
cutter 302:23
Cuz 11:20
C-U-R-L-E-Y
220:16
C-U-Z 11:22

**D**
D 4:1 5:1 6:1 7:1
261:17
DABK 97:9
daily 81:9
Daleville 13:8
19:13,15 23:6
24:3 28:1
231:10,11,15
damage 21:10
22:23 141:13
151:9
damages 21:13

21:19
dangerous 152:2
152:3,14,20
293:12,22
darn 319:1
data 223:18
284:2
database 248:13
283:2
date 9:2 16:21
86:23 97:14
108:19 194:7
280:1 322:8,17
dated 225:23
242:2 327:1
David 257:23
263:1,2 266:20
day 2:7,23 9:10
98:18 103:6,9
103:10,11,14
146:1,9 147:5
147:9,10 157:1
157:21 207:1
215:1,7 219:8
223:20 228:2,4
228:5 230:9
257:14 292:12
292:13,14
293:18 313:23
314:5 319:11
days 27:5 38:13
50:8 82:4,6
111:10,15
290:1 303:22
303:23 304:3,4
304:8
day-shift 27:8
day-to-day
249:17
deadline 250:11
Deakins 1:19
2:19 8:14 9:7
deal 56:13 63:17
63:22 64:1,4,7

295:22
death 33:2
Debbie 179:9
December
189:13 253:4
253:22 263:20
303:8,11
decided 250:13
280:21 281:5
decision 156:12
159:9 163:1
173:20 249:10
249:12 251:22
deductions
149:23
deemed 186:21
Defendant's
4:12 38:1
40:14 41:10
43:7 45:18
47:19 48:14
49:10 50:13
51:19 53:18
70:15 73:3
77:19 79:18
84:16 85:15
90:9 96:20
104:14 106:1
109:1,13
115:15 118:18
120:11 123:18
138:12 139:12
141:16 144:15
147:13 153:6
164:12 204:11
206:13 211:4
212:10 214:1
216:14 220:5
223:1 225:17
226:8 229:7
230:3 241:8
245:19 251:1
252:1 307:1
314:21 318:12

318:13,16
319:7 320:2
322:12,22
324:2,3,9
327:6
Defendant(s)
1:13 8:11
deficiency
328:22
defined 104:23
defunded 204:5
degrading
268:14,19
269:5
degree 18:15
25:5 28:19,20
29:13 276:15
276:18,20,21
degrees 76:20
delivering 2:4
denial 297:13
denied 168:18
254:22 255:2,7
255:10,15,22
256:3
denotes 51:2
dent 142:18
deny 42:18
denying 340:23
departed 131:16
department
69:15 90:17
182:20 240:1,5
254:11
depends 33:3
deployed 229:21
DEPONENT
343:12
deposed 10:9
deposition 1:15
2:16 3:3,4,15
3:18 108:8
322:6 323:22
341:21 344:7

depositions 3:7
depth 333:17
deputy 125:16
description 4:11
141:22,23
173:22
desirable 225:5
destroy 339:5,10
destroyed
337:21 338:3
338:21,23
339:3
details 198:7
detained 20:9
develop 121:19
154:10,22
developing
121:9
development
121:6
developmental
6:19 121:13
154:14,17
dick 62:23
Dickey 177:11
difference 128:7
different 174:8
194:23 195:8
195:16 225:14
251:18 266:8
283:20 297:20
316:19,22,23
317:2
differently
200:4 281:14
282:5 340:15
340:20
difficult 251:14
diploma 28:22
28:23
direct 83:23
86:13,16
121:15
directed 131:12

# FREEDOM COURT REPORTING

132:6
**direction** 132:23
**directly** 132:3
265:6
**dirt** 98:9
**disagree** 140:2,8
140:15 225:11
225:15
**disagreed**
140:14
**disagreement**
139:21
**disagreements**
123:15 212:19
**discarded** 98:5
98:12
**discharge**
138:19
**discharged** 39:2
**disciplinaries**
322:15 330:13
334:15
**disciplinary**
5:21 106:6
107:3,4 165:23
216:6 269:15
269:16 281:7
288:20 289:1
294:6,12
320:12 322:6
322:21 324:5
326:15 327:1
327:20,23
339:21,23
**discipline** 296:4
**disciplined**
33:13,15 40:10
108:2 166:4
296:5,10
**disclosures** 6:18
163:23 165:2
167:11,12
**discovered**
243:5

**discrepancy**
286:3
**discriminated**
200:22
**discriminating**
297:22
**discrimination**
337:6
**discuss** 144:22
154:21 329:23
330:11,12,21
**discussed**
224:19
**discussing**
157:12
**discussion** 16:20
38:17 50:11
71:4 83:7
109:11 154:1
157:1,3,14
221:14 320:19
321:16
**dishonest** 239:8
**dismissal** 207:20
**displayed**
131:20
**disposition**
135:1
**distraught** 297:3
**distributed**
131:20
**DISTRICT** 1:1
1:2
**diversed** 262:5,6
262:9
**diversity** 119:4
119:11
**divi** 261:16
**division** 1:3
89:11 124:14
**divorce** 15:14
**divorced** 15:15
15:17 16:16
**dock** 334:3

**docked** 217:22
218:22 333:23
**docs** 71:2
**document** 40:20
43:12,20 44:1
49:14,23 50:18
50:23 52:1,5
70:21 71:1
79:22 80:1
86:5 88:4 97:4
112:7 113:22
114:2,4,14,16
115:1 126:8
133:3 136:21
141:4 145:2
149:22 154:4
204:16 205:12
206:19 216:20
217:20 222:19
223:9 225:2
226:2 228:10
241:14 242:14
242:17 272:13
299:12 318:12
333:14,16
**documentation**
215:5 252:9
267:8 284:7
**documented**
150:15,18
171:23 218:8
218:17 260:3
309:23
**documents**
42:19 45:12
242:8 243:1
306:19,22
307:6,13
316:12 337:20
338:3,6,7,9,10
338:15,21
339:2,10,12
**dog** 259:2
**doing** 30:9 61:20

63:15 67:23
95:3 128:3,5
128:16 129:8,9
157:6,7 175:8
191:10,11
208:11 256:19
268:21 302:21
312:6 314:12
331:21 339:7
**DOL** 69:14
**dollar** 298:8
**dollars** 74:18
310:13,20
312:21 334:6
**door** 91:11
112:4 204:20
**Doug** 163:14,17
163:18 164:5,6
164:7 165:6
169:20,21
275:11
**Douglas** 316:21
**drink** 98:4
**drive** 90:6 91:17
111:4 161:21
271:16 312:16
**driven** 92:2
**driver** 313:23
316:18
**drivers** 312:15
316:4,14,20,23
**driver's** 17:6
317:5
**driving** 92:8
110:9 288:9
314:14
**dropped** 25:23
199:11
**drop-off** 323:7
**drove** 91:1,13,20
92:3 103:5,16
104:1 226:15
**due** 51:3 143:14
143:17,21

144:1 148:21
148:23 177:13
217:23
**duly** 10:3
**duties** 103:1,4
**duty** 183:2,5
**D-A-L-E-V-I-...**
13:10

---

**E**

**E** 4:1 5:1 6:1 7:1
8:1,1
**earlier** 82:21
130:10 204:22
208:4 247:15
291:19 301:15
309:21 325:17
328:3 337:13
**earliest** 133:9
**early** 207:5
**eating** 256:18
**edge** 225:13
**education** 28:5,7
28:12 29:11
31:3 122:18
262:22 264:12
264:15,22
**educational** 31:9
262:16,23
263:12 264:8
**EEOC** 23:3
**effect** 3:5
**effective** 2:3
**effectively** 122:5
**eight** 31:1 57:12
70:10 148:5,11
215:1 217:3
262:2 269:20
295:8,15
327:17
**eighteen** 14:15
29:6
**eighty-one** 84:8
**either** 76:18

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 353

168:17 178:1
187:20 189:13
264:14,23
287:19 295:4
322:2 326:5
**Elba** 35:18,21
36:1 39:12
71:7,12 207:23
**electrical** 142:4
277:15 331:18
**electrician**
154:10 168:16
**electrocuted**
277:16 331:22
342:19
**electronic** 30:1
253:3,21,23
**electronically**
165:17
**electronics** 40:9
274:23
**elevating** 29:13
**eleven** 59:3
74:10,18 78:17
**eligible** 52:13
**Embarrassing**
268:16
**embrercing**
268:15
**emergency**
22:16 277:17
331:23
**employed** 31:16
32:2 35:11,15
39:12,18 71:21
72:4 73:16,18
76:12 84:2
85:2,6 88:19
124:16 200:5
339:18
**employee** 48:6,7
48:8 89:16
90:7 95:21
105:1 107:19

125:13 132:15
132:17 163:7
192:18 272:7
327:15 338:14
338:17 339:15
**employees** 61:16
68:6,11 76:8
95:2,10 97:8
127:22 129:7
139:1 149:14
158:23 191:1,3
192:19 243:13
244:14 245:8
267:4 295:5
330:13,22
339:7,7
**employers** 39:7
73:10 75:17
208:1
**employment** 5:9
6:5 52:18
109:7 161:11
207:21 208:2
327:14
**empty** 235:14,16
236:9,23
**encouraged**
154:9,12
**endeavor** 202:2
**ended** 67:11
303:8
**ends** 210:22
**engage** 138:23
**engaged** 159:20
160:3
**engine** 226:21
**Engles** 194:10
266:5
**enroll** 122:10,13
**ensure** 267:2
**enter** 277:15
**entered** 131:16
**Enterprise**
12:11 13:21

16:6,10 29:16
34:18,23 35:2
35:6,7,14
38:10,13 40:11
40:23 43:16
44:12 45:13
46:13 48:8
49:16 50:19
51:11 52:13
71:2,13 76:16
127:5
**entire** 70:22
120:3
**entry** 284:2
317:11
**environment**
131:19
**EQ** 228:9
**equally** 173:9
267:17
**equate** 334:5
**equipment** 5:16
19:8 97:3
100:19 128:11
129:2 146:23
180:9,20
195:11 234:11
263:8,11
271:17,18
280:17
**equivalent**
264:17,20
276:19
**Erickson** 8:22
26:2,7 82:22
86:6 87:2,8,13
88:1,5 90:4
94:8,16,20
128:18 135:10
150:8 153:12
154:9 169:2
171:2 173:21
175:19 176:7
178:3,14,20

179:2 180:2,16
181:5 183:6,8
183:15 185:14
185:18 187:23
188:17 189:22
189:23 190:15
190:23 191:2
200:23 203:13
205:15,18,22
210:4,22 212:8
214:12 215:12
216:3 218:4
224:11 225:23
226:4 228:13
251:21 257:12
257:12 258:5
271:20 272:3
273:2 278:11
278:14 279:3,7
280:21 281:3
283:6 287:7,13
328:17 335:6
335:14 336:12
337:20 339:4,5
341:15 342:2
**Erickson's**
87:16 179:5
181:18 280:16
336:2,7
**error** 317:12
**errors** 33:17
34:6
**establish** 57:21
**estate** 32:22
**et** 227:21
**evaluate** 133:9
**evaluated** 120:7
**evaluation** 6:9
6:17,23 7:14
120:17,22
123:15 150:1,2
150:16 153:11
154:7 212:19
213:9 251:7

288:2 333:9,13
**evaluations**
193:5
**Evans** 140:5
**evening** 27:11
**event** 117:4
294:7
**events** 251:19
**eventually** 74:3
263:10
**everybody** 38:14
62:1 201:19
277:23 281:6
**everybody's**
186:19
**evidence** 3:16
112:14 113:2
113:20 136:1
171:17 250:2,5
340:11
**Evidently**
291:13
**exact** 57:4 58:12
86:22 280:1
**exactly** 56:19
130:16 308:14
**examination** 4:3
9:13 10:6
317:21
**examined** 10:3
**example** 98:2
**exception**
181:14 266:1
**exceptions**
262:17,18
289:5
**exclusive** 289:3
**excuse** 89:13
163:18 171:4
222:5 274:1
277:10
**exhibit** 37:14,18
38:1 40:14,19
41:10,15 43:7

# FREEDOM COURT REPORTING

43:11 45:15,18
46:6,9,19,22
47:13,19 48:14
48:19 49:10
50:13,18 51:19
52:1,2,8 53:11
53:18 70:15,20
73:3,8 77:19
77:23 79:18
84:16 85:15,20
90:4,9 96:20
97:2 100:6,8
100:11,18
104:14,18
106:1,16 109:1
109:5,13,18
115:15,19
118:18,23
120:11,15
123:18,23
138:9,12
139:12,17
141:16 144:15
147:13,18
153:6,11
164:12,17
204:11,15
206:13,18
207:5,10 211:4
212:10,15
214:1,6,7
216:14,19
217:19 220:5
220:10,12
223:1,6 225:17
226:8 229:7,11
230:3,7 241:8
241:13 245:19
245:23 247:7,7
251:1,6 252:1
307:1 314:21
315:3 317:23
318:1,12,13,16
318:19 319:4

320:16,23
322:16 324:2,3
324:9 327:6
exhibits 2:8 4:11
37:13
exist 42:20
323:2
exists 171:13
exit 153:22
expect 259:2
expected 182:2
192:1 202:17
expects 217:11
217:15
expense 306:22
307:6,13
315:10 316:3
expenses 7:16
307:16 308:2
313:4,12 315:5
315:9
experience
168:9 171:21
171:22 255:17
261:4,8,11
264:17 265:1
276:19,20,21
277:2,6 300:2
300:3 301:17
302:11
experienced
167:19
expired 110:5
explain 47:12,14
119:14 158:12
190:8 292:8
311:19
explained
257:11 331:13
explains 140:17
exposed 234:14
235:4
exterior 97:21
98:6

extras 214:10
eye 22:10
eyes 131:10
e-mail 131:5
132:13,21
e-mails 6:10
125:6 260:15

### F

F 12:20
facility 55:12
262:7,10
fact 40:7 93:13
111:3 113:22
115:10 117:19
151:3 162:12
196:18 199:10
209:8 219:14
248:18 250:6
269:11 289:1
296:19,20
facts 18:12
failed 18:23
142:8 144:3
274:19 277:14
Failure 17:16
331:17
fairly 63:20
fake 114:5,15,19
false 19:16
20:16,16 114:4
114:14,18
245:1,5 246:19
falsely 296:8
fame 277:21
278:22
familiar 325:11
family 160:5
265:4
far 27:1 64:14
73:15 90:17
111:21,23
113:15 114:8
133:19 140:11

155:14 164:9
165:18,19,21
173:12,13
216:8 228:3
247:18 258:19
269:12 271:16
294:16 302:3
316:20
father 32:16
father's 41:9
fault 183:12
223:21,22
257:13,19
280:21 281:1,3
336:14
February 1:17
2:7,23 9:10
46:8 91:19,20
Federal 1:20
2:20 8:16 9:8
fee 149:17,23
270:2,3,16
332:18,22,23
333:1,13,14
334:4
feel 65:5,16
163:5 174:19
197:14 252:19
254:22 255:4,7
255:20,22
266:23
feet 132:12
fell 54:17
fellow 267:3
felt 65:11 112:3
197:5,15 200:3
200:21 252:10
255:1,9 269:8
269:8
field 171:23
fifteen 132:12
158:15 167:23
fifth 235:3
fifty 74:23

fifty-nine 74:10
78:17
fifty/fifty 94:2
fight 297:8
figure 64:13
file 42:22 70:22
108:7 112:12
112:23 177:6
242:8 281:9
289:20 323:8,8
323:15,16
339:3
filed 2:11 23:2,3
156:9 160:18
184:8 220:21
273:8 294:20
294:22
files 242:7
337:14,22
filing 3:18
fill 38:19 105:9
147:4,8,8
174:15 250:11
299:7,14 301:3
301:8,12
302:13
filled 39:18 69:3
147:6 174:17
224:5
filling 60:13
288:8 326:20
final 135:1
249:10,12
financial 338:7
financially
274:5
find 58:19 61:11
163:21 287:15
287:21 302:16
320:12 332:12
333:6
finding 142:5
findings 135:1
fine 150:13

# FREEDOM COURT REPORTING

Page 355

206:9
fined 149:16,21
150:6,13,14
151:4 215:18
248:22
finger 104:3
finish 113:7
131:8 151:6
188:9
finishing 301:18
302:1
fire 21:12,22
22:3,4,22
107:22 184:16
185:20
fired 46:16 48:2
72:22 73:11
126:17,21
166:21 167:3
174:1 184:17
184:20 185:23
191:15 247:16
247:17 250:3
285:6,8,11
first 10:3 15:4
24:10 40:7
42:11 83:22
87:9 105:21
132:2,2 177:18
177:21,21,22
178:13 207:15
231:21,22
241:16 261:18
297:17 309:23
311:23 312:3
323:10 327:16
336:21
firsthand 328:7
334:18,20
fit 228:22
five 25:3 53:12
56:9 62:21
66:9 72:23
88:22 108:5

112:5 162:8
168:5 177:10
246:1 264:23
288:5 290:1
297:23 302:15
330:5
fix 270:10
fixed 21:22
22:17 117:5
flagging 280:14
Flake 30:12
71:12
flat 62:11
115:11
flexibility
251:16
floor 22:14
137:15
floorboard
230:15
Floorboards
98:8
Flowers 65:22
66:8 67:14
68:7 85:6 94:6
169:10 170:10
170:13 175:20
176:19 177:11
180:1,6,8
196:12 326:11
fluctuates
274:14
follow 45:5 86:8
153:15
following 9:14
133:5 140:18
follows 10:4
follow-up 203:7
214:7 342:7
food 22:9 227:3
force 3:4
forced 39:3
Ford 118:15
foregoing 9:5

344:7,11
forget 246:12
forgot 22:10
40:5 156:6
318:17
form 3:11 4:14
4:15,16,18,19
4:20 5:5 6:20
40:22 161:13
204:9 205:5
210:1 214:17
214:22 215:4,6
215:6,9 248:13
249:4 279:5
288:8 326:20
336:3 339:21
339:23
formal 55:23
former 68:5,10
forms 146:12,17
209:14 288:15
Fort 72:6 76:1,5
77:11 88:10
89:13 110:11
111:6 120:4
124:15 231:7
forth 54:16
Fortunately
53:9
forty 76:13
171:22 217:23
Forty-eight 17:1
forward 199:23
forwarded
132:21 134:18
134:21
forwarding
184:3 185:1
186:1,3
found 138:18
205:21 211:10
214:8 224:3,11
226:21 228:2
239:3 294:17

333:8 336:12
foundation
336:4
four 56:7 149:7
267:16 269:21
269:22 304:19
304:20 334:14
fourteen 312:21
fourth 223:7
234:19
frame 167:15,17
220:11
Frank 119:20
Fred 301:11
free 97:22 98:9
friend 155:23
156:1,6 305:14
305:15
friends 155:1
156:4
front 133:17
273:6 307:9
326:16
frying 22:14
fuck 256:19
fueled 98:17
full 3:5 11:11
226:22 227:20
230:18 290:5
290:12 291:5
293:1,3,4,5,10
293:13
funding 325:13
funds 305:10
Funeral 32:19
funny 38:12
further 3:1,8,17
119:15 267:21
324:5 343:12
344:14
future 16:19
267:2
F-150's 118:16

# G

gain 229:17
games 51:8
garbage 97:22
237:4
Garrett 65:19
151:23,23
243:2 249:15
249:20 250:3,6
283:10,11
318:6
Garrison 151:22
187:5 283:8
gas 226:22
227:20 230:18
290:12 291:4,5
293:1,4,5,5,10
293:12,13
gasoline 290:6
geared 172:3
173:14
GED 262:22
264:12,14,17
264:23
gen 142:9
general 6:4 64:9
109:6 116:4
129:4 258:20
generalist 140:6
200:10
generator
142:10,14
Generstoe
142:11
gentleman 89:5
George 40:1,1
76:15
Georgia 305:17
getting 54:3,18
55:5,15 139:19
175:20 176:3
177:14 198:9
199:21 297:15
297:18 314:8

# FREEDOM COURT REPORTING

314:18 316:9
Gill 177:11
girls 14:12,13
  27:1,6
give 37:14 58:13
  69:2 106:15
  137:15 141:21
  142:6 150:16
  184:13,19
  245:16 261:2
  281:6 291:23
  306:4,6,18
given 50:1 115:9
  168:14,20
  169:17,19
  170:17,21
  172:8 173:23
  174:20,20
  241:19 274:21
  282:11,15
  283:23 288:11
  290:14 292:22
  296:3 326:14
  344:12
gives 150:15
  318:8
giving 133:12
  210:22
glad 64:6 312:18
glasses 131:11
go 10:14,17,19
  27:11,12 28:18
  34:20 37:21
  43:1 59:12
  60:16 81:4
  82:14 86:4
  90:1 95:15
  106:14 119:4
  127:9,21
  137:17 142:3
  160:5 161:9
  176:20 178:20
  179:11 180:2
  183:6 198:10

198:12 199:8
202:9 208:1
212:17 221:11
221:12,16,18
223:11 224:23
233:23 252:14
273:21 308:2
311:8 312:2
319:3 329:3,9
329:15 336:18
339:10 342:15
goals 121:20
goes 152:19
  207:22 236:14
  257:15
going 11:1 16:16
  37:12,13,17,18
  40:19 41:15
  43:1 45:15
  48:18 52:2
  53:10 65:11
  70:20 73:8
  76:15 85:20
  86:3 97:2
  118:23 123:23
  125:5 127:23
  139:17 146:22
  147:18 148:2
  157:2 159:12
  164:16,17
  174:15 178:16
  179:17 184:15
  186:15 190:15
  196:6,22 197:2
  198:8 201:18
  201:19,20
  202:2 206:17
  214:6 216:18
  218:4,7,22
  219:5 220:10
  223:5,6 241:13
  242:6 252:5
  272:13 287:15
  287:21 302:5

319:13,13
321:23 324:1
326:13
Golden 30:12
  71:12
golf 142:3
good 56:13,15
  63:17 64:3
  80:20 114:22
  164:21 199:9
  222:11 223:15
  314:7
gotten 291:3
  342:19
government
  90:14,19,20,23
  92:1,4,5,13,17
  93:1,14 95:10
  97:17 125:4
  136:9,11,13,15
  139:4 149:16
  149:21 150:6
  226:17 234:23
  248:9,23
  250:17 251:21
  260:4,8 270:7
  271:20 272:7
  281:6 286:12
  286:14 287:10
  295:2,4 332:7
  332:10 333:21
  335:12 341:15
  342:2
government's
  270:12 295:14
grade 263:8
  334:1
graduate 27:22
grandmother's
  22:18
grease 22:4,8,9
  22:10,13
great 42:23
  152:10 164:21

greater 219:15
green 194:2
  208:12 209:9
  248:19
Gregory 243:4
grime 98:10
grinding 133:13
gross 313:8
grossly 281:12
ground 10:15
  155:6 157:5
  178:16
grounds 3:14
  129:5 157:23
  158:2,6 196:14
  196:14
GSA 91:7 92:8
guard 26:6
  94:18
guess 19:2 21:18
  21:20 35:4
  47:3,5 94:9
  99:22 163:21
  179:6 185:19
  186:7 244:4
  284:2 297:13
  297:16 340:16
guitar 44:4,7
gun 25:5,6,7,9
  25:22
gunnery 76:7
  82:5 152:1,14
  175:2
guy 172:13
guys 325:21

### H
habits 225:4
Hadley 274:22
  276:5,7,17,23
Hadley's 277:2
half 274:11
  298:14
hammer 228:22

hand 106:20
  184:23 186:19
  332:3 339:6
  342:17
handbook 84:10
  84:13,22
  147:19 327:8,9
  327:12,15,23
handed 211:13
  215:7 276:3,4
hands 186:19,19
hands-on
  173:12
handwriting
  38:6 39:13
  272:14
Handwritten
  7:15
Hang 273:10
happen 185:9
  219:6
happened 22:8
  49:7 64:13
  113:12 158:20
  177:8 188:7,12
  189:3,8,16,20
  211:11 219:6,9
  257:11,17
  279:11 297:1
  326:3 329:1
  331:20
happening
  44:10 203:19
  331:15 340:19
hard 62:22
Hartford 298:17
  299:4,10
haul 313:18,20
  313:21,22
  316:5
Hawk 316:21
  317:6
Haynes 173:23
  174:1,7

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| hazard 293:23 | 43:9 45:20 | **Hill** 301:11 | 142:21,21 | 55:2,16 56:2 |
| **Hazmat** 234:5 | 47:21 48:16 | **Hines** 155:6,18 | 280:17 336:8 | 56:21 57:11 |
| 235:15,18,19 | 49:12 50:15 | 159:17,20 | **Hodges** 68:18 | 58:10 61:3 |
| 235:19,22 | 51:21 53:20 | 162:9 169:17 | 69:20 70:3 | 63:18,23 64:20 |
| **head** 11:7 72:2 | 70:17 73:5 | 170:12,18 | 75:22 77:3 | 65:1 67:15 |
| 126:4,6 193:20 | 77:21 79:20 | 171:19 172:5 | 78:23 109:23 | 68:6,11,14,16 |
| 230:1 273:15 | 84:18 85:17 | 173:15,16 | 110:16 111:1 | 68:20 70:1 |
| 299:17 | 90:11 96:22 | 174:2,2,7,10 | 112:3 120:23 | 71:16,23 72:4 |
| **heading** 97:7 | 104:16 106:3 | 174:11,23 | 121:3 125:6 | 73:17,23 74:4 |
| **headrest** 126:5 | 109:3,15 | 176:5 184:10 | 129:12,16,20 | 75:10 76:1,9 |
| **health** 56:16 | 115:17 118:20 | 201:3,16 202:4 | 131:7 134:19 | 76:23 77:6 |
| 64:5 298:17 | 120:13 123:20 | 202:15 260:23 | 135:7,9,12,16 | 81:17 84:6,10 |
| 299:4 | 138:14 139:14 | 261:4 269:14 | 138:8 140:17 | 85:22 86:18 |
| **hear** 77:9 101:9 | 141:18 144:17 | 277:8,11 | 153:15,17 | 88:6,9 89:16 |
| 176:9 198:7 | 147:15 153:8 | 278:23 279:13 | 208:5 323:12 | 89:19 90:7 |
| 323:11 328:12 | 164:14 204:13 | 280:23 281:8 | 337:13,18 | 91:3,6,9,10,17 |
| 328:15 | 206:15 211:6 | 281:11 285:5 | **hold** 24:5 178:21 | 92:7 93:14 |
| **heard** 77:5,10 | 212:12 214:3 | 285:11 325:18 | 186:10 245:17 | 95:2,14,16,22 |
| 77:13 181:10 | 216:16 220:7 | 328:1,2 331:2 | **Holland** 257:23 | 96:3,6 97:17 |
| 187:7,9 258:11 | 223:3 225:19 | 331:7,11 | 258:2 263:1,2 | 105:10 107:19 |
| 298:19 323:5 | 229:9 230:5 | 333:20 337:1,2 | 266:13,15 | 108:2 109:8 |
| 328:16 334:19 | 241:10 245:21 | 337:8 340:14 | **home** 16:6 22:17 | 111:6 119:5 |
| 336:20 | 251:3 252:3 | 341:8 342:23 | 31:20 34:19 | 120:2,3 122:2 |
| **hearing** 66:13 | 307:3 314:23 | **hire** 75:13 | 35:2,8,15,19 | 123:3,4 124:23 |
| 344:13 | 318:3 | 158:22 159:6 | 35:22 36:2 | 127:22 130:23 |
| **heat** 22:23,23 | **hey** 56:12 64:2 | 177:19 178:17 | 38:10 40:11 | 131:2 132:15 |
| 157:11 | 83:6,7 148:21 | 265:4 267:17 | 41:19 43:16 | 134:4 135:3 |
| **held** 37:10 | 149:15 151:14 | **hired** 43:18 56:6 | 44:4 45:14 | 136:8,23 137:3 |
| **Helen** 12:20 | HG 236:13 | 68:17 69:4 | 46:13 48:9 | 137:6 138:19 |
| **Hell** 54:1 | **high** 27:22 28:7 | 70:6,12 79:4 | 49:16 50:19 | 139:1 149:21 |
| **help** 196:16 | 122:18 262:21 | 84:22 85:2,7,9 | 51:11 52:14 | 150:6,13,14 |
| 202:17 203:20 | 264:12,15 | 85:11,12 109:7 | 55:13 71:2,8 | 151:3 164:10 |
| 203:23 306:20 | 275:3 | 166:18,23 | 71:12,13 127:5 | 165:20 166:1 |
| **helper** 69:12,16 | **higher** 74:14 | 168:2 176:19 | 207:23 241:4 | 166:10,19 |
| 204:4 229:16 | 83:9 170:12,19 | 177:18,20,22 | 257:6 | 167:8,22 |
| 291:20,22 | 170:20 172:7 | 177:23 178:2,2 | **homes** 55:10,11 | 169:14 180:22 |
| 292:16 301:19 | 172:14,19 | 178:13,22 | **Honey** 125:4 | 183:4 184:7,8 |
| 301:23 | 193:6,10 | 203:23 262:15 | 148:20 | 186:9,16,23 |
| **helping** 302:4,7 | **highest** 69:23 | 262:21 263:2,4 | **Honeywell** 1:12 | 189:2,5,9 |
| **helps** 242:4 | 168:17 275:3,9 | 263:5 | 10:8 11:3 | 197:21 200:6 |
| **Henry** 18:1 | 275:12,18,23 | **hiring** 267:1 | 17:21 26:4 | 200:15 207:4 |
| 24:11,15 | 276:6,11,22 | **history** 269:15 | 31:17,18 32:4 | 209:3 210:14 |
| **hereto** 38:3 | **highlight** 37:14 | 269:17 | 32:5 37:11 | 215:17 217:1 |
| 40:16 41:12 | **highly** 262:22 | **hit** 141:12 | 52:21 54:6,23 | 217:12,13,16 |

# FREEDOM COURT REPORTING

221:4 224:18
242:4,18
248:22 249:13
250:18 251:10
251:15 260:5,9
264:3,14 268:1
271:10,13
277:6 284:16
284:18 286:13
294:23 295:1,4
295:5 297:12
307:14,19
317:14 322:1
341:4,7,9
**Honeywell's**
88:14 95:9,11
121:18 125:14
139:5 148:21
182:19 200:2
216:6 270:12
270:14,17
289:1 295:14
**hope** 108:10
**hospital** 36:16
**hot** 10:16 152:15
152:19 230:23
**hour** 74:19 75:1
78:18 217:23
256:16 304:3
**hourly** 78:21
84:5
**hours** 20:9
171:22 295:11
**hour's** 218:23
**house** 12:14,15
12:16,21 33:9
**Houston** 18:9
**HO5L** 131:17
**HR** 140:6
182:19 184:3,7
184:7 185:2
200:2,10
**HTSI** 121:21
122:1

**human** 55:17
186:3 299:11
**Humana** 36:13
36:15,18 37:1
37:3 48:3
71:12 126:18
126:21
**humidifier**
236:22
**humidifiers**
236:12
**humiliate** 269:9
**humiliating**
268:14,18
269:5
**hundred** 274:17
298:8 312:21
**hung** 67:8
**Hunt** 200:8
202:20
**Hunt's** 203:4
**hurt** 343:5

## I
**idea** 96:7 148:16
148:17 171:9
296:17 341:6
**identification**
38:2 40:15
41:11 43:8
45:19 47:20
48:15 49:11
50:14 51:20
53:19 70:16
73:4 77:20
79:19 84:17
85:16 90:10
96:21 104:15
106:2 109:2,14
115:16 118:19
120:12 123:19
138:13 139:13
141:17 144:16
147:14 153:7

164:13 204:12
206:14 211:5
212:11 214:2
216:15 220:6
223:2 225:18
229:8 230:4
241:9 245:20
251:2 252:2
307:2 314:22
318:2
**identifies** 234:9
**identify** 317:22
**illegal** 25:8
303:17
**immediate**
138:19 167:16
207:19
**immediately**
161:20,22
**impair** 12:3,7
**importance**
208:23 209:5
**impression**
144:20 145:4
**improper**
149:15 151:13
248:11,12
282:20,23
284:1
**inaccountability**
151:16 248:8
283:23
**inappropriate**
131:19
**incident** 6:12,13
24:9 48:21
59:23 109:21
109:22 111:22
113:14,15
114:8 125:7
126:3,11
129:13 130:9
131:7 138:7
140:11 141:22

144:12,20
148:22 151:4
177:8 183:18
188:4 189:6,14
189:15,21
190:22 211:11
215:13,23
216:2 292:15
331:12,13,16
332:6,8 333:7
334:2 335:17
**incidents** 189:15
252:9 336:20
**inclined** 165:18
**included** 90:2
116:23
**including** 97:21
227:2 324:6
**income** 304:5,7
**Incorporated**
122:3
**incorrect** 74:21
128:2 130:1,3
132:16 160:21
165:11 243:14
247:9
**incorrectly** 75:3
**Independence**
13:20
**independent**
186:17 308:1
308:10
**indicate** 112:2
**indicates** 215:15
**indicating** 46:18
99:9 100:5
213:7 273:7
**indirectly** 68:7
**individual** 18:3
101:6,12
171:20 228:19
262:21 269:12
280:19 286:12
328:21

**individuals** 55:8
272:6 286:10
**industry** 315:18
**inferring** 131:23
**information**
134:22 183:21
207:13 249:19
283:2 331:2,4
**informed** 131:5
131:14 272:5
275:11,21
332:10
**infraction**
285:14 290:23
**inherit** 32:23
**inheritance** 33:1
**initially** 79:4
335:9
**initiate** 133:10
**initiation** 187:4
**initiative** 251:17
**injured** 285:6
340:15
**injustice** 73:15
**Inn** 13:8
**input** 223:18
224:3 323:21
**inputted** 317:10
**inquired** 69:1
247:12
**inquiry** 252:18
299:3,15
**inside** 238:7
**insisted** 187:12
**inspect** 98:16
128:9,10
**inspecting**
128:13 129:4
**inspection**
125:23 128:5
132:4
**inspections**
128:20 209:13
**inspector** 60:21

# FREEDOM COURT REPORTING

Page 359

61:1,4,9 162:7
239:22 240:3,8
247:2
instance 132:2
139:5
instructed 60:7
75:20,21 102:7
142:3
instructions
45:5
instruments
235:22
insubordinate
44:17 49:1,5
50:7
insubordination
51:17 140:20
141:3
insurance 21:7
21:15,16,18,18
21:20,22,23
110:15 111:16
Integrated
238:3
integrity 267:3
intensive 216:20
intentions
268:22
interested 26:21
344:17
interface 89:1
interfere 136:13
interior 97:21
98:6
internal 133:13
Interoffice 7:4
interpret 62:8
99:22 289:4
interrupt 127:10
152:12
interruption
249:22
interview 54:15
55:23 76:22

135:21 172:7
interviewed
76:21 77:2
79:5 182:7
interviewing
178:5
intimated
185:17
intimidate
185:13
inventories
287:11
inventory
208:21,23
209:6 243:5
247:8,20,23
248:15,19
249:1,5 285:16
285:19 286:9
investigate
187:11
investigated
186:8 280:19
investigating
267:23
investigation
50:5 184:5
186:18 267:1
267:22 296:21
involve 19:20
involved 82:11
149:14 156:12
162:18,21
185:11 280:16
286:11
involving 125:8
132:4
in-house 174:20
174:22
Iraq 229:23
iron 280:13
334:22
issue 150:3
187:2 199:11

210:22 223:23
248:2 270:4
335:13
issues 19:20
162:16
item 228:3
234:11
items 224:8
228:1
ITM 237:21
238:1,2,20,21

## J

jackknifed
141:11 142:17
161:19
Jacksonville
280:20
James 120:23
January 46:7
51:4 225:23
290:1 309:10
309:23 311:14
311:21,23
312:2,3,20
319:20
Jeff 8:7 37:22
105:16 230:11
245:15 316:9
316:21 336:16
JEFFERSON
344:4
JEFFREY 8:6
jeopardized
267:4
jerked 126:6
Jerry 60:10 77:3
84:2 96:8,10
96:13 116:10
156:11 159:17
159:21 162:10
167:14 185:12
253:12 258:3,6
258:7 290:18

338:11 339:3
Jim 151:23
249:15 318:5,5
Jimmy 68:17,18
69:20 75:22
77:3 78:23
121:2 133:8
155:6 184:10
185:13 323:12
job 13:12 22:20
26:4,7,8,10,14
26:22 27:2,3,7
27:8,12,15
30:13,17,18
36:10,17 37:7
37:10 39:3,20
47:17 48:3
54:13,17 55:20
56:5 60:19
69:1,5,14 72:8
74:3 75:10
76:22,23 78:12
78:17 79:16
81:2,3,4 82:23
83:4,9 95:3
103:1,4 125:15
126:18 127:1,6
128:14 138:18
167:20 168:9
168:16,18,20
170:17,21
172:4 173:12
173:13,13,17
173:20,23
174:18,21
175:8,10,20
176:4 177:10
178:1,10,19
180:2,9,11,14
180:15,18,19
180:21 181:4
191:10 201:14
202:7,9,11,18
253:3,12 257:8

261:3 262:13
263:17 264:13
264:16,22
266:21 269:7
271:22 272:8
274:23 275:4
276:2,3,15,18
282:10 298:18
299:22 302:16
307:22 314:9
325:14 343:6,7
jobs 27:9 71:13
71:17 72:19,23
177:17 195:1,8
195:16 266:8
271:13 297:20
Joe 96:16,16,18
124:1 132:22
133:7
journal 192:2,5
192:9,17
221:22 222:1
222:14,17,19
268:6,8,11
Jr 1:16 2:17
9:12 10:2
11:13
Juliette 130:4
227:16
July 225:8
jumbled 232:8
June 224:10
Junior 29:16
justify 285:20
J-002 226:14

## K

keel 191:12
keep 31:14,14
115:10 249:4
292:20
keeping 27:1
192:2,5,6,8,17
192:23,23

# FREEDOM COURT REPORTING

208:23 209:6
221:22
**Ken** 8:22 62:22
63:12 118:2
218:13 258:2,3
268:20
**kept** 34:5 65:8
177:16 178:5,8
178:11
**key** 243:18
244:1,3,5,5,5,6
244:8,18 245:6
246:4,6,9,13
246:16,21
247:1,4
**keys** 243:13
244:6,15 245:9
**kidding** 316:8
**kin** 344:15
**kind** 19:22 21:1
108:10 150:20
183:3 193:12
297:10 315:22
329:7,17 332:8
336:21
**knew** 65:9 92:20
183:22 197:15
199:10 290:20
**knocked** 323:7
**know** 10:19 14:4
16:15 21:21
27:13,17 37:17
47:6 59:5,11
59:22,23 60:1
60:4,10,14,16
61:4,6 64:14
64:15 66:22,23
67:5 78:9
79:10,11 85:11
85:12 88:21
89:5 90:22
91:8 94:13
96:13 99:21
108:13 112:6,7

113:3 116:2
124:5,8,12
128:18 129:1,6
129:10 131:9
131:10 134:8,8
134:11 149:20
150:4,5 153:21
155:9,12
156:11 158:21
159:1,3,7,8,11
159:13,16
160:13 165:15
165:22 168:1,8
168:10 172:6
178:9,9,15
180:17 181:5
181:13,15
183:1 185:5,12
189:17 190:16
190:18 191:13
191:18 194:19
195:5,9 196:19
197:2 203:4
204:4,6 209:22
212:1,4 215:1
217:13 221:7
221:21 222:13
226:9 229:23
231:3,13 233:2
234:16 236:4
236:21 238:22
239:6,7 240:18
243:15,17
246:11,12,14
246:18,20
247:4,10,11,21
249:7,8,10
250:16 254:5
256:8,8 258:5
258:6 259:1,2
259:12,18,18
260:3,7,13
261:16 266:3

273:2 275:2,20
277:18 278:2
279:20 280:1,2
283:6 284:19
286:15 287:9
287:14,17,20
289:12 291:10
295:17 303:11
303:16 315:22
319:3,5 325:15
326:3,12 329:1
329:2 334:9,12
336:5 337:19
338:1 339:11
341:3,10,14,22
342:1,23
**knowing** 90:18
173:12 296:21
**knowledge**
27:16 34:4
38:22 88:18
90:21 154:18
159:18 204:3
241:21 258:10
270:8 278:4
291:21 328:8
334:18,20
336:21 341:11
**known** 11:16
**knows** 315:22

### L

L 2:4,13,18 8:3
9:1 344:21
**label** 234:5,8
235:20
**Labor** 69:15
**laborer** 170:10
176:20 195:14
263:5 266:22
**laborers** 196:14
**laid** 176:22
177:10,13,17
**landed** 22:14

**language** 41:18
**large** 142:18
**Larry** 181:22
**late** 33:19 87:19
104:23 105:6
218:1 219:15
225:7,10
257:14 306:15
311:20
**launch** 186:17
**Laura** 299:16
**Laurel** 53:7,14
54:2,5,11,14
55:18 56:5
299:16
**Lavar** 8:23
52:20 54:8
56:18 57:2,14
58:2,4,9,23
59:13 60:8
61:21,23 65:3
68:8 85:1 94:3
117:21 144:11
145:10,10
152:22 162:3,4
162:12 168:14
191:23 192:4
205:21 206:1
210:2,7,13,17
210:23 211:9
214:8,15 216:2
225:23 226:4
226:13 230:8
231:20 233:3
236:18 239:3,7
239:18 240:18
243:23 246:6
246:21,23
247:3 281:22
290:19,21,22
291:1,16
299:22 335:8
335:16 340:19
340:23

**Lavar's** 60:19
144:19 145:4
214:12
**law** 2:18 9:6
111:7,15 221:6
316:15,16
**laws** 3:6
**lawsuit** 10:9
18:17 23:17
27:20 62:16
68:6 169:5,8
337:5
**lawyer** 10:12
165:15 241:15
241:18,19
**lead** 210:9
265:16 329:15
**leader** 265:17
**leading** 3:11
23:18 321:13
329:14
**leads** 24:9
**learn** 257:2
**leave** 30:17
32:14 33:5
36:1 37:3
61:10,13 72:14
112:5 153:20
203:11 290:15
291:4 292:23
293:4,9,12
304:14,15
**leaving** 52:17
293:2
**led** 189:21
210:10,15
**left** 52:21 54:6
55:2,15 56:1
56:20 64:20
65:1 67:14
69:13 75:10
83:15 84:6
89:10 96:6
98:3 124:11

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

174:16 175:9
176:20 179:8
205:8 234:14
234:20 235:3,7
240:15,19
257:5,7 287:17
293:5 337:18
343:1
**left-hand** 42:16
**legal** 11:5
**length** 50:6
**lesser** 260:21
269:12 296:3
**letter** 5:10 7:20
78:2,7 242:13
**letting** 329:1
**let's** 53:10 80:6
106:14 155:6
161:9 233:23
233:23 234:4
319:1,3 328:1
333:2
**Leyh** 89:6,6
124:19 125:7,9
125:19 127:13
128:3,19
129:17 130:5
130:22 131:1
132:5,9 260:16
335:13 338:13
338:17 339:18
**Leyh's** 338:12
**liberal** 141:2
**license** 17:6,6
31:15 102:22
110:6 111:16
198:10,12
271:4,5,14
296:22 297:6
314:18 317:5
**licensed** 28:13
28:14,15,17,20
**licenses** 55:21
**licorice** 315:14

315:23
**lie** 39:4,22
**lied** 54:8 218:10
218:15 286:18
**lienholder**
306:10,16
**lieu** 34:3
**life** 11:2 64:8
198:2
**lifter** 130:5,6
**light** 180:9,20
195:11 263:8
263:11
**line** 53:15,16,22
53:23 56:8,9
56:10 64:11
97:12
**lined** 54:4,14,19
55:6,15
**lines** 59:22
262:2
**Lisa** 15:8 48:7
101:14 140:5
229:18
**list** 75:16 166:6
166:7 169:11
197:2 207:23
318:7,11
**listed** 39:7 208:7
**Listen** 182:15
306:12
**little** 115:21
116:5,11 117:8
119:14 141:2
158:11,14,18
182:4
**Little's** 117:9
**live** 13:19 16:13
30:6 78:13
231:3 236:13
**lives** 12:21
**living** 56:13,15
63:16 64:3
273:12,13

**LLC** 8:7 306:1,2
310:23
**loaded** 334:21
**located** 29:2
33:10 200:14
**location** 131:17
201:14
**lock** 99:6,10
331:19 342:14
**locked** 93:7,9
99:11 293:19
**locking** 100:12
**lockout** 279:16
285:6 342:12
**lockout/tagout**
140:18 277:14
282:2 331:17
**logging** 71:22
302:19,22
304:11,23
305:2 308:1
309:1 312:4
315:18
**logo** 242:18
**long** 10:18 13:22
15:9,21 29:4
30:23 32:1,8
35:17,21 36:23
56:20 66:7
72:10 86:15
91:13,17 119:7
123:8,11
148:10 167:21
191:15 199:5
199:12
**longer** 39:14
73:17 86:13
308:23 311:13
313:20 314:2
326:7 338:13
339:18
**longest** 37:9
**look** 45:23 46:4
46:5 53:12

64:11 164:22
165:4 178:21
230:12 269:2
308:14 317:5
320:11,11
**looked** 186:14
256:18,20
**looking** 58:23
59:5 60:14
88:3 129:2,3,7
143:18 149:2
167:10 199:23
207:9 232:7
234:19 236:2
237:9,11,15
240:9,11,13
272:12 326:23
**looks** 142:12
**lose** 296:22
297:6
**loss** 332:12,19
332:20
**lost** 149:17
**lot** 22:23 51:9
337:20
**loud** 34:16
**LPH** 298:18
**LPN** 16:11
28:13,15,16
31:6 298:22
**LPNs** 198:16
**lunch** 137:20
256:15 315:15
315:20
**lying** 196:22

····· **M** ·····
**M** 8:13 336:1
**MacArthur** 29:1
29:5 76:18,19
**machine** 237:23
342:11
**machinery**
237:15,19

239:5 240:10
240:12,15,17
240:20 281:13
281:15 343:2
**machines** 30:15
**Madam** 321:3
**mail** 203:11
**maintain** 76:6
81:6 210:3
**maintaining**
135:16 136:4,6
**maintenance**
5:17 30:14,15
61:12,17 69:12
69:16 76:2
77:11 82:14
97:4 100:20
145:23 146:4
211:18 214:10
214:16 226:14
227:13,18
229:14 238:14
238:18 239:4
239:11,15
251:15 289:10
289:16 343:1,3
**maintenances**
81:9
**major** 294:6
**making** 83:1
263:16 307:22
**male** 167:5
274:22 285:23
**males** 196:3
**Malicious** 18:11
**man** 54:3 56:12
56:13 62:23
64:3 124:5
172:12 261:3
262:17 275:8
**management**
55:19 98:21
122:6
**manager** 69:2

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

69:21 110:1
119:23 125:17
153:13 238:9
251:13 260:2
272:5
**Manger** 265:3
**mannequin**
282:16,18
283:15
**mannequins**
151:16 247:9
247:18,21
282:19,21
283:1 284:1,4
285:16
**manner** 238:16
258:23
**Manor** 31:18,19
32:2,6,9,15
33:5,10,13
34:9,12,13
74:16,18 76:17
299:13
**March** 47:2 88:3
118:9 149:12
205:20 318:18
318:22 319:5
319:10,12
320:12,17
322:10
**Marietta** 305:17
**marijuana**
24:14 25:18
**mark** 37:18
40:19 41:15
45:15 48:19
53:11 70:20
73:8 85:20
97:2 118:23
123:23 139:17
147:18 164:17
214:6 220:10
223:6 241:13
251:6 267:18

267:19
**marked** 38:2
40:15 41:11
43:8 45:19
47:20 48:15
49:11 50:14
51:20 53:19
70:16 73:4
77:20 79:19
84:17 85:16
90:10 96:21
104:15 106:2
107:2 109:2,14
115:16 118:19
120:12 123:19
138:13 139:13
141:17 144:16
147:14 153:7
164:13 204:12
206:14 211:5
212:11,14
214:2 216:15
220:6 223:2
225:18 229:8
230:4 241:9
245:20 251:2
252:2 307:2
314:22 318:2
**married** 13:14
13:23 14:2,5
14:20 15:1,3
15:10 160:2,11
160:23
**Maryland**
200:16,16
**material** 98:5
**matter** 40:6
117:19 196:18
221:5,6
**Matthews** 124:5
124:13 125:20
132:14,17,20
133:7
**ma'am** 80:17,18

240:3 279:22
292:4,7
**McDonald's**
237:4 287:18
**mean** 36:20 39:8
42:1 43:3
54:12,20 56:14
64:2 76:18
92:16,17
107:21 114:18
119:12 127:10
134:5 152:12
155:12,20
170:6 172:9,21
173:11 187:10
208:10 219:7
234:7 242:7
254:12 256:5
259:1 260:11
262:11 283:7
284:13 286:14
300:20 301:21
303:2 308:11
316:13 320:7
325:8 326:6
333:17,23
**meaning** 332:21
**means** 45:8
54:13,21 56:16
107:22 138:19
170:7 172:14
172:19 173:5
219:8 262:12
344:9
**meant** 79:10,12
93:4 256:8
**measures**
133:11
**mechanic** 300:3
**mechanism**
238:3 281:22
282:1
**mechanisms**
281:18

**medical** 207:22
**medication**
33:17,23 34:6
**medications**
12:3,7
**meeting** 150:11
329:5,7,8,9,12
329:17,18,23
331:4
**meetings** 181:11
329:20 330:3
330:14
**members** 265:4
**memo** 112:2,19
112:22 115:10
115:20 116:4,7
116:23 117:2
118:9,11
125:20 130:17
138:7,10
139:19,22,23
140:1,9,14,16
218:11,12,15
225:22 226:3
247:6
**Memorandum**
6:6,7,11,15,21
7:5,9,12
**memorializing**
132:14
**men** 151:12
**mention** 76:15
122:17
**merchandise**
24:17,18
**merits** 133:10
**messy** 333:2,4
**met** 16:7
**microwave**
256:17
**middle** 1:2
11:14 177:9
178:4 251:11
**mileage** 147:10

**military** 110:1
**Mill** 12:11
**mind** 186:11
188:16
**minds** 196:10
**mine** 156:2
270:5 310:11
**minimal** 264:8
**minimum**
263:13
**minor** 223:17
**minute** 105:5
137:10 178:21
328:2
**minutes** 66:9
105:2 112:5
130:9 158:4,16
218:1 219:16
**mirrors** 190:13
**mis** 39:8
**misdemeanor**
25:13,18
**misprint** 75:5
**misput** 39:10
**misread** 228:7
**misrepresent**
341:20
**misrepresenta...**
207:18
**missing** 247:18
282:17,19
283:15 286:16
**mistake** 20:11
**mistaken** 118:14
219:10 253:20
254:1
**mistakes** 224:9
**mistreating** 64:1
**moment** 166:16
**Monday** 271:8
**monetary**
193:19,22
**money** 148:14
148:18,20

# FREEDOM COURT REPORTING

150:6 270:17
284:9 305:12
305:18 307:22
308:3 311:3
328:4,9
**monies** 149:17
311:7
**month** 27:10
56:23 57:1
64:23 274:16
283:3
**monthly** 287:11
**months** 27:10
29:6 31:1
56:23 123:13
168:19 199:8
199:12,13,16
201:20,21
203:16 283:3
298:1 302:15
**Mooney** 305:16
305:19,20,22
306:3 310:20
311:5
**morning** 60:12
293:20 329:9
329:13 330:1
**mother** 12:17,22
12:23 13:2,4
273:12,14
274:6 298:8
**mother's** 12:18
**Motor** 305:16
305:18,22
310:20 311:5
**Motors** 301:11
**move** 16:18
190:14 268:13
272:6
**Moved** 260:19
**movement**
254:10
**mover** 142:3,5
336:8

**moving** 280:17
336:8
**MPMG** 82:9
**MRF** 82:7,8
**mud** 98:9
**Murphy** 125:10
125:12 128:4
129:16 130:6,8
130:22 131:4,5
131:8,13,18
132:8
**M&M's** 235:13

**N**

**N** 2:13 4:1 5:1
6:1 7:1 8:1
182:5
**name** 11:11,14
12:19 13:16
15:6 46:21
69:11,15 96:8
123:6 156:7
181:23 200:8
220:15 221:1
229:17 246:13
299:12 341:18
**named** 48:7,8
89:5 96:10
124:5 275:8
**names** 11:17
317:2,9 326:1
**Nash** 1:19 2:19
8:14 9:7
**National** 94:18
**nature** 19:3 95:4
131:22 186:20
328:23
**near** 16:19
**necessarily**
41:23 59:15
**necessary** 3:9
276:15
**need** 10:16,17
11:8 30:22

65:17 79:6
121:14 133:8
133:12 137:16
154:14,17,21
157:9 161:3
314:15,16
342:12
**needed** 27:3
64:15 65:5
81:8 82:12,12
82:15 117:5
121:5 133:11
197:14 208:5
208:11 224:13
257:2 302:6
**needs** 121:14,15
157:7 215:2
267:2
**negative** 17:7
**negatively** 230:1
**neither** 344:15
**nephew** 266:13
266:14
**nephews** 265:5
**never** 23:14
46:16 54:5
78:7 94:10
100:22 113:22
114:1,3,13,16
114:23 135:7
145:12 166:3
178:2,6,6
182:8 183:20
183:21 197:19
200:1 203:3,9
217:8 222:1,13
241:18 247:12
247:19 249:18
258:11 260:2
264:19,20
265:18 267:8,9
281:21 282:3
296:10 298:19
302:6 313:22

323:2,4 341:12
**new** 82:9 251:18
**nickname** 11:23
**niece** 159:21
160:9
**night** 27:6,12
30:16 178:8
**nights** 32:12
**nine** 51:3
**ninety** 231:16,18
82:15 117:5
**Nods** 11:7 72:2
193:20 230:1
273:15 299:17
**noise** 60:9
**nope** 324:2
**normally** 80:21
230:23
**north** 1:22 2:21
8:18 9:9
231:12
**Nos** 51:19
318:14 319:8
321:5
**note** 5:8 7:6,8
43:20 167:14
285:15 291:2,7
291:8,11
**noted** 121:5
222:20 280:20
289:14 296:8
335:15 336:13
**notes** 7:15 192:6
215:12 222:10
223:14 224:16
252:11 272:1
336:1
**notice** 3:18
142:8 144:3
220:23
**noticed** 286:2
**notified** 162:3,5
332:5
**noting** 49:14
**November** 16:2

187:21 254:3
302:19 303:11
**no-call** 71:7
**No-Call/No-S...**
5:8
**no-shows** 71:7
**null** 19:2
**number** 1:5 4:3
4:11 17:3
85:22 88:6,19
97:20 106:10
106:15,18
116:16 127:10
150:23 267:16
271:13 317:5
322:2
**numerous**
248:14 260:2
282:13,17
283:13
**nurse** 16:11
28:13,14,15,17
28:21 31:23
32:7
**nurses** 50:7
**nursing** 16:6
31:20 34:19,23
35:2,8,9,14,18
35:22 36:2
38:10 40:8,11
41:19 43:16
44:4 45:14
46:13 48:9
49:16 50:19
51:11 52:13
54:2,12,22
55:9,11,12,13
64:16 71:2,7
71:12,13 127:5
198:9,11,12
199:1 207:23
296:22 297:6
**nuts** 236:6

# FREEDOM COURT REPORTING

**O**

O 2:13

Oaks 53:7,14 54:2,6,11,14 55:18 56:5 299:16,16

Oakview 32:6,9 32:14 299:13

oath 10:21 80:15 241:20 291:16 292:2

object 161:12 324:18 336:3

Objection 204:8 205:4

objections 3:10 3:13

objectives 121:20

observed 110:4 125:23 132:3

obviously 227:17

occasion 110:16

occasions 67:21 203:22 224:20

occur 168:21 187:17 194:6

occurred 23:1 117:4 130:9 140:12 161:21 183:19 188:2 219:4 292:16 331:13 334:3

occurrence 190:8

occurring 252:10

occurs 330:16 332:6

October 48:20 49:15

offense 143:6,9 294:7

offer 78:10 207:20

offered 3:15 78:16 178:1 250:10 325:7

office 129:12,16 129:20 176:10 176:12 179:2,5 183:23 241:23 242:22 304:6 324:21

officer 20:3 95:18

Officers 72:6

Offices 2:19 9:6

off-the-record 38:17 50:11 71:4 109:11 154:1 221:14 320:19 321:16

Ogletree 1:19 2:19 8:14 9:7

oh 26:8 32:20 37:23 60:8 87:4 107:1 117:14 122:16 142:13 158:10 188:2 213:5,19 230:13 254:17 272:9 296:15 306:11 308:5 314:1 321:14 334:9

oil 291:6 293:14

okay 11:6 24:7 29:22 31:13 32:21 34:21 38:5 43:1,5 46:10,10,23 52:4,9 58:21 58:22 59:4,7 62:18 71:10 72:12 75:2 78:3 79:14

80:19 81:1 89:22 96:14 97:13,15,19 99:19,20 101:5 105:13 107:5 109:20 112:16 113:9 115:8 118:6 131:4 133:20 134:1 134:16 137:8 137:13 140:22 144:13,19 145:21 146:3 146:16 148:1 149:6 151:6 152:7,9 155:15 157:9 161:5,8 164:8 169:10 169:16 170:16 172:1,16 177:12 179:14 184:14,23 185:7 187:19 191:5 195:3,15 204:7 206:21 208:9 212:18 213:19 226:6 226:12 228:6 232:5 238:17 242:16,19 245:23 246:2 252:11 253:6 253:18 254:17 255:3 257:9 258:22 259:7 262:5 263:6 264:5 267:9,12 268:12,17 270:21 271:6 272:9,10,22 273:11 275:15 276:1,14 279:2 286:21 287:23 288:4 293:6

296:1 307:10 307:11 311:10 311:18 312:11 313:9 314:15 314:17 316:1 317:12,16 319:6,19,20 321:4,11,20 325:11 326:13 332:1 334:11 336:15,17 339:2

old 16:23 38:13 202:9 339:11

oldest 339:14

omission 207:17

once 21:4 90:16 111:11 186:20 209:18,22 266:4

ones 177:16 196:19 297:21 335:10 340:21

online 122:15,18 122:22 123:2,9 123:12

on-hand 171:22

on-site 285:20 294:23 302:7

on-the-job 168:14

opened 308:12

opening 308:18

operate 101:23 102:21 146:23 147:1 271:17

operated 170:7

operating 271:16

operator 98:3 101:17,20 102:16,17,20 103:7,18,19,21 145:21 170:2,5

180:9,21 195:12 203:23 263:8,12

operators 102:19 326:2

opinion 176:5 179:21,23 191:14 221:5

Opp 29:3

option 88:23

oral 2:6 9:13

ordeal 24:11

order 198:12

ordered 18:23

original 2:5 147:19,23 148:3

originally 143:1 177:23 202:15

outcome 18:16

outside 57:5 161:9 179:4 196:12 275:19 277:2,3,6

outstanding 251:17

out-of 108:17

out-of-state 110:5

overall 193:9 275:4

overweight 316:2

owned 90:23 91:7,9 308:12 312:5

ownership 90:20

owns 12:16

Ozark 231:2,4,5 231:7,11,12

**P**

P 2:13 8:1,1

# FREEDOM COURT REPORTING

Page 365

packet 90:3
page 4:3,11 39:2
41:3 53:12
56:7,9 59:2
62:21 64:10,11
86:1,5 133:17
149:6 165:5,5
207:9,10
220:13 232:8
234:19 235:4,7
237:4,11 240:9
246:1 261:18
282:8,14 288:5
289:2
pages 237:10
paid 263:7
284:19
paint 227:7
230:21 232:8
233:16 234:2
235:4 291:6
293:14
pan 22:14
papers 184:2
paperwork
55:22 127:14
127:16 184:18
184:22 185:1
paragraph
149:13 162:8
242:14 251:12
274:18
parked 190:3
parking 281:3
part 42:21 58:21
188:14 234:17
239:23 251:7
307:16 330:8
particular 55:12
173:1 223:23
224:8 225:2
233:15 236:10
300:14 327:23
333:7

parties 2:15
3:13 344:16
party 221:4
part-time 30:11
32:4,5
pass 37:15
179:19
passed 27:14
32:16 169:12
passenger
204:20 230:16
Pat 116:5,10
117:8,9,18
158:11,14,14
patient 36:21
patient's 41:17
Paula 265:7,15
pay 17:16
148:18 201:10
201:11 217:23
218:23 270:9
274:11 284:17
284:20 298:7
298:10 313:10
316:7,14,16
paying 83:9
302:8
PC 2:20 8:15 9:8
PCA 36:19,20
penalty 138:3
332:19
penny 83:16
people 121:10
177:10 182:3
185:10 197:2
209:14 257:3
258:9,18,19
259:5,11,14,18
277:21 313:21
percent 287:11
percentage
333:22 334:4
334:10
percentages

334:1
perception
224:17 271:21
272:7
perfect 152:8
163:8
perfection
163:10
perform 81:9
82:14 93:17
147:3 202:18
239:4 343:2,7
performance
88:15 136:23
137:5 190:6,8
192:7 193:3,13
212:5,7 213:8
213:16 251:7
282:12 283:13
performed
61:16 120:23
128:19 214:16
214:21 226:13
238:17
performing
60:11 98:22
190:2 238:13
331:18 343:6
period 29:7
295:15 336:2
perjury 138:3
292:6
permission
290:15,17
291:3,9,23
292:20,22
person 172:18
174:8 210:7,13
239:8 247:4
249:14 256:11
299:11
personal 94:12
252:8 267:8
268:11

personnel 5:4
42:22 89:3
95:1 108:7
112:23 117:3
122:6 133:18
139:2 177:5
251:10,16
289:19 323:8
323:16 337:21
338:6,8,10
perspective
131:17
pertaining 27:17
28:9
Phillips 317:2,6
phone 67:6
299:15
photograph
239:2
Photographs
7:11
photos 230:9,12
234:20 240:19
pick 60:17
330:10
picture 231:21
233:3 236:1
pictures 231:23
232:2 236:18
piece 146:23
280:12,17
piecework 304:1
Pike 31:18,19
32:2 33:5,10
33:13 34:9,12
34:13 74:16,18
76:17
place 1:20 2:20
8:16 9:8
191:21 273:19
331:3
placed 98:13
198:20,23
201:1 215:21

268:13 277:8
277:11,18
278:5,10,15,23
279:15,21
places 152:2
Plaintiff 165:10
282:9,14 288:6
Plaintiff's 7:19
317:23 318:1
318:19 319:4
322:16
Plaintiff(s) 1:8
8:5
planning 54:21
plans 16:18
plant 60:16,16
plate 110:6
play 51:8
playing 44:3
please 2:9 11:6
13:9 40:20
46:6 47:8
53:12,16 58:20
64:12 106:19
109:19 116:1
238:8 241:20
250:1 252:7
317:22
PM 251:12
PMC 320:7,7
PMCS 146:13
146:14 147:1,4
209:14 210:1
211:10 227:12
227:16 228:3,4
228:8 288:8,14
319:14 320:9
320:10 326:20
331:18
pocket 270:12
270:14
point 26:2 43:16
76:11 82:12
124:9 179:1

# FREEDOM COURT REPORTING

185:2 206:8
268:1 292:6
306:15
**pointing** 46:20
104:3
**points** 51:3
172:6
**police** 20:3
**policies** 5:13
85:22 88:6
90:2 100:3
103:14 106:22
111:6,7 121:21
216:6 229:13
234:1
**policy** 4:17,21
5:15,17,20,22
90:6 92:15
93:4 95:6,8,9
97:2,20 99:3,6
99:13 100:9,10
100:23 102:18
104:9,10,19
106:6,9 107:4
107:9 108:6
136:9,12 181:1
181:21 210:14
219:13,14
233:11 279:18
288:10,20
289:1,5,6
294:6,13
295:17 322:6,9
322:18,21
323:18 327:1,4
337:13,17,23
340:12
**pond** 182:4
**poor** 282:12
283:12
**pop** 282:18
**pop-up** 81:7
282:16 283:15
**position** 5:11

16:9 31:21
35:7 69:23
80:3 89:8,18
101:15 124:7
124:20 169:13
169:16,18,22
200:9 201:1,2
201:7,8,13
204:5 254:2,10
260:20,21
262:23 263:22
263:23 264:1,9
265:17 268:13
269:9
**positions** 26:18
26:18 72:17
83:19 253:19
254:7,13,15
326:7
**positive** 45:22
61:21 133:15
146:15 261:20
264:21 272:16
310:2 311:6
320:4
**possesses** 263:18
**possession** 23:15
24:1 25:13,18
146:17,19
199:3
**possible** 16:17
36:6 163:15
165:10,12
166:6 181:12
**post** 28:6 122:17
249:3 277:23
**posted** 68:20
**posting** 68:23
248:12
**post-high** 28:4
28:12 29:10
31:2
**power** 158:22
159:5 342:16

**PPE** 234:10,17
**practical** 28:17
28:20
**practices** 267:1
**pre** 146:7 169:1
253:15
**precisely** 326:15
**premises** 111:5
**presence** 133:14
139:1
**present** 8:21
286:20 287:16
**Presley** 302:12
**pressured** 136:7
**pressuring**
135:12
**pretty** 22:19
32:23 80:20
81:22 87:22
152:14 314:7
**prevent** 331:15
340:19
**preventive**
61:11,16
145:23 146:4
211:18 214:9
214:16 226:14
227:13,18
238:14,18
239:4,15
289:10,16
343:1,3
**previous** 39:7
73:10 208:1
**previously** 110:8
111:13,19
113:17
**pre-op** 146:7
**pre-operation**
146:7
**prior** 3:16 54:22
146:7 149:9,12
168:5 253:8
**prison** 176:21

179:12
**privileged** 307:8
**probably** 76:19
94:2 105:19
123:13 132:11
166:3 207:5
295:7
**probation**
198:21,23
215:22 216:10
277:9,12,19
278:3,6,10,15
279:1,3,4,6,16
279:21 288:7
288:18,23
326:14,18
327:5 340:1
**problem** 47:3
71:6 210:18
**problems** 183:1
209:2 223:17
**procedure** 2:2
5:21 9:4 106:6
281:12 282:2
**procedures**
140:19 248:15
**proceeded**
158:12
**proceedings**
9:14 18:22
**processed** 19:2
**produce** 306:18
**produced** 252:6
**profanity** 42:8
258:21 259:4
259:14,15,17
**program** 119:23
121:20 125:16
208:16,19
238:9 260:1
**progressed**
172:1
**prohibit** 288:17
288:22 340:1,4

**project** 69:1,21
110:1 153:13
208:18 209:9
248:19 251:13
272:5
**promised**
180:14,15,20
**promoted**
252:23
**promotion**
169:12 252:20
252:21 253:1
253:18 254:6
255:5,15 256:3
274:20,21
**promotions**
253:7,9 254:18
**proof** 110:14
**proper** 69:11
98:13 221:4
280:14 286:9
342:18
**properly** 204:19
227:9 268:4
285:19 326:19
331:19
**property** 21:10
90:15 120:4
137:1
**prosecution**
18:11
**protected**
232:21
**protective**
232:10
**prove** 185:21
**proven** 251:16
**provide** 307:6
307:12
**provided** 9:3
198:21 207:13
306:22 315:2,6
**provoke** 257:18
**psychiatrist**

# FREEDOM COURT REPORTING

| | | | | |
|---|---|---|---|---|
| 198:2 297:10 | quarter 7:7 | race 62:12,13 | 244:12 251:15 | reasons 255:1 |
| psychologist | 223:8 251:12 | 70:4 162:20 | 253:2 261:4,10 | 256:2,2,4 |
| 197:20 198:1 | 333:9,15 | 200:5 203:5 | 269:6 325:13 | 283:20 318:8 |
| 297:11 | quarter-panel | 210:5,19,21 | 326:6 | 324:10 |
| pull 187:12 | 142:18 | 243:9 250:4 | ranges 76:7 81:6 | recall 21:4 26:5 |
| 207:3 238:23 | question 10:18 | 286:7 287:4,6 | 81:14,19 82:2 | 33:21 34:17 |
| pulled 239:11 | 39:1 42:3 47:9 | 300:5,6,8,18 | 82:10,17,19,20 | 35:13,16 36:3 |
| 256:22 | 63:5,5 99:23 | 300:19,20,21 | 101:23 152:1 | 36:5,8 39:19 |
| pulling 187:5 | 101:10 113:8 | 337:6 | 170:4,8 174:16 | 41:20 42:15 |
| purchased | 115:3 118:5 | racial 79:12 | 175:5,13,14 | 43:14 44:2,9 |
| 111:12 305:1 | 126:23 137:12 | 162:15 195:18 | 202:14 236:7 | 44:11,13,20,23 |
| 311:23 312:1 | 137:15 145:19 | 196:1 | 268:19 325:14 | 45:7,13 47:23 |
| purpose 238:11 | 151:6 152:6 | racially 171:3,4 | 325:19 | 48:21,22 49:21 |
| put 22:12 60:5 | 158:12 182:16 | 171:18 172:10 | rate 78:17,21 | 50:2 51:1 |
| 76:17 119:5 | 188:10 197:13 | 172:14,20,22 | 84:5 251:10 | 52:19,21 53:8 |
| 160:11 198:11 | 213:13,18 | 173:5 200:22 | rated 193:6,9 | 56:19,22 57:4 |
| 235:21 236:13 | 250:1 255:3,19 | 297:22 | read 53:14 56:8 | 57:13,15 58:15 |
| 237:1 256:17 | 267:18,19 | racist 58:10 | 59:9,19 62:5 | 66:1 68:9 |
| 256:23 267:19 | 278:1 321:21 | 63:12 66:23 | 63:16 84:12 | 71:15,19 72:5 |
| 278:2,12,12 | 330:3 332:16 | 73:15 79:1 | 116:1 160:17 | 72:20 78:1,16 |
| 288:7 291:20 | 338:18 339:22 | 134:13 135:17 | 174:3 327:18 | 83:1,11 84:9 |
| 291:22 293:21 | questioned | 136:5 163:2 | 327:20 333:18 | 86:22 88:2 |
| 297:7 299:18 | 247:19 | 249:20 | reading 3:2 | 106:12 108:3,6 |
| 335:15,16 | questions 3:11 | radio 142:7 | 149:18 | 108:15,16 |
| putting 22:12 | 3:12 10:12 | ran 129:16 | reads 131:5 | 109:21,22 |
| 288:18,22 | 11:2 99:19 | random 61:13 | 234:4 255:4 | 110:13,17,18 |
| 340:1 | 105:15 107:8 | 93:17 98:22 | ready 80:12 | 111:2 113:10 |
| | 107:11,15 | 339:8 | 107:23 137:23 | 113:14,18 |
| **Q** | 117:23 118:1 | range 69:7,10,18 | 138:1 292:10 | 114:7,7,9 |
| QA 124:21 | 127:9 191:9 | 76:7 81:1,2,3,4 | 321:21,22 | 115:9 116:3 |
| QC 237:13 | 192:21 287:19 | 82:1,6,7,8,13 | realize 169:4,7 | 117:13 119:1,9 |
| 238:8 239:19 | 288:4 306:13 | 83:22 89:14 | really 56:22 | 119:16,17 |
| 240:1,4,7,7 | 307:9 344:8 | 116:15 124:14 | 79:9 148:4 | 121:22 122:8 |
| qualification | quicker 51:10 | 152:14,15,16 | 150:4 182:23 | 122:23 123:1 |
| 181:7 | Quinn 2:4,18 | 152:19 157:22 | 241:17 305:6 | 123:10 125:8 |
| qualifications | 8:3 9:1 344:21 | 169:12,15 | rear 142:17 | 126:2,3,8,10 |
| 173:9 | quit 72:15 177:1 | 171:23 172:3 | 227:1 | 126:12 127:17 |
| qualified 173:11 | 179:11 312:8 | 173:14 174:12 | reason 50:1 57:4 | 127:20 130:16 |
| 173:17 178:12 | quota 79:6 | 175:1,3 180:6 | 57:22 87:11,15 | 130:19 139:18 |
| 255:16 274:20 | quote 189:22 | 190:2,10 201:1 | 136:3 150:3 | 139:20 140:7 |
| qualify 276:10 | 221:22 | 201:4,6,22 | 172:6 252:16 | 141:6 148:12 |
| quality 60:19 | | 202:14 236:13 | 282:11,15 | 151:2 153:13 |
| 61:2,7 124:21 | **R** | 238:5 239:10 | 283:12 289:7 | 166:15 189:10 |
| 125:23 128:19 | R 8:1 | 239:12 243:6 | 315:4 341:19 | 207:2 209:19 |

# FREEDOM COURT REPORTING

226:6 230:8
241:2,6 265:22
272:2 284:11
285:18 296:6
325:23 327:22
337:3
**receipt** 84:21
85:21 315:7
**receipts** 7:17
312:19 315:2,5
**receive** 52:16
76:20 78:5
104:18 109:6
193:12 274:21
**received** 40:23
41:22 42:12
88:5 92:15
106:5,22 107:3
107:6,11 109:9
130:7 147:20
148:9 168:8
186:5 193:14
214:11
**receiving** 25:6,7
78:2 84:9
106:12 119:1
**Receptionist**
13:13
**recess** 80:9
137:20 161:15
206:11 271:1
317:19 340:8
**recollect** 112:22
**recollection** 68:3
108:11
**recommendati...**
249:9
**recommended**
159:13
**reconcile** 16:16
**record** 4:23 7:10
11:12 68:1
112:19 161:11
165:23 187:16

208:3 255:19
**recorded** 5:7
34:16 65:10
**recouping** 21:19
**Reese** 15:8,14
**refer** 81:1
207:15
**reference** 130:8
318:6
**referenced**
318:19
**references** 75:6
**referred** 69:17
182:3
**referring** 91:14
121:16 195:19
228:2 256:12
**refrigerator**
256:23
**refused** 45:5
267:17
**refuses** 225:13
**refusing** 44:1
**regard** 130:13
**regarding** 50:6
97:3 106:8
125:7 144:11
165:3 229:13
297:11
**regardless** 65:13
93:13
**regards** 157:4
**registration**
110:15 111:11
**regularly** 224:3
**regulation** 92:14
**regulations**
110:11 234:13
**rehire** 52:13
**rehired** 45:12
46:1,3,12 47:2
47:11,11,16
**Reiss** 2:5 4:4
8:12 9:18 10:6

10:7 37:21
42:23 43:5
47:7 80:6,11
105:14,19
115:4 137:22
142:11,14
149:6 152:7,10
161:3,6,10,17
163:22 164:21
171:6,10,14
206:9,17 212:4
213:4,14,17
226:9 230:11
242:1,9,16
245:14 270:21
271:3 306:14
307:11,18
308:4,8,11,16
309:9 315:14
316:8 317:13
317:16 318:15
318:21 320:8
320:13 321:1
321:12,18
324:18 325:1
329:14 332:15
332:20 333:2
334:12 335:20
336:3,10,15,23
337:11 340:10
342:5,21
343:10
**related** 159:17
159:19,22
160:14 162:10
162:12,13
**relating** 3:6
**relationship**
160:8
**relative** 41:18
42:1
**relaxed** 191:20
**released** 20:10
**relevance**

167:17
**remark** 132:5
**remember** 43:23
44:3 45:1 48:6
50:21 51:13
58:5 70:11
71:17 72:16
74:6 78:4
82:23 86:3
87:5,10 110:21
110:23 111:19
111:21,22
112:1 119:18
123:6 126:7
127:13 141:9
179:10 211:8
211:11 217:22
225:3 241:4
242:20
**reminds** 138:17
**removed** 325:12
**renew** 88:13
**renewing** 215:17
**rent** 274:7,10
298:8
**rented** 20:4
**renter's** 21:17
**renting** 21:11
**repair** 81:8
**Repeat** 12:5
250:1
**replied** 131:9
**report** 6:13
41:22 79:7
86:19 87:7
95:13 96:1
129:12 136:18
136:22 137:5
142:6 161:20
161:23 182:20
183:3 187:23
214:12 260:13
265:13 266:10
266:16 280:22

281:5 304:5
**reported** 87:2
161:22 200:1
216:3 260:5,9
260:12 266:19
266:20 335:9
**Reporter** 2:11
9:16 11:9
321:3
**reports** 88:1
96:2 186:5
187:7 210:10
211:1
**represent** 10:8
**representative**
95:19
**represents**
344:11
**reprimanded**
296:10
**request** 60:2
134:23
**require** 263:12
267:21 287:10
**required** 198:16
198:18 232:19
232:23 233:11
249:3 262:15
262:15 264:17
329:22
**requirement**
264:8,23
**requirements**
262:16
**requires** 99:6
286:12
**reserves** 94:21
94:22 289:3
**reservoir** 60:4
**resign** 33:7 34:2
39:3
**resignation**
184:13,20
185:7

# FREEDOM COURT REPORTING

Page 369

resigned 33:6
resource 299:11
resources 55:18
  186:3
respective 2:16
respond 202:20
response 17:7
  45:22 59:10
  61:21 87:17
  127:19 133:15
  146:15 169:9
  261:20 272:16
  310:2 311:6
  320:4
responsibility
  81:5 98:21
  104:5,6 202:12
responsible
  101:7 102:11
  103:13,17
  229:4 295:19
  307:14
rest 177:23
Reston 163:14
  165:6
restroom 10:17
result 150:12
  215:22 344:17
resulted 149:16
  215:13
retained 2:10
retard 22:22
retired 94:14,18
  94:20
RETS 30:1
return 19:1
  238:8
returned 46:5
reunion 160:6
review 37:19
  40:20 41:16
  109:19 154:4
  156:8 167:11
  212:6,7,16

220:20 298:23
reviewed 154:5
reviewing
  127:16
revoked 17:6
RE-EXAMIN...
  337:11 342:9
  342:21
Ricky 302:12
rid 205:16,20
  206:2
riding 101:21
right 31:17
  38:19 39:6,16
  60:22 61:19
  63:16 72:20
  75:11,15 88:11
  100:4 106:7
  110:3,7 113:1
  114:22 115:22
  117:15 120:8
  121:11 122:10
  126:16 127:7
  132:9 136:16
  136:22 139:6
  140:11 142:15
  142:17 144:6
  146:2 149:10
  160:10,21
  164:20 170:23
  170:23 171:10
  185:9 186:23
  191:1,3,10
  195:13,17
  202:5 204:20
  209:18 210:11
  213:7,10,10
  217:2,5 221:3
  228:12,14,18
  229:20 236:6
  239:17,20
  246:18 247:4
  249:5,14
  254:20 255:9

257:15 261:6
  262:4,19
  263:21 267:7
  267:11 271:22
  272:14 284:22
  285:4 288:2
  289:3 301:7
  309:2,15 310:3
  312:19 313:6
  313:10,13
  314:3,8,19
  317:12,16
  319:20,23
  320:6 321:1,9
  322:18 323:3
  324:20 326:22
  327:11,11
  328:4 335:2,4
  339:16,20
Riston 163:17
  163:18 164:5
  165:7,8 166:3
  169:20 275:11
  275:22
Rite-Aid 315:8
RN 29:13
Road 8:8
Robert 274:22
  276:5 316:21
  317:1,1,6,8,9
rode 101:7,13
Roger 77:4 84:1
  153:18 168:22
  193:14 194:9
  266:6
Ron 124:4,5,13
  124:13
room 22:16
  243:14 244:1,9
  244:11,15,16
  245:9 246:3
  277:17 331:23
rotate 27:10
  83:20 201:15

201:21 202:4
rotated 201:22
rotation 201:18
  203:14 260:22
  269:6
RPR 2:18 8:3
  344:21
Rucker 72:7
  76:1,5 77:11
  88:10 89:13
  110:11 111:6
  120:4 124:15
  231:7
Rule 2:1 9:3
rules 2:2 3:6 9:4
  10:15 219:20
run 307:16
running 191:20
  302:23
runs 330:6
RYAN 8:13
R&S 71:22
  302:21 304:14
  304:15,23
  305:1 309:1
  311:13 312:4,8
  312:14

S

S 2:13 8:1 320:8
safe 217:7
safety 6:12 26:7
  26:8,18,22
  27:7 82:23
  83:4,6,19
  194:5 215:14
  215:16,18
  234:9,12 265:8
  277:13,22
  278:8,16
  280:19 281:12
  294:2,4,6
  326:6 329:11
  329:18,20,23

330:3,18,20,22
  331:12 332:9
  334:14
SAITH 343:12
salary 74:7,15
  74:18
Sandra 2:5 8:12
  10:7
sandwich
  256:16,22
satisfied 78:20
saved 236:7
  311:8
savings 298:9
saw 68:23
  228:22 242:20
  257:17 260:4,8
  260:15 324:21
  335:3
saying 43:4
  46:20 64:21
  75:4 80:20,23
  99:12 111:18
  114:21 126:14
  127:14 130:19
  131:9 134:12
  144:1 162:23
  168:11,13
  173:16 175:15
  178:11 182:9
  186:12 188:4
  191:2,4 193:18
  194:20 205:7
  207:16 210:17
  217:10,14
  218:10,15
  239:9 243:23
  260:22 261:2
  261:13 286:5,8
  286:17,19
  287:1,2,4,7
  309:3
says 39:14 41:8
  41:21,22 42:3

## FREEDOM COURT REPORTING

42:4,16 46:7
49:6 50:9 51:6
51:7 60:8
61:21 62:2,7
62:11 66:18
67:4 83:7 97:8
109:23 119:13
122:11 130:17
133:3 134:21
136:22 141:2,4
141:21 157:9
173:22 182:8
184:14 185:6,7
185:10,11,12
185:14,15,18
219:14 224:2
226:1 228:7
238:8 243:3,8
258:5 284:13
294:15 304:18
316:13 318:21
319:5 324:4
**schedule** 5:19
104:19
**scheduled** 82:13
105:2 190:17
224:14 287:13
**school** 27:23
28:4,7,12,18
29:10 30:1
31:2 34:14,22
122:18 262:21
264:12,15
**score** 172:19
275:3,10,12,18
275:23 276:6
276:11
**scored** 168:17
170:12,19,20
172:2 276:22
**scores** 172:13
**scrap** 315:22
**Screaming**
158:9

**screw** 171:3
**screwed** 171:3
**se** 339:6
**seat** 230:16
**second** 18:15
25:4 39:1
229:12 232:7
289:2 294:7
336:22
**secondary**
232:14 233:13
233:16,19
234:3 235:5
**secret** 192:2
221:22 222:3,6
222:9 268:5,7
**secretary** 179:6
179:7
**section** 59:7
116:5,12,13,14
117:1,3,3
155:6 157:5
178:16 254:11
260:20 265:7
327:21 328:22
328:23 330:16
**Sections** 327:19
**secure** 99:7,10
204:19,23
**secured** 93:7,10
**securing** 100:12
**security** 5:15
17:2 26:4,6,18
27:14,18 90:5
**see** 38:12 53:10
60:17 61:20
62:9,10,20
66:17 67:4,22
68:21 95:14
96:2 127:15,23
129:7 135:14
136:6 143:19
149:1 155:7
166:9 191:10

197:19 211:17
226:2,10
227:11 228:7
233:23 234:4
238:13 242:11
242:12 245:11
248:15 261:21
261:23 268:2
277:23 278:7,9
279:5 291:14
297:10 302:5
307:13,22
308:7,7,14
318:23 319:2
320:11 323:17
335:6 338:2
340:18 341:17
**seeds** 25:19,19
**seeing** 321:19,19
**seen** 43:12 50:17
50:22 51:23
52:5,8,10
70:21 71:1
79:22 80:1
97:4 113:22
114:1,4,13,16
114:23 138:10
144:10 150:17
150:19 177:5
190:13 197:23
204:16 206:19
216:19 217:20
222:1,13 223:9
226:3,5 231:23
241:14,15,22
242:2 281:8,21
289:19 295:10
322:20 323:2,4
324:16,22
325:3,4 327:8
335:13
**self-employed**
304:19 305:3
**sending** 184:22

**senior** 339:17
**sense** 79:12
**sent** 55:1,3
70:22 132:21
133:7 165:2
167:12 250:6
277:17 287:7
331:23
**sentence** 131:8
207:15 261:21
**separate** 117:7
179:10
**separated** 15:18
15:22 16:1
241:1 273:16
**separation**
199:17
**September**
125:21
**series** 11:1 125:6
**serious** 269:23
277:13
**service** 124:17
**services** 229:14
**set** 83:19 123:4
268:22
**setting** 10:11
82:11
**settled** 20:17
**seven** 20:9 53:15
53:23 54:1
75:17 81:6,12
97:20 130:4
208:2 216:23
217:3 261:16
261:22 274:17
295:7 298:7
**seventh** 237:3
**severance** 250:7
250:14
**severely** 331:22
**shame** 335:16
335:17
**Shannon** 2:4,18

8:3 9:1 344:21
**Shap** 119:20
**Shawanda**
200:7 272:21
**shed** 228:9
**sheet** 147:1,4,11
150:20,23
211:10 214:10
227:16 228:8
285:17
**sheets** 146:13,14
150:16 227:12
**shift** 27:3,11,12
97:23 98:4,10
98:15 105:3
265:16,19
269:6
**shifted** 325:20
**shifts** 83:19
**shooting** 152:16
**short** 156:7
247:20
**shortage** 243:6
**shortcomings**
222:12,21
**shorter** 167:7
**Shortly** 278:18
**shoulder** 59:6
**show** 37:13,17
40:18 41:14
43:11 45:14
47:13 48:18
52:2 70:19
73:7 77:23
85:19 97:1
109:17 115:19
118:22 120:15
120:16 123:22
125:5 138:7
139:16 147:17
149:4 153:10
164:16 206:18
209:20 212:5
212:14 214:5

# FREEDOM COURT REPORTING

217:19 220:9 223:5 225:22 229:11 230:7 241:12 251:5,6 252:5 256:1 268:9 272:13 308:4 315:5 321:23 324:1 340:11
showed 62:4 150:22 222:4,7 222:8 241:16 267:9
showing 112:18
side 91:10
sides 305:2
Sigma 208:15,19
sign 44:1 103:2 185:6 186:2 222:15 250:13 292:17 324:14 325:5
signature 3:2 41:2 45:16 49:17 84:20 85:23 112:17 112:20 120:19 220:12,14 221:9 324:7
signatures 324:12
signed 42:5 49:23 147:20 148:4 196:20 205:12,22 207:11,12 213:4 221:8 292:14 298:21 299:1 320:14 327:9,14
simply 58:16
Singletary 77:4 84:1 86:9,12 153:18,19

193:15
Singletary's 168:22
singling 111:1
sir 40:20 53:12 101:11 118:6 252:7
sisters 265:5
site 69:18 70:1 120:2 155:10 339:15
sits 179:4
sitting 125:9 224:12 230:20 233:4 256:18
situation 21:1 173:2 183:9 224:11 285:7
six 31:1 168:19 201:20,20 203:16 208:15 208:19 274:18 289:10
sixteen 199:12
Sixth 235:7
sizable 33:1
size 185:14
skeewed 171:3,4
skewed 171:5,7 171:18 172:10 172:15,20,22 173:5
skilled 262:22
skills 121:10 154:10,19,22
SKIPPED 5:18
slam 44:7
slash 168:16
sleeping 37:6 47:16 48:3 126:18 127:1,5 129:22 133:11 138:6,18 260:1 260:5,9,10,14

260:16 272:8
slept 271:21
slots 177:19
small 20:22 76:7 82:18 142:8 144:4 226:21
smaller 185:11
Smoak 1:19 2:19 8:14 9:7
smoked 2:19
smooth 191:20
sneak 190:11
sneaking 190:21
Social 17:2
socialize 57:5
soda 227:3
Solutions 1:12 122:3
somebody 39:12 113:12 284:20 316:15
someone's 112:12
Somewhat 303:15
sorry 15:16 20:10 127:9 142:13 151:7 152:11 210:12 213:5,20 258:1 305:21 318:13 329:16
Sounds 314:7
south 231:11
SOUTHERN 1:3
spare 115:11
speak 11:8 63:8 66:7 257:3 299:9
speaks 284:7
special 198:14
specific 82:17 102:23 103:3,5

specifically 269:4
spell 11:21 13:9 171:7
spelled 220:16 220:20 221:1 268:17
spent 241:4
spoke 62:23 155:16,19
spoken 68:13 196:11
sponsor 41:23
Sports 305:16 305:18,22 310:21 311:5
spot 209:13
spot-check 95:3 231:21
spray 227:8 230:20 291:6
stable 27:3
staffing 251:9 251:14
stalking 190:1,5 190:7,20 211:22
stand 28:16 92:11 107:5 122:1
standard 5:19 193:7,10
standing 132:9
start 105:2 115:5 149:8 188:18,19 242:3
started 40:7 84:10 188:13 188:22,23 205:18 302:18 308:18 309:17 310:5,9 327:16
starting 53:15

53:22,23 74:6 78:21 297:17
starts 261:17,21 309:9
start-up 310:12 310:16 311:9
start-ups 311:11
state 11:11 29:16 39:23 44:19 54:9 74:17 76:16 108:18 111:7 111:15 145:1 149:13 169:11 171:1 181:22 231:19 233:21 243:12,12,16 252:19 278:14 281:11 282:8 289:22 294:11 295:9 344:3
stated 30:21 39:9,11 44:16 50:3 58:16 66:12 87:14 135:20 145:12 154:15 189:12 196:18 199:8 199:20 208:4 225:9 227:12 251:11 264:19 278:11,12 281:2 283:4 289:9 331:6,9 331:11,14 333:21
statement 6:22 36:11 64:17,18 83:2 113:16 114:10,12 131:15 141:20 144:11 145:3 157:19 158:13 182:13 183:17

367 VALLEY AVENUE
(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

207:11,16
225:12 244:23
245:4 246:19
248:10 263:16
335:11
**statements**
196:21,21
294:17
**states** 1:1 52:12
92:16 97:20
125:18,21
140:21 145:7
248:13 289:2
**stating** 46:2
114:17 126:13
133:7 157:5,5
165:13 207:12
225:4 272:3
291:15 338:16
**status** 5:5 142:4
142:5
**stay** 156:7
298:14
**stealing** 19:7
33:23
**stellar** 163:7,11
163:12
**stenotype** 344:8
**step** 263:7
**stereo** 19:8
**Stewart** 1:19
2:20 8:15 9:7
**stick** 342:17
**STIPULATED**
2:14 3:1,8,17
**stipulation** 9:5
**stipulations**
9:17 153:21
198:10,15,22
**stir** 182:23
**stocked** 98:17
**stole** 24:17
**stolen** 25:9
**stood** 112:4

**stop** 158:3
**stopped** 142:20
158:10,11,15
**stopping** 206:8
**storage** 237:2
**stored** 227:9
236:16
**story** 185:19
325:1
**straight** 325:2,3
**Street** 78:14
**strengthen**
154:17
**strengths** 222:20
**Strike** 326:13
**strong** 172:6
**stuck** 112:12
**students** 30:22
**stuff** 114:9
207:22 323:7
**subject** 219:16
219:18
**submitted** 174:4
**subordinate**
101:18
**substance** 23:15
24:1,8,10,14
25:2,4
**substandard**
193:3
**sudden** 181:1
**sue** 18:7,10
19:14 21:8
73:9
**sued** 17:20,23
18:2 19:9,12
20:12,18,21
21:5,12
**suffer** 296:13
324:4
**suggested** 26:2,3
122:9
**suggests** 138:22
**suing** 63:18

108:9 221:4
**Suite** 1:21 2:20
8:8,17 9:8
**summarize**
267:13
**Summary** 7:14
**summer** 231:2
231:15,16
**sums** 269:3
**supervise**
194:21
**supervised**
259:11
**supervisor** 75:1
83:23 86:9,11
86:13,16,16
102:5,8,9
156:14,17
162:2 167:16
168:12,16
192:11 253:11
259:8 260:1
**supervisors** 45:6
48:11 93:16
98:15,20 122:5
272:4
**supply** 242:15
243:13 244:1,9
244:11,15,16
245:9 246:2
248:9,11
257:23
**support** 251:18
298:10,13
**supported**
282:12 283:13
**supposed** 129:8
146:11,16
147:7 165:7
177:18,20
178:13 190:16
201:23 215:4,8
232:9,20 233:7
233:8,12,14

234:13 235:21
238:23
**supposedly**
151:17 205:14
**sure** 30:8 93:17
95:2 104:4
105:23 128:15
133:9 148:4
151:18 177:3
203:13 206:4,5
209:14 246:15
252:15 255:18
315:16,23
319:7 321:19
338:5 342:16
**surrounding**
328:20
**suspended** 17:9
17:11,15,18
41:5 49:20
50:8 228:16
240:23 289:23
**suspension**
49:15 294:8
**suspicions** 135:6
**swapped** 201:2
**sworn** 10:3
196:21
**system** 176:21
179:12

**T**
**T** 2:13,13
**table** 10:19
**tactics** 136:8
**tag** 108:18
237:16,18,19
238:7,8,12,23
239:9 240:14
240:16,19
342:14
**tagout** 279:17
285:7 342:12
**tags** 61:10

237:13 343:1
**taillight** 142:19
**take** 10:16,20,22
26:10 32:17
80:6 92:17
122:19 123:9
123:11 137:17
169:18 178:19
190:18,19
202:13 224:13
240:19 270:20
270:22 313:3
**taken** 2:6,17
172:18 200:23
228:8 285:16
344:7
**takes** 54:16
**talk** 87:12
131:15 137:16
178:10 180:2
218:4 259:20
328:1
**talked** 94:10
155:12,21
254:17 301:14
**talking** 50:5
55:17 65:8
82:21 91:6
122:7 155:17
192:3 213:6
232:18 242:17
244:13 252:21
254:18 258:20
279:12 319:6,7
321:5 322:5,16
327:12 333:11
336:5,6
**tank** 226:22
**tape** 5:6 65:9
242:3
**tape-record**
57:19 65:21,22
66:5
**tape-recorded**

# FREEDOM COURT REPORTING

Page 373

| | | | | |
|---|---|---|---|---|
| 52:23 53:9 | 76:10,14 88:17 | 292:19 323:21 | 282:10,15 | 138:4 147:2 |
| 65:18 | 89:20 106:18 | 325:20 328:16 | 283:5,7,14,21 | 203:21 324:19 |
| **tape-recording** | 108:7 115:23 | 328:19 330:7 | 284:10 285:14 | 344:12 |
| 53:4 65:4,15 | 117:17 134:6 | 335:6,14 | 287:3 289:11 | **testing** 168:20 |
| **tardies** 4:17,22 | 146:4 154:3 | 339:14 | 297:19 298:1 | **Thank** 35:11 |
| 46:8 51:4 | 156:19 157:8 | **Temple's** 159:21 | 302:3 321:9 | **thanks** 37:23 |
| **tardiness** 104:20 | 161:2 183:7 | 338:12 339:3 | 324:11 | 230:13 |
| 225:13 | 185:4,8 191:23 | **ten** 14:1 53:16 | **termination** | **theft** 18:14,15 |
| **tardy** 47:1 105:6 | 196:5,6 197:6 | 53:22 64:11 | 4:23 7:20 34:3 | 25:5 |
| 206:23 219:13 | 197:16,17,17 | 108:14 111:10 | 57:22 159:14 | **thereof** 310:1 |
| **target** 238:3 | 203:14 204:16 | 111:15 130:9 | 162:18 184:2 | **thereto** 3:16 |
| **targets** 81:8,12 | 212:15 218:6 | 270:22 287:11 | 184:23 197:21 | 344:9 |
| 282:16 283:15 | 220:18 222:2 | **tends** 256:1 | 249:9,11 | **thing** 92:19 |
| **tasks** 224:3 | 237:10 252:7 | **tension** 196:1 | 250:19 251:14 | 183:22 187:1 |
| **tech** 29:1,5 69:7 | 264:3 279:7 | **tenure** 167:7 | 283:4,22 288:1 | 190:4 195:6 |
| 69:10,18 76:18 | 290:19,21 | 168:23 179:17 | 297:11 318:6,9 | 242:12 319:16 |
| 81:1,2,3 83:23 | 315:1 316:20 | 339:17 | 323:22 324:6 | **things** 55:15 |
| 116:15 169:12 | 328:19 334:17 | **term** 11:5 | 341:16,18 | 76:4 95:4,13 |
| 169:15 171:23 | **telling** 113:11 | 162:15 173:5 | 342:3 | 96:1 115:6 |
| 173:14 174:12 | 158:20 256:7 | **terminable** | **Terry** 75:7 | 127:23 199:21 |
| 175:1,3 180:6 | **tells** 184:12 | 143:5,9 | 301:14,15 | 297:14 334:19 |
| 201:1,4,6 | 185:6 | **terminate** 135:9 | **test** 168:14,17 | 334:19 |
| 202:14 253:3 | **temperature** | 135:13 156:13 | 169:18,19,23 | **think** 34:15 44:6 |
| 253:23 261:4 | 231:1,15 | 157:9 158:22 | 170:13 171:2 | 63:7,9 65:7,8 |
| 261:11 326:6 | **Temple** 77:3 | 159:9 163:2 | 171:17 172:2,3 | 78:1,23 112:9 |
| **technical** 30:1 | 84:2 86:6,8,11 | **terminated** | 172:5,8,9,14 | 123:5 145:15 |
| 121:10 260:21 | 86:17 87:8,10 | 30:19,20 36:4 | 172:17,20 | 145:17 148:8 |
| **technician** 253:3 | 88:5 90:4 93:3 | 36:7,10 37:4,5 | 173:6,6,8 | 170:1 171:14 |
| 253:22 | 115:21 116:10 | 39:10 43:15,21 | 174:19 179:19 | 174:17 179:16 |
| **Technology** 1:12 | 117:7 150:21 | 44:12,14,15 | 271:8 275:13 | 187:21 193:11 |
| 122:2 | 156:12 157:17 | 46:7,17 51:10 | 275:14,19,22 | 213:3 219:9 |
| **techs** 82:1 | 158:21 159:17 | 51:14 54:23 | 276:22 | 232:12 240:6 |
| 201:22 239:11 | 162:2,10,13,13 | 69:9 71:11,14 | **testified** 10:4 | 245:12 247:1 |
| 325:12,15,16 | 162:14,17 | 71:18 135:8 | 71:11 113:13 | 285:7 292:5 |
| 325:18 | 167:14 168:19 | 143:11 144:7 | 219:2 247:14 | 310:1 335:12 |
| **telephone** 55:7 | 182:3 188:1 | 151:8,12,15,19 | 308:22 309:20 | **thinking** 314:11 |
| 299:3 | 189:23 192:1 | 152:23 157:2 | 325:17 328:2 | **third** 47:14 |
| **tell** 26:9,13 | 192:13 212:8 | 157:10 159:4 | 334:23 336:11 | 113:19 223:7 |
| 37:20 40:4 | 218:3 220:1 | 162:15 166:9 | **testify** 12:4,8 | 233:3 279:8 |
| 41:15 53:3,12 | 221:20 223:11 | 174:13 184:4 | 165:3 182:2 | 284:3 |
| 58:10 62:2,9 | 224:16 253:12 | 185:23 187:5 | 192:1 195:18 | **thirdhand** |
| 65:3,6,12,14 | 256:11 258:8 | 187:13 189:1,4 | 195:22 196:7 | 336:22 |
| 66:14,20,21 | 290:18 291:4,8 | 189:9 212:22 | 204:22 340:17 | **Third/Fourth** |
| 67:2 75:23 | 291:17,23 | 248:8 268:23 | **testimony** 2:6 | 7:7 |

# FREEDOM COURT REPORTING

Page 374

**thirty** 105:1
158:4 219:15
310:13,19
311:8,12
**thirty-six** 199:8
**Thomas** 8:23
162:2 205:21
206:1 210:2
335:8
**thought** 22:15
61:23 62:4
152:23 154:16
155:22 174:7
184:15 189:4
236:8 247:14
247:15 256:3
259:13 292:19
297:14 314:8
335:22
**thousand** 305:9
310:13,20
311:5,8,12
**thousands**
295:10
**threatened**
112:3
**three** 25:4 35:3
35:5 46:8 50:8
56:9 57:9
86:17 121:6
123:13 165:5,5
202:16 208:6
239:10 269:22
282:8 294:17
316:19 317:2
319:2 321:3,4
325:11,15,16
325:18,22
326:16,17
334:13
**threw** 202:13,17
**thrown** 186:22
**thumb** 237:16
237:18,19

**ticket** 17:16
**tilted** 126:4
**time** 3:14,15
15:4,19 17:18
22:6,12 24:12
24:19 29:7
30:7,10 35:17
36:21 37:16
39:21 41:16
54:14,15 57:3
67:13 69:2
79:6,9,13
82:12 83:10,12
84:3,6,22 85:2
85:7 87:3,9
89:15 91:2,4,5
91:18 92:3,4,6
96:6 97:10,10
102:5 103:17
104:20 105:9
107:10,23
113:20 117:6,7
117:12 118:10
119:22 120:1,3
120:8,8 124:3
124:9 130:7
132:2 148:10
155:5 162:7
168:5 169:23
170:9 172:22
173:18 174:12
174:21 175:8
176:20 177:1,7
178:3 179:1,8
179:11 180:19
183:9 184:18
190:1 196:8
200:22 205:15
220:11 224:14
229:22 231:22
232:3 240:22
241:16 243:19
243:20,21
244:2 246:8

250:10 257:22
261:5,5 263:22
273:20 274:4
279:8,18 289:6
292:15 298:15
300:22,23
302:3 303:4
304:20 312:4
323:7 325:23
326:9 332:6
336:7 337:3,19
338:14,18,20
339:19
**timely** 169:5,8
238:16
**times** 14:23,23
21:3 23:20
57:8 67:17
108:1,4,14
146:18,20
176:14 203:9
219:23 239:16
248:14 260:2
265:12,21
266:3,18
**Time/Tardiness**
5:20
**tirade** 158:4,6,8
**tire** 115:11,11
116:5
**tires** 117:5
**title** 60:23 61:9
69:15 101:16
175:11 195:5,9
240:2,8 264:1
**told** 22:21 45:4
53:6,13 55:20
60:2 65:12
78:11 87:18
103:2 124:1
143:10 150:8
151:20,21
162:1 176:3,8
176:9,11,13

178:10,15
184:1,10 185:2
186:1,9 189:6
192:4,8 200:21
201:17 202:1
203:16 214:15
218:3,16
219:10 248:1,3
248:5,7 256:4
257:2 258:3,4
258:5 271:20
276:2 279:2,3
283:6 284:16
284:18 290:23
291:16 299:21
323:14 337:16
341:12,13
**ton** 92:5
**tool** 5:14 90:5
**toolbox** 99:14
204:19,23
205:3 319:16
**toolboxes** 97:22
**toolroom** 205:9
**tools** 205:8
**top** 42:16 232:16
232:17,18
233:8,11
234:14 242:5
322:3
**topic** 330:10
**tops** 232:21,23
**total** 81:16
**touch** 203:2,3,9
**track** 249:4
**trade** 167:15,18
**trades** 69:12,16
**trailer** 141:7,11
141:12 142:9
142:17 144:4
161:19 334:22
**train** 202:3
**trained** 269:13
271:18

**training** 119:5,8
119:19 251:18
316:15
**traits** 222:11
**transcribed**
344:9
**transcript** 2:6
56:8 58:9,19
62:19 63:22
344:12
**transcription**
5:6 344:10
**transferred**
268:19
**Transmatic**
300:1 301:3
**Transmission**
300:1 301:4
**transporting**
280:12
**trash** 98:12
227:2,21
295:11
**Travis** 194:9
266:6
**treated** 63:19
66:23 90:19
200:4 252:20
255:5,12,20
259:3 272:19
**treating** 268:3
**tree** 303:3
**trial** 3:14
**trickled** 19:22
**tried** 18:19
24:16 203:8
**trimming** 314:2
**troubleshooter**
223:15
**Troy** 33:11
**truck** 60:13,15
90:6,14,23
91:2,3,7,7,8,9
91:12,14,18,21

# FREEDOM COURT REPORTING

91:21 92:4,5,6
92:7,8,9,12,12
92:13 93:9,14
102:11,13,15
102:16,17,21
103:1,4,5,8,11
103:15,16,17
103:19,21
104:1 115:12
116:6,6,19
117:8,8,9,10
117:11,14,15
117:17,18,20
118:8,10,12,13
118:15 125:9
141:7,10,12,13
142:8,16,20,20
142:22 143:19
146:6,21 147:9
151:9 153:1
190:3,12
204:20 205:2,9
224:12 227:7
227:20 228:4,4
229:4,5 230:9
231:20 232:2
233:5,7 234:21
235:1,8 237:1
237:5 257:5
270:10 271:16
280:13,16
284:12 285:9
287:18 288:9
290:3,6,9,11
290:13,16
291:5,22 292:1
292:11,12,14
292:18,21,23
293:3,14,18,21
295:18,19
304:12 305:1,7
305:8,11 306:9
308:2 309:7
310:7,11

311:22,23
312:1,5,12
313:15 314:13
319:14,17
320:7 335:18
335:20 336:2,7
**Trucking** 309:6
309:14 311:21
311:22 312:22
**trucks** 60:3 92:1
92:18 93:1
102:19 117:7
294:23 295:4,5
295:10,14,14
**true** 36:11 57:22
207:14 281:13
290:3 294:14
344:11
**trump** 342:12
**truth** 65:12,13
66:14,15,20,22
67:2 185:4
197:6,16,17,18
**truthful** 64:17
64:18
**truthfully** 38:21
**try** 99:21 136:8
292:9
**trying** 57:21
190:11 205:16
205:19 206:1
307:23
**tumbling** 188:22
188:23
**turn** 147:11
**turned** 256:20
256:21 257:3
316:11 342:17
**twelve** 199:12
**twenty** 56:8
64:10,12 81:5
81:11 286:15
286:16
**twenty-eight**

311:4
**twenty-four**
82:20 199:16
**twenty-nine**
315:7
**twenty-seven**
81:14,19 82:20
202:14
**twenty-six** 305:8
**twenty-three**
56:10
**twice** 23:22
35:12
**Twizzlers** 315:7
315:13
**two** 14:11,13
23:13 25:4
27:10 32:3
56:23 57:9
67:19 81:23
151:16 194:23
195:8,15 208:7
208:8,8 237:9
239:13 247:21
254:9,18 266:8
276:23 282:16
283:3,14,20
284:1 286:9
296:20 301:1
304:17 305:6
308:18 309:17
311:17 312:8
315:7 316:22
316:22 317:9
319:2 323:15
337:14
**Two-and-a-half**
15:11
**two-way** 142:7
**type** 13:12
235:22 334:15
**typed** 74:22 75:2
283:9
**types** 76:4

**U**
**U** 2:13
**ultimately**
102:10,12,15
229:3
**umbrella** 82:19
**um-hum** 45:22
61:21 80:20
133:15 146:15
261:20 272:16
310:2 311:6
320:4
**unaccounted**
151:17
**underneath**
267:13
**understand**
10:20 11:4,5
46:16 80:14
135:23 138:2
173:4 207:17
217:11,15
252:16 306:21
311:19
**understanding**
26:1 94:23
118:7 121:15
121:19,21
176:18 265:19
**understood** 42:8
92:21 93:8
104:22 107:18
208:22 209:2,5
**unemployed**
303:21
**unemployment**
52:17 298:5
303:5,8,14,20
304:6
**unfairly** 252:20
255:5,13,14,21
272:19
**unh-unh** 17:7
80:21

**uninsured** 110:9
110:20 111:4
**UNITED** 1:1
**units** 81:9
**university**
122:21 123:2
**unlicensed**
110:10,20
111:4
**unlidded** 237:7
**unlocked** 99:14
**untrue** 294:18
**Update** 7:6,8
**upset** 151:11
**use** 11:4 234:10
234:10,11
237:1 238:4
313:14
**Usual** 9:16
**usually** 256:16
**Uti** 101:14
229:18 292:16

**V**
**Valleydale** 8:8
**vegetation** 81:7
**vehicle** 5:14,16
90:5,19,20
97:3 98:2,6
99:7,10,10
100:13,19
110:10 126:1
131:16 145:22
214:17 226:15
226:18,20
227:2,14,15,16
**vehicles** 92:16
92:23 98:9,16
**vendetta** 287:5
**venture** 181:12
**verbal** 294:13
**violate** 104:8
**violated** 110:10
279:16 281:12

# FREEDOM COURT REPORTING

violating 100:23 104:7 210:14
violation 111:5 215:14,16 229:13 277:14 278:8,16 288:12,13 289:14 294:2,4 294:7 331:12 332:9 341:8
violations 215:19 269:23 277:22 280:5 280:10 289:10 289:16 330:19 330:22 334:14 341:4,7,10
violence 183:19 184:4 187:3 296:9
violent 186:6 187:8
voice 203:11 217:17
voiced 176:5
voltages 342:16
voluntarily 176:23 179:11
volunteering 302:10
vs 1:10

**W**

W 8:6
wait 92:3 137:10 137:11
waive 181:6,8,20
waived 3:3,19
walked 18:22 68:22 211:23 257:1,1,4
walking 190:4,9
Walk-in 301:10 301:13

wall 68:23 277:21,23 278:21 335:15 335:16
Wallace 40:1,2 76:15
walls 22:22 275:9,17
want 22:19 26:3 90:1 100:11 104:4 115:4 138:7 155:9 182:23 197:17 198:6 217:18 230:12 256:9 270:19 273:22 274:2 285:5 294:10 321:18
wanted 33:8 57:18 66:14 67:8 105:23 135:2 156:18 156:20 163:13 189:4,8 228:7 267:21 285:10
wanting 176:9 178:9
wants 217:13
warned 110:9 111:14,20,23 113:17
warning 42:12 47:15 214:11 288:11,12,19 288:23 294:13
wasn't 27:7 42:2 60:11 63:2,4 63:19 64:1 83:21 96:15 116:6 124:10 128:9 133:5 140:10,12 148:8 151:10 155:20 157:6

157:18 158:1 159:11 172:3 176:9 177:22 178:12 187:10 187:10 196:17 196:19 203:19 205:19 219:5 221:1 225:9 248:3 250:20 251:23 260:10 274:4 279:19 280:23 284:14 284:23 285:1 287:16 290:7 297:21 302:8 303:23
watch 27:6 95:2 316:5 321:12
way 63:8 118:4 127:11 150:9 163:5 184:9 190:3 255:3 258:14,15,16 259:3 268:18 268:20 307:14 334:1 342:10
ways 258:17
WD-40 227:8 233:4,17,18,22 234:5 235:22
wearing 131:11
Webers 96:8,11 96:12,16,17,18 124:1 125:7 132:22 133:7 134:19
week 178:22 228:17 240:23 241:4 279:11 294:8 304:16 304:16 305:5 329:20 330:4
weekend 32:13

weeks 296:20 304:19,20 305:6 308:19 309:17 311:17 312:8
weigh 316:5
well-being 267:3
went 18:21 22:11,16,17,20 22:21 32:10 54:14 60:3 63:3 77:6 88:4 90:3 93:4 106:22 133:1 175:18 178:5 178:14 181:6 183:20,22 184:9,12 186:10,21 189:14 202:6 203:17,18 212:6 225:1 257:6,7,11 258:2 268:21 284:14 296:20 310:7 326:6
weren't 25:21 26:21 47:2 82:16 126:14 143:18 151:8 270:5 289:15 328:6
we'll 10:19 51:9 80:23 330:10
we're 41:14 43:1 73:7 85:19 97:1 139:16 214:5 220:9 223:6 241:12
we've 254:17 259:22 294:17 319:2,11
whatnot 30:16 32:19 111:17

337:22
Whitaker 48:7
white 149:14 151:12 167:5 171:19 172:12 172:13,18 192:18,18 196:2 235:12 243:13 244:14 244:20 245:8 262:17 274:22
whited 251:8
whites 243:18
wife 15:7,19 27:4 199:18 241:1,5 273:17
wife's 13:16 26:23 159:21 160:4,7
Wiggins 301:6
William 89:6 166:5,7,8,9
wired 281:14,19 282:4,5 340:15 340:20 342:11
witness 3:3 9:12 27:19 40:21 47:8 99:20 101:11 113:9 116:18 127:12 137:13,18 145:20 149:10 169:11 176:15 213:15 307:5 307:10 309:7 315:15,19 320:17,21 336:6,13 344:13
witnesses 68:12 165:3 197:3 257:17,21
Woe 308:8,8,8
won 18:18

# FREEDOM COURT REPORTING

Page 377

wonder 241:17
wondering
  70:23
wood 179:9
  313:19
woods 304:2
word 113:23
  178:19 182:5
  252:17 261:17
wording 92:19
words 58:12
  144:4 256:6
work 5:19 11:3
  13:5,7 16:3,5
  27:3,10 30:23
  32:9,12 34:11
  34:18 35:1,18
  35:21 36:13,23
  57:6 63:1,2
  66:18 67:5
  77:7,16 82:5,6
  82:7,8 87:19
  98:5 102:2,6
  104:19 110:4
  137:2,2 152:2
  152:3 157:6,7
  158:3 166:17
  172:1,3 176:21
  179:12 180:23
  190:3,5,5,7
  192:7 193:3
  194:13,15,17
  196:16 204:3
  216:21 218:1
  240:23 249:16
  264:2,13
  265:10 281:4
  295:3,5 297:23
  302:5 304:4,4
  305:1 311:13
  325:8
workday 93:8
  93:10 99:8
worked 27:4

30:11 32:3
35:20 54:5
61:6,7 81:20
82:1,4 120:3,4
155:2 175:4,12
209:11 216:22
217:1,8 231:5
265:18 271:10
281:23 304:9
309:1
working 24:6
26:23 27:5
32:5 39:14,21
53:6,13 54:9
72:6 77:11
170:3 174:12
188:19 205:18
208:20 265:5
281:14 295:10
302:18 303:13
303:20,23,23
304:1,23 305:2
312:4 325:13
325:18 326:7
workplace 42:9
183:20 184:5
187:3 191:19
296:9
works 81:17
118:5
worksheet
211:18
worse 270:13,16
wouldn't 26:14
79:15 80:21
111:9 112:5
162:22 181:2
181:16,17,20
183:8 222:3,6
222:9 227:19
236:21 268:8
293:16 342:19
wrapper 235:13
290:2

wrappers 98:4
227:3,4 235:7
235:9 287:18
write 139:8
141:20,23
162:9 266:23
318:17
write-up 47:1
48:20 140:12
204:18 210:23
211:9 216:8
247:7 284:4
291:3,12
318:18
write-ups 210:9
210:11,15
282:13,18
283:14 337:15
written 42:11
47:15 100:22
104:11 108:16
115:20 116:7
118:9,11 127:4
133:19 169:20
214:11 288:10
288:11,12,18
288:23 322:21
323:18 327:5
wrong 128:6
224:4 227:22
227:23 257:16
258:3
wrongdoing
136:18
wrongfully
187:14 228:18
wrote 36:9
59:20 101:3
125:20 132:13
132:20 138:8
142:1,2 160:20
165:16 221:7
228:13 253:4
263:19 283:20

294:3 328:10
335:23

**X**

X 4:1 5:1 6:1 7:1
264:12
XX 5:18

**Y**

yeah 50:22
59:11 60:9
61:22 105:17
140:2 149:11
151:22 159:11
165:5 166:9
170:18 171:14
176:13 202:6
202:10 205:6
205:11,11
207:10 233:6
235:11 238:6
253:23 257:15
260:18 304:8
305:4 309:5
310:4 316:6
322:4 342:6
year 14:4 28:2
35:23 37:2
70:9,11 72:13
88:14,23 118:8
120:9 125:2
130:19 132:1
139:18 153:11
168:1 187:16
199:7 203:15
203:18 212:22
215:22 216:9
216:10,11
229:13 263:3
280:6,8 284:4
288:7,19
297:18
years 14:1 15:11
32:3,9 35:1

40:6 57:10
61:8 70:10
75:17 86:17
88:20,22 148:5
148:11 167:23
168:5 208:2
215:1 216:23
217:3 255:16
261:16,22
264:13,23
269:21 278:12
278:13 282:10
295:15 323:15
327:17 337:15
year's 277:9,12
277:19 278:2,5
278:10,15
279:1,3,4,6,15
279:21 288:7
326:14,17
year-and-a-half
15:23 29:23
72:11
yell 44:7
yelling 157:22
158:1,9
Young 1:7,16
2:17 9:12 10:2
10:7 11:13
13:17,23 14:8
14:21 15:8
23:21 37:10
45:16 49:17
50:18 54:1
56:12 60:19
64:12 80:12
106:7 109:18
112:3 116:11
117:9 118:7
119:15 131:6,9
131:14,15,18
131:23 132:4
133:17 137:22
152:2 161:17

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

206:18 220:13
240:10 242:21
251:20 271:3
291:21 292:3
309:6,14
311:20,22
312:22 340:10
342:23
**younger** 261:3
**Young's** 131:12
167:16
**y'all** 16:15 57:5
72:5 121:2
130:18,21
154:21 157:11
157:12,12
224:19 238:4
270:19 295:3
**y'alls** 242:13

**0**

**002** 227:16
**02** 32:11
**03** 32:11 188:2
194:8 200:13
205:20
**04** 194:8,8 213:1
213:3,8 253:5
253:23 263:20
**05** 7:6 117:14,18
118:9 187:18
188:7 213:2,4
213:15 220:11
223:8 254:3
280:9,11
**06** 91:19,20,21
91:22 117:15
117:17 290:1
319:22
**06-03** 92:15
**06-05** 97:3
**06-07** 219:15
**06-09** 106:9
107:4

**07** 117:18
118:14

**1**

**1** 4:13 7:20
37:18 38:1
317:23 318:1
318:20 319:4
322:17
**1-26-59** 16:22
**1:06-CV-563** 1:5
**10** 4:4,23 51:19
52:2
**10th** 41:6
**10:00** 1:18 9:11
**1000** 1:21 2:21
8:17 9:8
**104** 5:20
**106** 5:22
**109** 6:5,6
**11** 5:4 51:20
52:2,8
**11:00** 27:4
**115** 6:7
**118** 6:8
**12** 5:6 53:11,18
207:6
**120** 6:9
**121** 13:20
**123** 6:10
**13** 5:8 70:15,20
207:8
**13th** 51:4
**138** 6:11
**139** 6:12
**14** 5:9 73:3,8
207:6,7 253:5
**14th** 322:10
**141** 6:14
**144** 6:15
**147** 6:16
**15** 2:3 5:10
77:19 78:1
88:4

**153** 6:17
**16** 5:11 79:18
**164** 6:18
**17** 5:12 84:16
**18** 5:13 85:15,20
107:2
**1819** 1:22 2:21
8:18 9:8
**19** 5:14 90:4,9
100:7,8,11
**1979** 30:5
**1980** 30:5
**1985** 15:5
**1988** 2:3
**1992** 41:7
**1993** 17:14
**1994** 51:4
**1997** 14:2
**1999** 108:17

**2**

**2** 4:14 40:14,19
**20** 5:16 96:20
97:2 100:19
**2000** 118:10
120:17 124:12
124:19 125:3,8
139:18 226:1
300:14
**2002** 169:2,2
188:20 193:13
193:17 253:16
**2003** 153:12
182:18 188:21
189:8,10
202:23 318:22
**2004** 189:11,12
189:13 272:23
**2005** 16:1,2
83:19 149:13
189:7 208:13
212:6 318:18
319:5,10,12
320:12,17

326:21 327:2
340:12
**2006** 88:4 226:1
242:3 243:4
282:11 322:10
327:1 340:12
**2007** 1:17 2:7,23
9:10
**204** 6:20
**205** 38:12
**206** 6:21
**21** 5:18
**211** 6:22
**212** 6:23
**214** 7:4
**216** 7:5
**22** 5:19 104:14
104:19
**22nd** 225:8
**220** 7:6
**223** 7:8
**225** 7:9
**229** 7:10
**23** 5:21 106:1,11
106:17 322:3,4
322:12,22
326:14 327:6
**230** 7:11
**24** 6:4 109:1,5
**241** 7:12
**245** 7:13
**25** 6:6 109:13,18
**25th** 225:23
**251** 7:14
**252** 7:15
**26** 6:7 115:15,20
116:18
**26th** 319:20
**27** 1:17 6:8
118:18,23
**27th** 2:7,22 9:10
**28** 6:9 120:11,16
**28th** 125:21
**29** 6:10 123:18

123:23 127:12

**3**

**3** 4:15 41:10,15
**3A** 8:8
**3rd** 149:13
225:8 242:3
243:3 319:12
**30** 6:11 9:3
138:9,12 248:7
**30th** 248:4,5
282:11
**307** 7:16
**31** 6:12 139:12
139:17
**31-03-C-0001**
97:9
**314** 7:17
**317** 4:4,7 78:13
**318** 7:20
**32** 6:13 141:16
**33** 6:15 144:15
**3318** 249:4
285:17
**337** 4:5,7
**34** 6:16 147:13
147:18
**342** 4:5,6,8,8
**343** 4:6
**35** 6:17 153:6,11
**35203** 1:23 2:22
8:19 9:10
**35242** 8:9
**36** 6:18 164:12
164:17
**36330** 12:12
13:21
**37** 6:19 204:11
204:15
**38** 4:13 6:21
206:13,18
**39** 6:22 211:4
214:7

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

**4**

**4** 4:16 43:7,11
  46:22
**40** 4:14 6:23
  212:10,15
**41** 4:15 7:4
  214:1,6 320:23
  321:6 324:2
**42** 7:5 216:14,19
  217:20
**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**
  17:4
**43** 4:16 7:6
  220:5,12
**44** 7:7 223:1,7
**45** 4:17 7:9
  225:17 226:8
**46** 7:10 229:7,11
  318:13,14
  319:8 320:3
  321:5 324:3
**47** 4:18 7:11
  230:3,8
**48** 4:19 7:12
  241:8,13 247:8
  318:14 319:8
  321:5 324:10
**4898** 8:8
**49** 4:20 7:13
  245:19,23

**5**

**5** 4:17 45:15,18
  46:9 189:13
**5th** 1:22 2:21
  8:18 9:9
**5(d)** 2:1
**50** 4:22 7:14
  251:1,6
**51** 4:23 5:5 7:15
  252:1
**52** 7:16 307:1
**53** 5:7 7:17
  314:21 315:3

**6**

**6** 4:18 47:13,19

**7**

**7** 4:19 48:14,19
**7:00** 27:4
**70** 5:8
**705** 12:11
**73** 5:9
**77** 5:10
**78** 28:3
**79** 5:11

**8**

**8** 4:20 49:10
**84** 5:12
**85** 5:13
**86** 18:6 19:18
**87** 18:6 19:18

**9**

**9** 4:21 50:13,19
**9:30** 125:22
**90** 5:15
**93** 47:1,2,15
  48:20 49:15
**94** 29:9
**95** 29:9
**96** 5:17 198:5
**97** 14:6 29:20,20
  70:13 198:5
**98** 29:21
**99** 118:8,14
**99-05** 117:16
  118:12
**99-06** 117:18

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**