# Exhibit
# 1

Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF ALABAMA
 3                 SOUTHERN DIVISION
 4
 5   CURLY YOUNG,            )
 6        Plaintiff,        )
 7   vs.                    ) CIVIL ACTION:
 8   HONEYWELL TECHNOLOGY   ) 1:02-CV-00563-SRW
 9   SOLUTIONS, et al,      )
10        Defendants.       )
11
12        STIPULATIONS:
13        IT IS STIPULATED AND AGREED by
14   and between the parties through their
15   respective counsel, that the deposition
16   of JERRY L. TEMPLE may be taken before
17   Winters O. Hope, Alabama CSR #104,
18   Commissioner and Notary Public, State of
19   Alabama at Large, at the offices of Mr.
20   Joe W. Adams, Attorney at Law, 1278
21   Andrews Avenue, Ozark, Alabama, 36360, on
22   the 27th day of March, 2007.
23        IT IS FURTHER STIPULATED AND
```

Page 2

```
 1   AGREED that the signature to and the
 2   reading of the deposition by the witness
 3   is waived, the deposition to have the
 4   same force and effect as if full
 5   compliance had been had with all laws and
 6   rules of Court relating to the taking of
 7   depositions.
 8        IT IS FURTHER STIPULATED AND
 9   AGREED that it shall not be necessary for
10   any objections to be made by counsel as
11   to any questions, except as to form or
12   leading questions, and that counsel for
13   the parties may make objections and
14   assign grounds at the time of trial, or
15   at the time said deposition is offered in
16   evidence or prior thereto.
17        IT IS STIPULATED AND AGREED that
18   this deposition is taken after issuance
19   of formal notice.
20
21
22
23        INDEX:
```

Page 3

```
 1   EXAMINATION BY:              PAGE:
 2   MR. BENNITT       422
 3   MS. REISS         22 - 25
 4
 5
 6   - - - - - - - - - - - - - -
 7   BEFORE:
 8        Winters O. Hope, Commissioner.
 9   APPEARANCES:
10        Mr. Jeffrey W. Bennitt,
11   Attorney at Law, 4898 Valleydale Road,
12   Birmingham, Alabama, 35242, appearing for
13   the Plaintiff.
14        Ms. Sandra B. Reiss, Attorney at
15   Law, of the firm of Ogletree, Deakins,
16   Nash, Smoak & Stewart, P.C., One Federal
17   Place, Suite 1000, 1819 5th Avenue North,
18   Birmingham, Alabama, 35203, appearing for
19   the Defendants.
20        Also in appearance:
21        Mr. Curly Young, Plaintiff.
22        Mr. Kenneth A. Erickson.
23
```

Page 4

```
 1        I, Winters O. Hope, Alabama CSR
 2   104, and Notary Public for the State of
 3   Alabama at Large, acting as Commissioner,
 4   certify that on this date, as provided by
 5   The Federal Rules of Civil Procedure and
 6   the foregoing stipulation by counsel,
 7   there came before me at 12:48 p.m.,
 8   Central Daylight Time, on March 27, 2007,
 9   JERRY L. TEMPLE, witness in the above
10   cause for oral examination, whereupon the
11   following was had and done:
12
13
14             JERRY TEMPLE:
15        having been duly sworn, was
16   examined and testified as follows:
17
18   EXAMINATION BY MR. BENNITT:
19   Q    State your name, please, sir.
20   A    Jerry Lamar Temple.
21   Q    Who do you work for?
22   A    Honeywell Technology Solutions,
23   Incorporated.
```

Page 5

```
 1   Q    How long have you worked for
 2   Honeywell?
 3   A    Approximately 16 years, 8 months.
 4   Q    How long have you been the
 5   immediate supervisor over the Range
 6   Techs?
 7   A    I have been in a Crew Chief
 8   capacity for approximately nine years.
 9   Q    You do Range Tech work and
10   supervisory work --
11   A    Yes.
12   Q    -- together?
13   A    Yes, sir, I do.
14   Q    Did you know Chris Hines before
15   he went to work for Honeywell?
16   A    No, sir, I did not.
17   Q    Did you have any input in
18   recommending that Chris Hines take Mr.
19   Young's place, after Mr. Young left in
20   May of '06?
21   A    Can you clarify the question for
22   me?
23   Q    Did Mr. Erickson --
```

Page 6

```
 1   A    I don't really understand what
 2   you're asking. I'm a supervisor, and
 3   it's my job to make sure that this gets
 4   done. So, yes, I did have some input
 5   into the decision-making about who would
 6   be working on those small arms ranges.
 7   Yes, sir, I did.
 8   Q    Who did you recommend?
 9   A    Chris Hines.
10   Q    And you recommended that to Mr.
11   Erickson?
12   A    Yes, sir. I guess you could say
13   so.
14   Q    Did you recommend that he be --
15   that Mr. Young be terminated?
16   A    No, sir, I did not.
17   Q    No one asked for your
18   recommendation?
19   A    No, sir.
20   Q    Why did you recommend that Chris
21   Hines take over Mr. Young's place?
22   A    Because Chris Hines had been an
23   RCS Operator prior to that position, and
```

Page 7

```
1   he was familiar with all the small arms
2   ranges.
3   Q      Have you -- on the work side,
4   have you ever used any racial slurs?
5   A      No, sir, I have not.
6   Q      Have you ever used the phrase,
7   "Little 'N-word' catfish," or words to
8   that effect?
9   A      No, sir.  I don't recall ever
10  using that phrase.
11  Q      You never said the "N" word?
12  A      No, sir.
13  Q      Did you have a diary or manual
14  that you kept on the work habits of Mr.
15  Young, outside of his personnel file?
16  A      Well, the only thing I can think
17  of that you may be referring to, sir, is
18  the Performance and Development Summary
19  updates that I do on a regular basis for
20  all my employees, in order for end of the
21  year evaluations and merit increases.
22  Q      Where do you keep these
23  documents?
```

Page 8

```
1   A      I keep them in a PDS binder in
2   the Project Manager's office.
3   Q      Are they designated by the names
4   of the people you supervise?
5   A      Yes, sir, they are.
6   Q      What are the names on those
7   files?
8   A      Calvin Flowers, Chris Hines,
9   Curly Young and Doug Wriston.
10  Q      And the purpose of keeping these
11  files is to refresh your recollection
12  when it came time to do Performance
13  Evaluations?
14  A      Yes, sir.  For merit increases at
15  the end of the year.
16  Q      After the Performance Evaluation,
17  what did you do with this material?
18  A      I don't -- I don't have any idea.
19  I'm sure -- I guess they're still in the
20  PDS file.  That's not under my control.
21  Q      Tell me what PDS means.
22  A      Performance and Development
23  Summary.  I thought I already stated
```

Page 9

```
1   that.
2   Q      I'm sorry.
3   A      Yes, sir.  That's where they
4   stay.  I don't have any control over the
5   binder.  I just add updates to it on a
6   quarterly basis, or monthly, or whenever
7   I feel necessary that I need to put
8   something in it.
9   Q      Well, this binder, is it -- I
10  mean, is it outside of the personnel
11  files?
12  A      Yes, sir.
13  Q      And whose -- under whose
14  authority was this binder created?  Who
15  created this?
16  A      Well, Ken Erickson had suggested
17  that I keep up with all my employees in
18  this manner, in order to justify merit
19  increases at the end of the year.  If
20  somebody came to me and said, "I didn't
21  get no money." I'd say, "Well, you look
22  at your performance."
23  Q      So that binder is still active?
```

Page 10

```
1   I mean, what I'm saying is, you don't
2   purge it after the year is over?
3   A      No, sir.  I don't purge it at
4   all.  It's not mine to purge.
5   Q      Whose is it?
6   A      Like I say, I add the updates and
7   --
8   Q      Whose is it?
9   A      -- the binder stays in the office
10  of the Project Manager.
11  Q      Whose binder is it?
12  A      The Project Manager's.
13  Q      It's Mr. Erickson's binder?
14  A      Well, if that's what you want to
15  call it.  Yes, sir.  I guess it would be
16  his binder.  I don't think it had his
17  name on it, but it is in his office.
18  Q      Did you train Mr. Hines on the
19  incident involving his electrocution?
20  And I use the word "electrocution." I
21  mean, he was -- I mean, obviously, he was
22  shocked.
23  A      Yes, sir.  I guess you could say
```

Page 11

```
1   that I had given him some training.  But
2   I would also like to add that all of my
3   people work together to help each other
4   in -- in the time of need.  Especially,
5   if we've got a new employee coming in, I
6   may not provide all the training.  I've
7   got people, you know, in a lead capacity
8   role that can do training, as well.
9   Q      Who assigned him the job in the
10  bunker?
11  A      That's part of his normal duties,
12  monthly.  I don't assign tasks on a daily
13  basis.  I -- I've got a certain amount of
14  tasks that I have to complete every month
15  and every quarter, and the guys who are
16  working on different parts of the range
17  know what those tasks are, and they
18  perform them on a regular basis.
19  Q      Initially, though, at some point
20  initially, someone had to say, "You go
21  work in the bunker.  That's what your job
22  is." And my question is, who -- who sent
23  him to the bunker, initially?
```

Page 12

```
1   A      I didn't send him to no bunker.
2   I might have said, "Mr. Young, you know --" I mean,
3   "Mr. Hines, your Preventative
4   Maintenance Checks and Service for the
5   month is due on the Hood Mover.
6   Q      All right.  I'm not making myself
7   clear.  When was -- who put him on the
8   bunker for the first time, of the first
9   day of the job of working in the bunker?
10  Who sent him there?  Do you understand?
11  Am I being vague?
12  A      No, sir.  I don't think I
13  understand what you're getting at.
14  Q      Okay.
15  A      Mr. Hines was taken to a bunker
16  and shown what a bunker was.
17  Q      Okay.  Before he was taken to the
18  bunker, did he work for Honeywell?
19  A      Yes, sir, he did.
20  Q      What did he do?
21  A      He was an RCS Operator.
22  Q      Okay.  And then he switched jobs
23  with Mr. Young.  Correct?
```

Young v. Honeywell Tech. T.02-CV-00563-SRW Multi-Page™

Case 1:06-cv-00563-SRW Document 31-2 Filed 05/21/2007 Page 4 of 6

Jerry L. Temple, 3/27/07

Page 13

```
 1   A      After he became a Maintenance
 2   Trades Helper, which is a Junior Range
 3   Technician, yeah.
 4   Q      Okay.  So somebody -- somebody
 5   made the decision that said, "Go work in
 6   the bunker now."  Correct?
 7   A      Yes, sir.  But not after
 8   training.
 9   Q      Okay.  I'm just checking.  Who
10   said, "Go work in the bunker"?  Or --
11          MS. REISS:  I'm going to --
12   Q      -- who sent him to the bunker?
13   A      I don't -- I don't --
14          MS. REISS:  I'm going to object,
15   to the extent that he was asked and
16   answered this.  He basically said he
17   assigned them to the ranges, and that's
18   part of their duties.  He doesn't assign
19   each duty at the range.
20   A      That's right.  I don't.
21          MS. REISS:  He's already said
22   that.
23   Q      Here's what I'm trying to ask.
```

Page 14

```
 1   And it just was a bad question.  I don't
 2   think it's that complicated.  I know you
 3   don't do a daily assignment.  I know
 4   that.  But, initially, at the very
 5   beginning, somebody pointed out to Mr.
 6   Hines that, "This is now your job."
 7   Okay?
 8   A      Okay.
 9   Q      And who was that?
10   A      I don't recall.  It could have
11   been Mr. Young.
12   Q      Mr. Young?
13   A      Yes, sir.  It could have been Mr.
14   Young.  Mr. Hines could have rode with
15   Mr. Young for up to a month, training on
16   that part of the range.  I frequently do
17   that.  I send people out to train for --
18   cross-train for other jobs with my Junior
19   Range Techs.  RCS Operators ride with
20   them frequently.
21   Q      Whose responsibility was it to
22   train Mr. Hines in properly locking out
23   that bunker?
```

Page 15

```
 1   A      I would have to say it was
 2   partially my job and partially the Safety
 3   Representative for our company.  And the
 4   Q.A.Q.C. Specialist also does it.
 5   Q      What are the names of those
 6   people?
 7   A      Thomas Lavar and Mark -- well,
 8   let's see.  What would be the safety
 9   man's name down there then?
10          MS. REISS:  Wait.  No, no, no.
11   Don't -- (Directed to Mr. Erickson.)
12   A      I don't recall his name.  Robert
13   -- I don't recall his name.  But he was
14   the Safety Representative for all of
15   Honeywell down here.  At the present time
16   he is currently no longer employed by
17   Honeywell.  He moved on to another
18   position.
19   Q      Mr. Erickson stated in his
20   deposition that Mr. Hines was not
21   properly trained.  Is that a true -- is
22   that a correct statement, when he got
23   shocked?
```

Page 16

```
 1   A      He said that he was not properly
 2   trained?
 3   Q      Yes, sir.  Or words to that
 4   effect.
 5   A      Well, I -- yes, sir.  I guess
 6   that is a true statement, because being
 7   properly trained, he wouldn't have done
 8   it on purpose.  Nobody is going to stick
 9   a screwdriver in a hot box.
10   Q      Now, describe that procedure,
11   sticking a screwdriver in a hot box.
12   First of all, describe what a hot box is.
13   A      What happened was, in order to
14   perform lock-out, tag-out on a mover,
15   there are up to three breakers that have
16   to be locked and tagged out.  One of them
17   operates the motor start box; one of them
18   operates a motor starter; and the other
19   operates the isolation transformer or the
20   bus phases.  Okay?  And Mr. Young -- I
21   mean, Mr. Hines did not have one of those
22   breakers tagged out, and it went to a 110
23   source on the motor starter, in which he
```

Page 17

```
 1   was checking the screw tightness, which
 2   ultimately led to the shorting of the
 3   screwdriver.
 4          MS. REISS:  Did you understand
 5   that?
 6   Q      Should -- should he have known
 7   that he was putting a screwdriver in a
 8   hot box?
 9          MS. REISS:  I'm going to object
10   to the form.  Answer, if you know what he
11   should have known.
12   Q      Even if you're not trained in
13   electronics, shouldn't you know not to
14   stick your screwdriver in a hot box?
15   A      Well, certainly.  Everybody
16   would.
17   Q      Yeah.
18   A      But Mr. -- the thing about it is,
19   Mr. Hines had performed this job on
20   numerous occasions prior to.  I'm not
21   saying that, you know, he wasn't
22   thoroughly trained.  He had done this
23   same job over and over and over,
```

Page 18

```
 1   repetitious.  It was a monthly check that
 2   is done every month on at least five
 3   locations on his side of the range.
 4   Q      I want to know, did Mr. Young
 5   deliver the mannequins to the sites in a
 6   timely and proper manner, day, after day,
 7   after day?
 8   A      Can you rephrase the question, or
 9   clarify it?  "Deliver them to the site,"
10   I don't understand.
11   Q      All right.
12   A      Mr. Young was responsible for
13   several small arms ranges' supply rooms
14   on those small arms ranges; that he was
15   the only one that had keys to those
16   rooms, other than the people at Range
17   Control, which are under our key control
18   deal, which we have very little to do
19   with.  Mr. Young was the only one that
20   had a set of keys to those supply rooms
21   at various ranges.  The Modified Record
22   Fire Range, the Multipurpose Machine Gun
23   Range.  The C.P.Q.C. Range, or Combat
```

Case 1:06-cv-00563-SRW Document 31-2 Filed 05/21/2007 Page 5 of 6

**Page 19**

```
1   Pistol Qualification Range, does have a
2   key ring and a key box that several
3   people have access to.  But this was not
4   where this incident occurred.  This
5   incident was at the Multipurpose Machine
6   Gun range.  But he was the only one that
7   had control of those keys.  And, also,
8   let me go ahead and tell you that Mr.
9   Young was warned on several occasions of
10  random inspections by me, immediately
11  thereafter staff meetings -- which I knew
12  that it was going to come up -- and I
13  told him he needed to get his records
14  straightened out.  And then this last
15  issue came up, about him not having his
16  records straight.
17  Q     His job was to deliver mannequins
18  to the ranges.  That's what he was hired
19  to do.
20  A     No, sir.  No, sir.  Mr. Young was
21  hired to do preventative maintenance.  We
22  work on a $5,000,000 preventative
23  maintenance contract.  That's what we do.
```

**Page 20**

```
1   We prevent things from happening.  If
2   something does happen, we repair it.
3   Q     So he -- who replaces mannequins?
4   I just -- help me with this.  I thought
5   he was a Range Tech --
6   A     He was.
7   Q     -- and he delivers mannequins.
8   A     He does not deliver mannequins,
9   except unless he is running out, and then
10  he might get some from the Supply
11  Technician, who would -- he would then be
12  delivering them to his range, for his
13  supply room, to update his supply.  But,
14  no, his job does not just necessarily
15  entail him delivering mannequins.  He has
16  multiple duties, just as everybody else
17  does.
18  Q     Whose job is it to deliver
19  mannequins?
20  A     I just told you Mr. Young's job:
21  to deliver the mannequins to update his
22  supply room.
23  Q     Okay.  Did you work construction
```

**Page 21**

```
1   prior to coming to work for Honeywell?
2   A     Yes, sir, I did.
3   Q     And how many years did you do
4   that?
5   A     Approximately 15 to 17 years.
6   Q     And you acquired a knowledge in
7   electricity?
8   A     I already had some knowledge.
9   Q     Okay.  Did you expand your
10  knowledge in electricity by working
11  construction?
12  A     Yes, sir.  Somewhat.
13  Q     Could you rewire a house?
14  A     Yes, sir, I could.
15  Q     And I said "rewire."  I should
16  have said "wire."
17  A     Yes, sir.  I could wire a house.
18  Q     Hook it up to a main --
19  A     Yes, sir.
20  Q     -- box, that's sitting out there
21  in the front yard?
22  A     Yes, sir.
23  Q     And when you finish, unhook it,
```

**Page 22**

```
1   and so on, and so forth?
2   A     Yes, sir.
3         MR. BENNITT:  I'm going to take a
4   few minutes.
5         MS. REISS:  Sure.
6         (At this point, the pro-
7         ceedings were held in
8         recess and reconvened as
9         follows:)
10        MR. BENNITT:  We're done.
11  EXAMINATION BY MS. REISS:
12  Q     I have a couple of questions, Mr.
13  Temple.
14  A     Yes, ma'am.
15  Q     When Mr. Hines -- after Mr. Young
16  was terminated and Mr. Hines was
17  performing his -- was he performing Mr.
18  Young's duties, in addition to his own
19  range duties?
20  A     Yes, ma'am.  Partial -- part of
21  the time.  Yes.
22  Q     Was he paid any extra for that?
23  A     No.
```

**Page 23**

```
1   Q     Did he complain to you about it?
2   A     No.
3   Q     Is Mr. Young a complainer -- Mr.
4   Hines a complainer?
5   A     No, he's not.
6   Q     How was it to work with Mr.
7   Young, as far as attitude?
8   A     Aggressive, abusive, unruly,
9   pretty much 50% of the time he worked
10  there.
11  Q     Did you ever receive complaints
12  from any of Mr. Young's co-workers about
13  his work habits?
14  A     Oh, yes, I did.  Several times.
15  Q     Can you give me an example?
16  A     Well, Calvin and Chris were
17  having to do work on the small arms
18  ranges to help Curly out, to keep him up
19  to date.
20  Q     And Calvin who?
21  A     Calvin Flowers and Chris Hines.
22  Q     And what's Calvin Flowers' race?
23  A     He is a Maintenance Trades
```

**Page 24**

```
1   Helper, or Junior Range Technician.
2   Whatever you want to call it.
3   Q     And what's his race?
4   A     He's black.
5   Q     Okay.  And Chris Hines was the
6   other Range Tech?
7   A     Yes.
8   Q     Okay.
9   A     Both of them had to do work to
10  help Curly keep his ranges caught up.
11  And which I had -- the question was asked
12  to me several times that, why wasn't Mr.
13  Young taking all the equipment he needed
14  to do preventative maintenance on his
15  range on a daily basis.  And I checked
16  into it one day, which resulted in a big
17  argument between me and him.  And Curly
18  never would -- he never wanted to do all
19  the job.  He wanted to do the parts of
20  the job he wanted to do, and that was it.
21  Q     Did you receive complaints from
22  any other employees about Mr. Young?
23  A     Yes, I did.  On one of the
```

**Page 25**

```
 1   moments -- or one of the mornings in
 2   question, Roger Ingles had complained to
 3   me about, why he didn't ever get all the
 4   equipment he needed, and the rest of my
 5   Range Techs did.  David Holland had
 6   mentioned it on occasion.  I can't
 7   remember if anybody else did.
 8   Q     Did you ever come up on Mr. Young
 9   when he was just sitting in his truck
10   when he should have been working?
11   A     Yes, I did.
12   Q     How many times?
13   A     If I were to just say off the top
14   of my head -- because I don't recall all
15   of them -- I know of at least four or
16   five times, yes.  One time was with Mr.
17   Erickson, when he knocked on the window.
18         MS. REISS:  That's it.
19         MR. BENNITT:  All done.  Thank
20   you, sir.
21   A     Yes, sir.
22
23         FURTHER THE DEPONENT SAITH NOT.
```

**Page 26**

```
 1            C E R T I F I C A T E
 2
 3   STATE OF ALABAMA        )
 4   JEFFERSON COUNTY        )
 5
 6         I, Winters O. Hope, Alabama CSR 104,
 7   and Notary Public for the State of Alabama at
 8   Large, do hereby certify that I recorded by
 9   means of shorthand the foregoing deposition of
10   JERRY L. TEMPLE at the time and place stated in
11   the caption hereof.  That said witness was
12   first duly sworn to speak the truth.  That
13   later, under my supervision, the deposition was
14   reduced to typewriting and the foregoing pages
15   contain a full, true and correct transcript of
16   the testimony of said witness on said occasion.
17         I further certify that I am neither of
18   counsel nor of kin to any parties of said
19   cause, nor in any manner interested in the
20   result thereof.
21
22
23         _____
                  COMMISSIONER
```

**Page 27**

```
 1        CERTIFICATE OF REASONABLENESS
 2               OF INVOICE
 3
 4         I hereby certify that I am the Court
 5   Reporter who has taken and transcribed the
 6   deposition of JERRY L. TEMPLE, witness in the
 7   case cited in the caption hereof, and the
 8   following charges for said services are fair,
 9   reasonable and comparable charges to those of
10   others in my profession in this State.
11
12   Per diem:      _____ days    $_____
13   Original:      _____ pgs.    $_____
14   Copy:          _____ pgs.    $_____
15   Exhibits:      _____ pgs.    $_____
16   Video:         _____ hrs.    $_____
17   Postage/Parking:             $_____
18   Mileage:       _____ mi.     $_____
19   Condensed Xcript:            $_____
20   Total:              $_____
21
22         _____
23               WINTERS O. HOPE
```