# Exhibit 2

Page 1

```
 1       IN THE UNITED STATES DISTRICT COURT
 2       FOR THE MIDDLE DISTRICT OF ALABAMA
 3              SOUTHERN DIVISION
 4
 5  CURLY YOUNG,              )
 6       Plaintiff,           )
 7  vs.                       ) CIVIL ACTION:
 8  HONEYWELL TECHNOLOGY      ) 1:02-CV-00563-SRW
 9  SOLUTIONS, et al          )
10       Defendants.          )
11
12
13            STIPULATIONS:
14       IT IS STIPULATED AND AGREED by
15  and between the parties through their
16  respective counsel, that the deposition
17  of KENNETH A. ERICKSON may be taken
18  before Winters O. Hope, Alabama CSR #104,
19  Commissioner and Notary Public, State of
20  Alabama at Large, at the offices of Mr.
21  Joe W. Adams, Attorney at Law, 1278
22  Andrews Avenue, Ozark, Alabama, 36360, on
23  the 27th day of March, 2007.
```

Page 2

```
 1       IT IS FURTHER STIPULATED AND
 2  AGREED that the signature to and the
 3  reading of the deposition by the witness
 4  is waived, the deposition to have the
 5  same force and effect as if full
 6  compliance had been had with all laws and
 7  rules of Court relating to the taking of
 8  depositions.
 9       IT IS FURTHER STIPULATED AND
10  AGREED that it shall not be necessary for
11  any objections to be made by counsel as
12  to any questions, except as to form or
13  leading questions, and that counsel for
14  the parties may make objections and
15  assign grounds at the time of trial, or
16  at the time said deposition is offered in
17  evidence or prior thereto.
18       IT IS STIPULATED AND AGREED that
19  this deposition is taken after issuance
20  of formal notice.
21
22
23
```

Page 3

```
 1              INDEX:
 2  EXAMINATION BY:          PAGE:
 3  MR. BENNITT              445
 4  MS. REISS                45 - 57
 5
 6
 7  - - - - - - - - - - - -
 8  BEFORE:
 9       Winters O. Hope, Commissioner.
10  APPEARANCES:
11       Mr. Jeffrey W. Bennitt,
12  Attorney at Law, 4898 Valleydale Road,
13  Birmingham, Alabama, 35242, appearing for
14  the Plaintiff.
15       Ms. Sandra B. Reiss, Attorney at
16  Law, of the firm of Ogletree, Deakins,
17  Nash, Smoak & Stewart, P.C., One Federal
18  Place, Suite 1000, 1819 5th Avenue North,
19  Birmingham, Alabama, 35203, appearing for
20  the Defendants.
21       Also in appearance:
22       Mr. Curly Young, Plaintiff.
23       Mr. Jerry L. Temple, Defendant.
```

Page 4

```
 1       I, Winters O. Hope, Alabama CSR
 2  104, and Notary Public for the State of
 3  Alabama at Large, acting as Commissioner,
 4  certify that on this date, as provided by
 5  The Federal Rules of Civil Procedure and
 6  the foregoing stipulation by counsel,
 7  there came before me at 11:41 a.m.,
 8  Central Daylight Time, on March 27, 2007,
 9  KENNETH A. ERICKSON, witness in the above
10  cause for oral examination, whereupon the
11  following was had and done:
12
13
14            KENNETH A. ERICKSON:
15       having been duly sworn, was
16  examined and testified as follows:
17
18  EXAMINATION BY MR. BENNITT:
19  Q    State your name, please.
20  A    Kenneth A. Erickson.
21  Q    And your place of employment?
22  A    Honeywell, Fort Rucker, Alabama.
23  Q    Your title?
```

Page 5

```
 1  A    Project Manager.
 2  Q    Your duties?
 3  A    I am the Project Manager.  I
 4  supervise all the sections that are out
 5  there on the range.
 6  Q    And what were your duties at the
 7  time of Mr. Young's termination?
 8  A    Project Manager.
 9  Q    Same duties?
10  A    Same duties.
11  Q    State the race of Plaintiff at
12  the time of his termination.
13  A    Sir, you mean, state the race of
14  Curly Young?
15  A    Uh-huh.  (Indicated yes.)
16  A    Curly Young was black.
17  Q    Was Plaintiff qualified for his
18  or her job at the time of the decision?
19  A    He was qualified for the Junior
20  Range Tech position.  That's correct.
21  Q    Tell me the name, race of the
22  person who took his job.
23  A    Chris Hines is white.  He -- he
```

Page 6

```
 1  was placed in that position because he
 2  had to -- we had to fill that slot at the
 3  time.
 4  Q    And what date did he take over
 5  this job?
 6  A    The day after Mr. Young's
 7  termination papers.
 8  Q    Did he apply for the job?
 9  A    No, sir.  He just filled the
10  position at that time because we had no
11  one.  We hadn't even advertised the
12  position at the time.  He actually did
13  both jobs.  He had to do his job on that
14  Gunnery Range, plus this job, at that
15  time.
16  Q    Did he have help?
17  A    Yes, he did.
18  Q    How many helpers?
19       MS. REISS:  At what time?
20  Q    I'm sorry.  When he took over and
21  started performing Mr. Young's job.
22  A    He did not have a helper at that
23  time because the RCS Operator that we had
```

Page 7

1 was mobilized to Iraq.
2 Q   Did you give him helpers later?
3 A   Yes, sir. The Range Maintenance
4 Section would come in and help close out
5 all the contracts. We have contract
6 requirements that we have to meet each
7 quarter.
8 Q   How many helpers did he get?
9 A   He had -- on the range side would
10 be Mr. Temple, Calvin Flowers -- I'm not
11 sure if Gregory Borders -- no, Gregory
12 Borders was not -- and Rodney Sellers.
13 Q   What was the designation of Mr.
14 Young's range? What was its
15 nomenclature? What was it called?
16 A   He was called a Junior Range
17 Tech.
18 Q   But did his range itself have a
19 designation on it?
20      MS. REISS: At what time?
21 Q   At the time of his termination.
22 A   He was in charge of maintenance
23 on the small arms ranges. There was more

Page 8

1 than one.
2 Q   And so my question is, is that
3 when Mr. Hines took over his job on the
4 small arms ranges, did he have helpers?
5 A   Yes, he did.
6 Q   And those were the ones you
7 named?
8 A   Yes.
9 Q   What was the designation of Mr.
10 Hines' former range called?
11 A   Mr. Hines was a Junior Range Tech
12 --
13 Q   Yes, sir.
14 A   -- the same classification as Mr.
15 Young.
16 Q   And what was the name -- the
17 nomenclature? What was the name of his
18 range?
19 A   He was on the Gunnery Range at
20 the time.
21 Q   Who took Mr. Hines' place?
22      MS. REISS: I object to the form.
23 I don't understand. When? What are you

Page 9

1 talking about?
2 A   After we advertised --
3      MS. REISS: Let him clarify that
4 question, please.
5 A   Okay.
6 Q   Okay. Mr. Hines took Mr. Young's
7 place, and then his -- he worked both
8 jobs for a while.
9 A   Correct.
10 Q   And so my question is, is that at
11 some point in time you all got somebody
12 to take over Mr. Hines' former position.
13 Right?
14 A   Correct.
15 Q   And who was that, and what was
16 his race?
17 A   I believe it was Calvin Flowers,
18 and he is black.
19 Q   Okay. And when did he take over
20 Mr. Hines' spot? Approximately.
21 A   Approximately six weeks for the
22 hiring process to go into effect.
23 Q   Okay. Is Mr. Flowers still doing

Page 10

1 Mr. Hines' former job?
2 A   That is correct.
3 Q   Is Mr. Hines, at the present
4 time, still performing Mr. Young's former
5 job?
6 A   That is correct.
7 Q   Did you have input in the
8 decision to terminate Mr. Young?
9 A   Yes, sir. I had input. I
10 recommended the -- I can forward the
11 recommendations to Corporate
12 Headquarters. They have the final
13 decision-making authority.
14 Q   Okay. Can you state exactly, and
15 precisely, the reasons for the
16 termination decision that you made?
17 A   The decision I made was based on
18 three write-ups that Mr. --
19      MS. REISS: I'm going to object,
20 to the extent that that mischaracterizes
21 his testimony. He did not make the
22 decision.
23      MR. BENNITT: I'm sorry. Input.

Page 11

1      MS. REISS: He said he
2 recommended it.
3 Q   (By Mr. Bennitt) The same
4 question, only, when you made the
5 recommendation.
6 A   I made the recommendation because
7 of three write-ups that were given to
8 him; one of which was given to him from a
9 Thomas Lavar, who was black, who was my
10 Quality Control Inspector, for not having
11 a Preventative Maintenance and Checks and
12 Services sheet on his vehicle. The
13 second one was because of he left a
14 vehicle in disarray -- and that was
15 discovered by Thomas Lavar, also -- and
16 then he had a gas blower full of gas
17 inside the cab of the truck. The last
18 one was accountability: He did not
19 account for supply procedures for the
20 mannequins in the supply room that he was
21 in charge of. And he also was trained on
22 this, so that he would keep up with
23 accountability on the supplies. And that

Page 12

1 was the three reasons.
2 Q   Was the company fined by the Army
3 for any of these disciplinaries?
4 A   No, sir. They were not, because
5 Honeywell discovered these actions before
6 the Government Inspector caught them.
7 Q   Okay. Did Honeywell lose any
8 money because of these three
9 disciplinaries?
10 A   No, sir, they did not.
11 Q   Do you know if Mr. Temple had any
12 input with you in the decision-making
13 process?
14 A   Mr. Temple had no input on the
15 decision-making process for the
16 termination of Mr. Young.
17 Q   Did he say anything to you? Did
18 he give his recommendation to you?
19 A   No, sir, he did not.
20 Q   Did you make the decision to
21 promote Robert Hadley in that
22 Electrician's position?
23 A   No, sir, I did not. Robert

Page 13

1  Hadley was hired into that position that
2  he's in currently. I did not promote him
3  into that position; we hired him into
4  that position.
5  Q    And who hired him?
6  A    I recommended the hire. I put it
7  to Corporate Headquarters.
8  Q    Was Mr. Young given an
9  opportunity to try to get that position?
10 A    Yes, sir. Mr. Young was given an
11 opportunity, even though he did not meet
12 the minimum requirements for the
13 position. My -- my intent in that was in
14 case we couldn't find an individual that
15 had the minimum requirements for that
16 position, I was going to go down to the
17 government and ask for a waiver for that
18 requirement that required him to have an
19 electronics degree.
20 Q    Did -- did Mr. Young score higher
21 on the testing than Mr. Hadley, for that
22 position?
23 A    Yes, sir. He scored higher on

Page 14

1  the testing; however, he did not score
2  higher on the interview.
3  Q    Is the test an objective test,
4  asking objective questions?
5  A    No, sir. It's a skills test.
6  Q    The interview - is it an
7  objective or a subjective interview?
8  A    Please clarify.
9  Q    Can you give me the three top
10 reasons, if you can -- because I'm kind
11 of limiting this question -- of how Mr.
12 Hadley scored better on the interview
13 than Mr. Young?
14 A    Mr. Hadley came in and he had --
15 one of the requirements was background
16 education requirements, which he had.
17 The second issue was how much experience
18 he had. Mr. Hadley had six years of
19 electronics and electricity experience
20 background in his hiring process.
21 Q    Anything else?
22 A    No, sir.
23 Q    Could you have gotten a waiver?

Page 15

1  Or how hard is it to get a waiver?
2  A    Well, sir, I tried to get a
3  waiver for Calvin Flowers for a CDL
4  license. And I went down and talked to
5  the Contracting Officer's representative,
6  and they denied the waiver for the CDL
7  license. I'm assuming I would have tried
8  to go down and get one, if I had to come
9  up with that solution. I'm not too sure
10 the government would have approved it.
11 Q    Would this have given Mr. Young a
12 raise, had he been given the job?
13 A    I believe it would have given him
14 a very minimal raise.
15 Q    Of about how much, in your best
16 judgement?
17 A    I can't -- I could not. I would
18 have to look it up. I wouldn't want to
19 quote you an exact figure, but --
20 Q    I don't need an exact figure.
21 Just give me a judgement.
22     MS. REISS: I don't want him to
23 guess. If he doesn't know the amount, he

Page 16

1  shouldn't guess, to go on the record.
2  Q    Are there any more reasons that
3  you gave the job to Mr. Hadley, over Mr.
4  Young, than what you told me?
5  A    No, sir.
6  Q    Did Plaintiff make race
7  complaints to you?
8  A    No, sir. He made complaints to
9  me about the hiring process for some
10 individuals. And I informed Mr. Young
11 that my hiring process, if someone
12 doesn't get selected, then I call them in
13 my office and explain to them why.
14 Q    Did that have to do with the
15 Calvin Flowers?
16 A    Yes, sir.
17 Q    Did he make any -- any complaints
18 involving race? And let's don't talk
19 about Calvin Flowers.
20 A    He made a complaint to me about
21 an off-color joke that a Pat Little had
22 told on the range.
23 Q    When was that?

Page 17

1  A    I can't recall the exact date.
2  But I did address the issue with Pat
3  Little. I made Pat Little go over and
4  apologize to Mr. Young; and then I asked
5  Mr. Young, if he wanted to pursue this
6  further, give it to me in writing, then I
7  would more than definitely pursue that,
8  in writing, because Honeywell does not
9  tolerate that kind of thing.
10 Q    Did he make any complaints to
11 you, say, within a three month time
12 period of his termination, about what he
13 considered to be racial attitude,
14 atmosphere, going on at Honeywell?
15 A    No, sir, he did not.
16 Q    The same question, not limited to
17 three months. Just at any time.
18 A    No, sir.
19 Q    Do you know if Chris Hines is
20 related to Jerry Temple, from any source?
21 A    Sir, the only thing I know about
22 this situation is that I confronted it
23 after the deposition, and I asked Mr.

Page 18

1  Temple if he knew anything about the
2  relationship. And he mentioned something
3  to me about being a fourth cousin, and
4  they were not engaged. So Jerry Temple
5  is not related to Chris Hines.
6  Q    Do you know whether or not they
7  are friends?
8  A    No, sir, I do not.
9  Q    Are you familiar with Chris
10 Hines' work performance --
11 A    Yes, sir.
12 Q    -- with Honeywell?
13 A    Yes, sir, I am. Chris Hines is
14 an outstanding worker. He performs his
15 job every day. Every time I've ever come
16 up on Mr. Chris Hines, he was always
17 working. I never had to question his
18 ethic.
19 Q    Has he ever been disciplined?
20 A    Yes, sir, he has.
21 Q    And how many times?
22 A    Two times.
23 Q    Tell me about the first time.

Page 19

1  A   The first time, he shorted out a
2  system in a bunker, and it -- he just --
3  it was a safety violation.
4  Q   What was the safety violation?
5  A   The safety violation was, he
6  didn't lock-out and tag-out properly at
7  the bunker.
8  Q   What kind of violation was that,
9  in relationship to whether it's serious,
10 minor?
11 A   It was a serious violation. It
12 was his first attempt at the violation.
13 But after further investigation, we
14 realized that the training that we were
15 giving for the lock-out, tag-out
16 procedures for the bunkers was not
17 accurate; that not all the bunkers were
18 wired exactly the same. So the training
19 that Chris Hines had received was not on
20 that particular bunker. And then, since
21 then, we have put signs in these bunkers
22 to show the individuals the proper
23 procedures, because the bunkers aren't

Page 20

1  exactly alike.
2  Q   Did the company lose money over
3  this incident from the Army?
4  A   No. The company did not lose any
5  money at all. There was a $778 charge
6  for that piece to have to be repaired,
7  but that was back-charged to the
8  government.
9  Q   Was it fined by the Army? Was
10 the company fined by the Army for this
11 incident?
12 A   The company was not fined. But
13 it was mentioned in the award fee, and we
14 lost percentages on the award fee. That
15 is correct.
16 Q   How much did you lose? About?
17 Best judgement?
18 A   About -- about 2%.
19 Q   How much is that?
20 A   Approximately about $1,200.
21 Q   If -- if Mr. Hines was not at
22 fault, why was the company fined by the
23 Army?

Page 21

1  A   The company was fined on the
2  award fee at the time of the incident.
3  But after the investigation, which took
4  about three to four months to discover
5  this, we realized that there was an
6  error, and the government understood what
7  had happened: that he wasn't trained
8  properly on the -- on the lock-out, tag-out
9  procedures, because they were
10 different. But it was beyond -- we get
11 our award fees quarterly. And once that
12 award fee is given, it cannot be redone.
13 Q   Tell me exactly what he did in
14 his attempt to lock-out and tag-out, in
15 this incident where he got hurt.
16 A   I'm not exactly sure. I
17 understood that he had put a screwdriver
18 in a high-voltage area. That's all I
19 know. I'm not familiar with it. I'm not
20 an expert on lock-out, tag-out of the
21 bunkers.
22 Q   When you say the word "error," do
23 you mean that he made an error of

Page 22

1  judgement, or did he make an error of
2  failure to follow procedure?
3  A   He did not make an error of
4  judgement. In my opinion, he made an
5  error of following procedures, because he
6  wasn't properly trained on the lock-out,
7  tag-out for that particular bunker.
8  Q   Did he attempt to make -- to
9  perform a lock-out, tag-out?
10 A   Yes, sir, he did.
11 Q   What did he do?
12 A   He locked out -- he tagged and
13 locked out the wrong box.
14 Q   And that's in the report? That's
15 in the investigation?
16 A   Yes, sir. It was in the
17 investigation.
18 Q   Well, did he receive a discipline
19 for this?
20 A   Yes, sir, he did.
21 Q   Why did he receive a discipline,
22 if it was the company's fault, in that he
23 wasn't trained properly?

Page 23

1  A   He received a discipline, again,
2  because at the time he had the incident,
3  we assumed that he knew what he was
4  supposed to be doing, so we automatically
5  had written him up for that procedure.
6  Q   He was put on probation. Right?
7  A   Yes, sir, he was.
8  Q   And for a year. Right?
9  A   Yes, sir.
10 Q   Well, was he taken off probation
11 when your realized that it was really
12 your company's fault, and not his?
13 A   No, sir. We just annotated that,
14 and we used it as a safety tool to teach
15 others. But, no, it was not removed from
16 his records.
17 Q   How long had Mr. Hines been
18 employed when this first one occurred?
19 Approximately. In your best judgement.
20 A   Approximately two years.
21 Q   Had he ever worked a bunker like
22 this before?
23 A   No, sir. He was training on the

Page 24

1  bunkers. He had started on the small
2  arms ranges.
3  Q   Who had worked these bunkers
4  before?
5  A   Mr. Young and Mr. Temple.
6  Q   So Mr. Young knew how to lock-out, tag-out
7  these boxes. Correct?
8  A   Yes, sir. I'm assuming he did.
9  Q   Was Mr. Young required to teach
10 Mr. Hines?
11 A   Sir, I don't know who taught Mr.
12 Hines.
13 Q   It would be either Mr. Temple or
14 Mr. Young, though. Right?
15 A   That is correct.
16 Q   Okay. So if he wasn't trained,
17 somebody dropped the ball there.
18 Correct? That would be either Mr. Young
19 or Mr. Temple.
20 A   Sir, I believe it would have been
21 Mr. Temple.
22 Q   Well, was he written up for that?
23 A   No, sir, he was not.

Page 25

1  Q  Why not?
2  A  I probably should have written
3  him up for it.
4  Q  All right. Let's go to the
5  second incident with Mr. Hines. When did
6  that occur?
7  A  It occurred shortly thereafter.
8  I don't know the exact date. I would
9  have to look at the write-up to see that,
10 and I don't have it in front of me.
11 Q  All right. What happened?
12 A  However, there was a pipe -- that
13 he was taking a pipe out on the range,
14 him and another individual, and they had
15 the pipe sticking out of the back end of
16 the truck. They were crossing Highway
17 27, and the pipe was sticking out of the
18 back of the truck, and the Government
19 Quality Control Inspector spotted the
20 truck going with the pipe hanging out the
21 back, and he informed me that they were
22 doing it without putting a flag on the
23 back.

Page 26

1  Q  Was that considered to be, for
2  lack of a better term, a serious offense?
3  A minor offense?
4  A  I consider it a minor offense.
5  Q  Mr. Hines and Mr. Young, do they
6  perform nearly identically the same job?
7  A  They both have to be trained into
8  doing all aspects of a Junior Range
9  Technician. That's their job
10 description. Both of them have the same
11 job description.
12 Q  And are they under the same
13 supervisor?
14 A  That is correct.
15 Q  And under the same plant rules?
16 A  That is correct.
17 Q  Are they cross-trained to do each
18 other's job?
19 A  Yes, sir. We had just started
20 cross-training.
21 Q  So, then, in every aspect, every
22 relevant aspect of their jobs, they
23 perform nearly identical work.

Page 27

1  A  They were tasked to perform the
2  same identical jobs. That is correct.
3  Q  Talking about the three
4  disciplinaries that you had discussed
5  earlier, I shall call it P.M. -- it's the
6  truck thing, about maintaining your
7  truck. What is it called? P.M. -- the
8  first disciplinary you gave him.
9       MS. REISS: The form?
10 A  Okay, it's Preventative
11 Maintenance and Check Services.
12 Q  P.M.A.C.
13 A  No. P.M.C.S.
14 Q  I mean, P.M.C.S. Sorry. The
15 second one I'm going to call "Dirty
16 Truck."
17 A  Yes, sir.
18 Q  And then, the third one I'm going
19 to call "Accountability."
20 A  Yes, sir.
21 Q  How would you rate P.M.C.S.? As
22 a serious, minor or average offense?
23 A  The government sees that

Page 28

1  Preventative Maintenance and Checks and
2  Services is a very serious event, because
3  we have to maintain government equipment,
4  and they relegate it to the elevation of
5  serious.
6  Q  What about the Dirty Truck?
7       MS. REISS: I'll object to the
8  characterization. It's more than a dirty
9  truck.
10 A  Yes, sir.
11      MS. REISS: Go ahead and answer.
12 Q  I'm going to -- will you give me
13 the name for Number 2 in your own words?
14 A  The -- it was Preventative
15 Maintenance Checks and Services, but it
16 was also an environmental and safety
17 hazard; because not only was the truck
18 filthy, and scattered with paint cans and
19 everything inside the truck, it had a gas
20 blower inside the cab, full of fuel.
21 Q  Okay.
22 A  And the Quality Control
23 Supervisor came to me and said, "This is

Page 29

1  extremely dangerous. I opened the cab of
2  the truck and the fumes were just blowing
3  out." And actually --
4  Q  That was Mr. Lavar?
5  A  Yes.
6  Q  Okay. So how is Number 2 rated?
7  A  Very serious.
8  Q  And Number 3: Accountability.
9  How is that rated?
10 A  That's very serious, because in
11 our contract we are required to maintain
12 accountability of all government
13 equipment. And when the government comes
14 up, they are required to do a 10% check
15 each month. We perform 10% checks each
16 month in order to keep ahead and make
17 sure we don't. We actually had a
18 Greenbelt Certification Process, of which
19 Mr. Young was involved in, and he
20 understood that the accountability
21 process was extremely important to the
22 government. And we believe in voice of
23 the government, because it's our

Page 30

1  customer. And when we got into that
2  situation, we had started out the Six
3  Sigma Team. Greenbelt Certified people
4  had agreed that the card had to be
5  processed immediately when that item is
6  taken out of that supply room.
7  Q  So let's talk about -- I've seen
8  the photographs of the truck at the last
9  deposition, and that's what you're
10 talking about when you say disciplinary
11 Number 2 was a safety and environmental,
12 as well as a P.M.S.C. violation.
13 A  P.M.C.S., sir.
14 Q  Yeah. Acronyms are --
15 A  I understand. It's for
16 Preventative Maintenance and Check and
17 Service.
18 Q  I want to discuss -- first of
19 all, is there a "Wall of Shame"?
20 A  No, sir.
21 Q  Something called a "Wall of
22 Shame"?
23 A  People call it the "Wall of