# Exhibit 2b

Page 31

1 Shame," but I put that wall up on all
2 safety violations and safety accidents.
3 On some of those items that we identify
4 on that wall, and that board up there,
5 not everybody gets written up on. It's
6 to keep people informed of incidents or
7 accidents that happen on the range, to
8 help them better prepare and be safe.
9 Q    Okay.
10 A    It's really not a "Wall of
11 Shame"; it's a safety board.
12 Q    It's a nickname?
13 A    It's a nickname that they have
14 given it.
15 Q    They just use that to identify
16 it?
17 A    Correct.
18 Q    How bad was Mr. Hines injured?
19 A    We took him to the dispensary.
20 He came back. He didn't require any
21 over-the-counter medication or any
22 prescription drugs at all. They just
23 bandaged his hand. I looked -- I saw his

Page 32

1 hand, and it just had a light reddish
2 color on it. That's all that was wrong
3 with his hand.
4 Q    No residual effects?
5 A    No residual effects.
6 Q    How -- how many years, in your
7 best judgement, has Plaintiff been
8 delivering mannequins to the range,
9 approximately?
10 A    Sir, Mr. Young did not deliver
11 mannequins. Well, I guess he would,
12 because he would have taken them in lots
13 of 35. It's when he took over the small
14 arms ranges, I would guess that is when
15 he started taking them, which I would
16 guess was approximately a year and a
17 half, maybe two years.
18 Q    During that time period, had
19 there been any occasions where he had not
20 fulfilled his duties in delivering the
21 mannequins to the ranges?
22 A    The mannequins were on the
23 ranges. However, because of the Six

Page 33

1 Sigma thing and the government wanting us
2 to keep up with accountability -- an
3 example was the MRF Range; we went up
4 there, and Mr. Young had to come back and
5 get target arms, because he didn't -- he
6 failed to do a proper accountability on
7 the target arms at a different range:
8 Modified Record Fire Range. We went out
9 and did the inventory, and he was short
10 target arms. I counseled him verbally on
11 that, and said, "Mr. Young, we cannot do
12 this. We have to keep our inventory
13 correct." And I reminded him that when
14 you take it out of there, you have to put
15 it on the 3318 card and sign out that
16 card immediately; you cannot just take it
17 out of there at random. And that was one
18 of the major problems we had at Honeywell
19 prior to the Six Sigma Team.
20 Q    What was that problem?
21 A    The problem was keeping up with
22 accountability of all the items: The
23 cards, not only mannequins, but cards and

Page 34

1 target arms. People would come in the
2 supply room and take them out, and we
3 would spend hours trying to find out
4 where all these parts went that belonged
5 to the government. So we would have to
6 do accountability on them. We eventually
7 found them, but it would take a lot of
8 man-hours to find out where they went.
9 Q    So who did the inventory of his
10 shed, the mannequin shed?
11    MS. REISS: Object to the form.
12 When?
13 Q    On the -- in regards to the
14 disciplinary.
15 A    Okay. The inventory was done by
16 a Gregory Clay, and he was required to do
17 10% inventory then.
18 Q    And was he trained in doing
19 inventory?
20 A    Yes, sir. He was a trained
21 Supply Sergeant in the military.
22 Q    He works for the Army?
23 A    No, sir. He works for Honeywell.

Page 35

1 He retired from the military, and now he
2 works for us.
3 Q    Is there a procedure in
4 performing that inventory, as in how many
5 people are supposed to be present during
6 this inventory?
7 A    No, sir. Not in this. He did
8 accountability of the inventory. When it
9 had come up short, he immediately called
10 Thomas Lavar, the Quality Control
11 Inspector, and said, "We need to go out
12 and look at this." And they both went
13 out there and looked at it, and it was
14 short mannequins.
15 Q    So Mr. Lavar confirmed it?
16 A    He confirmed that it was short
17 mannequins. The numbers on the cards
18 didn't match the number of mannequins in
19 the supply room.
20 Q    And those two mannequins were
21 located in Mr. Young's truck?
22 A    That is not true. The two
23 mannequins were placed on the range where

Page 36

1 Mr. Young had replaced two mannequins.
2 He had two mannequins that were shot up,
3 that he brought back and had left in his
4 truck.
5 Q    Oh! Well, were they missing?
6 You see, I'm confused.
7 A    No, sir. We had --
8 Q    I thought they were all accounted
9 for, but they were just in the wrong
10 place.
11 A    No, sir. You have to sign out
12 the mannequin when you take it out of
13 that supply room. No exceptions. And
14 Mr. Young knew that. He took them out.
15 We had to do the research to find out
16 where the mannequins were.
17 Q    Where were they?
18 A    They were on the targets at the
19 M.P.M.G. The Machine Gun Range.
20 Q    So they weren't missing. I don't
21 mean to -- I'm the one that's confused
22 here.
23 A    The card was not correct.

Case 1:06-cv-00563-SRW   Document 21-4   Filed 05/21/2007   Page 3 of 6

Page 37

1  Q    The card was filled out wrong?
2  A    The mannequins were taken out
3  without signing out for the mannequins.
4  Q    Okay. Two mannequins were taken
5  out without signing for them, or all the
6  mannequins? Tell me what it was.
7  A    It was short two mannequins. The
8  mannequins in the supply room and the
9  mannequins on the card did not match.
10 They were short two.
11 Q    How could something like this
12 have happened? Did you all investigate
13 to find out? Or did you ask Mr. Young?
14 A    Yes. Mr. Lavar asked Mr. Young.
15 Q    Okay. And what was his answer?
16 A    He took the mannequins out. He
17 said he took them out.
18 Q    And didn't put it on the card?
19 A    That's correct.
20 Q    How many -- you see, this is
21 another thing that confused me. He just
22 took two out, or he took more than two
23 out? Did he miscount the total?

Page 38

1  A    He was short two in the supply
2  room, versus what was on the card. I
3  don't have any idea how many mannequins
4  that he took out on the range that
5  morning.
6  Q    Okay. What's your -- what's your
7  inference as to how this happened?
8  A    I don't understand.
9  Q    Well, what's your take as to how
10 you could make this mistake?
11 MS. REISS: I'm going to object
12 to the form. Asked and answered. He's
13 already answered the question once. Go
14 ahead. Go ahead.
15 A    The reason it happened is because
16 he took too many mannequins, or he took
17 those mannequins and he didn't sign
18 for them.
19 Q    Does that reflect some type of
20 intentional misconduct? Or how would you
21 describe it?
22 A    I'm not so sure it was
23 intentional. But I do believe he just

Page 39

1  was incompetent, and he just took those
2  out there, because he did the same thing
3  at the Modified Record Range. And I had
4  already counseled him about taking stuff
5  out of there, and he just -- he went in
6  there and got the mannequins and took
7  them out without signing for them. And
8  he was trained, Greenbelt Certified, Six
9  Sigma Certified, on how the procedures
10 worked. It's not that he wasn't trained
11 not to do this correctly.
12 Q    When I use the phrase "supply
13 room in the bay area," do you know what
14 I'm talking about?
15 A    Yes, sir, I do.
16 Q    What is the supply room in the
17 bay area? Is that the main supply room?
18 A    That is -- I would classify that
19 as the main supply room. And in there we
20 have expendable supplies and we also have
21 what they call prescribed load list of
22 extra parts for different areas on the
23 Aviation Gunnery Range, such as cards and

Page 40

1  stuff for the movers, and things like
2  that.
3  Q    And is this an area where you
4  have -- "you," and I use that "you"
5  generically, meaning the employer. Do
6  you have shortages in the supply room
7  every year?
8  A    Yes, sir. We used to have --
9  that's the reason for the Six Sigma
10 Greenbelt training, and that's why we
11 went through this procedure. Since the
12 Six Sigma training, we have not had
13 shortages in that supply room.
14 Q    Are you -- do you know who
15 William Culpepper is?
16 A    Yes, sir, I do.
17 Q    Does he work for your company?
18 A    He did work for Honeywell. Yes.
19 Q    Did he drive a truck?
20 A    Yes, sir, he did.
21 Q    Was he under the same P.M.C.S.
22 rules as Mr. Young?
23 A    Yes, sir, he was.

Page 41

1  Q    Was he terminated?
2  A    Yes, sir, he was.
3  Q    Was he terminated for violating
4  company rules with regards to P.M.C.S.?
5  A    He was terminated, or I
6  recommended termination for him for more
7  than that. It was numerous accounts that
8  I did it for.
9  Q    How many P.M.C.S. violations did
10 he have before he was finally terminated?
11 A    One.
12 Q    What other violations did he
13 have?
14 A    He had a safety violation for
15 pushing over a tree in the Aviation
16 Gunnery Range, which was not authorized.
17 Q    What else, if you can just --
18 A    He had a write-up for dispensing
19 fuel out of a fuel POD. He just turned
20 it open and let the fuel run out on the
21 ground.
22 Q    Any other write-ups?
23 A    I'm not exactly sure. I'd have

Page 42

1  to look in the records.
2  Q    Do you recall the last write-up
3  before his termination?
4  A    I do not recall. But I could
5  look at his records and find out. If you
6  have it, I --
7  Q    (Shaking head in the negative.)
8  A    Okay.
9  Q    Okay. Do you have a step
10 disciplinary policy in the handbook?
11 A    We could -- please clarify that.
12 What do you mean by "step"?
13 Q    Does your disciplinary policy
14 call for an oral warning first, a written
15 warning, suspension, up to and leading to
16 termination? That's what I would define
17 as a step disciplinary policy.
18 A    Yes, sir. We do have one
19 currently. Yes.
20 Q    And did you follow that in Mr.
21 Young's case?
22 A    Yes, sir, I did.
23 Q    Does that policy also allow you

Page 43

1 just to, if the offense is serious
2 enough, to go straight to termination?
3 A    Yes, sir, it does.
4 Q    What type of an offense would be
5 serious enough to go straight to
6 termination?
7 A    An offense would be if you
8 deliberately did not call your location
9 out on the range and you were barred from
10 the range because they didn't know where
11 you were. We have to keep radio contact.
12 A major safety violation. It's in the
13 Cardinal Safety Rules. I don't have them
14 in front of me. Fighting would be one of
15 them.
16      MS. REISS: Can we take a break
17 real quick?
18      MR. BENNITT: Yes, ma'am.
19      (At this point, the proceed-
20          ings were held in recess
21          and reconvened as
22          follows:)
23 Q    (By Mr. Bennitt) Do you know

Page 44

1 anything about what I'm going to call a
2 hay incident?
3 A    Yes, sir, I do.
4 Q    Tell me about that.
5 A    The hay incident was not an
6 accountability issue; it was a re-order
7 issue. And I had to -- what happened
8 was, they had 200 bales of hay, and they
9 used all the hay, and they failed to re-order the hay
10 at the time. And we -- the
11 government is the one who orders the hay.
12 And the Contracting Officer's
13 representative, Joe Webers, did not order
14 the hay in a timely manner; therefore, we
15 ran out of hay at the time.
16 Q    Joe Weber is white?
17 A    Yes, sir. And he is a government
18 -- he is a government representative. He
19 has to do that.
20 Q    He doesn't work for Honeywell?
21 A    No, sir.
22 Q    Was anyone -- did anyone from
23 Honeywell cause the problem? Anyone from

Page 45

1 Honeywell not order the hay?
2 A    No, sir. We submitted the
3 request for the hay, and we didn't get
4 the hay in a timely manner.
5 Q    From the government?
6 A    Correct.
7 Q    You say "government"; I say
8 "Army." The same thing?
9 A    The same thing.
10      MR. BENNITT: Okay. I'm
11 finished.
12      MS. REISS: I've got a few
13 follow-ups.
14 EXAMINATION BY MS. REISS:
15 Q    Mr. Bennitt started out asking
16 about the -- the Electrical Tech
17 position. Who actually scored the
18 highest on the test?
19 A    Jerry Waller.
20 Q    And did Mr. Waller take the job?
21 A    No. Mr. Waller did not take the
22 job, even though he did have an
23 Electronics degree.

Page 46

1 Q    So Mr. Waller scored higher on
2 the test than did Mr. Young?
3 A    That is correct.
4 Q    Okay. Did Mr. Hadley, who
5 received the job, have all the minimum
6 qualifications for the job?
7 A    Yes. Mr. Hadley did have all the
8 minimum requirements for the job.
9 Q    And they were what?
10 A    You had to have a degree in
11 Electronics, and you had to have the
12 experience, background experience.
13 Q    Okay. And did Mr. Young have all
14 the minimum qualifications for the
15 Electrical Tech job?
16 A    Mr. Young did not have all the
17 minimum requirements. He did not have a
18 degree in Electronics.
19 Q    Now, when you asked Mr. Young if
20 he wanted to take it any further with Pat
21 Little regarding the joke that Mr. Little
22 told him; did he want to take it any
23 further, beyond the apology?

Page 47

1 A    No, he did not. He said he
2 didn't want to create more problems than
3 were already on the range; that he did
4 not want to pursue it any further.
5 Q    Did you counsel Pat Little about
6 the incident?
7 A    Yes, I did.
8 Q    What did you tell him in
9 counseling?
10 A    I told him that it was totally
11 inappropriate for anybody at Honeywell to
12 be doing these kind of things. It's just
13 not -- Honeywell doesn't do that. And I
14 told him if the incident happened again,
15 that I would pursue it further.
16 Q    What do you mean by "pursue it
17 further"?
18 A    I would write him up and
19 recommend termination.
20 Q    Now, you talked about Mr. Hines
21 and Mr. Young were both Junior Range
22 Techs. Is that correct?
23 A    That's correct.

Page 48

1 Q    Okay. Is their job performance
2 comparable?
3 A    No, they're not comparable at
4 all.
5 Q    Why not?
6 A    Mr. Hines, every time he went out
7 on the range, Mr. Hines was working all
8 the time. When I would go out on the
9 range -- I'll just explain an incident
10 that went on. I went out on the range
11 with the Government Quality Control
12 Inspector, Bill Ray, who is now the Range
13 Chief, and we drove up behind Mr. Young,
14 and he was sitting in his truck. And the
15 perception from the government at that
16 time was that Mr. Young was not
17 performing his job. And the second time
18 we went out onto the Modified Record
19 Range, we had received a call that Mr.
20 Young was sitting in his truck, not
21 performing his work, while the grounds
22 people were out there helping him
23 complete his Preventative Maintenance and

Page 49

1 Checks and Services on that range. I
2 actually went over there. We took
3 approximately 10 to 15 minutes, and I
4 went down on the range and knocked on the
5 window before Mr. Young actually got out
6 of the truck. I explained to him that
7 the breaks were 8:00, 10:00 and 12:00. I
8 mean, 8:00, 10:00 for lunch, and then
9 twelve o'clock, unless it was Category 5,
10 and then there was breaks on every hour.
11 Category 5 means heat was very high. I
12 asked him if he had a problem and he
13 needed to get medical attention, where he
14 had to sit in the truck, and he said no,
15 he just needed a break. And these are
16 the two incidents I'm personally aware
17 of.
18 Q     Did you ever catch Mr. Hines just
19 sitting in his truck when he was supposed
20 to be working?
21 A     I have never caught Mr. Hines not
22 working.
23 Q     Has Mr. Hines -- have you ever

Page 50

1 gotten into an argument with Mr. Hines
2 about work, or what he was supposed to do
3 on the range, or --
4 A     No. I have never gotten in an
5 argument with Mr. Hines.
6 Q     Have you ever gotten into an
7 argument with Mr. Young about his work,
8 or what he was supposed to be doing on
9 the range, or his attitude?
10 A     I wouldn't say an argument. The
11 thing is, in reference to the
12 accountability, we have problems. And we
13 discussed issues and why it was so
14 important to keep up with the
15 accountability of everything.
16 Q     Did the government ever come to
17 you about Mr. Young's work performance,
18 or talk to you about Mr. Young's work
19 performance?
20 A     Yes. Mr. Lay did, and Ron
21 Matthews, both.
22 Q     What did Mr. Lay say?
23 A     Mr. Lay, who used to work for

Page 51

1 Honeywell, said that he didn't think that
2 Mr. Young was up to the performance
3 standards that we felt we required.
4 Q     Was he asking you to fire Mr.
5 Young?
6 A     No, he never did ask me to fire
7 him.
8 Q     What was he asking you to do?
9 A     He was asking me to move Mr.
10 Young out into the small arms ranges, so
11 he would have more visibility -- the
12 government would have more visibility of
13 his work performance.
14 Q     What did Mr. Matthews say about
15 Mr. Young?
16 A     Mr. Matthews told me that when
17 the incident with the truck -- that was
18 where Mr. Lay and I pulled up on him --
19 he was waiting for me at the firing desk,
20 and he wanted to bar Mr. Young from the
21 range.
22 Q     And what was -- and did you bar
23 Mr. Young from the range?

Page 52

1 A     No, I did not, because the log
2 didn't justify it.
3 Q     Have you ever found Mr. Hines
4 without his P.M.C.S. forms?
5 A     No, I have never found Mr. Hines
6 without his Preventative Maintenance and
7 Check sheets.
8 Q     Have you ever found Mr. Hines'
9 truck in the condition it was in the
10 pictures that we showed you of Mr.
11 Young's truck?
12 A     I have never found Mr. Hines'
13 truck in that condition.
14 Q     You stated, I believe, that a Mr.
15 Gregory Clay did the inventory regarding
16 the mannequins that led to Mr. Young's
17 termination. Is that correct?
18 A     That is correct.
19 Q     What is the race of Mr. Clay?
20 A     He's black.
21 Q     I'll show you what we had marked
22 as Exhibit "50" on the Plaintiff's
23 deposition. (Tendered document.) Can

Page 53

1 you tell me -- now, part of this document
2 is whited-out. But do you know what this
3 document is?
4 A     This is a Performance Evaluation
5 Summary given to us by the government,
6 and that's 5% of our profit margin for
7 Honeywell.
8 Q     Okay. And on this -- do you know
9 who drafted this document?
10 A     Our Contracting Officer
11 representative, Joe Webers.
12 Q     Okay. And it says here, "During
13 the quarter, the P.M. --" Who is the
14 P.M.?
15 A     That's me.
16 Q     "Made a difficult staffing
17 termination that results in overall
18 improved efficiency in the Range
19 Maintenance area." What staffing
20 termination is he referring to?
21 A     That's in reference to Mr.
22 Young's termination.
23 Q     Has there been a change in morale

Page 54

1 since Mr. Young left Honeywell?
2 A     I feel like there's been a great
3 change in morale.
4 Q     And how would you describe it?
5 A     I believe the people are working
6 together and helping each other a lot
7 more, and they don't mind getting in
8 there and working together with each
9 other.
10 Q     How is that related to Mr.
11 Young's termination?
12 A     I believe it was because of the
13 confrontation of the other people.
14 Q     What do you mean, "the
15 confrontation"?
16 A     Within the Range Division itself.
17 Range Maintenance Pool.
18 Q     I don't understand what you're
19 saying. Confrontation amongst people
20 with Mr. Young, or amongst people --
21 A     They were upset, I believe,
22 because they had to pick up the slack on
23 some of the jobs that he was not

Page 55

1 performing.
2 Q    That Mr. Young was not
3 performing?
4 A    That is correct.
5 Q    Did you receive complaints from
6 employees about the failure of Mr. Young
7 to perform his job?
8 A    No, I did not.
9 Q    Did you hear of complaints?
10 A    Yes, I did.
11 Q    And who did you hear those from?
12 A    I heard it from Mr. Temple, the
13 supervisor, when we'd have our staff
14 meetings.
15 Q    Did Mr. Hines ever have more help
16 with his range than did Mr. Young?
17 A    No, he did not. What we did was,
18 all the quarterly maintenance had to be
19 done by contract. So whenever a Small
20 Arms Range Technician was falling behind,
21 the full Range Maintenance Section would
22 go out and help perform maintenance to
23 make sure that nobody missed the

Page 56

1 Preventative Maintenance and Checks and
2 Service on all the equipment, to include
3 the grounds crew. We'd send the grounds
4 crew out to help mow the grass, and
5 stuff, to help. Nobody was ever sent
6 without help. We always help.
7 Q    Did Mr. Young ever complain to
8 you he did not have enough help?
9 A    I believe he did. Yes.
10 Q    And what did you do?
11 A    We assured him that he would not
12 be without help, and that his maintenance
13 would be done, if we had to get him extra
14 people.
15 Q    Did Mr. Hines actually have more
16 helpers, though, than did Mr. Young?
17 A    No, he did not.
18 Q    Did you ever receive any reports
19 or calls from H.R. regarding complaints
20 that Mr. Young may have made to Honeywell
21 H.R.?
22 A    No, I did not.
23 Q    Did you know Mr. Young before you

Page 57

1 were hired at Honeywell?
2 A    No, I did not.
3 Q    Did you hear anything about him
4 after you were hired?
5 A    I've heard some rumor controls.
6 But I believe in whatever it is. I just
7 treat everybody fair, and we start with a
8 fresh slate.
9        MS. REISS:  That's all.
10
11
12
13        FURTHER THE DEPONENT SAITH NOT.
14
15
16
17
18
19
20
21
22
23

Page 58

1              C E R T I F I C A T E
2
3 STATE OF ALABAMA        )
4 JEFFERSON COUNTY        )
5      I, Winters O. Hope, Alabama CSR 104,
6 and Notary Public for the State of Alabama at
7 Large, do hereby certify that I recorded by
8 means of shorthand the foregoing deposition of
9 KENNETH A. ERICKSON at the time and place
10 stated in the caption hereof. That said
11 witness was first duly sworn to speak the
12 truth. That later, under my supervision, the
13 deposition was reduced to typewriting and the
14 foregoing pages contain a full, true and
15 correct transcript of the testimony of said
16 witness on said occasion.
17      I further certify that I am neither of
18 counsel nor of kin to any parties of said
19 cause, nor in any manner interested in the
20 result thereof.
21
22      _____
23            COMMISSIONER

Page 59

1       CERTIFICATE OF REASONABLENESS
2                OF INVOICE
3
4      I hereby certify that I am the Court
5 Reporter who has taken and transcribed the
6 deposition of KENNETH A. ERICKSON, witness in
7 the case cited in the caption hereof, and the
8 following charges for said services are fair,
9 reasonable and comparable charges to those of
10 others in my profession in this State.
11
12 Per diem:    ____ days      $_____
13 Original:    ____ pgs.      $_____
14 Copy:        ____ pgs.      $_____
15 Exhibits:    ____ pgs.      $_____
16 Video:       ____ hrs.      $_____
17 Postage/Parking:            $_____
18 Mileage:     ____ mi.       $_____
19 Condensed Xcript:           $_____
20 Total:              $_____
21
22      _____
23          WINTERS O. HOPE